# ADDENDUM

## TABLE OF CONTENTS

| | |
|---|---|
| Superseding Information | A1 |
| Transcript of June 8, 2012, Plea Proceedings | A9 |
| Transcripts of Government Recordings | A40 |
| Plea Agreement | A71 |
| Affirmation by Paul Shechtman, Esq. | A81 |
| Affirmation by Sarita Kedia, Esq. | A85 |
| Motion to Withdraw Plea Dated 9/29/14 | A89 |
| Reply Plea Withdrawal Motion Dated 10/21/14 | A128 |
| Memorandum and Order Dated 10/30/14 | A171 |
| Transcript of Proceedings Dated 10/30/14 | A196 |
| Government Letter Dated 5/27/14 | A202 |
| Government Sentencing Letter Dated 1/19/14 | A207 |
| Letter Motion to Withdraw Plea Dated 1/21/14 | A211 |
| Reply Plea Withdrawal Letter Dated 2/3/15 | A219 |
| Memorandum and Order Dated 3/2/15 | A230 |
| Pretrial Supervision Status Report Dated 1/13/17 | A249 |
| Transcript of Status Conference Dated 6/3/16 | A252 |
| Sentencing Submission Dated 10/12/16 | A293 |
| Reply Sentencing Submission Dated 10/25/16 | A327 |
| Transcript of Sentencing Proceedings Dated 7/21/17 | A333 |
| Judgment Entered 8/25/17 | A387 |
| Memorandum and Order Denying Bail Pending Appeal Dated 8/23/17 | A394 |
| Notice of Appeal | A402 |
| Objections to Presentence Report | A403 |

TM:NMA/RN/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MICHAEL J. PERSICO,

Defendant.

- - - - - - - - - - - - - - - - X

S U P E R S E D I N G
I N F O R M A T I O N

Cr. No. 10-147 (S-6)(SLT)
(T. 18, U.S.C., §§ 371, 981(a)(1)(C) and 3551 *et seq.*; T. 21, U.S.C. § 853(p); T. 28, U.S.C., § 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

At all times relevant to this Superseding Information, unless otherwise indicated:

The Enterprise

1. The members and associates of the Colombo organized crime family of La Cosa Nostra constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact (hereinafter the "Colombo crime family" and the "enterprise"). The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The Colombo crime family engaged in, and its activities affected, interstate and foreign commerce. The Colombo crime family was an organized criminal

group that operated in the Eastern District of New York and elsewhere.

2. La Cosa Nostra operated through organized crime families. Five of these crime families – the Bonanno, Colombo, Gambino, Genovese and Luchese crime families – were headquartered in New York City, and supervised criminal activity in New York, in other areas of the United States and, in some instances, in other countries. Another crime family, the Decalvacante crime family, operated principally in New Jersey, but from time to time also in New York City.

3. The ruling body of La Cosa Nostra, known as the "Commission," consisted of leaders from each of the crime families. The Commission convened from time to time to decide certain issues affecting all of the crime families, such as rules governing crime family membership.

4. The Colombo crime family had a hierarchy and structure. The head of the Colombo crime family was known as the "boss." The Colombo crime family boss was assisted by an "underboss" and a counselor known as a "consigliere." Together, the boss, underboss and consigliere were the crime family's "administration." With the assistance of the underboss and consigliere, the boss was responsible for, among other things, setting policy and resolving disputes within and between La Cosa Nostra crime families and other criminal groups. The

administration further supervised, supported, protected and disciplined the lower-ranking participants in the crime family. In return for their supervision and protection, the administration received part of the illegal earnings generated by the crime family. Members of the Colombo crime family served in an "acting" rather than "official" capacity in the administration on occasion due to another administration member's incarceration or ill health, or for the purpose of seeking to insulate another administration member from law enforcement scrutiny. Further, on occasion, the Colombo crime family was overseen by a "panel" of crime family members that did not include the boss, underboss and/or consigliere.

5. Below the administration of the Colombo crime family were numerous "crews," also known as "regimes" and "decinas." Each crew was headed by a "captain," also known as a "skipper," "caporegime" and "capodecina." Each captain's crew consisted of "soldiers" and "associates." The captain was responsible for supervising the criminal activities of his crew and providing the crew with support and protection. In return, the captain often received a share of the crew's earnings.

6. Only members of the Colombo crime family could serve as a boss, underboss, consigliere, captain or soldier. Members of the crime family were referred to on occasion as "goodfellas" or "wiseguys," or as persons who had been

"straightened out" or who had their "button." Associates were individuals who were not members of the crime family, but who nonetheless engaged in criminal activity for, and under the protection of, the crime family.

7. Many requirements existed before an associate could become a member of the Colombo crime family. The Commission of La Cosa Nostra from time to time limited the number of new members that could be added to a crime family. An associate was also required to be proposed for membership by an existing crime family member. When the crime family's administration considered the associate worthy of membership, the administration then circulated the proposed associate's name on a list given to other La Cosa Nostra crime families, which the other crime families reviewed and either approved or disapproved. Unless there was an objection to the associate's membership, the crime family then "inducted," or "straightened out," the associate as a member of the crime family in a secret ceremony. During the ceremony, the associate, among other things: swore allegiance for life to the crime family above all else, even the associate's own family; swore, on penalty of death, never to reveal the crime family's existence, criminal activities and other secrets; and swore to follow all orders issued by the crime family boss, including swearing to commit murder if the boss directed it.

Methods and Means of the Enterprise

8. The principal purpose of the Colombo crime family was to generate money for its members and associates. This purpose was implemented by members and associates of the Colombo crime family through various criminal activities, including drug trafficking, robbery, extortion, fraud, bribery, embezzlement, illegal gambling and loansharking. The members and associates of the Colombo crime family also furthered the enterprise's criminal activities by threatening economic injury and using and threatening to use physical violence, including murder.

9. Although the primary purpose of the Colombo crime family was to generate money for its members and associates, the members and associates at times used the resources of the family to settle personal grievances and vendettas, sometimes with the approval of higher-ranking members of the family. For those purposes, members and associates of the enterprise were asked and expected to carry out, among other crimes, acts of violence, including murder and assault.

10. The members and associates of the Colombo crime family engaged in conduct designed to prevent government detection of their identities, their illegal activities and the location of proceeds of those activities. That conduct included a commitment to murdering persons, particularly members or associates of organized crime families, who were perceived as

potential witnesses against members and associates of the enterprise.

11. Members and associates of the Colombo crime family often coordinated criminal activity with members and associates of other organized crime families.

The Defendant

12. At various times, the defendant MICHAEL J. PERSICO was an associate within the Colombo crime family.

EXTORTIONATE EXTENSION OF CREDIT CONSPIRACY

13. The allegations in paragraphs 1 through 12 are realleged and incorporated as if fully set forth in this paragraph.

14. In or about and between May 2009 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. PERSICO, together with others, did knowingly and intentionally conspire to make one or more extortionate extensions of credit to John Doe #1 and John Doe #2, individuals whose identities are known to the United States Attorney, contrary to Title 18, United States Code, Section 892(a).

15. In furtherance of the conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. PERSICO, together with

others, committed and caused to be committed, among others, the following:

OVERT ACT

(a) In or about June 2009, the defendant MICHAEL J. PERSICO aided in the extension of a $100,000 usurious loan.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

CRIMINAL FORFEITURE ALLEGATION

16. The United States hereby gives notice to the defendant charged in this Superseding Information that, upon his conviction, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which requires the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to such offense.

17. If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p); Title 28, United States Code, Section 2461(c))

LORETTA E. LYNCH
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------x
UNITED STATE OF AMERICA,

versus 10 CR 00147(SLT)

MICHAEL PERSICO

Defendant. U.S. Courthouse
Brooklyn, New York
--------------------------------------x
June 8th, 2012

TRANSCRIPT OF CRIMINAL CAUSE FOR GUILTY PLEA

BEFORE THE HONORABLE SANDRA L. TOWNES,

UNITED STATES DISTRICT COURT JUDGE

APPEARANCES

Attorneys for Government:
LORETTA LYNCH
U. S. ATTORNEY
EASTERN DISTRICT OF NEW YORK
271 Cadman Plaza East
Brooklyn, New York 11201
BY: NICOLE ARGENTIERI, ESQ
ALLON LIFSHITZ, ESQ.

Attorneys for Defendant Michael Persico:

SARITA KEDIA, ESQ.
PAUL SHECHTMAN, ESQ.

Court Reporter:
LISA SCHMID, CCR, RMR
Official Court Reporter
225 Cadman Plaza East
Brooklyn, New York 11201
Phone: 718-613-2644 Fax: 718-613-2379
Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

MS. MACEDONIO: Your Honor, since the pleas are contingent upon both of the defendants accepting, can Mr. Persico stay during the next proceeding?

THE COURT: Yes.

MS. MACEDONIO:

DEFENDANT T. PERSICO: Thank you, Your Honor.

THE COURT: I would rather you move --

MS. MACEDONIO: Yes.

THE COURT: -- Mr. Persico, Jr. down to the end and bring Mr. Persico up.

MS. ARGENTIERI: Do you want a copy?

THE COURT: I have a copy here, and I want to put that in the file, also.

THE CLERK: Criminal cause for a plea, Docket Number 10 CR 147, United States of America versus Michael Persico.

Counsel, please state your names for the record.

MS. ARGENTIERI: Nicole Argentieri and Allon Lifshitz for the government. Good afternoon, Judge.

THE COURT: Good afternoon.

MS. KEDIA: Good afternoon, Your Honor. Sarita Kedia and Paul Schectman for Michael Persico.

THE COURT: Good afternoon.

And Mr. Persico is present also. Good afternoon.

DEFENDANT M. PERSICO: Good afternoon.

THE COURT: Now, I understand that Mr. Persico is

going to enter -- that he's prepared to plead this morning to an information charging a criminal offense. Is that correct?

MS. KEDIA: That is correct, Your Honor.

THE COURT: All right. Mr. Persico, the decision to plead guilty to a criminal offense is a serious decision. Before the Court can accept your guilty plea, the Court has to be satisfied that you are -- that you understand the rights that you're giving up by pleading guilty, and the consequences that may occur once you do so.

So I'm going discuss those matters with you. I'll be asking you some questions, as well. The answers to the questions have to be given under oath. So I will ask my deputy to now administer the oath.

THE CLERK: Yes, Judge.

(Defendant sworn.)

THE COURT: Please be seated. Please state your full name for the record.

DEFENDANT M. PERSICO: Michael Joseph Persico.

THE COURT: And Mr. Persico, you have taken an oath to tell the truth and that means that you must do so. If you should fail to tell the truth or intentionally mislead the Court in any way, you could be prosecuted for the felonies of perjury or of making false statements. Do you understand?

DEFENDANT M. PERSICO: Yes.

THE COURT: If there's anything you do not

understand, please don't hesitate to tell me. I'll be happy to stop and clarify anything that that's not entirely clear to you. Do you understand that?

DEFENDANT M. PERSICO: Yes.

THE COURT: How old are you?

DEFENDANT M. PERSICO: Fifty-five.

THE COURT: And how far did you go in school?

DEFENDANT M. PERSICO: College.

THE COURT: Have you now or have you recently been under the care of a physician or a psychiatrist?

DEFENDANT M. PERSICO: Physician.

THE COURT: And are you presently under the care of the physician?

DEFENDANT M. PERSICO: Yes.

THE COURT: For what?

DEFENDANT M. PERSICO: High blood pressure and high cholesterol.

THE COURT: Do you take medication for those conditions?

DEFENDANT M. PERSICO: Yes.

THE COURT: Have you taken any medication within the last 24 hours?

DEFENDANT M. PERSICO: This morning.

THE COURT: And does that medication interfere with your ability to think clearly?

DEFENDANT M. PERSICO: No, it doesn't.

THE COURT: Now, have you had -- other than the medication that you have taken for your medical conditions you've just described, have you taken any other pills or drugs or medication of any kind within the last 24 hours?

DEFENDANT M. PERSICO: No.

THE COURT: Have you had any alcoholic beverages to drink within the last 24 hours?

DEFENDANT M. PERSICO: No.

THE COURT: And as you appear before me this morning, is your mind clear?

DEFENDANT M. PERSICO: Yes.

THE COURT: Do you understand these proceedings?

DEFENDANT M. PERSICO: Yes, I do.

THE COURT: All right. Have you ever been hospitalized or treated for any substance abuse problem?

DEFENDANT M. PERSICO: No.

THE COURT: All right. Okay. Ms. Kedia -- and I will address my questions -- I'll address my questions to you -- have you discussed with Mr. Persico the question of entering a guilty plea?

MS. KEDIA: I have, Your Honor.

THE COURT: In your view, does he understand the rights that he will be waiving if he pleads guilty?

MS. KEDIA: Yes, I do believe he does.

THE COURT: Do you have any question about his competency to proceed today?

MS. KEDIA: I do not.

THE COURT: Mr. Persico, you have two counsel -- two attorneys with you. Are you satisfied with the assistance that you have received from both?

DEFENDANT M. PERSICO: Yes.

THE COURT: Do you feel that you need for more time to discuss with your attorneys your decision to plead guilty today?

DEFENDANT M. PERSICO: No.

THE COURT: All right. Now, I understand that you're prepared to plead guilty to an offense which is charged in an information, and I have the information before me. Did you receive a copy of that?

DEFENDANT M. PERSICO: Yes.

MS. KEDIA: Yes, Your Honor.

THE COURT: And did you read it and review that information with counsel before this proceeding?

DEFENDANT M. PERSICO: I did.

THE COURT: Do you understand the charge contained in the information?

DEFENDANT M. PERSICO: I do.

THE COURT: You are charged in this information with conspiracy to commit an extortionate extension of credit, and

this is contained in the information. I'm going to read it -- at least parts of it to you right now.

The superseding information charges that the Colombo family is a criminal enterprise comprised of a group of individuals who are associated in fact, and engaged in activities that affect interstate and foreign commerce.

The superseding indictment further charges that the Colombo family operates within the Eastern District of New York and elsewhere, and is an ongoing organization whose members function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

The superseding information further describes you as an associate within the Colombo crime family. And provides in this count that in or about and between May 2009 and February 2010, both dates being proximate and inclusive, within the Eastern District of New York and elsewhere, you, Mr. Persico, together with others, did knowingly and intentionally conspire to make one or more extortionate extensions of credit to John Doe Number One and John Doe Number Two, individuals whose identities are known to the United States Attorney, contrary to Title 18, United States Code, Section 892(a).

In furtherance of the conspiracy and to effect its objectives within the Eastern District of New York and elsewhere, you, Mr. Persico, together with others, committed

and caused to be committed among others, the following overt act: In or about June 2009, you aided in the extension of a $100,000 usurious loan.

Now, the information charges this count and the count has with it elements, elements which the government must prove beyond a reasonable doubt. And do you understand what the charge is?

DEFENDANT M. PERSICO: Yes.

THE COURT: All right. If the government were required to prove this offense against you at a trial, the government would have to establish certain elements of the offense. There are facts they would have to establish at trial and I will go over them.

This count charges a violation of 18 USC 371, which provides, "If two or more persons conspire to commit any offense against the United States and one or more of such persons do any act to affect the object of the conspiracy, each is guilty of an offense against the United States."

In order to prove this crime, the government would have to prove beyond a reasonable doubt the following four elements: That two or more persons entered into the unlawful agreement charged in the information; second, that you, Mr. Persico, knowingly and willfully became a member of the conspiracy; third, that the members of the conspiracy knowingly committed at least one of the overt acts charged in

the indictment; and fourth, that the overt acts which you find to have been committed were committed or was committed in this case to further some objective of the conspiracy.

In order to prove the first of these elements, the government would have to establish beyond a reasonable doubt that two or more persons entered into an unlawful agreement to commit the crime of extortionate extension of credit, in violation of Title 18, Section 892(a) of the United States Code. This provides in pertinent part that, quote, whoever makes an extortionate extension of credit is guilty of a crime, unquote.

To provide -- to prove a violation of 892 of Title 18 of the United States Code, each of the following two elements must be established beyond a reasonable doubt: First, that the defendant knowingly made an extension of credit; second, that there was an understanding between the defendant and the borrower, express or implied, tacet or otherwise, that if the borrower delayed in making his repayments or if there was a total failure to repay, violence or other criminal means would be used to force repayment.

Now, would the government like to be heard on this at all? Is this your understanding of the elements?

MS. ARGENTIERI: Yes, Judge.

THE COURT: Okay. And what about the defense?

MS. KEDIA: Yes, that's our understanding, as well.

THE COURT: All right. Mr. Persico, this is a felony offense that is included in the superseding information. Superseding information also -- number six, superseding information number six.

It is punishable by a term of imprisonment of more than one year. Because it is a felony offense, you have the right to have this charge that you violated the law brought against you by means of a document called an indictment.

At this point, this offense is charged in an Information. An Information is different from an indictment. An Information is a document that has not been reviewed by anybody other than the United States Attorney. The United States Attorney drafted this superseding information and decided to bring this charge against you.

An indictment is different because an indictment is a document that is reviewed by some other independent body of citizens called a grand jury. Now, you can waive your right to a indictment, but if you do not waive your right to indictment, the only way this charge could proceed against you is if the government went before a grand jury and obtained a grand jury's approval.

A grand jury is a group of between 16 and 23 citterns of the community. And their task is to listen to the evidence that the government produces and decide whether that evidence establishes probable cause to believe that an offense

has been committed by a given individual. At least 12 members of the grand jury have to vote in favor of the indictment, in order for the charge to be proceed.

So if you do not waive your right to indictment, the only way that this charge could proceed is if the government went before a grand jury, produced evidence to the grand jury, and at least 12 members of the grand jury agree to vote in favor of the indictment. Do you understand what I have explained to about you right to indictment?

DEFENDANT M. PERSICO: I understand.

THE COURT: Have you discussed with your counsel whether you wish to waive your right to indictment?

DEFENDANT M. PERSICO: We did.

THE COURT: And do you, in fact, wish to waive your right to indictment?

DEFENDANT M. PERSICO: Yes, I do.

THE COURT: Did anyone threaten you or make any promises to you to induce you to waive your right to indictment.

DEFENDANT M. PERSICO: No.

THE COURT: I have a document here, and it is called "A Waiver of Indictment." There is a paragraph and it says, "Being advised of the nature of the charge, the proposed information and my rights, I hereby waive in open court on January 8th, 2012(sic), prosecution by indictment and consent

that the proceeding may be by information rather than indictment."

And is that true?

DEFENDANT M. PERSICO: Yes.

THE COURT: All right. Below that paragraph, there is a line under which is written the word "defendant." There is a signature above that line. Is that your signature?

DEFENDANT M. PERSICO: It is.

THE COURT: All right. And I therefore find that you understand your right to indictment, and that you have knowingly and voluntarily waived that right, so that I will sign also and we will proceed today on the basis of the information that is now before the Court.

Now, I have signed the waiver of indictment.

Now, Mr. Persico, the first thing that I want to make sure that you sustained about the charge in the superseding information is that you have the right to plead not guilty to this charge. Do you understand that?

DEFENDANT M. PERSICO: Yes.

THE COURT: If you enter a plea of not guilty to the charge, then you have the right to a speedy and public trial before a jury with the assistance of your counsel. Do you understand that?

DEFENDANT M. PERSICO: Yes.

THE COURT: If you enter a plea of not guilty, then

we will proceed on Monday with a trial that was begun on the indictment. You understand that?

DEFENDANT M. PERSICO: Yes.

THE COURT: All right. You have the right to have your counsel present not only at trial, but in all proceedings related to this case. And if you could not afford an attorney, one would be provided at the court's expense at any proceeding. Do you understand?

DEFENDANT M. PERSICO: I do.

THE COURT: At a trial, if there is to be a trial, you would be presumed to be innocent. You would not have to prove that you are innocent. You would not have to prove anything. The government has the burden of proof at a criminal trial.

And the government's burden is to produce evidence at the trial that satisfies the jury unanimously that you are guilty beyond a reasonable doubt. If the government could not meet that burden at your trial, the jury would have the duty to find you not guilty. Do you understand that?

DEFENDANT M. PERSICO: I do.

THE COURT: At a trial, witnesses for the government would have to come to court and testify in your presence. Your attorney would be able to cross-examine the witnesses, could object to evidence that the government tries to introduce. And also to offer evidence on your behalf. Your

counsel could compel witnesses by subpoena to come in to court and testify on your behalf, if there are witnesses with favorable testimony for you. Do you understand that?

DEFENDANT M. PERSICO: Yes, I do.

THE COURT: At a trial, you would have the right to testify in your own behalf if you choose to testify, but you could not be required or compelled to testify. That choice would be entirely up to you.

That's because the Constitution of the United States guarantees that no defendant in a criminal case may be required to testify and say something that might be used to show that he is guilty. So if you chose to have a trial, but chose not to testify at the trial, the Court would instruct the jury that they could not hold that against you or consider it in any way in reaching a verdict. Do you understand?

DEFENDANT M. PERSICO: Yes, I understand it.

THE COURT: If you plead guilty instead of going to trial, you will be giving up your right to a trial and also all the other rights that I have just discussed with you. There will be no trial in this case, and this Court will simply enter judgment of guilty on this Information and impose a sentence based only on the plea of guilty and without a trial. Do you understand?

DEFENDANT M. PERSICO: Yes.

THE COURT: If you plead guilty, I will have to ask

you some questions about what did you in order to satisfy myself that you are actually guilty of the offense. You will be required to answer those questions.

In doing so that, you will be giving up that right that I've just mentioned a moment ago, that is, the right not to say something that can be used to show that you are guilty. Do you understand that?

DEFENDANT M. PERSICO: I understand.

THE COURT: Are you willing to give up your rights to a trial and the other rights that we have just discussed?

DEFENDANT M. PERSICO: Yes.

THE COURT: I have before me a document which we have marked Government Exhibit's Exhibit One. It is titled "Plea Agreement." It has a number of pages, and it bears today's date on the last page, June 8th 2012.

At the bottom, there is a paragraph that says, "I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily." Below that paragraph is a line under which is printed your name and the word "defendant." There is a signature above that line. Is that your signature?

DEFENDANT M. PERSICO: It is.

THE COURT: Before you signed this document, Government's Exhibit One, did you read the entire document?

DEFENDANT M. PERSICO: Yes, I did.

THE COURT: Did you discuss the various terms of the agreement with your counsel?

DEFENDANT M. PERSICO: We did.

THE COURT: Do you understand absolutely everything written in this document?

DEFENDANT M. PERSICO: I do.

THE COURT: Except for any promises in writing in this document, did anyone make any promise to you to induce you to plead guilty?

DEFENDANT M. PERSICO: No, not out all.

THE COURT: Now, there are a few things about the document that I'd like to discuss with you. Let me review with you now the potential punishment for the offense contained in this superseding information.

First of all, the count carries the following statutory penalties -- and I have gone through these that are included in the plea agreement and agree that the maximum term of imprisonment is five years. The minimum term is zero years. And so therefore, the Court can sentence you anywhere between no imprisonment up to five years. Do you understand that?

DEFENDANT M. PERSICO: Yes.

THE COURT: If you are sentenced to a period of imprisonment, that would be followed by a period of supervised release, which is exactly what the term implies. You are no

longer imprisoned, but you have conditions to follow and are supervised by a probation officer. Any questions about that?

DEFENDANT M. PERSICO: No questions.

THE COURT: If you were to violate the conditions of supervised release, you could be brought back into court and sentenced to up to two years for that violation, without any credit for the crime that you served on your original sentence or any credit for time served on post-release supervision. Do you understand?

DEFENDANT M. PERSICO: Yes, I do.

THE COURT: The maximum fine is the greater of $250,000 or twice the gross gain or gross loss. Any questions?

DEFENDANT M. PERSICO: No.

THE COURT: Restitution is to be determined by the Court. There is a $100 special assessment imposed on each defendant who pleads guilty to a felony. That is $100 that's due and payable at the time of sentencing.

DEFENDANT M. PERSICO: (Nods head affirmatively.)

THE COURT: Further, there is a criminal forfeiture provision in the superseding information, and as part of this agreement, you have agreed to criminal forfeiture in the amount of $325,000. Is that true? Do you agree with that?

DEFENDANT M. PERSICO: Yes.

THE COURT: All right. Now I said I was going to

read the -- I did read the superceding Information. Okay.

MS. KEDIA: Yes, Your Honor.

THE COURT: All right. And there are sentencing -- United States Sentencing Guidelines that the Court is required to consider when sentencing someone. They may affect sentencing. And have you discussed the United States Sentencing Guidelines with your counsel?

DEFENDANT M. PERSICO: I did.

THE COURT: All right. Before sentence, this Court will consider various factors about you, including your role in this crime, other factors related to the offense and then make a determination about the Guideline level that applies to your sentencing. I am required to by law to make that determination; however, the Guidelines are no longer mandatory, so that the Guideline level that is determined is to be considered by the Court, but the Court may sentence above the Guidelines, within the Guidelines or below the Guidelines.

And one of the things that this Court must do is also consider the factors pursuant to 18 USC 3553(a), that gives us some factors to consider about you, and that will also go into determining what your sentence will be. Do you understand that?

DEFENDANT M. PERSICO: Yes.

THE COURT: Now, I'm going to ask counsel, the

attorneys, to discuss with me the Guideline determination that you've made with regard to Mr. Persico, as part of his plea.

MS. ARGENTIERI: You want me to go through it now, Judge?

THE COURT: Yes.

MS. ARGENTIERI: Because he's charged with an underlying crime of extortionate extension of credit conspiracy, he starts out with a base offense level of 20. He is a manager or supervisor, pursuant to 3(b)1.1(B), which ads an enhancement of three points for a total of 23 points, Judge.

And if he allocutes and demonstrates responsibility here today, a two-level reduction will apply, leaving an adjusted offense level of 21, and assuming the Court finds that he is in criminal history category one, which we all believe he will be, the Guidelines range is 37 to 46 months.

THE COURT: Do you agree with that?

MS. KEDIA: Yes, we do agree.

THE COURT: All right. So that is what the attorneys have. That's the calculations that they have made.

I want to emphasize to you, Mr. Persico, that I alone will determine what the Guidelines are. If I find that the attorneys were incorrect based upon what I find in the report, the pre-sentence report, my calculation may be different from that of the attorneys. If that happens -- and

I can't make a final decision on that until literally the day that you are sentenced and after I have reviewed everything -- but if I find that the Guidelines are different, you will not be able to withdraw your guilty plea. Do you understand that?

DEFENDANT M. PERSICO: Yes, I do.

THE COURT: And Ms. Argentieri, are there -- well, before we go to that, there are a few other things I want to talk to you about in the plea agreement.

I am looking at paragraph four of the plea agreement, which says that you have agreed not to file an appeal other otherwise challenge by petition the conviction or sentence in the event that this Court imposes a term of imprisonment of 46 months or below. Do you understand that you are waiving your right to appeal if that should happen?

DEFENDANT M. PERSICO: Yes.

THE COURT: All right. You know that generally, defendants have the right to appeal their convictions and sentencing. And you are agreeing by this that you will not appeal if I sentence you to 46 months or below.

Now, has anyone made any threats or promises to you to induce you to waive your right to appeal anything other than what's included in the plea agreement?

DEFENDANT M. PERSICO: No one has.

THE COURT: Okay. Also in paragraph five, it says here that you acknowledge that you own property that is

subject to forfeiture as a result of your participation in extortionate collection of credit conspiracy, and that you consent to $325,000 in United States forfeiture of that amount in United States currency. Are you aware that the agreement includes that provision?

DEFENDANT M. PERSICO: Yes.

THE COURT: And do you acknowledge that you own such property?

DEFENDANT M. PERSICO: Yes.

THE COURT: Do you consent to forfeiture of $325,000 as part of your plea agreement?

DEFENDANT M. PERSICO: Yes.

THE COURT: Do you understand, Mr. Persico, what your rights and responsibilities are under this plea agreement?

DEFENDANT M. PERSICO: I do.

THE COURT: Do you understand the rights and responsibilities of the government under this plea agreement?

DEFENDANT M. PERSICO: Yes, I do.

THE COURT: Is there anything else I should discuss with Mr. Persico about the plea agreement?

MS. ARGENTIERI: I don't think so, Judge.

MS. KEDIA: I don't believe so, Your Honor.

THE COURT: All right. Now, Mr. Persico, do you have any questions that you would like to ask me about the

charge in the superseding Information or about your rights or anything else related to this matter that may not be clear to you?

DEFENDANT M. PERSICO: Everything is clear. No questions.

THE COURT: All right. Ms. Kedia, do you know of any reason why Mr. Persico should not plead guilty to this sole count of this superseding Information?

MS. KEDIA: No, Your Honor.

THE COURT: Do you know of any viable defenses to this charge?

MS. KEDIA: I do know a viable defenses, Your Honor, but in consideration of everything that Mr. Persico is charged with, and the risks inherent in a trial and the fact that Mr. Persico is able to allocute to this offense, he believes that -- he desires to enter into a plea of guilty to this offense, Your Honor.

THE COURT: All right. Is that true, Mr. Persico --

DEFENDANT M. PERSICO: It is.

THE COURT: -- what Ms. Kedia just said?

DEFENDANT M. PERSICO: (Nods head affirmatively.)

THE COURT: Let me ask you then, how do you plead to the superseding Information number six, charging you with extortionate extension of credit conspiracy?

DEFENDANT M. PERSICO: Guilty.

THE COURT: Are you making this plea of guilty voluntarily and of your own free will?

DEFENDANT M. PERSICO: Yes, I am.

THE COURT: Did anyone threaten you or force you to plead guilty?

DEFENDANT M. PERSICO: No.

THE COURT: Other than your agreement with the government, did anyone make any promise to you that caused you to plead guilty?

DEFENDANT M. PERSICO: No.

THE COURT: Has anyone promised you what your sentence will be?

DEFENDANT M. PERSICO: Nope.

THE COURT: Can you tell me what briefly in your own words what you did in connection with the offense that makes you guilty of the offense charged in the superseding Information?

DEFENDANT M. PERSICO: I arranged for someone to extend $100,000 loan to the trucking company run by James Bambino and Steve Marcus at a usurious interest rate.

THE COURT: And is that satisfactory, Ms. Argentieri?

MS. ARGENTIERI: Just one second, Judge?

THE COURT: Yes.

MS. ARGENTIERI: (Confers with Mr. Lifshitz.)

If you could just inquire, Judge, did that conduct occur between May 2009 and February 2009?

THE COURT: Yes, and where, also. I don't think we said the venue.

DEFENDANT M. PERSICO: I agree with the time frame.

THE COURT: Well, you have got to tell me what the time frame is.

DEFENDANT M. PERSICO: Between February 2009 -- May 2009 and February 2010.

THE COURT: All right. And where? The venue, where?

DEFENDANT M. PERSICO: In the Eastern District of New York.

THE COURT: Okay.

MS. ARGENTIERI: Judge?

THE COURT: Yes?

MS. ARGENTIERI: I'm not going to make him allocute to it, but I will just proffer that the government would prove -- be prepared to prove at trial that the extension of credit was made a -- not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year, and that at the time that the loan was made, the two John Does who this defendant identified believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit.

THE COURT: Okay. Did the defendant identify them?

MS. ARGENTIERI: He did. I believe he did.

THE COURT: I didn't -- I missed that.

MS. ARGENTIERI: I think he identified them as Steven Marcus and James Bambino.

MS. KEDIA: He did, Your Honor.

MS. ARGENTIERI: Okay.

THE COURT: Ms. Kedia, is there anything else that I should inquire about?

MS. KEDIA: No, I don't believe so, Your Honor.

The one thing I would say is, Your Honor went through the superseding Information, and it does charge the sole count of this 371 conspiracy, conspiracy to violate the extortionate extension credit.

I recognize that it has several pages of extraneous language about the Colombo family that is not a part and parcel of the charge, and it is not something that Mr. Persico agrees to or is allocuting to here today.

THE COURT: All right.

MS. ARGENTIERI: I don't know that the government needs to respond to that, other than to say we don't believe it's extraneous because part of the --

THE COURT: If you don't believe it's extraneous, you're telling me that you believe that he has to allocute to it?

MS. ARGENTIERI: I don't think he has to allocute to it, Judge. I think it goes to what I said before, which is the perception by the victims that the defendant and his coconspirators -- the defendant was an associate in the Colombo crime family. And his coconspirators reasonably believed at the time that they -- that they would use -- that these individuals would use extortionate means to collect an extension of credit. I don't think he has to specifically allocute to satisfy the 371 to being an associate in the Colombo crime family.

THE COURT: All right. Anything else?

MS. MACEDONIO: Judge, may I have a moment to speak to Ms. Argentieri?

THE COURT: Yes.

(Ms. Macedonio confers with Ms. Argentieri.)

MS. KEDIA: Did you have something else?

MS. ARGENTIERI: No. No.

THE COURT: Yes?

MS. ARGENTIERI: No.

MS. KEDIA: So Judge, I just want to set forth our understanding with respect to the plea agreement. As set forth in the plea agreement, there is certain conduct that's specifically laid out that is covered by the plea agreement.

THE COURT: Yes.

MS. KEDIA: And we recognize that -- our

understanding is that the government has disclosed all conduct of which it is aware and been investigating with regard to Mr. Persico go to the facts that are covered here under the terms of the plea agreement.

In addition, our understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall. That's entirely up to the Court. Of course, we will be advocating for a sentence below the Guideline range, but we understand, of course, and Mr. Persico understands that it's up to the Court to impose sentence here.

THE COURT: Yes.

MS. ARGENTIERI: The agreement is the agreement, and we have in no way represented that Mr. Persico is getting coverage for every single crime the federal government believes he may have committed.

THE COURT: Let's go through it and see what --

MS. ARGENTIERI: Judge, the reason why the agreement is in writing is because everything that we have agreed to is in the agreement, and the agreement is what controls. And I'm not going to stand here and modify verbally any part of the agreement.

THE COURT: Okay. You know, I asked you with regard to Mr. Persico, Jr., what was covered, and you explained it to

me, and here we have paragraph 11 that lists what is covered.

MS. ARGENTIERI: Yes, Judge, and that list is exactly what the defendant is receiving coverage for, no more and no less, just that list.

THE COURT: All right. Do you --

MS. KEDIA: We understood, Your Honor. I was just stating our understandings as a whole with respect to the plea agreement.

THE COURT: All right. Well, the plea agreement speaks for itself. So if it ever becomes an issue, we'll have to go back to the plea agreement.

Based upon the information provided today by Mr. Persico, I find that he is acting voluntarily, that he fully understands the charge in the superseding Information, and his rights and the consequences of his plea, and that there is a factual basis for the plea. I therefore accept Mr. Persico's plea of guilty to the charge in the superseding Information.

Now, we should schedule sentencing.

THE CLERK: September 21st, Judge, at 11:30.

THE COURT: Correct. September 21st, at 11:30.

Mr. Persico, the Probation Department will need to interview you. Please cooperate with them.

Would counsel like to be present?

MS. KEDIA: Yes, Your Honor.

THE COURT: We'll have Probation notify you, also.

MS. KEDIA: Thank you, Your Honor.

THE COURT: All right. Thank you.

MS. KEDIA: Your Honor, with respect to bail, I've discussed with Ms. Argentieri a couple modifications that we have requested that I believe that the government consents to.

THE COURT: Yes?

MS. KEDIA: One is, Mr. Persico is currently released on $5 million bail, secured by various properties.

THE COURT: Yes?

MS. KEDIA: I ask that be reduced to $3 million, in order to afford certain of the sureties the ability to refinance.

THE COURT: Yes. You made application.

MS. KEDIA: Yes.

THE COURT: And does the --

MS. ARGENTIERI: The government has no objection to that, Judge.

THE COURT: All right. I will do that.

MS. KEDIA: Thank you. Your Honor.

And then there are certain family members of Mr. Persico and other persons that were on a non-association list at the moment to whom the government now would consent to him seeing, two relatives, Daniel Persico and Sean Persico and Frank Leone, a friend.

MS. ARGENTIERI: Judge, with regard to Daniel Persico -- is he home?

DEFENDANT M. PERSICO: It's my brother.

MS. ARGENTIERI: It's the government's understanding that he is a felon, so he would normally be off of Mr. Persico's list.

It's the government's understanding from conversations with counsel that he's dying of cancer. So for that reason -- and he only has several months to live, is that right?

DEFENDANT T. PERSICO: We don't know at this point.

MS. KEDIA: We don't know. He has been diagnosed with cancer, Your Honor, and he's being treated and Mr. Persico would ask permission to see him.

MS. ARGENTIERI: With that understanding and that representation from counsel, we don't object.

THE COURT: All right. So we'll have to do a new --

MS. KEDIA: Your Honor, what I can do is submit an order, a modification order to the Court.

THE COURT: Yes.

MS. KEDIA: That would be terrific.

One additional modification is simply he would be permitted to speak on the phone with his incarcerated father and his incarcerated brother, and I believe the government

agrees to that, as well.

MS. ARGENTIERI: I'm sorry?

MS. KEDIA: Speaking on the phone with his father and his brother.

MS. ARGENTIERI: We have no objection to that, Judge.

THE COURT: All right.

MS. KEDIA: Thank you.

MS. MACEDONIO: I just have one other matter.

THE COURT: Who has other matter? All right.

MS. MACEDONIO: (Confers with Ms. Argentieri.)

MS. ARGENTIERI: With regard to -- with regard to Theodore Persico, Jr., what Ms. Macedonio has asked me to do is to lift certain separations that are preventing him, I guess, from the creating problems with his housing, which we have agreed -- we have agreed to lift. She just wanted me to put that on the record.

MS. MACEDONIO: Thank you, Judge.

THE COURT: Okay. We are adjourned.

MS. ARGENTIERI: Thank you, Judge.

(Proceedings concluded.)

11572, Session 2

| | | |
|---|---|---|
| <u>DATE OF RECORDING:</u> | 05-07-09 | |
| <u>PARTICIPANTS:</u> | STEVEN MARCUS | SM |
| | THEODORE PERSICO, JR. | TP |
| <u>ABBREVIATIONS:</u> | UI: Unintelligible | |

TP: We'll figure out a way, I don't know.

SM: No, no, but I'm saying.

TP: [UI] we'll get a loan. If we got to get a loan, we'll get a loan.

SM: [UI] that's what I'm thinking and why not.

TP: It's got to be a legitimate loan. It's gotta be on paper.

SM: That's fine.

11577, Session 5

| | | |
|---|---|---|
| <u>DATE OF RECORDING:</u> | 05-22-09 | |
| <u>PARTICIPANTS:</u> | STEVEN MARCUS | SM |
| | LOUIS ROMEO | LR |
| | THEODORE PERSICO, JR. | TP |
| | JAMES BOMBINO | JB |
| <u>ABBREVIATIONS:</u> | UI: Unintelligible | |

TP: Who's going to lay out $150,000?

JB: To get back 76,000.

TP: No, who's going to lay out $150,000 for us, not to get nothin' back? We gotta give somebody money to lay out the money.

JB: That's what I'm saying, of course.

TP: For a month.

LR: Two months, good scenario. 30 day billing, 30 day to get your money. Good scenario. Bad scenario, 100 days.

TP: I could borrow the money from somebody and offer them so much money. How much do you want to offer them to lend us $150,000 for two months? I'm not going to get anybody to give us 150,000 dollars just for two months. I don't have it; I'm not going to ask it.

11587, Session 3

DATE OF RECORDING: June 10, 2009

PARTICIPANTS: JAMES C. BOMBINO ("J. BOMBINO")

THEODORE PERSICO, JR. ("T. PERSICO")

STEVEN MARCUS ("MARCUS")

ABBREVIATIONS: UI: UNINTELLIGIBLE

T. PERSICO: I said we're gonna need about three hundred, we assume. If we don't need it, every a hundred thousand that we take, we have to give back one ten.

J. BOMBINO: (UI)

T. PERSICO: That's all you got, sixty or ninety days, whatever it is.

J. BOMBINO: Okay, sixty or ninety days.

T. PERSICO: Whatever the job takes, whatever we need. If we need –

MARCUS: In other words, as we get paid, we pay.

T. PERSICO: I said sixty. But, if we need it for an extra thirty days, we need it for an extra thirty days.

MARCUS: In other words (UI) what it costs.

T. PERSICO: No. It doesn't cost ten thousand a month. It's just the ten thousand for the thing.

J. BOMBINO: Oh, okay.

T. PERSICO: It's not --

MARCUS: That's what we wanted to know.

T. PERSICO: It's *me*.

J. BOMBINO: I know. (UI).

T. PERSICO: I'm doing – we're doing – They didn't ask me for the ten thousand dollars. I offered the ten thousand. Nobody came to me and says, "I'll lend you a hundred thousand and you gotta give me hundred ten thousand." I said, "Michael, I don't want you to go and ask people for money or use your own money. I'm willing to give you ten thousand on a hundred thousand. Let us use it for sixty days." He says, "No I'll get it for you, Teddy. No problem."

J. BOMBINO: Okay, that's it.

T. PERSICO: I went to him with it. He didn't ask me for, nobody's shaking us down.

J. BOMBINO: No. Nobody's --

T. PERSICO: If we get a --

J. BOMBINO: Nobody's saying that.

T. PERSICO: If we give him the money in seventy-five days, he ain't gonna complain.

J. BOMBINO: Okay.

MARCUS: (UI)

J. BOMBINO: That's all we wanted to clarify –

MARCUS: Perfect. We couldn't be, listen, it's even better than the bank, better than the bank.

11587, Session 4

| | | |
|---|---|---|
| <u>DATE OF RECORDING:</u> | 06-10-09 | |
| <u>PARTICIPANTS:</u> | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| <u>ABBREVIATIONS:</u> | UI: Unintelligible | |

JB: Yeah, absolutely. The guy did nothing wrong to us, are you kidding me? It's a free loan.

SM: Exactly.

JB: It's a free loan.

SM: That's what I'm saying.

JB: Of course.

11604, Session 3

DATE OF RECORDING: July 22, 2009

PARTICIPANTS: JAMES C. BOMBINO ("J. BOMBINO")

STEVEN MARCUS ("MARCUS")

ABBREVIATIONS: UI: UNINTELLIGIBLE

J. BOMBINO: What I see is, what I see is, I see Michael getting interest before he gets his money. I don't see Michael getting his money and interest in one shot. You know what I'm saying? I think he sees it that way, but I don't see it that way. I see him, in four months, we're gonna have to go to him and say, "Listen."

MARCUS: You don't, you don't understand.

J. BOMBINO: "Here's the interest, and we're gonna hold it for another four months." You know what I'm saying? Or whatever the time may be.

11614, Session 2

| | | |
|---|---|---|
| DATE OF RECORDING: | 08-11-09 | |
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| ABBREVIATIONS: | UI: Unintelligible | |

SM: Did Michael or anybody say anything about getting his money? Like did they tell you, anybody?

JB: No.

11632, Session 3

| | | |
|---|---|---|
| DATE OF RECORDING: | 09-15-09 | |
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| | PATRICK BOMBINO | PB |
| ABBREVIATIONS: | UI: Unintelligible | |

PB: You need to collect your money.

JB: That's what Michael keeps saying, every time I tell him, Michael, I'm out of money. Well, you gotta collect. Let me make a phone call, they gotta pay us, that's what he keeps saying.

PB: Well, he's right about that.

JB: Of course he's right. I know he's right.

SM: But the other guy, the other guy Anthony Preza that he went to, to give us 100.

PB: I'll match his 100 to get this Anthony guy off – you don't fuckin pay this guy juice. You're paying juice on this fuckin' money?

SM: Oh, we're going to have to. Cause that was the deal.

JB: No, we're paying flat fee, not juice. They want 10,000 on 100,000. We pay it back, we give 'em 110, that's what they want. They never said an ongoing juice thing.

PB: Wait a second. 10,000, no matter if you hold it a week or a year?

JB: Well, they said 4, 5 months.

SM: 3, 4 months, he said.

PB: How long you got it?

JB: If you need longer –

PB: How long you got it?

JB: We got it – 3 or 4 months easy. Sure. Since we started the work in June.

PB: Why don't we give him his hundred back? But that don't help you.

JB: No, that don't help me.

11652, Session 2

| | | |
|---|---|---|
| DATE OF RECORDING: | 10-29-09 | |
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| ABBREVIATIONS: | UI: Unintelligible | |

SM: I'm just surprised that they haven't asked for their money back.

JB: Why would they?

SM: Well that's – or at least 10?

JB: How could he? How could he ask for it back? He knows I ain't got it. He knows 'cause he knows every fuckin' detail of my business because I tell him.

SM: Right.

JB: How could he ask – how could he have the balls? As a matter of fact, when I saw him the other day, when I left here to go see him, and during the conversation, I threw it in there that, I says, "You know, Mike, I don't tell my brother nothing that's going on. But I know that if I fuckin' tell him, he'll give me –" "Don't even go there," he said, "What are you going to, throw more money into this fuckin' pit?" That's what he said. He told me, "Don't ask your brother for no money."

11657, Session 5

| | |
|---|---|
| DATE OF RECORDING: | 11-11-09 |

| | | |
|---|---|---|
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |

| | | |
|---|---|---|
| ABBREVIATIONS: | UI: | Unintelligible |

SM: Take another 10,000 off for Michael.

JB: Oh, yeah, the interest. I forgot. He's really gonna have the balls to charge us that, after this is all said and done?

SM: Why? Why shouldn't he?

JB: Yeah. We got to offer it, there's no doubt. But if he takes it that would be a fucking cold thing to do. [Laughing] But, you know [UI]

SM: What do you think?

JB: Do I think he'll take it? Absolutely.

SM: Yeah.

JB: Absolutely because Teddy will make him take it because Teddy will just take it. I don't – I think Michael, honestly, I think Michael might say, "Just give me back the money. Just pay Anthony back the money you owe him. Don't worry about it."

11695, Session 2

| | | |
|---|---|---|
| DATE OF RECORDING: | 01-22-10 | |
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| ABBREVIATIONS: | UI: Unintelligible | |

JB: Michael's guy is the next order of business, before everybody else but not before the creditors and my fuckin' name. I already said that to Michael. I said I gotta get my name straightened out before anything, and that's what I want to tell him about the 63,000. I'm going to go over the numbers in the office tomorrow with you on the 63,000 and see exactly what I owe the people that are suing me, and the union that's suing us, and this and that and everything, and then what I need left to run the upcoming job that we're starting next week. Whatever's left, I'm going to start straightening Anthony out with. I said, "Do you have a problem if I give Anthony you know, 20 thousand, 25 thousand at a time?" He says, "Well, you know, nobody wants to get money back like that, but you know, at this point, yeah, that's fine, that's fine." I says, "Okay, cause the way Testa did it to me, unfortunately, I gotta do it back that way, I don't have –"

SM: Yeah, no, no, Testa didn't – Exactly.

JB: "—100,000 to pay Anthony. So let me straighten out my name and the lawsuits and the union – the rest of the money I got coming in, and let me start putting together a little fuckin' check every time I get a lump sum, and I'll give it to Anthony so I can straighten him out." He says, "Alright, that's fine." So that's how I left that. So Anthony's third after the creditors and the union. Then Anthony.

SM: Right.

11706, Session 5

| | |
|---|---|
| DATE OF RECORDING: | 02-15-10 |

| | | |
|---|---|---|
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |

| | | |
|---|---|---|
| ABBREVIATIONS: | UI: | Unintelligible |

SM: What do they owe us?

JB: Who? Who?

SM: Uh, Testa.

JB: Minus the 63,000, 97,000, 98,000 -- just about 100,000.

SM: Alright, right around 100.

JB: Um hmm.

SM: Okay.

JB: I'd like – I'd like to tell her, "Listen, don't pay me anything until you pay me one fuckin' more check." That's it, so we can turn the 100,000 dollars over. Or at least 80 of it, something like that. I can get fuckin' Preza done with because all in all we, we, we --

SM: What do you think we're going to have to pay in interest over there?

JB: I don't think I want to pay anything.

11706, Session 5

| | | |
|---|---|---|
| DATE OF RECORDING: | 02-15-10 | |
| PARTICIPANTS: | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| ABBREVIATIONS: | UI: Unintelligible | |

JB: What'd you ask me? You just asked me something.

SM: Interest.

JB: I figure 10,000.

SM: Think they'll be happy with that?

JB: Yeah, without a doubt. If he wants more, then he's just going to have to wait for more, you know what I mean? Let Michael deal with that. Say, "10,000 was what you told me, Mike."

11645, Session 2

| | | |
|---|---|---|
| <u>DATE OF RECORDING:</u> | 10-16-09 | |
| <u>PARTICIPANTS:</u> | JAMES BOMBINO | JB |
| | STEVEN MARCUS | SM |
| <u>ABBREVIATIONS:</u> | UI: Unintelligible | |

11624, Session 5

| | | |
|---|---|---|
| DATE OF RECORDING: | 09-01-09 | |
| PARTICIPANTS: | JAMES BOMBINO | J. Bombino |
| | STEVEN MARCUS | Marcus |
| ABBREVIATIONS: | UI: Unintelligible | |

J. Bombino: Michael don't hang out with anybody.

Marcus: I know.

J. Bombino: He don't hang out with anybody that's not a fuckin' business associate of his or a dear friend of the family from his father. That's it. Michael won't meet new people. Michael doesn't talk. Michael lets you do the talking. Michael's a very sharp kid. And he did it to me today on the phone. He's been doing it to me for a while. It's getting less because I think I've already proved myself to the guy. You gotta remember, I only met Michael this time that Teddy came home. As long as I know Teddy, I never knew Michael --

Marcus: Yeah, I know Michael back ...

J. Bombino: I didn't know him.

Marcus: 2002, 3.

J. Bombino: He knew of me because Teddy would always speak highly of my brother and me so the whole family knows who I am but they don't really know who I am. You know what I'm saying. Now Michael's starting to learn who I am and what I am, put it that way.

Marcus: Right, right.

J. Bombino: But he, he tested me today 'cause I told my brother the story. He says, "He was testing you again." I said, "Yeah, I know." Because when I was telling him what Brad did, I said, "This kid called me up, 'Fuckin', who the fuck do you people think you are?'" I said, "Well," He said, "Yeah, uh huh. And what did *you* say?" That's what Michael said to me. I said, "Brad," I said, "Let's be gentlemen here. I'm speaking to you like a gentleman, you're cursing me out. This is insane. I'm just a truck driver. I own a trucking company. I came from driving the truck to owning the trucking company. I didn't graduate from Harvard and get a big job for Testa that I'm the project manager. I'm a truck driver who's out 260,000 dollars. So if I'm a little on edge, you have to forgive me. It's hard to be in my position." "Umhmm." He just listened. And I said – he said, "Then what happened?" "Oh, he continued for a little longer. And the more he got nasty with me, the nicer I got with him, until eventually he must have felt stupid and he stopped." "Okay, very good. Alright, I'll call you later." So, you know, if I would have told him that I said, "You fucking jerk off, I'll come there," Michael would have been done with me. Yeah. Yeah. He don't want to--

Marcus: That's not the way you, you want to conduct yourself.

J. Bombino: He said, "We're not gangsters. We're [UI] business. We're not gangsters. We don't do gangster things." He says it himself. Those days are over. "We're running a legitimate business here. Nobody wants to act like a gangster. What is that kid talking like that for?" "Mike, honestly, I don't know."

Marcus: Trying to push buttons.

J. Bombino: I said, "Personally--" That's what I said. "Personally, I think he tried to push my buttons. I don't know who's in his ear and who's talking to him or whatever or what he thinks. I think he tried to get my goat and he tried to get me to be stupid. But you know what, he's 33 years old. He's young enough to be my fucking son, he don't wake up early enough to get me to be stupid, okay." He says, "No, no, no, you did good. Don't worry about it. I'll call you later." And then Tommy called me a little after that. So he must have got on the phone. If you do right by Michael, Michael will do anything for you. Michael is really a good-hearted guy.

Marcus: He sure is.

11704, Session 4

| | | |
|---|---|---|
| DATE OF RECORDING: | 02-11-10 | |
| PARTICIPANTS: | JAMES BOMBINO | JB |
| ABBREVIATIONS: | UI: Unintelligible | |

JB: I know Michael. Michael wears a cardigan sweater with elbow patches. I mean, the guy ain't no fuckin' gangster. Michael's as squeaky clean as they come. More than likely he's not getting convicted. They'll indict him, because of who his father is, who his brother is. I mean, naturally, his last name is a curse.

TM:NMA/RJN/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA — PLEA AGREEMENT

- against - — 10 CR 147 (S-6) (SLT)

MICHAEL PERSICO,

Defendant.

- - - - - - - - - - - - - - - - - - -X

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and MICHAEL PERSICO (the "defendant") agree to the following:

1. The defendant agrees to waive indictment and plead guilty to a superseding information to be filed in this district "Superseding Information (S-6)", charging a violation of 18 U.S.C. § 371. The count carries the following statutory penalties:

a. Maximum term of imprisonment: 5 years (18 U.S.C. § 371).

b. Minimum term of imprisonment: 0 years (18 U.S.C. § 371).

c. Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years imprisonment without credit for pre-release

imprisonment or time previously served on post-release supervision (18 U.S.C. § 3583(b), (e)).

d. Maximum fine: the greater of $250,000, or twice the gross gain or gross loss (18 U.S.C. § 3571(b)(3), (d)).

e. Restitution: to be determined by the Court (18 U.S.C. §§ 3663 and 3663A).

f. $100 special assessment (18 U.S.C. § 3013).

g. Other penalties: criminal forfeiture in the amount of $325,000, as set forth below.

2. The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. The Office estimates the likely adjusted offense level under the Guidelines to be level 23, which is predicated on the following Guidelines calculation:

<u>Extortionate Extension of Credit Conspiracy</u>

| | |
|---|---|
| Base Offense Level (§ 2E2.1) | 20 |
| Plus: Manager or Supervisor (§ 3B1.1(b)) | <u>+3</u> |

Total: 23

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 21 and a range of imprisonment of 37 to 46 months, assuming that the defendant falls within Criminal History Category I. The defendant stipulates to the above Guidelines calculation.

3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 46 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed

in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 12(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

5. The defendant acknowledges that he owns property that is subject to forfeiture as a result of his participation in an extortionate collection of credit conspiracy, as charged in the Superseding Information (S-6). The defendant consents to the forfeiture of $325,000 in United States currency (the "Forfeiture Money Judgment") pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense, and/or as substitute assets pursuant to Title 21, United States Code, Section 853(p). Payment of the Forfeiture Money Judgment shall be made by certified or bank check, payable to the United States Marshal Service. On or before August 3, 2012, the defendant shall cause said check to be hand-

delivered to Assistant United States Attorney Brian Morris, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the check.

6. If the Forfeiture Money Judgment is not paid on or before August 3, 2012, interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date. If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before August 3, 2012, the Office may execute the Forfeiture Money Judgment against any other assets of the defendant, up to the outstanding balance, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedure Act, or any other applicable law.

7. The defendant consents to the entry of an Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure forfeiting the above-referenced sum of money to the United States. The defendant agrees to fully assist the government in effectuating the payment of the Forfeiture Money Judgment. The defendant agrees not to file or interpose any claim or to assist others to file or interpose any claim to any property against which the government seeks to execute the Forfeiture Money Judgment in any administrative or judicial forfeiture proceedings.

8. The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish same

on timely notice to do so, shall constitute a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw his plea, but the Office may bring additional criminal charges against the defendant.

9. The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of the monies and/or properties forfeited hereunder, including notice set forth in an indictment or information. In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of said monies and/or properties, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto Clause of the Constitution, the statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

10. The defendant agrees that the forfeiture of the above sum of money is not to be considered a fine or a payment on any income taxes that may be due.

11. The Office agrees that:

a. no further criminal charges will be brought against the defendant for his participation in: (1) racketeering conspiracy as alleged in Count One of the underlying indictment, captioned Superseding Indictment S-4; (2) the extortionate extension and collection of

credit from John Doe #1[1] between 1989 and 1991 and the conspiracy to commit the same (as alleged in Racketeering Acts 1 and 2); (3) the murder of Michael Devine and conspiracy to commit the same; (4) the murder of Joseph Scopo and conspiracy to commit the same (as alleged in Racketeering Act 3); (5) the extortionate extension, financing and collection of credit to John Doe #2 between 1993 and 1994 (as alleged in Racketeering Act 5); (6) the extortion of John Doe #2 between June 2007 and 2009 and the conspiracy to commit the same (as alleged in Racketeering Act 12 and Counts 4 and 5); (7) the attempted extortion of and conspiracy to extort John Doe #6 between September 2007 and February 2010 (as alleged in Racketeering Act 13); (8) the extortionate extension, financing and collection of credit from John Doe #8 and John Doe #9 between May 2009 and February 2010 and the conspiracy to commit the same (as alleged in Racketeering Act 16 and Counts 8 - 11); (9) wire fraud, commercial bribery and the conspiracy to commit the same related to Testa Corporation between June 2009 and February 2010 (as alleged in Racketeering Act 17 and Counts 13 and 14); (10) attempted extortion, and extortion, of John Doe #10 and John Doe #11 between September 2009 and February 2010 and the conspiracy to commit the same (as charged in Racketeering Act 18 and Counts 15 - 17); (11) the attempted extortion of Testa Corporation between October 2009 and December 2009 and conspiracy to commit the same (as charged in Racketeering Act 19 and Counts 18 and 19); (12) the murder of Joseph Lalima and conspiracy to commit the same; (13) the conspiracy to murder Bruce Black; (14) the extortion and conspiracy to extort Roger Califano; (15) loansharking between 1992 and 2000, as set forth in the government's motion to admit other acts evidence; and (16) illegal gambling - joker poker machines between 2000

[1] The John Does referenced in this paragraph reflect the numbering set forth in the underlying indictment captioned Superseding Indictment S-4.

and 2007, and the Office agrees not to use such conduct as a predicate racketeering act in a subsequent prosecution pursuant to 18 U.S.C. § 1962, it being understood, however, that this agreement does not otherwise bar the use of such conduct in a subsequent prosecution, including as the basis for a sentencing enhancement, and at the time of sentence, it will move to dismiss any underlying indictment with prejudice;

and, based upon information now known to the Office, it will

b. take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

c. make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 11(b) and 11(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to the provisions of paragraph 11(a)-(c).

12. This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

13. This agreement is conditioned upon the following: (a) the defendants listed below (the "covered defendants") entering guilty pleas, pursuant to plea offers dated June 6, 2012, on or before June 7, 2012; and (b) acceptance of those pleas by a United States District Court Judge at the time of the plea allocution. The covered defendants are:

(i) Michael J. Persico and

(ii) Theodore Persico, Jr.

If fewer than all of the covered defendants satisfy conditions 13(a) and 13(b), or if any of the covered defendants subsequently seeks to withdraw his guilty plea, the Office, in its sole discretion, may elect to void any or all of the covered defendants' plea agreements and proceed to trial.

14. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements,

if applicable, this agreement supersedes all prior promises, agreements or conditions between the parties. To become effective, this agreement must be signed by all signatories listed below

Dated: Brooklyn, New York
June ___, 2012

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: ______________________________
Nicole M. Argentieri
Rachel Nash
Allon Lifshitz
Assistant United States Attorneys

Approved by:

______________________________
Taryn Merkl
Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

______________________________
MICHAEL PERSICO
Defendant

Approved by:

______________________________
Sarita Kedia, Esq.
Paul Shechtman, Esq.
Counsel to Defendant

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page83 of 172

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

S-6 10 CR 147 (SLT)

-against-

AFFIRMATION

MICHAEL PERSICO,

*Defendant.*

-----------------------------------------------------------X

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

PAUL SHECHTMAN, being duly sworn, hereby affirms the following:

1. I am an attorney admitted to practice in the State of New York and before this Court. I submit this affirmation in support of the defendant Michael Persico's motion to withdraw his guilty plea in this case.

2. I have practiced criminal law for more than 30 years as a prosecutor and defense attorney.

3. Sarita Kedia and I represented Mr. Persico in this case, in which he pleaded guilty to one count of conspiracy to make a $100,000 usurious loan.

4. The charges in the indictment against Mr. Persico were serious, including a racketeering conspiracy count with predicate acts of murder and murder conspiracy. After carefully reviewing the evidence, I concluded that the proof was exceedingly weak. I told Mr. Persico that he had a distinct possibility of an acquittal on all counts. I also told him that predicting a trial's outcome was perilous, and that, if he were convicted of a serious charge, he

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page84 of 172

would face a long sentence. For that reason, I recommended that he authorize Ms. Kedia and me to enter into plea discussions with the government, and he did so.

5. The focus of the plea discussions was on the amount of "time" in prison that Mr. Persico would likely serve if he pleaded guilty. The discussions were unusual: the government would make an offer; after conferring with Mr. Persico, we would reject it; and the government would then return with a lower offer. Shortly before jury selection began, the government offered a "five-year plea," and we rejected it. We told the government that unless the offer was two to three years, Mr. Persico would not accept it. That was his firm position, and, in my view, it was reasonable given the weakness of the government's case.

6. Plea discussions continued during jury selection. Ms. Kedia and I spoke with the prosecutors, sometimes together and sometimes separately. Our "bottom line" was the same: we would go to trial unless the likely sentence was in the two-to-three-year range.

7. After much back and forth, we agreed that Mr. Persico would plead guilty to a crime with a five-year maximum sentence and an estimated Guidelines range of 37 to 46 months.

8. At the time of the agreement, it was my understanding that the government would not advocate for an upward departure and would not ask the Probation Office or the Court to consider at sentencing any criminal conduct beyond the offense of conviction. Moreover, the government would not recommend where within the Guidelines range the sentence should be, but we would be permitted to seek a sentence below the Guidelines range. Absent that understanding, I would not have recommended the plea. I believed (i) that if the Court considered only the crime of conviction, there was a substantial likelihood that Mr. Persico would receive the bottom of the range (37 months) or lower and (ii) that if the government asked

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page85 of 172

the Court to consider crimes such as murder and murder conspiracy, Mr. Persico was likely to receive a greater sentence. I say that because (i) the standard of proof at a Fatico hearing (preponderance) is lower than that at trial (beyond a reasonable doubt), and (ii) even if the Court found against the government at a Fatico hearing, I believed that merely having a hearing could affect Mr. Persico adversely.

9. I told Mr. Persico that I could give him no guarantees, but that the deal that had been struck gave him a high likelihood of the three-year sentence (or lower), which he was willing to accept.

10. During the plea proceeding, Ms. Kedia stated that "[o]ur understanding is that the government is not going in any way to advocate to the Probation Office or the Court for an above-Guidelines range or where within the Guidelines range Mr. Persico will fall. Of course, we will be advocating for a sentence below the Guidelines range." Plea Tr. at 27. I took her words to mean that the government would not be asking the Probation Office or the Court to consider that Mr. Persico had allegedly participated in murders or other crimes, which comported with my understanding of the agreement.

11. When I read the Presentence Report, I was stunned. The government had asked the Probation Office to consider other crimes, including murder and murder conspiracy, and the Probation Office stated that the additional conduct could provide a basis for an upward departure. I considered what had occurred a breach of the plea agreement. In such circumstances, a prosecutor cannot inform a probation officer that a defendant has supposedly participated in murders and not expect anything other than a recommendation for an upward departure.

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page86 of 172

12. After reviewing the Probation Report, I spoke with the government on several occasions and asked that it remove the other-conduct allegations from the Presentence Report. I made clear that, in my view, what had occurred was a breach of the plea agreement. In our discussions, the government said that it had advised the Probation Office about the additional conduct only to ensure that Mr. Persico would receive a Guidelines sentence, knowing that he would be advocating for a below-Guidelines sentence. I therefore asked the government if it would agree to delete the allegations if Mr. Persico agreed not to seek a below-Guidelines sentence. That request was rejected.

Dated: New York, New York
January 29, 2015

Paul Shechtman

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page87 of 172

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

S-6 10 CR 147

-against-

DECLARATION

MICHAEL PERSICO,

*Defendant.*

-----------------------------------------------------------X

SARITA KEDIA, an attorney admitted to practice in this Court, declares under penalty of perjury:

1. I am an attorney admitted to practice in the State of New York and before this Court. I submit this declaration to supplement that of my colleague Paul Shechtman, who submitted one previously in connection with the defendant Michael Persico's motion to withdraw his guilty plea based on the government's breach of the plea agreement.

2. I have been practicing as a criminal defense attorney for more than 20 years. Along with Mr. Shechtman, I represented Mr. Persico in this case. To the best of my recollection, the facts surrounding Mr. Persico's plea deal are these. We began plea discussions with the government shortly before the trial was set to begin. Although Mr. Persico had not expressed interest in taking a plea deal, the attorney for Mr. Persico's co-defendant Francis Guerra called me to ask if Mr. Persico would consider some kind of plea because the government had advised him that it would not extend a plea offer to his client unless there was a global plea. At that time, there were three defendants preparing for trial – Guerra, Michael Persico and Theodore Persico Jr. (Michael's cousin). Therefore, Mr. Shechtman and I agreed to discuss the possibility of a plea deal

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page88 of 172

with the government, although we believed that the government's proof on all charges against our client was extraordinarily weak.

3. Though we had some discussions with the trial assistants, Taryn Merkl, then Chief of the Organized Crime and Gangs unit, led the plea discussions on the government's behalf, noting that she was handling the negotiations because, given the trial date's proximity, the trial assistants were busy preparing. The government made various plea offers. At one point, it offered Mr. Persico a deal of 5 years, meaning pleading guilty to a crime with a statutory maximum sentence of 5 years and a Guidelines range of 5 years or more, which Mr. Persico swiftly rejected.

4. Ultimately, the government offered a plea to Guerra of 15 years, a plea to Theodore Persico Jr. of 12 years and a plea to Michael Persico to a crime that would carry a 5-year statutory maximum and a Guidelines range of 37 to 46 months. Although Guerra rejected the plea offer of 15 years, the government nevertheless continued to offer plea deals to Theodore Jr. and Michael, despite its previous persistence that any plea offers would only be global. The government insisted, however, that it would not permit Theodore Jr. to take a plea deal unless Michael Persico took one as well. On several occasions, we asked the government to permit the other two defendants to take plea deals and allow our client to proceed to trial, but it refused.

5. Before Mr. Persico agreed to take a plea deal, we had specific discussions with Ms. Merkl about the government refraining from having either prosecutors or law enforcement agents suggest to the Probation Office or the Court that Mr. Persico was involved in crimes apart from the offense to which he would be pleading guilty. Indeed, both Mr. Shechtman and I well knew that, if Probation were advised that the government was asking that conduct such as murder, murder conspiracy or long time criminal activity be considered, it would have at least the same deleterious effect as directly advising the Court. Indeed, we believed that, if the

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page89 of 172

government asked that such conduct be considered, Probation would most likely recommend an upward departure, as it did. We also expected that if the Court were presented with any such alleged conduct – even if the government failed to offer proof or to prevail at a Fatico hearing – it might impose a much harsher sentence than it otherwise would impose. To be sure, we expected that the Court might impose the statutory maximum sentence of five years that Mr. Persico had already rejected if it were tainted by claims of murder or long-time criminal history.

6. In response to our concerns, Ms. Merkl stated in substance that she was not willing to change the standard language in the plea agreement but that, in her view, there was no need to do so since the government asking the Court to consider additional crimes such as murder or murder conspiracy would essentially be inviting the Court to impose a sentence above the agreed-upon Guidelines range of 37 to 46 months. She also agreed that we could place something on the record regarding our understanding of the agreement at the time of the plea proceedings.

7. Based on these discussions, it was my understanding, prior to Mr. Persico agreeing to take a plea deal, that the government agreed that it would not advocate for an upward departure or a sentence above the 37 to 46 month Guidelines range contained in the plea agreement, nor would it ask the Probation Office or the Court to consider at sentencing any criminal conduct beyond the offense of conviction. Moreover, I understood at the time Mr. Persico pleaded guilty that the government would not make any recommendation regarding where within the Guidelines range calculated by the Court the sentence should fall and that Mr. Persico would be free to seek a sentence below the Guidelines range. Both Mr. Shechtman and I advised Mr. Persico based on this specific understanding. I attempted to make clear this understanding during the plea proceeding when I stated the following: "Our understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the Guideline[s]

Case 17-2701, Document 25-2, 09/12/2017, 2122149, Page90 of 172

range or where within the Guideline[s] range Mr. Persico should fall.... Of course, we will be advocating for a sentence below the Guideline[s] range." Plea Tr. at 27. My purpose in making that statement was to place on the record Mr. Shechtman's and my understanding that the government would in no way suggest to the Probation Office or the Court that it should consider, let alone assert that the government could prove, that Mr. Persico had allegedly participated in crimes beyond the offense of conviction.

8. Just prior to placing on the record my understanding of what the parties could and could not do at sentencing, I noted my belief that Mr. Persico was getting coverage in the agreement for all crimes for which the government had been investigating him. Plea Tr. at 26-27. In response to this understanding, the government noted: "The agreement is the agreement and we have in no way represented that Mr. Persico is getting coverage for every single crime the federal government believes he may have committed.... [The] list [in the agreement] is exactly what the defendant is receiving coverage for, no more and no less, just that list." *Id.* at 27-28. I did not understand from the government's remarks that it was repudiating our agreement regarding the respective positions the parties could take with respect to sentencing. At the end of the plea hearing, I firmly believed, as did Mr. Shechtman and Mr. Persico, that the government would honor its agreement to refrain from making additional conduct allegations to Probation and the Court.

9. Like Mr. Shechtman, I too was stunned upon reading the Presentence Report and considered the government's conduct to breach the plea agreement. Along with Mr. Shechtman, I participated in discussions with the government asking that it remedy the breach and ask Probation to remove the allegations regarding additional conduct. The government rejected our request, after which Mr. Persico submitted a plea withdrawal motion based on the breach.

Sarita Kedia

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**----------------------------------------------------------------X**
**UNITED STATES OF AMERICA,**

**-v.-** **10 CR 147 (SLT)**

**MICHAEL PERSICO,**

*Defendant.*
**----------------------------------------------------------------X**

# MEMORANDUM IN SUPPORT OF PLEA WITHDRAWAL

**LAW OFFICE OF MARC FERNICH**
810 Seventh Ave. Ste. 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**-----------------------------------------------------------X**
**UNITED STATES OF AMERICA,**

**-v.-** **10 CR 147 (SLT)**

**MICHAEL PERSICO,**

*Defendant.*
**-----------------------------------------------------------X**

## MEMORANDUM IN SUPPORT OF PLEA WITHDRAWAL

## STATEMENT

Michael Persico respectfully moves to withdraw his previously entered guilty plea in the captioned case.

**First**, the government breached its plea agreement with Persico by engaging in impermissible sentencing advocacy before the Probation Department.

**Second**, the plea lacks an adequate factual basis and was otherwise insufficiently informed.

For these reasons, amplified below, the Court should grant Persico's motion and vacate his plea.

## ARGUMENT

## POINT I

## THE GOVERNMENT BREACHED PERSICO'S PLEA AGREEMENT BY ENGAGING IN OVERT SENTENCING ADVOCACY BEFORE THE PROBATION DEPARTMENT – A RIGHT IT EXPLICITLY BARGAINED AWAY

Persico pleaded guilty to a single charge of facilitating a usurious $100,000 loan, with an agreed-upon guideline range of 37-46 months' imprisonment. Plea Agreement 1-3; 6/8/12 Tr. 23; PSR ¶ 37. The plea agreement allows the government to "advise" the "Probation Department of information relevant to sentencing, including [other] criminal activity engaged in by the defendant." Plea Agreement 2. But at the same time, it expressly prohibits the government from "tak[ing any] position concerning where within the Guidelines range" the "sentence should fall" or "mo[ving] for an upward departure." *Id.* 8.

The government breached the latter proscriptions by "maintain[ing]" before Probation that "*it can prove by a preponderance of the evidence*" that Persico was "involved" in "several additional significant crimes." PSR

¶¶ 38-40, 119 (emphasis supplied). Topping the list: two murders and two murder conspiracies, a veritable tail wagging the dog of the discrete "count of conviction." *Id.*

Though they concededly "could not be considered in the guidelines calculations," the government's assertions had their natural and probable effect, successfully achieving their intended goal. *Id.* As night follows day, they goaded Probation to conclude – *in the very sentence after the preponderance representation* – that the government's claims merit upward departure consideration "per Guideline 5K2.0." *Id.*

It is fundamental that plea agreements are interpreted under ordinary contract principles, *U.S. v. Griffin*, 510 F.3d 354, 360 (2d Cir. 2007), tempered with "special due process concerns for the fairness and adequacy of procedural safeguards." *U.S. v. Granik*, 386 F.3d 404, 413 (2d Cir. 2004). Prosecutors in the plea bargain setting are thus held to "the most meticulous standards of both promise and performance." *In re Altro*, 180 F.3d 372, 375 (2d Cir. 1999). Ambiguous agreements are construed strictly against the government as drafter,[1] with specific provisions

[1] *E.g., U.S. v. Palladino*, 347 F.3d 29, 34 (2d Cir. 2003).

prevailing over general ones. *E.g., Puerto Rico Tel. Co. v. Sprintcom, Inc.*, 662 F.3d 74, 96 (1st Cir. 2011).

The government's conduct in this case has turned these familiar tenets on their respective heads. For the prosecutors went far beyond what the plea agreement contemplates and authorizes in terms: merely "advis[ing]" Probation of relevant "information" about additional "criminal activity" allegedly involving Persico. Instead, the government adamantly insisted that it could *prove* its extrinsic allegations, including Persico's participation in two murders and two murder conspiracies, by *preponderant evidence* – the standard that must be met to obtain an upward departure or otherwise increase the sentence ultimately imposed. *E.g., U.S. v. Vaughn*, 430 F.3d 518, 525 (2d Cir. 2005) (Sotomayor, J.).

As a functional matter, saying the government can carry its burden of proof for a top-of-range sentence or an upward departure is no different from requesting those outcomes *in haec verba*. To the contrary, the two approaches are one and the same in content and context alike – exactly

what the agreement forbids,[2] or at least what Persico reasonably understood it to preclude.[3]

To put it in fine, the government conspicuously did *not* limit itself simply to conveying pertinent information within the agreement's ambit. In stark contrast, the prosecutors remarked favorably on the information's quality and credibility, hailing it as sufficiently convincing to warrant elevated punishment under the operative standard of proof – whether by departure or otherwise. That is unabashed advocacy, tried and true. Any other conclusion would artificially exalt form over substance, anathema in this area of law. *E.g., U.S. v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002) (parties' "reasonable understanding" controls plea agreement construction); *Mosher v. Lavallee*, 491 F.2d 1346, 1348 (2d Cir. 1974) (where objective circumstances at time of plea reasonably justify defendant's mistaken impression, plea entered involuntarily, without full knowledge of consequences).

[2] Plea Agreement ¶¶ 11(b)-(c) (government will take no position concerning where within guideline range sentence should fall and seek no upward departure).

[3] *See* 6/8/12 Tr. 27 ("[O]ur understanding is that the government is not going to advocate in any way to the Probation Office ... for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall.").

Tellingly, Probation itself understood the government's position precisely as the prosecutors manifestly intended. Receiving the message loud and clear, it predictably went on to suggest that the Court consider the additional conduct as an upward departure basis, as the government was none-too-subtly inviting. PSR ¶¶ 38, 119. After all, how else could one plausibly interpret the government's exhortations consistent with the "special due process concerns," *Granik*, 386 F.3d at 413, and "meticulous standards of … promise and performance," *In re Altro*, 180 F.3d at 375, attending plea bargains in our circuit? To ask the question is to answer it.

*U.S. v. Vaval* illustrates the point. There, the Second Circuit had no trouble finding that prosecutors breached a similar plea agreement by indicating they could "'technically'" seek an upward departure due to an unexpectedly low criminal history score, while purporting to refrain from actually requesting one. 404 F.3d 144, 153 (2005). How much worse the violation when prosecutors pregnantly juxtapose murder and murder conspiracy accusations with an invocation of the standard of proof governing departure and other enhancement requests – after expressly promising *not* to seek a departure or even take a position on where within

the agreed-upon guideline range the sentence should fall? Again, the question answers itself.

*Vaval* alone thus dictates relief for Persico. Here, too, it is "difficult to draw a principled distinction between … actually moving for an upward departure" and stridently insisting the government can satisfy the burden of proof necessary to obtain one. *Id.* And here, too, the "severity and context" of the government's "conduct" – pairing references to the most heinous of crimes with the applicable evidentiary standard in a fashion designed to maximize prejudicial impact – "went far beyond a few ill-advised words." *Id.* at 154.

Indeed, a more clear-cut or textbook breach is hard to imagine. As the Court of Appeals has aptly warned: "Where the government's commentary reasonably appears to seek to influence" Probation "in a manner incompatible with the agreement, we will not hesitate to find a breach, notwithstanding formal language of disclaimer." *Griffin*, 510 F.3d at 361 (citing *U.S. v. Amico*, 416 F.3d 163, 167 n.2 (2d Cir. 2005)); *accord, e.g., Vaval*, 404 F.3d at 153 (statements that government did not intend to violate agreement do not shield it from breach finding "if in fact what

was said constituted an argument" violating agreement); *U.S. v. Hall*, 515 F.3d 186, 198 (3d Cir. 2008) (promise to "take no position speaks to no attempt at all to influence the defendant's sentence").

Influencing Probation "in a manner incompatible with the agreement" is just what the government set out to accomplish here. "Given the government's often decisive role in the sentencing context," courts closely "scrutinize" prosecutors' behavior to "ensure that it comports with the *highest standard of fairness*." *U.S. v. Lawlor*, 168 F.3d 633, 637 (2d Cir. 1999) (emphasis supplied). In view of that standard and the duty of good faith and fair dealing inherent in every contract,[4] Persico reasonably understood the government's offer of a plea to an isolated credit offense with a modest guideline range as an implied promise to forgo infinitely graver allegations – murder and murder conspiracy among them – for sentencing purposes. *E.g., Riera*, 298 F.3d at 133 (parties' "reasonable understanding" controls).

Put another way, the agreement provision permitting the government to present relevant information about unconvicted crimes is

---

[4] *E.g., Nat'l Mkt. Share v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004).

in tension with the prosecutors' more specific promises not to seek an upward departure or advocate for a top-of-range sentence – particularly where the unconvicted crimes are so much greater in severity than the offense of conviction. Resolving the ambiguity in Persico's favor,[5] and preferring the specific clauses to the general one,[6] the information provision must be read as limited to crimes of equivalent severity to the offense of conviction – *not* crimes likely to trigger a *sua sponte* upward departure or top-of-range sentence by their mere mention.

On this reading, the government breached the agreement *simply by attempting to implicate Persico in a string of extrinsic murders and murder conspiracies* – even apart from its improper references to the prevailing standard of proof. Any other interpretation would enable the government to obtain via the back door the very upward departure or top-of-range sentence it explicitly promised not to pursue through the front. Such deceptive bargaining is wholly "incompatible"[7] with the "highest" and

---

[5] *See ante* n.1 & authority cited.

[6] *E.g., Puerto Rico Tel. Co.*, 662 F.3d at 96.

[7] *Griffin*, 510 F.3d at 361.

"most meticulous" standards of "fairness" and "performance" incumbent on the prosecutors here. *Lawlor*, 168 F.3d at 636-37; *Altro*, 180 F.3d at 375. This is especially true when the government's provocative description of Persico, in codefendant sentencings, as a "particularly powerful" Colombo Family associate is added to the mix. *E.g.,* Govt. Ltr. re T. Petrizzo, ECF 764, at 3-4 (Aug. 12, 2014).

In the end, only a "stubbornly literal mind would refuse to regard the [g]overnment's commentary" to Probation – that it has preponderant evidence of Persico's participation in multiple murders, murder conspiracies and other crimes substantially more serious than the narrow offense of conviction – as "communicating a position on sentencing." *U.S. v. Crusco*, 536 F.2d 21, 26 (3d Cir. 1976) (government's portrayal of defendant as a "major figure in organized crime" was "transparent effort to influence the severity of [his] sentence"); *see Hall*, 515 F.3d at 198 ("we will not permit the government to rely upon a 'rigidly literal' approach" in construing plea agreement terms).

In light of the government's flagrant breach, it follows that Persico is entitled to withdraw his plea or have the underlying agreement

specifically performed, *e.g., Vaval*, 404 F.3d at 154 – in this case via sentencing before a different judge who will not be tainted by the illicit advocacy infecting his current PSR. *E.g., U.S. v. Woltmann*, 610 F.3d 37, 43-44 (2d Cir. 2010); *U.S. v. Hernandez*, 604 F.3d 48, 55-56 (2d Cir. 2010).

## POINT II

## PERSICO'S PLEA IS LEGALLY INFIRM BECAUSE IT LACKS AN ADEQUATE FACTUAL BASIS AND HE WAS INSUFFICIENTLY INFORMED ABOUT THE NATURE OF THE CHARGE

### A. The Plea Allocution

On June 8, 2012, in the midst of jury selection, Persico agreed to plead guilty to a superseding information charging him with conspiring to extend an extortionate extension of credit in violation of 18 U.S.C. § 371. The information provided, in relevant part:

> In or about and between May 2009 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. PERSICO, together with others, did knowingly and intentionally conspire to make one or more extortionate extensions of credit to John Doe #1 and John Doe #2, individuals whose identities are

> known to the U.S. Attorney, contrary to Title 18, United States Code, Section 892(a).
>
> In furtherance of the conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. PERSICO, together with others, committed and caused to be committed, among others, the following:
>
> OVERT ACT
>
> (a) In or about June 2009, the defendant MICHAEL J. PERSICO aided in the extension of a $100,000 usurious loan.

*See* Superseding Information 10-CR-147 (S-6), ¶¶ 14-15.

Asked by the Court to describe in his "own words" what he had done to make him guilty of the offense, Persico stated: "I arranged for someone to extend [a] $100,000 loan to the trucking company run by James B[o]mbino and Steven Marcus at a usurious interest rate." 6/8/12 Tr. 23. The Court asked the government whether the allocution sufficed, and it requested that the Court simply ask Persico if "that conduct occurr[ed] between May 2009 and February 2009 [sic]." *Id.* 23-24. The Court then proceeded to question Persico regarding the time frame and location of his conduct. *Id.* Persico acknowledged that the conduct he described had

occurred between May 2009 and February 2010 in the Eastern District of New York.

Thereafter, the prosecutor said the following:

> I'm not going to make him allocute to it, but I will just proffer that the government would prove – be prepared to prove at trial that the extension of credit was made a – not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year, and that at the time that the loan was made, the two John Does who this defendant identified believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit.

*Id.* 25.

At no point was Persico asked directly or through defense counsel whether he agreed with the statements proffered by the government. Defense counsel then informed the Court that Persico disagreed with the Superseding Information's language about the Colombo family and his alleged association with it. *Id.* While claiming that language went to the victims' "perception" that "the defendant and his coconspirators – the defendant was an associate in the Colombo crime family," the prosecutor said she did not think Persico needed to agree to it. *Id.* 26. Thus, the Court did not ask Persico any additional questions in this regard.

Persico made no statements concerning his intent at the time the loan was made, and no inquiry was made by the Court or the government about his intent. The government's proffer was equally silent regarding Persico's alleged intent.

## B. The Elements of the Offense

Section 371 of Title 18, U.S. Code, makes it unlawful for two or more persons to conspire to commit any offense against the United States. For a conspiracy conviction, the following elements are necessary: (1) that two or more people entered into an agreement to commit a crime – here, to make an extortionate extension of credit in violation of 18 U.S.C. § 892(a); (2) that the defendant knowingly and willfully became a member of that conspiracy; and (3) that the defendant or a coconspirator knowingly committed at least one of the overt acts described in the charging instrument in furtherance of the conspiracy.

Section 892(a) prohibits "any extortionate extension of credit," defined in § 891(6) as "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result

in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person."

"Crucial to conviction under this statute is proof that *both* the creditor and the debtor understood when the loan was made that force could be used to collect the loan at issue." *U.S. v. Allen*, 127 F.3d 260, 266 (2d Cir. 1997) (emphasis supplied). "The states of mind of *the defendant and the debtor* are, therefore, *both* essential elements of the crime of making extortionate extensions of credit under § 892." *U.S. v. Lombardozzi*, 491 F.3d 61, 68 (2007). *See also U.S. v. Spillone*, 879 F.2d 514, 525-26 (9th Cir. 1989) (statute requires *mutual* understanding that failure to repay could lead to violence).

As to the *defendant's* state of mind, the government must prove that *the defendant intended by his conduct* to make those to whom he extended credit understand that delinquency or default in payment could result in the use of violence. *Lombardozzi*, 491 F.3d at 68; *see U.S. v. Curcio*, 712 F.2d 1532, 1544 (2d Cir. 1983) (government must establish that "*defendant* understood ... his conduct could have the stated consequences") (emphasis supplied). This is true even if the government proves a *prima*

*facie* case. *Allen*, 127 F.3d at 268 (§ 892(b), providing for *prima facie* evidence that a credit extension is extortionate if certain conditions are met, "does not eliminate or alter the requirement that the *requisite understanding of the creditor* be proved beyond a reasonable doubt") (emphasis supplied).

Accordingly, the essential elements of the offense of conviction in this case are that (1) Persico agreed with another person to make an extortionate extension of credit, and (2) at the time of the agreement, *Persico intended by his conduct* for the debtors to understand that if they delayed in repaying the loan, or failed to repay it altogether, violence could be used to harm them.

**C. The Relevant Facts**

The evidence relating to the extortionate extension of credit charge comes from recordings made by an individual, Steven Marcus, who began cooperating with the government in 2006. Along with codefendants James Bombino and Theodore Persico, Jr. ("Theodore"), Marcus operated All Around Trucking, a company which, according to the government, was "funded by Michael Persico." *E.g.,* ECF 764 at 3. Persico is not heard on

any of the recordings regarding the loan. Rather, only the three debtors – Marcus, Bombino and Theodore – are heard discussing the loan's terms and its non-repayment.

On May 7, 2009, Michael's cousin Theodore speaks to Marcus about All Around's need to raise capital so it can buy more trucks and take on additional work: "We'll get a loan. If we got to get a loan, we'll get a loan." A couple of weeks later, on May 22, Theodore again discusses All Around's need for a loan – this time with Bombino and Marcus. He proposes: "I could borrow the money from somebody and offer them so much money. How much do you want to offer them to lend us $150,000 for two months?"

On June 10, Theodore spells out for Bombino and Marcus the terms of a loan he had asked his cousin Michael to provide the trucking company or arrange through business colleagues. Theodore explains: "Every a hundred thousand that we take, we have to give back one ten." While the money's "sixty or ninety day[]" return is contemplated, Theodore makes clear, "it doesn't cost ten thousand a month. It's just the ten thousand for the thing." Theodore explains the loan is being given to *him* (*i.e.*, Theodore, along with Bombino and Marcus, is a borrower) and that *he* –

not the lenders – set its terms, emphasizing: "Nobody's shaking us down." Marcus comments: "Perfect.... It's better than the bank, better than the bank."

The same day, June 10, the trucking company received a $100,000 check from the colleague Michael had asked to extend the loan. Notably, in a discussion outside Theodore's presence later that day, Bombino tells Marcus: "The guy did nothing wrong to us, are you kidding me? It's a free loan." Marcus responds, "Exactly… That's what I'm saying."

Six weeks later, on July 22, Bombino is heard telling Marcus that in four months' time, he expects to repay Michael Persico only the loan interest – not its principal – and that the company will need to retain the principal for another four months. On Aug. 11, Marcus asks Bombino whether Persico or anybody else has said anything about getting the money back. Bombino replies, "No." On Sept. 15, Marcus, Bombino and Bombino's brother Patrick again discuss the loan. When Patrick asks whether they're paying "juice" on the loan, Bombino answers: "No, we're paying a flat fee, not juice. They want 10,000 on 100,000. We pay it back, we give 'em 110, that's what they want. They never said an ongoing juice

thing." Asked if it mattered how long they held the principal, Bombino responds, "Well, they said 4, 5 months."

On Oct. 29, Marcus remarks to Bombino that he's "surprised that they haven't asked for their money back." Bombino responds, "How could he [referring to Michael Persico]? How could he ask for it back? He knows I ain't got it…. How could he ask – how could he have the balls?" A couple of weeks later, during a Nov. 11 conversation about All Around's finances, Marcus and Bombino discuss outstanding debts. Referring to the interest owed on the loan, Marcus says, "Take another 10,000 off for Michael," to which Bombino responds, "Oh, yeah, the interest. I forgot. He's really gonna have the balls to charge us that, after this is all said and done?.... We got to offer it, there's no doubt. But if he takes it that would be a fucking cold thing to do…. I think Michael, honestly, I think Michael might say, 'Just give me back the money. Just pay Anthony back the money you owe him. Don't worry about it.'"

On Jan. 22, 2010, more than seven months after the $100,000 loan was extended, neither the principal nor any interest has been paid.

Bombino explains to Marcus that he's more concerned with his credit and reputation – his "name" – than repaying Michael's colleague:

> Michael's guy is the next order of business, before everybody else but not before the creditors and my fuckin' name. I already said that to Michael.... I said, "Do you have a problem if I give Anthony, you know, 20 thousand, 25 thousand at a time?" He says, "Well, you know, nobody wants to get money back like that, but you know, at this point, yeah, that's fine, that's fine." I says, "Okay, cause the way Testa did it to me, unfortunately, I gotta do it back that way. I don't have … 100,000 to pay Anthony. So let me straighten out my name and the lawsuits and the union." … So that's how I left that. So Anthony's third after the creditors and the union. Then Anthony.

As late as Feb. 15, Marcus asks Bombino how much interest they'll have to pay on the loan. Bombino responds: "I don't think I want to pay anything." Bombino then expresses his belief that "without a doubt," the lender will be happy with $10,000 in interest, and that if he wants more, Bombino would "let Michael deal with that" since "10,000 was what [Michael] told [Bombino]." Ultimately, when Persico was indicted in early March 2010, no principal or interest had been paid on the $100,000 loan; no threats, express or implied, had ever issued with respect to it; and

neither Bombino nor Marcus had ever expressed any concern that violence might ensue due to the company's failure or delay in repaying the loan.

Notably, numerous recordings capture Bombino and his brother Patrick telling Marcus their view of Michael Persico.[8] On Sept. 1, 2009, for example, Bombino tells Marcus that he doesn't believe Michael would associate with him if Michael thought Bombino were behaving unprofessionally toward anyone. Indeed, according to Bombino, Michael did everything possible to dispel any notion that he was someone to be feared and even tried to teach Bombino to conduct himself in a gentlemanly, businesslike manner. In this regard, Bombino tells Marcus, "[Michael] said, 'We're not gangsters. We don't do gangster things. We're running a legitimate business.'" Bombino concludes: "If you do right by Michael, Michael will do anything for you. Michael is really a good-hearted guy." Marcus concurs, saying: "He sure is."

[8] In several recordings James Bombino also speaks about his and his brother's relationship with Theodore Persico. *E.g.*, 10/16/09 ("Teddy's closer to Pat[rick] than to his father."); 1/22/10 (Teddy told him to give Teddy's share of money from the company to Patrick); 2/15/10 ("Teddy and I grew up together. I knew him all my life. He's like my brother. He's my partner.").

In another conversation recorded Feb. 11, 2010, Bombino tells Marcus:

> I know Michael. Michael wears a cardigan sweater with elbow patches. I mean, the guy ain't no fuckin' gangster. Michael's as squeaky clean as they come. More than likely he ain't getting convicted. They'll indict him because of who his father is, who his brother is. I mean, naturally, his last name is a curse.

In still another conversation with his brother and Marcus, this one on Dec. 17, 2009, Bombino explains that he "feel[s] safe around Michael" and "like[s] hanging around [him]."

### D. The Guilty Plea Was Taken in Violation of Rule 11

A guilty plea "is a grave and solemn act to be accepted only with care and discernment." *Brady v. U.S.*, 397 U.S. 742, 748 (1970). It "differs in purpose and effect from a mere admission or an extra-judicial confession; it is itself a conviction." *Kercheval v. U.S.*, 274 U.S. 220, 223 (1927). To "guard[]" against its "ominous consequences," the court therefore must conduct a "thorough ... inquiry" before accepting a guilty plea. *U.S. v. Cody*, 438 F.2d 287, 289 (8th Cir. 1971). In pleading guilty, a defendant is

thus required to "admit[] all of the elements of a formal criminal charge." *Hayle v. U.S.*, 815 F.2d 879, 881 (2d Cir. 1987).

The nature of the inquiry required by Rule 11 varies from "case to case." *McCarthy v. U.S.*, 394 U.S. 459, 467 n.20 (1969), superseded by statute as recognized in, e.g., *U.S. v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988). "In all such inquiries, 'matters of reality, and not mere ritual, should be controlling.'" *McCarthy*, 394 U.S. at 467 n.20 (quoting *Kennedy v. U.S.*, 397 F.2d 16, 17 (6th Cir. 1968)). Thus, the requisite inquiry "will depend, *inter alia*, upon the complexity of the crime charged." *Irizarry v. U.S.*, 508 F.2d 960, 964 (2d Cir. 1974).

Where the charge is "uncomplicated," the accusatory instrument "detailed and specific," and the admission "unequivocal," reading the charging document at the plea hearing, coupled with the defendant's admitting the acts described in it, may suffice to establish a factual basis for the plea. *Godwin v. U.S.*, 687 F.2d 585, 590 (2d Cir. 1982). Where, however, the charge is "more complex," further explanation is required. *U.S. v. Szymanski*, 631 F.3d 794, 799 (6th Cir. 2011). "An acceptable guilty plea … implies an admission of conduct which, if proved, would warrant

a verdict of guilty." *U.S. ex rel. Metz v. Maroney*, 404 F.2d 233, 236 (3d Cir. 1968).

The Second Circuit requires "strict adherence to the mandates of Rule 11 . . . [and] examine[s] critically even slight procedural deficiencies to ensure that the defendant's guilty plea was a voluntary and intelligent choice, and that none of the defendant's substantial rights has been compromised." *U.S. v. Parkins*, 25 F.3d 114, 117 (2d Cir. 1994). If the court fails to comply with any aspect of the rule, "the plea must be treated as a nullity." *U.S. v. Journet*, 544 F.2d 633, 636 (2d Cir. 1976).

### 1. There Was No Valid Factual Basis for the Plea

Fed. R. Crim. P. 11(b)(3) requires that the district court, "[b]efore entering judgment on a guilty plea, ... determine that there is a factual basis for the plea." In other words, the court must "make certain that the *factual* conduct admitted by the defendant is sufficient as a *matter of law* to establish a violation of the statute to which he entered his plea." *U.S. v. Rodriguez*, 501 F. App'x 86, 90 (2d Cir. 2012) (emphasis in original); *see U.S. v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995) ("The purpose of [Rule 11(b)(3)'s] requirement is to ensure the accuracy of the plea through some

evidence that a defendant actually committed the offense."); *U.S. v. Negron-Narvaez*, 403 F.3d 33, 37 (1st Cir. 2005) ("At its most abecedarian level, the requirement that a guilty plea must be supported by an adequate factual basis ensures that the conduct to which the defendant admits constitutes the crime with which he is charged."). "'Requiring this examination of the relation between the law and the acts the defendant admits having committed is designed to 'protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge.'" *U.S. v. Garcia*, 587 F.3d 509, 514 (2d Cir. 2009) (quoting *McCarthy*, 394 U.S. at 467).

The "ideal means" of establishing a plea's factual basis is for the district court to ask the defendant to state in his own words what he did that he believes constitutes the crime to which he is pleading. *Tunning*, 69 F.3d at 112. When doing so, the court should ensure "that the defendant's statement includes conduct – and mental state if necessary – that satisf[ies] every element of the offense." *Id.*

The court is not limited, however, to an examination of the defendant's plea allocution but may look more broadly to "any facts on the record at the time of the plea proceeding." *U.S. v. Adams,* 448 F.3d 492, 499 (2d Cir. 2006) (citing *Irizarry,* 508 F.2d at 967); *see also U.S. v. Acevedo-Colon*, 417 F. App'x 46, 48 (2d Cir. 2011) (in assessing whether the defendant's conduct satisfies the elements of the charged offense, "[t]he court may rely on defendant's own admissions, information from the government, or other information appropriate to the specific case") (citing *U.S. v. Andrades,* 169 F.3d 131, 136 (2d Cir. 1999)). But any information the court relies on "must be put into the record at the time of the plea." *Irizarry*, 508 F.2d at 967; *see Adams*, 448 F.3d at 499 (withdrawal improperly denied where district court found sufficient factual basis during post-plea hearing, rather than when plea taken). Central to an intelligent determination of whether there is a factual basis for the plea – whatever its source – is "a sufficient statement of the *acts and intent of the particular defendant,*" i.e., "*what the defendant did and intended*" that is believed to constitute the crime to which he is pleading. *Rizzo v. U.S.*, 516 F.2d 789 (2d Cir. 1975) (emphasis supplied).

A deficient factual basis is a "substantial defect" that calls the plea's validity into question. *See Godwin,* 687 F.2d at 591. "Such defects are not technical, but are so fundamental as to cast serious doubt on the [plea's] voluntariness," requiring "reversal and remand so ... the defendant may plead anew or stand trial." *Adams*, 448 F.3d at 502. "The district court's obligations under [Rule 11(b)(3)] continue until it has entered judgment. If it decides there was no factual basis for a guilty plea after accepting it, the court should vacate the plea and enter a plea of not guilty on behalf of the defendant." *U.S. v. Smith,* 160 F.3d 117, 121 (2d Cir.1998); *see also Libretti v. U.S.*, 516 U.S. 29, 38 (1995) (notwithstanding plea's acceptance, court should not enter judgment "without making such inquiry as shall satisfy it that there is a factual basis for the plea"); *U.S. v. Gonzalez*, 420 F.3d 111, 133 (2d Cir. 2005) (withdrawal motion should be granted where, prior to entering judgment, court finds factual basis for plea inadequate).

The offense to which Persico agreed to plead guilty was conspiring to make an extortionate extension of credit. As discussed above, however, his guilty plea was legally insufficient for want of an adequate factual basis. Asked to describe what conduct made him guilty of the offense, Persico

stated simply that he had "arranged for someone to extend [a] $100,000 loan to the trucking company run by James B[o]mbino and Steven Marcus at a usurious interest rate." 6/8/12 Tr. 23. Under further questioning from the Court, Persico agreed that his conduct occurred between May 2009 and February 2010 in the Eastern District of New York. *Id.* 24. The government then proffered that it was prepared to prove the interest rate on the loan was not just usurious, but in excess of 45 percent, and that Bombino and Marcus – the borrowers – believed Persico and his coconspirators had a reputation for using extortionate means to collect extensions of credit. *Id.* Persico was not asked whether he agreed with the government's statements in this regard.

Thus, the only element established through Persico's admissions was the commission of the overt act alleged in the superseding information – that he aided in extending a usurious $100,000 loan. *Id.* 23-24. The government's proffer – neither agreed to nor adopted by Persico – established only that the government believed it could prove the loan carried an interest rate of over 45 percent per year and that the *borrower* possessed the requisite state of mind when the loan was made. At no point

during the plea proceedings, however, did the Court elicit a factual basis demonstrating (a) the existence of a conspiracy to make an extortionate extension of credit, (b) that Persico knowingly and willfully joined such a conspiracy or (c) that at the time the loan was extended, *Persico* had the requisite intent to make him guilty of the crime.

The Second Circuit has routinely reversed convictions on guilty pleas, or upheld district court rejections of such pleas, where the showing of defendant's intent was insufficient. *See, e.g., U.S. v. Culbertson*, 670 F.3d 183 (2d Cir. 2012) (withdrawal improperly denied, despite arguably sufficient factual basis proffered by government, where defendant essentially contested an offense element during his plea allocution); *Adams*, 448 F.3d 492 (factual basis insufficient and withdrawal improperly denied; though defendant admitted involvement in drug conspiracy, and indictment and plea agreement advised that substance in issue was cocaine, defendant allocuted only to participating in marijuana conspiracy); *Montgomery v. U.S.*, 853 F.2d 83 (2d Cir. 1988) (despite admission that defendant agreed with others to sell drugs, no admission that he participated in an *illegal* conspiracy since he allocuted only to conspiring

with government agents and "others unnamed"); *Godwin*, 687 F.2d 585 (habeas improperly denied where record failed to establish requisite intent to commit crime charged); *U.S. v. Navedo*, 516 F.2d 293, 297-98 (2d Cir. 1975) (guilty plea properly rejected where defendant denied knowledge of, and intent to participate in, a drug conspiracy).

The Sixth Circuit's decision in *U.S. v. McCreary-Redd*, 475 F.3d 718 (6th Cir. 2007), is especially instructive. There the court vacated a conviction on plain error review[9] as the established facts – that the defendant possessed approximately three grams of crack cocaine, "individually wrapped and packaged for resale" – were insufficient to show "possession with intent to distribute" since one could "equally conclude" the drugs were "for personal use." *Id.* at 723-24. Not only did the defendant fail to acknowledge an intent to distribute, but the government, despite "ample opportunity," failed to produce or even proffer any evidence regarding the defendant's intent. *Id.* at 723. Because intent was a "critical element" of the crime charged, it could not properly be "inferred" in the context of a

---

[9] Persico need not demonstrate plain error because he seeks withdrawal in this court prior to sentencing. Rather, the Court must vacate the plea upon a mere showing of an inadequate factual basis. *Smith,* 160 F.3d at 121.

"challenge to the factual basis supporting a guilty plea." *Id.* at 724. The record thus "failed to clearly establish" the plea's factual basis. *Id.*; *see also Tunning*, 69 F.3d at 113 (declining to infer "critical [intent] element" in context of factual basis challenge even though rational fact finder could infer intent from evidence placed on record during plea proceedings); *Goldberg*, 862 F.2d at 106 (same where inferring intent would "negate the well-established safeguards inherent in the Rule [11(b)(3)] mandate").

The failure here was significantly worse than those in many of the cases cited. For in this case the record fails to establish that any conspiracy to make an extortionate extension of credit existed – much less Persico's knowing *participation*. Persico's allocution establishes only that he arranged for a loan to be made at a usurious interest rate by another person. Thus, it fails to make clear that Persico and the "someone" who made the loan *conspired* to do *anything illegal*. And entirely absent from the record is a factual basis for a finding that Persico and this "someone" *conspired* to make an *extortionate* loan.[10]

---

[10] Notably, the government has repeatedly proffered that Persico "funded" the trucking company that received the loan, further undermining any inference that he intended it to be "extortionate."

Additionally, nothing in the record demonstrates that *Persico possessed the requisite intent* to cause the borrowers to believe that delinquency or default in payment could prompt the use of violence – an indispensable element for the offense of conviction. *Curcio*, 712 F.2d at 1544; *Lombardozzi*, 491 F.3d at 68; *Allen*, 127 F.3d at 266. Given its essential character, Persico's intent cannot properly be "inferred" in the "context" of this "challenge to the factual basis supporting [his] guilty plea." *McCready*, 475 F.3d at 724. This is especially so in light of Persico's disagreement with the allegations regarding the Colombo family and his purported association with it. 6/8/12 Tr. 25.[11]

Accordingly, the plea lacks a sufficient factual basis.

[11] The evidence also casts grave doubt on the government's contention that the borrowers believed (let alone *reasonably* so) that Persico or his alleged coconspirator(s) would use violence if there was a delay or default in repayment. Indeed, since the loan was requested by Persico's cousin Theodore – a partner in the trucking company and a "powerful captain in the Colombo family" (Govt. Ltr. re T. Persico, ECF 739, at 3 (May 27, 2014)) – it would not be reasonable to infer that the lenders *or* the borrowers believed that violence might ensue if the loan was not repaid timely or at all. These facts, together with those previously recited, demonstrate that Persico is legally innocent of the crime charged, another "fair and just reason" to vacate his plea. Fed. R. Crim. P. 11(d)(2)(B).

### 2. The Court Failed to Properly Ascertain Persico's Understanding of the Nature of the Charge to which He Was Pleading

Rule 11(b)(1)(G) requires the court to determine that the defendant fully understands "the nature of [the] charge to which he is pleading." This rule is "designed to assist the district judge in making the constitutionally required determination that a defendant's guilty plea is truly voluntary." *McCarthy*, 394 U.S. at 465.

"A guilty plea 'is more than a confession which admits that the accused did various acts.'" *U. S. v. Broce*, 488 U.S. 563, 570 (1989) (quoting *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)). It is an "admission that he committed the crime charged against him." *North Carolina v. Alford*, 400 U.S. 25, 32 (1970). "By entering a plea of guilty, the accused is not simply stating that he did the discrete acts described in the indictment; he is admitting guilt of a substantive crime." *Broce*, 488 U.S. at 570. "That is why the defendant must be instructed in open court on 'the nature of the charge to which the plea is offered.'" *Id.* (quoting Fed. R. Crim. P. 11(b)(1)(G)). A guilty plea "cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." *McCarthy*,

394 U.S. at 466; *see also Henderson v. Morgan*, 426 U.S. 637, 645 (1976) ("[C]learly [a] plea c[an]not be voluntary in the sense that it constitute[s] an intelligent admission that he committed the offense unless the defendant received '*real notice of the true nature of the charge against him*, the first and most universally recognized requirement of due process.'") (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)) (emphasis supplied).

"Failure to comply with Rule 11(b)(1)(G) is plain error, and 'cannot be said to be harmless, even for an educated, well-represented defendant.'" *Szymanski*, 631 F.3d at 799 (quoting *U.S. v. Lalonde*, 509 F.3d 750, 759-60 (6th Cir. 2007)). "There is no adequate substitute for demonstrating *in the record at the time the plea is entered* the defendant's understanding of the nature of the charge against him." *McCarthy*, 394 U.S. at 470 (emphasis in original). The court must confirm with the defendant *personally* that he possesses the requisite understanding of the elements of the offense in relation to the facts. An attorney's representation that she understands or has explained the charge to the defendant is insufficient. *Id.* at 466-67; *see also Cody*, 438 F.2d at 288.

Convictions are often reversed where the record fails to demonstrate that defendant was fully informed about and understood each element of the crime to which he pleaded. *See McCarthy*, 394 U.S. 459; *Godwin*, 687 F.2d 585; *McCreary-Redd*, 475 F.3d 718; *U.S. v. Landry*, 463 F.2d 253 (9th Cir. 1972) (withdrawal required where defendant did not acknowledge that he understood each element of the crime charged).

In *Szymanski*, the defendant agreed to plead guilty to receiving child pornography. 631 F.3d at 798-99. During the plea hearing, the prosecutor said the information charged that "the defendant did knowingly receive in interstate and foreign commerce by means of a computer child pornography and computer image files which had been shipped and transported in interstate and foreign commerce." *Id.* at 799. The court then asked Szymanski whether he understood the nature of the charge, to which he responded affirmatively. *Id.* The government subsequently made a lengthy proffer regarding its evidence. *Id.* at 800. Immediately thereafter, the court asked Szymanski whether he disagreed with any part of the government's statement or wished to add or correct anything. Szymanski said no. *Id.*

Despite Szymanski's admissions, the Sixth Circuit vacated the conviction because it was never made clear to the defendant that he had to know he was receiving child pornography at the time he received it. *Id.* at 800-01. Absent an admission or other offer of proof that Szymanski knowingly and intentionally received such material, there was no showing that he understood when entering the plea the mental state the offense required. *Id.*

Likewise, in *McCreary-Redd*, discussed earlier, the district court not only failed to establish an adequate factual basis for the plea, but also failed to determine that the defendant understood the nature of the charge, having neglected to ascertain his comprehension of the intent element. 475 F.3d at 725.

Here, too, the Court asked Persico whether he understood the charge outlined in the information. *See* 6/8/12 Tr. 6. Crucially, however, it did so *before* reading any portion of the information or reciting the elements of the offense. *Id.* 6-7. At no time *after* reading part of the information or stating the offense elements did the Court ask if Persico understood the

charge, the requisite elements or "the law in relation to the facts." *McCarthy*, 394 U.S. at 466.

To be sure, Persico never agreed that he engaged in the conduct alleged in the information.[12] And even after Persico indicated that he simply "arranged for someone to extend [a usurious] $100,000 loan to the trucking company run by ... B[o]mbino and ... Marcus" (6/8/12 Tr. 23), the Court never explained – much less made sure he understood – the elements of conspiracy (knowing and intentional agreement with another to commit substantive loan sharking) or that he had to intend that the borrowers believe delinquency or default could spur the use of violence. Given these derelictions, Persico failed to receive "real notice of the true nature of the charge against him," *Henderson v. Morgan*, 426 U.S. at 645, and the Court neglected to ascertain that he properly understood it.

---

[12] Because the intent element in this case is quite complex, Persico's allocution was insufficient without an assurance that he understood the requisite mental state – even had he admitted the charged conduct itself. *See Syzmanski*, 631 F.3d 794.

## CONCLUSION

The government breached Persico's plea agreement by lobbying for a top-of-range sentence or an upward departure based on his alleged participation in extrinsic murders and murder conspiracies. What's more, the plea is legally suspect because it lacks an adequate factual basis and was otherwise insufficiently informed. For the reasons stated, this Court should grant Persico's motion and vacate his plea.

Dated: New York, NY
Sept. 29, 2014

Respectfully submitted,

**LAW OFFICE OF MARC FERNICH**

**By:** /s/

**MARC FERNICH** (MF9819)
810 Seventh Ave. Ste. 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**------------------------------------------------------------X**
**UNITED STATES OF AMERICA,**

**-v.-** **10 CR 147 (SLT)**

**MICHAEL PERSICO,**

*Defendant.*
**------------------------------------------------------------X**

# REPLY MEMORANDUM IN SUPPORT OF PLEA WITHDRAWAL

**LAW OFFICE OF MARC FERNICH**
810 Seventh Ave. Ste. 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

*Attorney for Michael Persico*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**--------------------------------------------------------------X**
**UNITED STATES OF AMERICA,**

**-v.-** **10 CR 147 (SLT)**

**MICHAEL PERSICO,**

*Defendant.*
**--------------------------------------------------------------X**

## REPLY MEMORANDUM IN SUPPORT OF PLEA WITHDRAWAL

## STATEMENT

Michael Persico respectfully submits this reply memorandum in further support of his motion to withdraw his previously entered guilty plea.

# ARGUMENT

## POINT I

## THE GOVERNMENT BREACHED PERSICO'S PLEA AGREEMENT BY ENGAGING IN OVERT SENTENCING ADVOCACY BEFORE THE PROBATION DEPARTMENT – A RIGHT IT EXPLICITLY BARGAINED AWAY

### A. RECAP

As outlined in our moving papers, Persico pleaded guilty to a single credit transaction offense under an agreement that "follows the standard format for most plea agreements in this district." *U.S. v. Wyatt*, No. 06 CR 782 (DLI), 2008 WL 2433613, at *1 (E.D.N.Y. June 12, 2008).

Thus, on the one hand, the agreement allows the government to "advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant." *U.S. v. Vaval*, 404 F.3d 144, 149 (2d Cir. 2005) (internal quotes omitted).

Yet on the other hand, the agreement prohibits the government from seeking an "upward departure" or taking any "position" as to where within

the operative "Guidelines range" – 37-46 months – "the sentence should fall." *Id.* (internal quotes omitted).

The government breached the agreement, primarily by telling Probation that it can *prove by preponderant evidence* Persico's participation in two extrinsic murders and two extrinsic murder conspiracies.[1]

By juxtaposing the worst of crimes against the standard of proof governing enhanced sentencing, the prosecution effectively invited a top-of-range sentence or an upward departure – precisely what the agreement forbids. *Cf. id.* at 153 (no "principled distinction" between "actually moving for an upward departure" and stating that government "'technically'" could do so while "adding arguments that would support" one).

[1] The presentence report (PSR) references the "preponderance of the evidence" standard repeatedly – not just once, as the government's opposition suggests. *Compare* Opp. 7 n.3 *with* PSR ¶¶ 38 (recommending that Court consider departing upward on this basis), 39, 119 (reiterating recommendation of departure consideration).

## B. THE GOVERNMENT CANNOT EVADE ITS BREACH OR ESCAPE ITS CONSEQUENCES BY CONSIGNING IT TO A TRITE AND SENSELESS FOOTNOTE

Tellingly, the government does not deny – and thereby concedes implicitly – that it made the offending preponderance remarks attributed to it in the PSR. Instead, the government studiously attempts to divert the Court from those remarks – the crux of our breach claim – by burying them in a specious and cursory footnote. Opp. 7 n.3; *see also id.* 11. The ploy is unavailing.

**First**, if Persico had "not yet placed the[] facts" surrounding the unconvicted murders "in dispute," as the government insists,[2] it follows that preemptively invoking the "legal standard"[3] for sentence boosts "served no purpose other than to advocate that the court upwardly depart or impose a high sentence within the Guidelines range." *Vaval*, 404 F.3d at 154.

**Second**, to state the obvious, no one "expect[s]" the government to "lie to Probation." Opp. 7 n.3. Rather, the government could have

[2] Opp. 7 n.3, 11.

[3] Opp. 7 n.3.

refrained from volunteering information regarding additional crimes, as it did with some of Persico's codefendants. Alternatively, it could have simply reported its "information" about Persico's alleged additional "crim[es]" without "volunteer[ing] highly [provocative] characterizations," *Vaval*, 404 F.3d at 153, as to the purported "strength of [its] evidence." Opp. 7 n.3, 11. As a different prosecutor pithily noted in a similar context, the plea agreement permits the government to "advise" Probation "of all relevant facts. It *doesn't* require the government to prove them up." *Wyatt*, 2008 WL 2433613, at *6 (citation, footnote and internal quotes omitted) (emphasis supplied); *cf.*, *e.g.*, *U.S. v. Amico*, 416 F.3d 163, 165 (2d Cir. 2005) (agreement distinguished between ""information and evidence""); *Brogan v. U.S.*, 522 U.S. 398, 400-04 (1998) (discussing difference between false denials and outright lies).

**Third**, insofar as the government "intended to adduce evidence" of the extrinsic offenses at Persico's trial – more on this irrelevancy later – it would *not* have had to prove such subsidiary facts "beyond a reasonable doubt, a much higher standard." Opp. 7 n.3; *e.g., Brown v. Greene*, 577 F.3d 107, 111 (2d Cir. 2009) (reasonable doubt standard "does not operate

on the many subsidiary facts" prosecution may use to establish a particular *element* "beyond a reasonable doubt") (citation and internal quotes omitted).[4]

In sum, the sophistry distinguishing the government's solitary footnote – like the gratuitous editorializing that prompted this motion – is incompatible with the "meticulous" duty of "performance," *Vaval*, 404 F.3d at 153, and the "highest standard of fairness" behooving the prosecutors here. *U.S. v. Griffin*, 510 F.3d 354, 365 (2d Cir. 2007), abrogated in part on other grounds by *Puckett v. U.S.*, 556 U.S. 129 (2009) (citation and internal quotes omitted).

## C. THE GOVERNMENT GROSSLY MISCONSTRUES THE PREVAILING LAW

### 1. *Wyatt*

Judge Irizarry's decision in *Wyatt* illustrates our point and dismantles the government's rebuttal.

---

[4] Aside from its legal frailty, this prosecution argument is factually suspect. The government surely would not have offered a plea to a single credit conspiracy charge, carrying a presumptive 37-46 month guideline range, if it believed it had credible evidence of Persico's involvement in murders and murder conspiracies.

Wyatt pleaded guilty to illegally possessing a firearm as a convicted felon under an agreement materially identical to Persico's. 2008 WL 2433613, at *1-*2. As in this case, the government proffered presentence information implicating Wyatt in an extrinsic murder. *Id.* at *1, *3-*4. As a result, Probation prepared an amended PSR recommending a major "elevat[ion]" of the guideline range contemplated in Wyatt's plea agreement. *Id.* at *4, *10.

Wyatt brought a breach motion, arguing, like Persico, that the government had improperly "attempt[ed] to influence the court with the [murder] information." *Id.* at *6. In so doing, Wyatt maintained, the government violated its written "promise[] not to use any information it knew at the time of the plea to support an upward departure from or a particular sentence within the applicable guidelines range." *Id.* at *1; *see also id.* at *7 ("Wyatt argues that the plea agreement prohibited the government from using information already in its possession at the time of the plea to advocate for a specific sentence within the guidelines range or to move for an upward departure.").

The government countered with the same flimsy excuses it musters here. Denying any breach, it insisted that it had merely provided "public information" about Wyatt "in good faith" as the plea agreement anticipated – without "pressing for a higher sentence." *Id.* at *1, *5-*7 (government "acknowledges that it was aware of the [murder] information before the plea, but denies using it to argue for a particular sentence within the applicable guidelines range or in favor of an upward departure").

Judge Irizarry sharply disagreed, holding that "the government's use of the [murder] information" breached the plea agreement "because it was intended to support a higher sentence, even if the government has tried to avoid saying so explicitly." *Id.* at *1.

When Wyatt "pled guilty to being a felon in possession of a firearm," the court explained, he reasonably understood that the government would not use extrinsic information "already in its possession against him at sentencing." *Id.* at *10. But the allegations at issue "altered" that "original understanding" by "essentially implicat[ing]" Wyatt in an unconvicted homicide. *Id.*

"The government knew or should have known that disclosing this information" could lift Wyatt's sentence, the court continued. *Id.* Nor was the government's conduct "shielded by its obligation to inform the court of information relevant to sentencing." *Id.* at *11. To the contrary, the government had "crossed [the] line from informing the court to improper advocacy." *Id.*

"[S]trictly constru[ing]" provisions that bar departure requests "based on information" known before the plea, Judge Irizarry thus concluded that the murder information had been disclosed to "support a higher sentence" than the agreement "contemplated." *Id.* at *9. As Wyatt, unlike Persico, was "not seeking to withdraw his ... plea," the court strove to cure this government breach by crafting a remedy akin to "specific performance." *Id.* at *11-*12. It therefore struck the pertinent PSR addendum and "disregard[ed]" the murder allegations "for sentencing." *Id.* at *9, *11-*12.

### a. *Wyatt* Applied

This case presents an even starker breach than *Wyatt*.

True, both plea agreements preclude the government from seeking a top-of-range sentence or an upward departure based on information known at entry. And as its opposition fairly flaunts, the government here was fully aware of the extrinsic murder allegations long before reaching its accord with Persico.

But Wyatt's prosecutors merely furnished *information* purporting to link him to an unconvicted murder. Persico's went "well beyond" that – and "well beyond the pale." *Griffin*, 510 F.3d at 364. For they reverted to open advocacy, combining four murder and murder conspiracy allegations with persistent representations that their evidence is strong enough to justify enhanced punishment on this ground.

Equally significant, Judge Irizarry found the government in breach even *after* it attempted repair by retracting its murder accusations and asking the court to ignore them in sentencing Wyatt. *E.g.,* 2008 WL 2433613, at *1, *6, *8-*9. Here the government shuns any such curative

measures, *see Vaval*, 404 F.3d at 155, refusing to withdraw its extrinsic murder allegations despite months of defense requests. *See post* 17.

It follows that Persico is entitled to a breach ruling on the force of *Wyatt* alone.

**2. *Vaval***

The prosecution's bid to coopt *Vaval* is curious. *See* Opp. 9. After all, the case teaches that the "government need *not* explicitly move for an upward departure" to breach a plea agreement prohibiting "such advocacy, if, in fact, the government's arguments and comments" amount to "an argument about where within the range the court should sentence defendant or whether to upwardly depart." *Wyatt*, 2008 WL 2433613, at *10 (citing *Vaval*, 404 F.3d at 152-54) (emphasis supplied).

In *Vaval*, as here, a plea agreement barred the government from "seeking an upward departure or taking a position as to a particular sentence within the applicable guidelines range." *Id.* at *10. At sentencing, the prosecutor professed to "abide by those prohibitions and never explicitly sought a higher sentence." *Id.* (citation omitted).

Even so, the Second Circuit found that the prosecutor breached the agreement, largely by volunteering "highly negative characterizations" of the defendant's criminal history, suggesting that she could "technically" move for an upward departure and proceeding to cite the reasons why. *Vaval*, 404 F.3d at 153. The government's reserved right to convey "information relevant to sentencing, including criminal activity engaged in by the defendant," did not rescue its illicit advocacy. *Id.* For its arguments provided "no new factual or legal information," *Wyatt*, 2008 WL 2433613, at *10, serving only to incite the court to "upwardly depart or impose a high sentence within the Guidelines range." *Vaval*, 404 F.3d at 154.

So it is here, where the government insists in a credit transaction sentencing that it has preponderant evidence tying Persico to two murders and two murder conspiracies. To reiterate, there is no "principled distinction" between formally requesting an upward departure and juxtaposing the purported facts with the applicable legal standard in a manner designed to induce one *sub silentio*. *Id.* at 153.

### 3. ***Williamsburg Check Cashing Corp.***

Equally misplaced is the government's reliance on *U.S. v. Williamsburg Check Cashing Corp. See* Opp. 9-10.

Construing substantially different plea agreement language, the court held there that "where the government agrees to make no recommendation as to sentence," it may "still provide the Probation Department with any factual material relevant to sentencing." 905 F.2d 25, 28 (2d Cir. 1990) (agreement "cannot be interpreted to preclude all government sources, including case agents, from providing the Probation Department with factual information regarding appellants").

Here, again, the government went far beyond simply providing "factual information." Instead, the government sought to instigate the very upward departure or high-end guideline sentence it was foreclosed from advocating, leveling fraught murder claims while pointedly invoking the evidentiary standard authorizing aggravation on that basis.

Additionally, the Second Circuit found significant that the defendants there were afforded an opportunity to withdraw their pleas but declined. *Id.* This, it noted, distinguished the case from *U.S. v. Cook*, 668

F.2d 317, 321 (7th Cir. 1982), where the court vacated the defendant's plea, finding the government in breach for providing its case file to the Probation Office (without any characterizations regarding the strength of its evidence), despite its promise not to offer information to aggravate the defendant's sentence. *Id.*

Given these key distinctions, *Williamsburg Check Cashing Corp.* does nothing to help the government's cause.

**4. *LoCascio***

The government fares no better with *U.S. v. LoCascio. See* Opp. 10-11.

There the court determined that the government, in describing LoCascio as a "repeat offender" convicted of a "massive" and "serious" financial crime, had not broken an oral promise it had made to refrain from contesting the propriety or extent of a family circumstances departure. 185 F. App'x 88, 89-90 (2d Cir. 2006) (citation and internal quotes omitted).

The "undisputed" facts anchoring the prosecutor's brief, "mild, non-provocative, merely informative, and substantially justified comments,"

the court opined, were "relevant to the holistic assessment" prescribed in 18 U.S.C. § 3553(a), and "no[t] comparable" to the "highly negative" criminal history characterizations condemned in *Vaval*. *Id.* at 90 (citations and internal quotes omitted). This was especially so, the court said, since LoCascio actually received the benefit of his bargain in the form of a "significant downward departure." *Id.*

Here, on the other hand, it is "difficult" to imagine, *Vaval*, 404 F.3d at 153, more "provocative" government "conduct" than tarring Persico with four extrinsic murders and murder conspiracies and indicating that his involvement is supported by preponderant evidence. *LoCascio*, 185 F. App'x at 90. If that is not a backdoor invitation to the upward departure or high guideline sentence the government is barred from requesting directly, then what would be? The question answers itself, rendering *LoCascio* wholly inapt.

## D. THE GOVERNMENT'S REMAINING ARGUMENTS ARE UNPERSUASIVE

The government makes several last-ditch efforts to rationalize its behavior and redeem its breach. All fall flat.

Heeding the adage that the best defense is a good offense, the government **first** attacks our sincerity in bringing this motion, insinuating that it is driven by an ulterior motive – namely, a "prefer[ence]" for a "different sentencing forum." Opp. 11. This claim is fanciful.

1. As our opening brief attests, Persico's preferred remedy for the government's breach is withdrawal of his plea – *not* transfer to a different sentencing judge.

2. Even if he did prefer transfer, that is the alternate remedy mandated by law[5] – *not* some stratagem on our part.

---

[5] *E.g.*, *Griffin*, 510 F.3d at 367 (because a "government-rung bell cannot be unrung," treating this course as a "prophylactic rule ensures that the appearance of justice will not be compromised" and "encourages punctilious respect for similar agreements in the future") (citing *U.S. v. Kaba*, 480 F.3d 152, 159 (2d Cir. 2007)) (additional citation and internal quotes omitted); *Vaval*, 404 F.3d at 155 ("to avoid even the appearance of ... harm, when we do remand for breach of a government obligation not to engage in sentence advocacy, we direct the case to a different judge"); *U.S. v. Corsentino*, 685 F.2d 48, 52 (2d Cir. 1982) ("once the Government's commitment to take no position at sentencing has been violated, compliance with the agreement is best assured by requiring resentencing before another district judge"); *U.S. v. Heredia*, No. 12-50331, __ F.3d __, 2014 WL 5018109, at *11 (9th Cir. Oct. 8, 2014) ("case law *requires* that any further proceedings occur before a different judge, even if we have no doubt that the first district judge treated the defendant fairly and impartially.... Once the district judge has seen or heard the offending words that denied the defendant the benefit of his bargain, any further proceedings before him would necessarily be tainted by the government's breach. The only way to undo the damage is to reassign the case.") (citations and internal quotes omitted) (emphasis supplied).

3. Before filing the motion, Persico urgently entreated the government – in numerous conversations and meetings – to cure its breach[6] by retracting its objectionable assertions and requesting that Probation drop them from the PSR.[7] But the government steadfastly refused, suggesting that *it* is the one with a hidden agenda: a desire to retain the benefits of a guilty plea while working behind the scenes to bump up Persico's agreed-on sentence.[8] Try as it might, the government can't have its cake and penny too.

---

[6] *Cf. Heredia*, 2014 WL 5018109, at *6 ("Defense counsel promptly emailed the prosecutor to express his view that the government had breached the plea agreement by failing to recommend, in substance, a sentence at the low end of the Guidelines range. Counsel urged the government to withdraw its sentencing position and file a new one.").

[7] Compare *Griffin*, 510 F.3d at 365 (government "did nothing to retract its questionable statements or otherwise ameliorate their impact") with *Amico*, 416 F.3d at 165 (once notified of violation, government filed amended statement explaining that it expressly did not advocate certain enhancements and reiterated that position several times thereafter) and *U.S. v. Riera*, 298 F.3d 128, 136 (2d Cir. 2002) (to "clear up any confusion as to any possible implicit" advocacy, government "repeatedly told the district court that it had not intended to advocate and was not advocating a departure") (footnote omitted). *See generally Vaval*, 404 F.3d at 155 (discussing "Curative Performance Exception").

[8] *Cf. Wyatt*, 2008 WL 2433613, at *6 n.11 (government confessed that plea was perhaps "not a plea" it "should have entered into at the time") (citation and internal quotes omitted).

**Second**, the government assails the motion as premature in that it addresses statements "included in the PSR" rather than statements "made by the government at sentencing." Opp. 11. This is a distinction without a difference.

1. It is settled in our circuit that the government may breach a plea agreement "before the sentencing hearing" occurs. *Griffin*, 510 F.3d at 373-74 (Wesley, J., dissenting). In *U.S. v. Palladino*, for example, the government's breach consisted partly of a prosecutor's convincing the "Probation Office" to recommend "imposition of a six-point sentencing enhancement" that was "inconsistent" with the plea agreement's letter and "spirit." 347 F.3d 29, 30-31 (2d Cir. 2003).

2. The government posits a false dichotomy, as breaches reside in *any* "attempt[] to influence the court" improperly. *Wyatt*, 2008 WL 2433613, at *6. And influencing judicial sentencing determinations is exactly why PSRs exist. "[W]here the government's commentary reasonably appears to seek to influence the court in a manner incompatible with the agreement," courts "will not hesitate to find a

breach," *Amico*, 416 F.3d at 167 n.2 – whether the commentary manifests in a PSR or otherwise.

3. If anything, the fact that Persico has "yet to even file" PSR "objections," Opp. 11, only intensifies the government's breach, rendering its remarks to Probation both "unsolicited by the court" and unprovoked by the defense. *See Griffin*, 510 F.3d at 365 ("This is not to say that the plea agreement required the government to remain silent were the defendant to make statements inconsistent with the government's understandings.").

4. Last but not least, recent Supreme Court precedent demands a seasonable objection to any perceived breach on pain of forfeiting the claim for appeal. *See Puckett v. U.S.*, 556 U.S. 129, 133-43 (2009); *U.S. v. MacPherson*, 590 F.3d 215, 218-19 (2d Cir. 2009).[9]

---

[9] *MacPherson* also belies the government's passing suggestion (Opp. 8 n.4) that defense counsel's plea colloquy statements bear no weight. *Contra* 590 F.3d at 223 ("A plea colloquy can be examined to determine a defendant's understanding of a plea agreement.") (collecting cases). And while the prosecutor disputed counsel's stated view of the agreement's "coverage," she conspicuously did *not* challenge counsel's "understanding" that the government would not "advocate in any way to the Probation Office or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall." Opp. 6 (quoting Plea Tr. 27-28).

**Third**, and finally, the government asserts that the Court learned nothing new from "reading the PSR," maintaining that "most[] if not all" of its extrinsic accusations were subject to "voluminous motion practice," "significant pretrial litigation" and "extensive" oral argument. Opp. 7, 10-11. These contentions miss the mark.

1. At bottom, they essentially exhort the Court to overlook the government's breach as harmless. Harmless error analysis, however, has no application in this context. *E.g.*, *Griffin*, 510 F.3d at 375 ("This circuit has eschewed a 'harmless error' or 'lack of prejudice' defense to the breach of a plea agreement by the government.") (dissenting op.); *Vaval*, 404 F.3d at 154 ("Whether a breach by sentence advocacy caused prejudice in the form of an increased sentence is irrelevant to the need for a remedy.").

2. More fundamentally, the government's position proves too much and merely confirms the breach, as the agreement bars it from using previously known information to try and hike Persico's sentence. *E.g., Palladino*, 347 F.3d at 30, 32-33, 35 (agreement "hopelessly tainted" by government's injecting unconvicted "conduct" known on entry). With

"all relevant legal and factual information" already before the Court, the only conceivable "purpose" of the "government's statements" to Probation was thus to engineer a high guideline sentence or an upward departure. *Vaval*, 404 F.3d at 154; *accord Wyatt*, 2008 WL 2433613, at *1, *5-*7, *11 (government broke promise "not to use any information" known at time of plea by drawing court's attention to "public information" in order to "support an upward departure from or a particular sentence within the applicable sentencing guidelines range").

3. In all events, the government substantially misstates the salient facts. Contrary to the government's representations, *Persico* never "litigated" *any* murder or murder conspiracy allegations. Opp. 2, 11. And for its part, the Court did *not* rule on the strength of the evidence proffered against him *in limine*. Indeed, the record reflects that the government never even argued the point. Far from "order[ing] admissible" proof of "other criminal acts [allegedly] committed" by Persico,[10] the Court *excluded* the lion's share of the *in limine* evidence tendered against him. *See* 6/1/12 Tr. (Ex. A).

---

[10] Opp. 2.

a. As for evidence regarding Joseph Lalima,[11] the government did not even seek to prove that he was murdered – let alone that Persico was somehow responsible. *Id.* 11 ("We don't even intend to argue the murder."). And in the end, the government opted to exclude the Lalima evidence altogether. *Id.* 14.

b. As for evidence of Persico's alleged participation in a conspiracy to murder Bruce Black,[12] the government's motion to admit it was never decided. *Id.* 22.

c. And with respect to Steven Piazza's purported murder,[13] the PSR does not even ascribe it to Persico, making the government's effort to do so now another potential breach. At any rate, the government never tried to prove Piazza was killed, much less that Persico played any role. To the contrary, the prosecutor conceded she had no evidence of Persico's involvement, offering only a remark he allegedly passed after Piazza's death. *Id.* 24-25.

---

[11] *Ibid.*

[12] *Ibid.*

[13] *Ibid.*

## E. CONCLUSION

As the Supreme Court recently recognized, plea bargaining is no longer "some adjunct to the criminal justice system; it *is* the criminal justice system." *Mo. v. Frye*, 132 S. Ct. 1399, 1407 (2012) (citations and internal quotes omitted). Under this new regime, it is more vital than ever that plea agreements be "strictly enforced" and prosecutors' performance "responsibilities" scrupulously "fulfill[ed]." *Griffin*, 510 F.3d at 360, 363 (citations, footnote and internal quotes omitted). Any defendant is entitled to expect that much – no matter how notorious his relatives or infamous his surname.

The government here abandoned its responsibilities to Persico, "extend[ing] the promise of a reduced prison term with one hand" while taking it away – surreptitiously agitating for "harsher punishment" – with the other. *Morales Heredia*, 2014 U.S. App. LEXIS 19242, at *4, *31. For these reasons and those previously given, Persico must get back his plea.

## POINT II

## PERSICO'S PLEA IS LEGALLY INFIRM

### A. INTRODUCTION

In our moving papers, we demonstrated that Persico's plea is invalid under Rule 11 of the Federal Rules of Criminal Procedure, because (1) it lacked an adequate factual basis and (2) he was not sufficiently informed about the nature of the charge. In response, the government argues that "Persico has not alleged a fair and just reason for withdrawal of his plea." Opp. at 11. In doing so, the government erroneously conflates the legal standard for addressing Rule 11 deficiencies – particularly violations of Rules 11(b)(1)(G) and 11(b)(3) – with the legal standard for determining a withdrawal motion made pursuant to Rule 11(d)(2)(B)."[14] *See, e.g.*, *U.S.*

---

[14] The government's continual complaint that neither Persico nor his prior counsel submitted affidavits in support of his motion is perplexing. *See* Opp. at 1 n.1, 2 n.2, 16, 17. Also puzzling are the government's citations to *U.S. v. Gonzalez*, 647 F.3d 41 (2d Cir. 2011) and *U.S. v. Torres*, 129 F.3d 710 (2d Cir. 1997) (*see* Opp. at 1 n.1), for neither case involved a motion to vacate for want of a sufficient factual basis or for failure to ensure that defendant fully understood the nature of the plea. In both cases, the defendants submitted affidavits because the facts they asserted were *contrary* to those previously placed on the record and/or *absent* from the record. *See Gonzalez*, 647 F.3d at 51-52; *Torres*, 129 F.3d at 714-17. In this case, affidavits are plainly unnecessary since the information upon which we rely is already in the record. To the extent that the Court needs clarification on some issue, we trust that it will so advise.

*v. Maher*, 108 F.3d 1513 (2d Cir. 1997) (discussing different standards applicable to motions to vacate based on failure to comply with requirements of Rules 11(b)(3) and 11(b)(1)(G)[15] and motion to withdraw pursuant to Rule 11(d)(2)(B)[16]).

The standard articulated by the government applies where, despite the Court's scrupulous compliance with Rule 11's directives, a defendant moves to withdraw his guilty plea based on some other "fair and just reason." *U.S. v. Rosen*, 409 F.3d 535, 546 (2d Cir. 2005). Where, as here, however, the Court failed to "strict[ly] adhere[ ]" to Rule 11's "mandates," *U.S. v. Parkins*, 25 F.3d 114, 117 (2d Cir. 1994), the plea proceedings are deficient and render the plea a "nullity." *U.S. v. Journet*, 544 F.2d 633, 636 (2d Cir. 1976). *See U.S. v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006) (district court "*must grant*" motion to withdraw plea where plea proceedings failed to comport with Rule 11's procedural requirements

---

[15] Rule 11(b)(3) was formerly Rule 11(f) and Rule 11(b)(1)(G) was formerly Rule 11(c).

[16] Rule 11(d)(2)(B) was formerly part of Rule 32.

unless error is harmless); *U.S. v. Gonzalez*, 420 F.3d 111, 131 (2d Cir. 2005) (same).[17]

## B. THE PLEA LACKS A SUFFICIENT FACTUAL BASIS

As discussed in our opening brief, before the Court may enter judgment, it must "make certain that the *factual* conduct admitted by the defendant is sufficient as a *matter of law* to establish a violation of the statute to which he entered his plea." *U.S. v. Rodriguez*, 501 F. App'x 86, 90 (2d Cir. 2012) (emphasis in original). While the Court recognized its duty to "satisfy [it]self that [Persico was] actually guilty of the offense," 6/8/12 Tr. 15, it relied on the government when determining whether the factual basis was sufficient here, inquiring after the defendant's allocution: "And is that satisfactory, Ms. Argentieri?". 6/8/12 Tr. 23. Apart from the time frame during which Persico's conduct occurred, the

---

[17] The Second Circuit has made clear that Rule 11's "Harmless Error" provision "encompasses only such minor errors as a modest understatement of the maximum penalty, where the penalty actually imposed did not exceed the maximum as erroneously represented by the court." *Parkins*, 25 F.3d at 117 (internal quotation marks omitted). *See also Adams* (failure to adduce sufficient factual basis for the plea not harmless); *U.S. v. Pineda-Buenaventura*, 622 F.3d 761, 773 (7th Cir. 2010) (failure to ensure that defendant understood nature of the charge not harmless); *U.S. v. Bradley*, 381 F.3d 641, 647 (7th Cir. 2004) (same).

government did not request that any further inquiry be undertaken. *Id.* 23-24.[18] It also failed to proffer sufficient facts to provide an adequate basis for the plea. *Id.* 24.[19] The Court should not imprudently rely on the government again.

The government concedes as it must that, for the Court to find a sufficient factual basis for a plea, it must determine "that *the conduct to which the defendant admits* is in fact an offense that is alleged in the charging instrument." Opp. at 13. *See U.S. v. Garcia*, 587 F.3d 509, 514 (2d Cir. 2009) (court must ensure that "conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty"). Struggling to avoid vacatur, however, the government

---

[18] Presumably, the government failed to request further inquiry because it was concerned that, if asked, Persico would deny any intent to cause the borrowers to fear violence as well as an association with the Colombo family – which he subsequently did (*see* 6/8/12 Tr. 25). Indeed, just one week before the plea proceedings, Ms. Argentieri remarked: "Michael Persico is not going to acknowledge at this trial his association with the Colombo Crime Family. I expect that what we're going to hear is that he is being prosecuted because of his last name, and not because he engaged in any acts on behalf of the Colombo Crime Family and not because he was an associate." 6/1/12 Tr. 20, Ex. A.

[19] Notably, the government failed not only to address all elements of the offense, it did not even mention all factors set forth in 18 U.S.C. § 892(b), including that repayment of the loan would be unenforceable and that debtors' ostensible belief was "reasonable." *Id.*

fails to address how the facts developed during the plea proceedings establish each element of the offense. Instead, it intentionally distorts Persico's position, claiming: "Persico argues principally that *his allocution* failed to establish [his] knowing participation in [the charged] conspiracy." Opp. at 13 (emphasis supplied).

Of course, Persico maintained no such thing. To be accurate, he demonstrated that his allocution, *coupled with all facts to which he admitted*, failed to establish a *factual basis* for the charged conspiracy. *See* Br. at 26-29, 31-32. And while we believe it significant that Persico did not agree with the factual representations made by government counsel, as discussed in our opening brief, the factual basis was insufficient even if he had so agreed. To be sure, considering *all facts placed on the record at the time of the plea proceedings, including those proffered by the government*, Persico's "conduct does not actually fall within the charge." *Adams*, 448 F.3d at 499-500 (quoting *McCarthy v. U.S.*, 394 U.S. 459, 467 (1969), superseded by statute as recognized in, e.g., *U.S. v. Goldberg*, 862 F.2d 101, 106 (6th Cir)).[20]

---

[20] The uncontested evidence presented in our opening brief additionally (continued...)

Tellingly, the government resolutely disregards that the plea record is devoid of proof that *the defendant* had the requisite intent to make him guilty of the offense charged – *i.e.*, there was no "sufficient statement" by any source regarding "what the defendant did and intended" to do that constitutes the crime changed. *Rizzo v. U.S.*, 516 F.2d 789 (2d Cir. 1975). Rather, the government incongruously grumbles that the Second Circuit has not yet ruled on whether a *debtor's* state of mind is an element of the crime at issue. *See* Opp. at 14 n. 7. This is so despite the fact that

---

(...continued)
undermines the government's contention that there was a factual basis for the plea. *See* Br. at 17-23. It also undercuts the government's plea proffer: (1) the interest rate on the loan did not exceed 45 percent per year; rather, it was "just [ ] ten thousand" for the loan (6/10/09 Rec., Bates 11587, Session 3, at 2) as a "flat fee" (9/15/09 Rec., Bates 11632, Session 3, at 2); (2) the borrowers did not believe Persico had a reputation for the use of extortionate means to collect extensions of credit; Bombino "honestly" believed that Persico would forgive the interest: "Michael might say, 'Just give me back the money. Just pay Anthony back the money you owe him. Don't worry about it.'" (11/11/09 Rec. Bates 11657, Session 5, at 2). *See* Ex. B. Although the Court could not now consider additional evidence to find the factual basis for the plea *sufficient* since it was not on the record at the time of the plea, *see Adams*, 448 F.3d at 502, because its "obligations under Rule 11[(b)(3)] continue until it has entered judgment," *U.S. v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998), it should consider the additional evidence to determine that the factual basis is *insufficient* and thus the plea should be vacated. *Id.*

Persico's motion focused on the failure to establish *his own* state of mind, not that of the borrowers.[21]

To be sure, the plea proceedings fail to demonstrate – through defendant's allocution, the government's proffer or otherwise – that *Persico intended by his conduct* to make the borrowers believe that delinquency or default in payment could spur violence, an element requisite to a conviction for conspiracy to violate § 892. *See Allen*, 127 F.3d at 266; *Curcio*, 712 F.2d at 1544. The government's lengthy response is deafeningly silent as to this deficiency, one which in itself dooms the plea's validity.[22]

---

[21] As *correctly* noted in our initial brief, a conviction under Section 892 requires proof that "both the creditor and the debtor understood when the loan was made that force could be used to collect the loan at issue." *See* Br. at 15-16 (quoting *U.S. v. Allen*, 127 F.3d 260, 266 (2d Cir. 1997)). Although the Circuit has yet to rule on whether the borrower's state of mind is an essential element of the crime of *conspiracy* to violate § 892, the law is clear that the *defendant's* state of mind is a requisite element of this offense. *See U.S. v. Lombardozzi*, 491 F.3d 61, 68 (2d Cir. 2007); *U.S. v. Curcio*, 712 F.2d 1532, 1544 (2d Cir. 1983).

[22] The government's comment that the Superseding Information alleges various particulars regarding the Colombo family is baffling, given that not only did Persico not concede their accuracy, he explicitly *disagreed* with that portion of the Information. *See* 6/8/12 Tr. 25. *Cf. Adams*, 448 F.3d at 501-02 (plea insufficient where defendant's statements tended to negate his intent to commit the offense); *Godwin v. U.S.*, 687 F.2d 585, 590 (2d Cir. 1982) (same); *Montgomery v. U.S.*, 853 F.2d 83, 85-86 (2d Cir. 1988) (same); *Pineda-Buenaventura*, 622 F.3d at 772 (although government's proffer provided a sufficient factual basis for the offense, the defendant's statements

(continued...)

Aside from this infirmity, additionally absent from the record are facts establishing the existence of a *conspiracy* to make an extortionate extension of credit and Persico's knowing and willful participation in such a conspiracy. This failure renders the plea defective as well.[23]

The government's assertion that Persico's "own words" establish such a conspiracy is deeply troubling. Opp. at 15. Indeed, Persico's words were simply this: "I arranged for someone to extend [a] $100,000 loan to the trucking company run by James B[o]mbino and Steven Marcus at a usurious interest rate." 6/8/12 Tr. 23.

Nothing in this statement evinces an *agreement* by Persico and another person to commit a crime, let alone an agreement to make an *extortionate* loan. Thus, even if the plea proceedings had sufficiently established a substantive violation of § 892 – which they did not given the absence of facts establishing Persico's requisite state of mind – they nevertheless failed to establish a factual basis for a *conspiracy* to commit

(...continued)
undermined the court's confidence in his understanding). Moreover, even had Persico not overtly disputed those allegations, the Information's Colombo-related rhetoric established no element on the offense, nor does the government contend as much. *See* Opp. at 15.

[23] *See, e.g., Montgomery v. U.S.*, 853 F.2d 83 (2d Cir. 1988).

this crime. *See U.S. v. Darling*, 766 F.2d 1095, 1100 (7th Cir. 1985) (vacating plea to conspiracy charge where defendant's admission to substantive crime was insufficient to establish conspiracy to commit that crime).

Equally alarming is the government's further claim that "usurious" is synonymous with "extortionate." Opp. at 15. Rather, "usurious" simply means an excessive or illegally high rate of interest. *See* www.merriam-webster.com/dictionary/usury; *see also In re McCorhill Pub., Inc.*, 86 B.R. 783, 785 (S.D.N.Y. 1988) ("[w]ith regard to usurious intent, nothing more is needed than an intent to take and receive a rate of interest in excess of that allowed by law"). Thus, a "usurious" loan does not carry with it the element of force or violence as an "extortionate" one does. *See* 18 U.S.C. § 891(6).

Finally, the government's reference to defense counsel's statements that she "do[es] know a viable defense" but that Persico was choosing to plead guilty because of "the risks inherent in a trial" (Opp. at 14) is peculiar, as it only weakens its argument. In reality, those statements suggest not that Persico was pleading guilty because he was in fact guilty,

but rather that he was pleading guilty despite his innocence for other reasons.

At bottom, in the "absence of a factual basis supporting [the charge]," the Court "was not at liberty to accept [it]," despite Persico's agreement to plead guilty to it. *Adams*, 448 F.3d at 501-02. Accordingly, the Court must vacate the plea. *See Smith*, 160 F.3d at 121.

### C. THE COURT FAILED TO SUFFICIENTLY DETERMINE THAT PERSICO FULLY UNDERSTOOD THE NATURE OF THE CRIME TO WHICH HE WAS PLEADING

The government argues that, despite Persico's extremely limited allocution and his failure to acknowledge any additional conduct or intent, the Court sufficiently determined his understanding as to the charges. *See* Opp. at 17. In support, it notes that (1) after reciting the elements of the charge, the Court inquired whether defense counsel agreed with its recitation, to which counsel responded affirmatively; and (2) in response to the Court's general inquiries about whether Persico understood the charge or had any questions – inquiries made prior to eliciting any facts from him – Persico responded affirmatively. *See id.* But the law is clear that Rule 11(b)(1)(G) is "*not satisfied by affirmative answers to the court's*

*inquiries whether the defendant has discussed the charges with his attorney and whether the defendant understands the charges*." *Darling*, 766 F.2d at 1099 (emphasis supplied).

Rather, due process requires that, in order for a plea to be "voluntary," as in "an intelligent admission," a defendant must receive "real notice of the true nature of the charge against him." *Henderson v. Morgan*, 426 U.S. 637, 645 (1976). Not only is the Court required to *inform* the defendant as to the nature of the charges, but it must ensure that he *understands*. *Darling*, 766 F.2d at 1098. As the Supreme Court put it, the record must reflect that the defendant "possesses an understanding of the law in relation to the facts." *McCarthy v. U.S.*, 394 U.S. 459, 466 (1969), superseded by statute as recognized in, e.g., *U.S. v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988). As demonstrated in our opening brief, the record here does not so reflect.

The government's reliance on *U.S. v. Juncal*, 245 F.3d 166 (2d Cir. 2001), is entirely misplaced. In *Juncal*, not only was the indictment "exceptionally detailed" and the charges and their elements "clearly explained," *id.* at 171, but critically the defendant's *own lengthy*

*description* of what he did accurately described the offense charged. *Id.* at 169. Indeed, the court found that, had a jury found as fact precisely "the acts and omissions described in [defendant's] allocution," the evidence would have been sufficient as a matter of law. *Id.* at 171.[24] It was on *these facts* that the Second Circuit found that defendant's claims lacked merit. *Id.*

The requisite inquiry, however, "necessarily var[ies] from case to case" (*McCarthy*, 394 U.S. at 467), and in this case the Superseding Information failed to detail the offense or its elements. *See* 10-CR-147 (S-6). Only two paragraphs discussed the offense (*see* 10 Cr. 147 (S-6), ¶¶ 14-15); the remainder contained "extraneous" information regarding the Colombo family (6/8/12 Tr. 25) and a criminal forfeiture allegation.[25] The

---

[24] Although the defendant in *Juncal* never admitted to knowing that his actions were illegal at the time he committed them, based on his explicit admissions that he "deliberately failed to heed" the warnings given to him by law enforcement, the court found that evidence of his conscious avoidance sufficed to provide the knowledge element. *Id.* Not only did Persico's allocution contain no similar admissions, the Second Circuit made clear that, while conscious avoidance may substitute for knowledge, it cannot "substitute for the *intent* necessary to prove the crime[] charged." *U.S. v. Samaria*, 239 F.3d 228 (2d Cir. 2001), abrogated in part on other grounds by *U.S. v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008) (emphasis supplied).

[25] The government's bad faith in plea negotiations is further evinced by the plea agreement's forfeiture provision, in which the government required the defendant to forfeit $325,000, ostensibly representing property he acquired "as a result of his

(continued...)

offense elements and factual details were also absent from the plea agreement, nor were they contained in any document that Persico acknowledged reading.

Thus, the Court failed to adequately determine that Persico understood that, in order for him to be guilty of the charged crime, he must have (1) intended by his conduct to instill fear of violence in the borrowers and (2) conspired with another person to commit the substantive crime of making an extortionate extension of credit, not simply "*arranged* for someone to extend [a] $100,000 *usurious* loan." 6/8/12 Tr. 23.

As a "matter[ ] of reality," then, the Court's "ritual[istic]" recitation of the offense elements, without further explanation as to how they applied to the facts here, failed to suffice. *McCarthy,* 394 U.S. at 467. This is especially so here, given the complexity the charges. *See Irizarry v. U.S.*, 508 F.2d 960, 964 (2d Cir. 1974) (nature of requisite inquiry varies

---

(...continued)
participation in an extortionate *collection* of credit conspiracy, as charged in the Superseding Information (S-6)." *See* Plea Agreement at ¶ 5 (emphasis supplied). No such conspiracy, however, was charged in the Superseding Information. *See* 10 Cr. 147 (S-6)).

"depend[ing], *inter alia*, upon the complexity of the crime charged"); *U.S. v. Szymanski*, 631 F.3d 794, 799 (6th Cir. 2011) (greater explanation is required where the charge – and particularly the intent element – is "more complex"). Indeed, numerous courts have observed the complexity of conspiracy law,[26] as well as the intent requirement for a violation of 18 U.S.C. § 892. *See Allen*, 127 F.3d at 266; *Curcio*, 712 F.2d at 1544.

Notably, even the government apparently failed to understand the intent element required for a conviction under this statute.[27] Had the government understood, it surely would have asked the Court to make the requisite inquiry or, at a minimum, proffered that it could prove the defendant's intent, rather than simply proffering, as it did, the debtors' state of mind. *See* 6/8/12 Tr. 24 (Ms. Argentieri: "[A]t the time that the loan was made, [the borrowers] believed that Mr. Persico and his

---

[26] *See U.S. v. Pineda-Buenaventura*, 622 F.3d 761, 771 (7th Cir. 2010) ("[c]onspiracy is not a concept immediately understandable to a layperson"); *United States v. Blalock*, 321 F.3d 686, 689 (7th Cir. 2003) ("conspiracy is generally considered a rather complicated offense"); *United States v. Wetterlin*, 583 F.2d 346, 350 (7th Cir. 1978) (charge of conspiracy "is not a self-explanatory legal term").

[27] The intent element is further negated by the government's position that Persico "funded" (ECF 764 at 3) the trucking company to which the loan was made. *See Allen*, 127 F.3d at 268-70 (vacating conviction after trial despite the presence of *prima facie* evidence where defendant's intent could not reasonably be inferred from his conduct).

coconspirators had a reputation for the use of extortionate means to collect extensions of credit.”).

Finally, even had the Court’s recitation of the elements, without further explanation, been sufficient – which it was not – Persico never *personally* confirmed that he understood them, nor was he asked to do so. *See* 6/8/12 Tr. at 8-9. Contrary to the government’s argument that the Court’s inquiry of *counsel* was sufficient (*see* Opp. at 17), the Supreme Court definitively pronounced that the Court must verify with the defendant “personally” that he “understand[s] the law in relation to the facts.” *McCarthy*, 394 U.S. at 466. Indeed, shortly before *McCarthy* was decided, Rule 11 was amended to encompass this requirement. *See* Fed. R. Crim. P. 11, Advisory Committee Notes, 1966 Amendments (“the court [must] address the defendant *personally* in the course of determining that the plea is made voluntarily and with understanding of the nature of the charge”) (emphasis supplied). As such, an “attorney’s representations” in this regard are insufficient. *U.S. v. Blackwell*, 199 F.3d 623 (2d Cir. 1999) (vacating conviction where defendant did not personally provide the court with sufficient information to establish that he understood the meaning

of his plea) (citing *McCarthy*, 394 U.S. at 466-47); *see also U.S. v. Cody*, 438 F.2d 287, 288 (8th Cir. 1971) (same). To be sure, Persico's own description of his conduct strongly suggested that he did not understand the requisite elements of the offense.

Accordingly, in light of Persico's scant allocution, the government's limited proffer, and the Court's insufficient inquiry, Rule 11(b)(1)(G) was violated. As such, the guilty plea is invalid.

## POINT III

## THE PLEA SHOULD BE VOIDED BECAUSE PERSICO IS LEGALLY INNOCENT

Curiously, the government repeatedly argues that Persico has not "assert[ed] his legal innocence." Opp. at 12 n.6; *see also id.* at 15-16. In our opening brief, however, we expressly presented the facts relevant to the offense and declared that they "demonstrate[ ] that Persico is legally innocent of the crime charged." Br. at 32 n.11.

Indeed, it is abundantly clear from the opening brief's factual recitation that, as a matter of law, Persico is not guilty since: (1) he did not conspire with anyone to make an extortionate loan, and (2) the loan was not extortionate in nature as neither the defendant nor the borrower

understood that delinquency or default in payment could prompt violence.

Notably, the government does not challenge any of Persico's factual representations or that Persico is legally innocent of the charge but quibbles only with the manner in which these issues were addressed.[28] Indeed, the government tacitly concedes that its evidence proves:

(1) the defendant's cousin Theodore Persico, Jr. – whom the government describes as a "powerful captain in the Colombo family" (ECF 739 at 3) – was a "borrower" of the $100,000 loan, along with Bombino and Marcus;

(2) although the loan's return was initially contemplated in 60 to 90 days, there was no fixed term and the understanding was that the interest would remain $10,000 no matter the length of the loan's extension;

(3) the borrowers determined the interest to be paid, considered it a "free loan," and believed it to be "better than the bank";

---

[28] Unable to contest the facts set forth in the opening brief, the government risibly complains that the defense has not provided sufficient information to support the facts presented, despite our inclusion of the source of the information (recordings made by the government's cooperating witness Steven Marcus at its behest), the precise date of those recordings, and specific excerpts from the recordings. *See* Opp. at 16 n. 10. For greater ease of reference, however, we include transcripts of the relevant portions of the recordings in the order cited in our opening brief, with the government's Bates and Session numbers cited. *See* Ex. B. If the Court wishes to review any of the recordings themselves or needs additional information, we will provide it as directed.

(4) Bombino expressed no concern whatever about delaying repayment on the loan; to the contrary, he repeatedly stated that he did not believe delay in the loan's repayment was a problem;

(5) Persico never engaged in conduct designed to cause the debtors to fear violence; and

(6) when Persico was indicted in March 2010 (nine months after the loan was extended), no principal or interest payments had been made on the loan and no one had discussed or expressed any concern regarding the threats or use of violence.

*See* Br. at 16-22. Thus, the evidence reveals that Persico is legally innocent of the charged crime.

As the Supreme Court aptly observed: "[C]oncern about the injustice that results from the conviction of an innocent person has long been at the *core* of our criminal justice system." *Schlup v. Delo*, 513 U.S. 298, 325 (1995) (emphasis supplied). Ultimately, then, even if the government has suffered the prejudice it claims[29] – a consideration irrelevant to the

---

[29] The government's complaint about having to prepare for trial "nearly two years after the underlying events" (Opp. at 18) is preposterous, given that the ostensible "underlying events" date back to 1989. Moreover, the trial against Guerra alone was considerably shorter (3 weeks) than the government anticipated it to be when Persico was to be a defendant at trial – some "8 to10 weeks" (ECF 442-1 at 6), and Guerra was notably *acquitted* of all charges in which Persico was also named.
(continued...)

situation discussed above where the requirements of Rules 11(b)(3) and 11(b)(1)(G) were not satisfied – its argument is unpersuasive, as a showing of innocence, as we have made here, must indisputably prevail.

## CONCLUSION

Persico's plea must be vacated.

Dated: New York, NY
Oct. 21, 2014

Respectfully submitted,

**LAW OFFICE OF MARC FERNICH**

**By:** ____________/s/__________________

**MARC FERNICH**
810 Seventh Ave.
Suite 620
New York, NY 10019
(212) 446-2346
maf@fernichlaw.com

*Attorney for Michael Persico*

(...continued)
*Compare Barker*, 514 F.2d 208, 222 (D.C. Cir. 1975) ("prejudice [ ] occurs where a defendant's guilty plea removed him from an ongoing trial of co-defendants, who were then found *guilty*") (emphasis supplied).