**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

EAG:NMA/AL
F.#2010R00195

January 19, 2015

By Hand and ECF

The Honorable Sandra L. Townes
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Michael Persico
Criminal Docket No. 10-147 (S-6) (SLT)

Dear Judge Townes:

The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, in which a Fatico hearing is scheduled for January 23, 2015. For the reasons set forth below, the government respectfully asks the Court to impose a term of imprisonment within the advisory Guidelines range of 37 to 46 months and a fine within the advisory Guidelines range of $7,500 to $75,000.

Background

On June 8, 2012, the defendant pled guilty to the sole count of the above-captioned superseding information, which charged him with conspiring to participate in an extortionate extension of credit, in violation of 18 U.S.C. § 371. (Docket Entry No. 566.) On October 30, 2014, after briefing by the parties, the Court denied the defendant's motion to withdraw his guilty plea. (Docket Entry No. 791.) Later that day, the parties appeared before the Court, and the Court ordered a Fatico hearing in order to hear proof regarding the defendant's history and characteristics. (Docket Entry dated Oct. 30, 2014; Transcript dated Oct. 30, 2014 at 2-6.)

## Discussion

The government respectfully submits that, in this case, a term of imprisonment within the Guidelines range of 37 to 46 months is appropriate in light of all relevant sentencing factors, and also respectfully requests that the sentence include a fine within the advisory Guidelines range of $7,500 to $75,000.

### I. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

### II. The Guidelines Range of Imprisonment Is 37 to 46 Months

In the plea agreement, the government estimated that the advisory Guidelines range of imprisonment is 37 to 46 months. (Plea Agreement ¶ 2.) The defendant stipulated to this calculation (id.; see also Transcript dated June 8, 2012 ("Guilty Plea Tr.") at 19) and the Probation Department agrees with it (Presentence Investigation Report ("PSR") ¶ 109).

### III. A Sentence Within the Guidelines Range Is Appropriate

The defendant has indicated that he will seek a sentence below 37 months. (Guilty Plea Tr. at 27 ("Of course, we will be advocating for a sentence below the Guideline range[.]").) However, the government respectfully submits that a sentence within the Guidelines range is appropriate in light of all relevant sentencing factors.

#### A. The Nature and Circumstance of the Offense

In 2009, the defendant provided $100,000 to co-defendant Anthony Preza, who in turn provided it to co-defendants James Bombino and Theodore Persico, Jr., as well as a third individual who was cooperating with the government. (PSR ¶ 37.) The $100,000

was a loansharking loan extended by the defendant, and it was conveyed through Preza because the defendant wanted to disguise his role in extending the loan. This is a serious crime committed under the auspices of a powerful, violent criminal enterprise. In particular, the defendant was able to make loansharking loans – and to expect to obtain repayment of those loans – because of his position as a powerful associate in the Colombo organized crime family of La Cosa Nostra (the "Colombo family" and "LCN," respectively). Loansharking is a staple LCN crime that allows the Colombo family and other LCN crime families to thrive, and that often results in violence or threats of violence.

B. The History and Characteristics of the Defendant

As noted above, the defendant intends to seek a sentence below the Guidelines range. (Guilty Plea Tr. at 27.) The government respectfully submits that a sentence below the Guidelines range would be inappropriate in light of the defendant's history and characteristics. In addition to the crime of conviction, the defendant's history includes participation in additional crimes. In light of the Court having ordered a Fatico hearing, the government will offer proof at the hearing of several such crimes, most of which were the subject of extensive testimony during the trial of co-defendant Francis Guerra in June and July of 2012. First, the defendant has participated in racketeering as a long-time associate of the Colombo family and has, at times, been involved in managing the crime family's members and associates. (Guerra Trial Tr. at 181-82, 203-04.) Second, the defendant has participated in murder because he provided firearms to be used in the 1993 murder of Joseph Scopo and participated in assembling the crew that carried out that murder. (Id. at 204-09, 217-18.) Third, the defendant participated in loansharking (id. at 257-70), and fourth, the defendant participated in extortion (see, e.g., 3500-AR-22 at 21-24, 36-37, 43-45). These crimes are staples of organized crime and – because they are difficult to commit without the protection of an organized crime family – reflect the defendant's role in the Colombo family. Fifth, the defendant participated in a conspiracy to acquire and sell stolen video games with associates of the Colombo family, indicating that he has been willing to profit not just from the staple crimes of the Colombo family but also from the wide variety of crimes committed by its members and associates as opportunities arise. (Guerra Trial tr. at 270-76.) Because of this history, a sentence below the Guidelines range would be inappropriate in this case.

C. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

A sentence within the advisory Guidelines range is necessary to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the offense of conviction is serious, and the defendant's additional crimes indicate that he lacks respect for the law.

D. Affording Deterrence and Protecting the Public

A sentence within the advisory Guidelines range is necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) & (C). "Under section 3553(a)(2)(B), there are two

major considerations: specific and general deterrence." United States v. Davis, 08 CR 332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010). Because the defendant has committed crimes over a long period of time, he is in need of specific deterrence. In addition, by imposing a sentence within the Guidelines range in this case, the Court can send a message to others in the defendant's position, or who are considering embarking on a life of crime, and can discourage them from doing so.

## IV. A Fine Within the Guidelines Range Is Warranted

Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998). In this case the Probation Department found that the defendant has not satisfied that burden. (PSR ¶ 107.) Based on an adjusted offense level of 21, the Guideline fine range is $7,500 to $75,000. (Id. ¶ 117 (citing U.S.S.G. § 5E1.2(c)(3) & (c)(4).) It is appropriate that the defendant "reimburse society for the drain on economic resources" that he has caused, as well as for "the high costs of [his] own necessary imprisonment" should a term of imprisonment be imposed. United States v. Sessa, 821 F. Supp. 870, 875 (E.D.N.Y. 1993) (Weinstein, J.). The government therefore respectfully requests that the defendant be required to pay a fine within the Guidelines range.

## Conclusion

For the reasons set forth above, the government respectfully asks the Court to impose a term of imprisonment within the advisory Guidelines range of 37 to 46 months and a fine within the advisory Guidelines range of $7,500 to $75,000.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/
Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
(718) 254-6232/6164

cc: Clerk of the Court (SLT) (by ECF)
Marc Fernich, Esq. (by ECF)
John L. Almanza, U.S. Probation Officer (by email)

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page5 of 204


LAW OFFICE OF
MARC FERNICH

MARC FERNICH maf@fernichlaw.com
ALSO ADMITTED IN MASSACHUSETTS

810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019
212-446-2346
FAX: 212-459-2299
www.fernichlaw.com

January 21, 2015

**BY ECF**

Hon. Sandra L. Townes
U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *US v. Michael Persico*, 10 CR 147 (SLT) (EDNY)

Dear Judge Townes:

I write to respectfully address several issues raised by Monday's government letter.

**1.** For the reasons that follow, I renew our motion to withdraw Mr. Persico's plea based on the government's breach of the plea agreement or alternatively for specific performance – that is, to have the government's offending statements to the Probation Office and the Court stricken, *e.g., U.S. v. Vaval*, 404 F.3d 144, 154 (2005), and Mr. Persico sentenced before a different judge, untainted by illicit government advocacy. *E.g., U.S. v. Woltmann*, 610 F.3d 37, 43-44 (2d Cir. 2010); *U.S. v. Hernandez*, 604 F.3d 48, 55-56 (2d Cir. 2010); *U.S. v. Heredia*, 768 F.3d 1220, 1236 (9th Cir. 2014) ("Once the district judge has seen or heard the offending words that denied the defendant the benefit of his bargain, any further proceedings before him [are] necessarily ... tainted").

**First**, in its Oct. 30, 2014 decision ("Dec."), the Court opined that the government had not breached the agreement by advocating a position before Probation, as the agreement proscribed "advocacy only before the Court." *See* Dec.

11. But as I noted on the record at our last conference, the statements to Probation had their intended effect, directly inducing the Court to "schedule a hearing with regard to information about the history and characteristics of Mr. Persico that the government says that they can prove" – a breach if ever there was one. 10/30/14 Tr. 2; *see also id.* 4-5 ("[W]ith regard to those acts that the government alleges they can prove by a preponderance of the evidence, I would have to hear that in order to make an informed decision with regard to sentencing…. I have no idea what the proof is, I have no idea whether the government can prove it by a preponderance of the evidence.").

Since there is no dispute that the agreement bars the government from advocating before the Court, the government could and should have declined to offer proof of additional crimes allegedly committed by Mr. Persico – especially where the underlying information was inarguably known at the time of the plea. But instead of trying to repair the breach, the government *compounded* it by Monday's letter stating it is prepared to prove Mr. Persico's involvement in a spate of extraneous crimes beyond the offense of conviction. 1/19/15 Ltr. 3.[1]

The assertion that the government wants to prove these extrinsic offenses simply to oppose a sentence "*below*" the stipulated 37-46 month guideline range is a thin pretext that scarcely cures its breach. *Id.* As the Second Circuit has made abundantly clear, statements "acknowledg[ing]" that the plea agreement "prohibit[s the government] from seeking an upward departure or taking a position on the appropriate sentence within the applicable Guidelines range" – and disavowing any "inten[t] to violate those provisions" – do *not* "insulate" it from a breach finding if its actions in fact constitute a form of advocacy. *Vaval*, 404 F.3d at 153; *see also U.S. v. Griffin*, 510 F.3d 354, 361 (2d Cir. 2007) (finding government breach and

---

[1] Tellingly, it appears that the government did not advise Probation that it could prove additional crimes by a preponderance of the evidence with respect to other defendants with whom it had plea agreements, with the exception of Theodore Persico Jr. But it hardly mattered for Theodore Persico Jr., as the guidelines for his crime of conviction (life) far exceeded his maximum statutory penalty (12 years). Because the government did not take a similar position before Probation or the Court, the Court did not schedule a *Fatico* hearing as to any other defendant with a plea agreement resembling Michael Persico's. This is so even though the other defendants were also charged with crimes more serious than their respective offenses of conviction.

Case 17-2791, Document 25-5, 09/12/2017, 2122149, Page7 of 204




warning that when prosecutorial commentary "reasonably appears to seek to influence the court in a matter incompatible with the agreement," Second Circuit "will not hesitate to find a breach, [despite] formal language of disclaimer"); *U.S. v. Wyatt*, No. 06 CR 782 (DLI), 2008 WL 2433613, at *1 (E.D.N.Y. June 12, 2008) (government remarks breached plea agreement because "intended to support [] higher sentence, even if [it] has tried to avoid saying so explicitly"); *id.* at *10 ("government need not explicitly move for an upward departure" to breach plea agreement prohibiting "such advocacy if, in fact, the government's arguments and comments" amount to "an argument about where within the range the court should sentence defendant or whether to upwardly depart").

Indeed, enforcing "meticulous standards of performance," *U.S. v. Bulluck*, 182 F. App'x 7, 10 (2d Cir. 2006) (citation omitted), the Second Circuit has held the government in breach where, despite advocating a sentence within the guidelines range specified in the plea agreement, prosecutors embraced a sentencing *calculation* used in the presentence report that "differed in key respects from that which [they] had indicated in the … agreement that [they] would recommend." *Id.* at 9-10.

**Second**, the Court's Oct. 30 decision deemed unreasonable the defense understanding that the agreement barred the government from advocating a position before Probation, maintaining that the prosecutor had "expressly rejected" that construction at the plea hearing. Dec. 12. But Monday's government letter expressly *adopts* – ***not*** *rejects* – defense counsel's statements at the hearing. *See* 1/19/15 Ltr. 2.[2] In fact, the government insists that it is proffering extrinsic offense evidence solely because counsel remarked during the plea colloquy that Mr.

---

[2] During the plea colloquy, the government challenged only the defense understanding that the agreement covered all crimes the government had been investigating. 6/8/12 Tr. 27. The government did *not* dispute that it would refrain from advocating in any way, before Probation or the Court, for an above-guidelines sentence or where within the guidelines range the sentence should fall. *Id.*

Persico "will be advocating for a sentence below the Guideline range." *Id.* (quoting 6/8/12 Tr. 27).[3]

Counsel made that statement explicitly in amplifying the defense understanding of what the plea agreement allowed each party to advocate: "[O]ur understanding is that the government is not going to advocate *in any way* to the Probation Office or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall…. Of course, we will be advocating for a sentence below the Guideline range." 6/8/12 Tr. 27 (emphasis supplied).

As the Court must "enforce what 'the defendant reasonably understood' the plea agreement to mean" when entered – and because "oral agreements can amplify ambiguous terms" – it follows inescapably that the government is in breach. *Stern v. Shalala*, 14 F.3d 148, 150 (2d Cir. 1994); *see also U.S. v. MacPherson*, 590 F.3d 215, 223 (2d Cir. 2009) ("A plea colloquy can be examined to determine a defendant's understanding of a plea agreement.") (collecting cases).

**2.** We renew our contention that the plea lacks a sufficient factual basis. To reiterate, the Court's "obligations under [Rule 11(b)(3)] continue until it has entered judgment. If it decides there was no factual basis for a guilty plea after accepting it, the court should vacate the plea and enter a plea of not guilty on behalf of the defendant." *U.S. v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998); *see also Libretti v. U.S.*, 516 U.S. 29, 38 (1995) (despite plea's acceptance, court should not enter judgment "without making such inquiry as shall satisfy it that there is a factual basis for the plea"); *U.S. v. Gonzalez*, 420 F.3d 111, 133 (2d Cir. 2005)

---

[3] The government's claim is disingenuous. As recounted in our earlier briefing, counsel had numerous discussions with the government regarding its breach prior to filing the withdrawal motion. *See* Reply Br. [ECF 790] 17. During those discussions, counsel specifically asked if the government would remedy the breach and refrain from advocating Mr. Persico's alleged involvement in murders and other unconvicted crimes if the defense agreed not to request a below-guidelines sentence. The government refused. Moreover, although codefendants with agreements like Mr. Persico's sought and received below-guidelines sentences, the government did not attempt to prove their participation in additional crimes.

Case 17-2791, Document 25-5, 09/12/2017, 2122149, Page9 of 204




(withdrawal warranted where, prior to entering judgment, court finds inadequate factual basis for plea).

In Monday's letter, the government concedes that the $100,000 loan at issue went to a trucking company owned by Theodore Persico Jr., James Bombino and cooperating witness Steven Marcus. 1/19/15 Ltr. 2. This confession meshes with the evidence, primarily comprising consensual recordings made by Marcus while cooperating. The recordings establish that Michael Persico's cousin Theodore asked him for a loan; that the loan was going to Theodore as borrower; that Theodore set the loan terms; that the parties agreed on a flat $10,000 interest rate for the $100,000 loan, whatever its duration; and that Theodore and the other borrowers understood they were not being "shak[en] down." 6/10/09 Rec., Bates 11587, Session 3, at 2.

Though the record is void of evidence showing that Mr. Persico intended to instill in the borrowers a fear of violence, the Court suggested that a defendant's intent "can reasonably be inferred from the terms of the loan that he extended." Dec. 21 (citing *U.S. v. Lombardozzi*, 491 F.3d 61, 71 (2d Cir. 2007)).

Preliminarily, since intent is a "critical element," the Court may *not* "infer" it in the "context of a challenge to the factual basis supporting a guilty plea." *U.S. v. McCreary-Redd*, 475 F.3d 718, 724 (6th Cir. 2007); *U.S. v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988); *U.S. v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995). Thus, while a petit jury may draw reasonable inferences regarding a defendant's state of mind from the evidence presented at *trial* (*see Lombardozzi*, 491 F.3d at 71), permitting such inferences in the *plea* context would "negate the well-established safeguards inherent in the Rule 11[(b)(3)] mandate." *McCreary-Redd*, 475 F.3d at 724 (citing *Goldberg*, 862 F.2d at 106).[4]

---

[4] The inference that Mr. Persico "conspired" to commit the crime (Dec. 21) – another critical element – is also improper. Arranging for someone to extend a loan is not equivalent to conspiring with another to make an extortionate extension of credit.

Moreover, even if such inferences *were* permissible in the plea context, any inference of intent is entirely unreasonable on the facts of this case.[5] Belying that inference, again, is the borrower's status as Mr. Persico's cousin – a partner in the trucking company and a "powerful captain in the Colombo family" (Govt. Ltr. re T. Persico, ECF 739, at 3 (May 27, 2014)) – whereas Mr. Persico is not even claimed to be an enterprise member. These facts, among others outlined in our prior submissions, demonstrate that the plea lacks a sufficient factual basis and that Mr. Persico is legally innocent of the crime charged.

**3.** If the Court continues to uphold the plea and require a hearing despite the government's breach, I must respectfully request an adjournment so I may render adequate assistance of counsel. Having indicated at the last conference that it was not seeking a *Fatico* hearing (10/30/14 Tr. 3), the government now says it aims to prove Mr. Persico's involvement in a wave of extraneous crimes to support its request for a 37-46 month guideline sentence. 1/19/15 Ltr. 3. Specifically, the government now claims it can prove that Mr. Persico (a) is a long-term Colombo family associate, at times acting in a managerial role; (b) participated in murder by furnishing guns used in the 1993 Joseph Scopo homicide and helping assemble the crew that carried out the killing; (c) participated in extortion and loansharking; and

---

[5] Contextual difference aside, *Lombardozzi* is factually inapt. **First**, while the *Lombardozzi* interest payments ranged from 104% to 250%, the government's plea colloquy statement here – that the loan's annual interest rate topped 45% – lacks foundation. Rather, as indicated in text, the evidence shows that the interest on the $100,000 loan was to be a $10,000 "flat fee" regardless of duration, and that no interest or principal payments were ultimately made over the ensuing nine month period. 9/15/09 Rec., Bates 11632, Session 3, at 2; 6/10/09 Rec., Bates 11587, Session 3, at 2. **Second**, Lombardozzi and a cohort repeatedly threatened their borrower – readily implying an intent to instill fear – whereas Mr. Persico did no such thing. To the contrary, at least one borrower here – Bombino – expressed his belief that Mr. Persico might just forgive the interest altogether. 11/11/09 Rec. Bates 11657, Session 5, at 2. **Third**, whereas *Lombardozzi* involved an unsecured loan to a virtual stranger, the loan in this case went to a trucking company that, according to the government, was "funded by [Mr.] Persico" himself and concededly run by his cousin. *E.g.*, ECF 764 at 3.

(d) conspired with Colombo family associates to obtain and sell stolen video games. *Id.*[6]

In support of its position regarding additional conduct, the government advised Monday night that it intends to call as witnesses Anthony Russo and an FBI agent. In doing so, the government stated that it previously provided some of Mr. Russo's 3500 material to Mr. Persico and other defendants and provided more 3500 material Monday night and late Tuesday afternoon. I have not yet had the opportunity to review any of this material, but understand that it consists of hundreds of hours of audio recordings and thousands of pages of documents, including testimony and debriefing reports. The government has yet to identify the FBI agent it intends to call or provide any of the agent's 3500 material. If the Court still plans to go forward with a hearing, I therefore request that it be rescheduled for a convenient date in March or April to enable me to digest the voluminous materials in question.[7] I also ask that the government identify the agent it intends to call and provide any additional 3500 material in sufficient time for me to absorb the information.

I anticipate that I may need to call rebuttal witnesses, but I will make that determination once I have had an opportunity to review the government witnesses' 3500 material and hear their testimony. Finally, I ask that the government produce any *Brady* and *Giglio* information bearing on its claims.

---

[6] Though the government has dropped its bid to prove Mr. Persico's involvement in additional murders and murder conspiracies, the extortion claim does not appear in the draft PSR and is entirely new – yet another plea agreement breach.

[7] I am unavailable March 24-27 and April 1-2 due to previously scheduled hearings.

As always, we appreciate the Court's attention and consideration.

Respectfully,

/s/

Marc Fernich

cc: All counsel (ECF)

A000219

LAW OFFICE OF
MARC FERNICH

MARC FERNICH maf@fernichlaw.com
ALSO ADMITTED IN MASSACHUSETTS

810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019
212-446-2346
FAX: 212-459-2299
www.fernichlaw.com

February 3, 2015

**<u>BY ECF</u>**

Hon. Sandra L. Townes
U.S. District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: *US v. Michael Persico*, 10 CR 147 (SLT) (EDNY)

Dear Judge Townes:

I respectfully write in further support of Mr. Persico's renewed motion to withdraw his guilty plea.

## I. The Government Has Breached the Plea Agreement – Again

### A. The Government's Advocacy Before the Court Constitutes Another Breach of the Agreement

Despite Your Honor's Oct. 29, 2014 order ("Dec.") recognizing that the plea agreement "*unambiguously prohibits advocacy [ ] before the Court*" (Dec. at 11), the government submitted a sentencing letter to the Court *advocating* that it can prove Mr. Persico's involvement in a rash of additional crimes – including murder – beyond the offense of conviction. 1/19/15 Ltr. at 2. Still, the government denies breaching the agreement because its submission professes to seek only a sentence

within the 37-46 month Guidelines range and not to request an upward departure. *See* 1/30/15 Ltr. at 2.[1]

At the outset, the government's advocating a 37-46 month sentence is improper because the Court has not yet determined the applicable Guidelines range. To this end, the plea agreement specifically provides that the government "will take no position concerning *where within the Guidelines range determined by the Court* the sentence should fall." *See* Plea Agreement ¶ 11(b) (emphasis added). Thus, if the Court were to determine that the appropriate range is lower than that estimated in the agreement,[2] the government would be barred from arguing for a 37-46 month sentence. Doing so at this juncture, it follows, constitutes a breach in itself.

Nor are the arguments in the government's sentencing submission relevant to determining the operative Guidelines range. Indeed, the government does not even discuss the offense level applicable to Mr. Persico's crime of conviction or how one arrives at a 37-46 month range. It merely declares summarily that this is the range the agreement contemplates. *See* 1/19/15 Ltr. at 2.

The government's submission thus appears to be written solely in an effort "to influence the court in a manner incompatible with the agreement." *U.S. v. Griffin*, 510 F.3d 354, 361 (2d Cir. 2007), abrogated in part on other grounds, *Puckett v. U.S.*, 556 U.S. 129 (2009). That the submission purports to seek only a sentence within the 37-46 month Guidelines range – and not an upward departure (*see* 1/30/15 Ltr. at 2) – fails to "insulate" the government "against a finding of breach." *U.S. v. Vaval*, 404 F.3d 144, 153 (2005).

---

[1] At the last court appearance, the government took pains to stress that it was *not* requesting a *Fatico* hearing, presumably realizing that advocating to Your Honor that it could prove additional crimes would breach the agreement. *See* 10/30/14 Tr. at 3.

[2] This prospect is by no means fanciful. To the contrary, the Court found co-defendant Petrizzo's Guidelines range to be lower than that estimated in his plea agreement. And the range the Court found applicable to co-defendant Preza, who pleaded guilty to financing the same loan at issue here, was 10-16 months – significantly lower than the estimate for Mr. Persico.

Given the sensational nature of the government's claims – including that it can prove Mr. Persico's involvement in murder – any suggestion that it is simply advocating for a Guidelines sentence, and not attempting to signal where within the range the sentence should fall, "r[i]ng[s] hollow." *U.S. v. Heredia*, 768 F.3d 1220, 1224 (9th Cir. 2014). This is especially true where, as here, (1) the extrinsic activity it urges the Court to consider has no impact on the Guidelines determination[3]; (2) Mr. Persico has yet to request or advocate for any specific sentence; and (3) the government adamantly refused to retract its explosive statements to Probation, and refrain from repeating them to the Court, even if the defense agreed not to seek a below-Guidelines sentence. *See* 1/21/15 Ltr. at 4 n.3; *see also* Shechtman Aff. (Ex. A) at 4, ¶ 12.

Equally implausible is the notion that the government did not breach the agreement because "not a single statement" in its letter "advocate[ed] for an upward departure or a particular sentence within the Guidelines range." 1/19/15 Ltr. at 3. After all, the prosecutors' similar claims to Probation led it immediately to broach an upward departure under USSG § 5K2.0. *See* PSR ¶¶ 38, 39, 119.

More precisely, the government's letter – responsive to no sentencing submission from the defense – pejoratively alleges that, relative to the offense of conviction, Mr. Persico was "able to make loansharking loans – and to expect to obtain repayment of these loans – because of his position as a powerful associate in the Colombo organized crime family of La Cosa Nostra." 1/19/15 Ltr. at 3. The letter continues by unnecessarily embellishing: "Loansharking is a staple LCN crime that allows the Colombo family and other LCN crime families to thrive, and that often results in violence or threats of violence." *Id.* It also provocatively comments: "This is a serious crime committed under the auspices of a powerful, violent criminal enterprise." *Id.*

The letter goes on to say that the government is prepared to prove "the defendant's history" includes "participation" in many additional crimes, among them racketeering, the murder of Joseph Scopo, loansharking, extortion and conspiracy to acquire and sell stolen video games. *Id.* In recounting this putative history, the letter pejoratively describes Mr. Persico "as a long-time associate of

---

[3] *See* PSR ¶ 38 (additional offenses government says it can prove "cannot be considered in the guidelines calculations for the count of conviction").

the Colombo family," at times "involved in managing [its] members and associates." *Id.* It then reiterates gratuitously: Loansharking and extortion "are staples of organized crime and – because they are difficult to commit without the protection of an organized crime family – reflect the defendant's role in the Colombo family." *Id.* The letter also offers – again superfluously – that Mr. Persico's alleged participation in selling stolen video games "indicat[es] that he has been willing to profit not just from the staple crimes of the Colombo family but also from the wide variety of crimes committed by its members and associates as opportunities arise." *Id.*

The letter then reemphasizes the "serious" nature of the offense, needlessly opining that "the defendant's additional crimes indicate … he lacks respect for the law." *Id.* Finally, it asserts that Mr. Persico requires "adequate deterrence" and that "the public" needs protection from his "further crimes." *Id.* It closes by exhorting, in still more incendiary language: "Because the defendant has committed crimes over a long period of time, he is in need of specific deterrence," and the Court should "send a message to others in defendant's position, or who are considering embarking on a life of crime, and can discourage them from doing so." *Id.* at 4.

Tellingly, the government made these statements to the Court having already apprised Probation of the additional conduct imputed to Mr. Persico. *See* PSR ¶¶ 11-12, 14-15, 38-40, 119. And even if the agreement allowed the government to provide "information" regarding additional, significantly more serious conduct, it unequivocally prohibits the prosecutors from *advocating* to the Court, by "pejorative editorializing," that it can *prove* such conduct. *Heredia*, 768 F.3d at 1233.

Thus, in "repeatedly" and "unnecessarily" highlighting Mr. Persico's alleged criminal history – including his supposed involvement in murder – and "adding for good measure" bombshell accusations designed solely to "influence" the court to "impose a harsher sentence," the government has at least "*implicitly* ma[de] a sentencing recommendation." *Id.* at 1224, 1232 (emphasis added). This it is unquestionably forbidden to do. *Id.*

Case 17-2791, Document 25-5, 09/12/2017, 2122149, Page17 of 204




Courts routinely reject arguments like those the government musters in response, finding that far less inciting statements violated agreements the government knowingly entered and defendants reasonably relied on in deciding to plead guilty.

In *Vaval*, for example, the defendant pleaded to scheming to rob and carjack an illegal gun buyer who was actually a government informer carrying federal funds. 404 F.3d at 148. The offense of conviction had a 135-168 month Guidelines range, and the parties executed an agreement materially mimicking Mr. Persico's. *Id.* at 149. First, based on information known at the time of the plea, the government promised to "make no motion for an upward departure" and "take no position concerning where within the Guidelines range determined by the Court the sentence should fall." *Id.* Second, the government nonetheless reserved the right to "advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant." *Id.*

Though the government disavowed any intent to seek an upward departure or recommend a "particular [sentence] within the Guidelines range," the Second Circuit found that "some of its statements did not fall within th[e] category of permissible behavior" and held it in breach. *Id.* at 150. For one thing, the government characterized Vaval's criminal history as "appalling." *Id.* at 153. For another, it called his contrition "disingenuous." *Id.* But even Vaval's prosecutors did not go so far as to suggest to Probation or the Court that they could prove additional – and significantly more severe – unconvicted crimes on his part. Instead, they relied solely on Vaval's *prior convictions*, noting that "the guidelines preclude[d them] from looking at or calculating certain offenses … but certainly this is not this defendant's first or second offense." *Id.*

What's more, the facts regarding Vaval's alleged crimes – like those ascribed to Mr. Persico – had already been "fully canvassed … in the PSR, and at the trial of [Vaval's] co-defendant[ ] before the same judge." *Id.*[4] Thus, on the strength of *Vaval* alone, it follows inescapably that the government's statements

[4] The government's letter even acknowledges that "most" of the additional crimes it claims it can prove "were the subject of extensive testimony during the trial of co-defendant Francis Guerra" before this Court. *See* 1/19/15 Ltr. at 3.

here "serve[] no purpose other than to advocate that the court upwardly depart or impose a high sentence within the Guidelines range." *Id.* at 154.[5]

Likewise, the *Heredia* prosecutors also purported to recommend the sentence contemplated in the plea agreement. But written statements regarding the defendant's criminal "propensity," the need to "deter[]" him, his lengthy "criminal history" and "consistent disregard" for the law left the reader to "wonder" why the government thought the sentence it professed to endorse was "appropriate in the first place" – especially given its omission of any "mitigating information." 768 F.3d at 1234. Voiding the sentence imposed, the Ninth Circuit held that the government's "pejorative comments" about Heredia's "criminal history" and "prior offenses" served only to advocate a "harsher punishment" than the agreement prescribed. *Id.* While claiming to advocate the stipulated sentence, the Court made clear, the government breached the agreement by "*implicitly*" seeking something more. *Id.; cf. U.S. v. Moncivais*, 492 F.3d 652, 662 (6th Cir. 2007) (government must do more than pay "lip service" to its promises); *U.S. v. Saxena*, 229 F.3d 1, 6 (1st Cir. 2000) (prosecution can't make "end-runs" around its promises).

So too the Third Circuit held that the government's portrayal of defendant as "a major figure in organized crime" was a "transparent effort to influence the severity of [his] sentence." *U.S. v. Crusco*, 536 F.2d 21, 26 (3d Cir. 1976). Finding the prosecution in breach, the Court observed: "Only a stubbornly literal mind would refuse to regard the Government's commentary as communicating a position on sentencing." *Id.*; *cf. U.S. v. Hall*, 515 F.3d 186, 198 (3d Cir. 2008) ("a promise to take no position speaks to no attempt at all to influence the defendant's sentence").

---

[5] Importantly, the district court in *Vaval* remarked that it "understood" the defense concern about the government's "arguments," but found no breach because they "d[id] not change [its] view." 404 F.3d at 150. Yet the Second Circuit reversed anyway, "to avoid even the appearance of [ ] harm." *Id.* at 155. Here, the Court has candidly acknowledged that the prosecutors' illicit advocacy has affected its view, ordering a hearing based solely on the government's telling Probation it could prove several additional offenses by preponderant evidence. *See* 10/30/14 Tr. at 2, 4-5.

Similarly instructive is *U.S. v. Amico*, 416 F.3d 163 (2d Cir. 2005). There, the Second Circuit ruled that the government breached a plea agreement by adopting, in writing, findings in a revised PSR that proposed enhancements not envisioned in the plea agreement. *Id.* at 165. The government cured the breach, the Court said, only by "quickly" rescinding its "mild, brief and unassertive" comment, and repeatedly opposing the PSR's suggested adjustments. *Id.* At any rate, *Amico* noted, the government was "free" to argue in a manner "casting a pejorative light on the defendant and his criminal activity," as "nothing in the plea agreement [there] barred the government from forcefully advocating for a sentence at the top of th[e] range." *Id.*

Here, by contrast, the government has not only failed to remedy its earlier breach, but compounded it with its written submission. And since the agreement in this case *does* bar the government from taking any position on where within the guidelines range the sentence should fall, the "pejorative light" it casts on Mr. Persico and his alleged criminal history is a plain violation. As *Heredia* admonished, the government "may not superficially abide by its promise to recommend a particular sentence while also making statements that serve no practical purpose but to advocate for a harsher one." 768 F.3d at 1231; *see also U.S. v. Mondragon*, 228 F.3d 978, 979-80 (9th Cir. 2000) (statements concerning defendant's prior crimes, even if invited by claim that they were "petty," rehashed facts already contained in PSR and merely sought to induce a "harsher sentence"); *U.S. v. Whitney*, 673 F.3d 965, 970-972 (9th Cir. 2012) (remarks unnecessary to "justify" government's low-end guidelines recommendation where no indication court was considering a lesser sentence).

Finally, nothing in 18 U.S.C. § 3661 or any other source compels the government to offer proof of additional crimes within its claimed knowledge. First, though many of Mr. Persico's co-defendants pleaded guilty to offenses far less serious than those charged, the government never told Probation or the Court it could prove additional misconduct as to them. *See* 1/21/15 Ltr. at 2 n.1. The government provides no explanation for this stark discrepancy. Second, while its sentencing submission for co-defendant Bombino indicated that it could link him to several additional crimes "beyond a reasonable doubt," the government declined to do so "*for strategic reasons, including the desire not to expose its cooperating witnesses and evidence*." ECF 431 at 3 (emphasis added). This despite the fact

that Bombino's additional crimes constituted "relevant conduct" directly impacting his Guidelines calculation. *See id*.; Bombino PSR. Moreover, the government in Bombino's case, unlike this one, offered "mitigating" information to support a reduced sentence. ECF 431 at 3. And neither the Court nor the government invoked § 3661 to suggest that prosecutors *must* present all known information regarding the defendant. Nor did the Court require a *Fatico* hearing or delay sentencing. Indeed, even in Mr. Persico's case, the government has tacitly refrained from offering evidence – or conceded its insufficiency – of crimes it previously told Probation it could prove by a preponderance. *Compare* PSR ¶¶ 38-40 *with* 1/19/15 Ltr. at 3.

For all these reasons, the government's advocacy before the Court continues to breach the agreement, demanding repair.

**B. The Government's Own Sentencing Letter Demonstrates that Mr. Persico's Understanding of His Plea Agreement Was Reasonable**

The government studiously ignores our next point: its letter *expressly adopts* the defense understanding of the conduct permitted by the plea agreement, proving beyond doubt that the defense had no inkling its understanding was mistaken. *See* 1/19/15 Ltr. 2 (quoting defense counsel's plea hearing statement of understanding – "we will be advocating for a sentence below the Guideline range").

During the plea hearing, defense counsel announced that Mr. Persico was operating under two specific understandings in accepting the government's offer. First, he was getting coverage for all crimes that the government had been investigating as to him. Second, to clarify any ambiguity as to what the parties could argue at sentencing, counsel explained: "Our understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall. Of course, we will be advocating for a sentence below the Guidelines." Plea Tr. at 27.

The government addressed *only* the first understanding, not the second, stating in response: "The agreement is the agreement and we have in no way represented that Mr. Persico is getting coverage for every single crime the federal

government believes he may have committed…. [The] list [in paragraph 11] is exactly what the defendant is receiving coverage for, no more and no less, just that list." *Id.* at 27-28.

Nothing in the government's retort even hinted that the defense understanding as to what the parties could and could not do at sentencing was inaccurate. Undeniably, then, a "'plausible interpretation'" of the plea agreement was that, apart from requesting a Guidelines sentence, "'the Government would make no comment to the sentencing judge, either orally at sentencing or in writing prior to sentencing, that b[ore] in any way upon the type or severity of the sentence to be imposed.'" *U.S. v. Carbone*, 739 F.2d 45, 46-47 (2d Cir. 1984) (quoting *U.S. v. Corsentino*, 685 F.2d 48, 51 (2d Cir. 1982)). And even were the government's interpretation also reasonable, the tie would go to Mr. Persico, as "courts construe plea agreements strictly against the Government" as drafter. *U.S. v. Mergen*, 764 F.3d 199, 208 (2d Cir. 2014) (construing agreement in defendant's favor where his and government's interpretation both plausible). *A fortiori*, Mr. Persico's understanding prevails and must be "enforce[d]." *Stern v. Shalala*, 14 F.3d 148, 150 (2d Cir. 1994).[6]

**C. Conclusion**

The government has indisputably violated the agreement in this case as Mr. Persico reasonably understood it, dictating withdrawal of his plea or transfer to an untainted judge for sentencing.

## II. THE PLEA ALLOCUTION WAS INSUFFICIENT

The government fails to engage the merits of our renewed motion to withdraw Mr. Persico's plea for factual insufficiency. Instead, it construes the motion as seeking reconsideration and urges denial accordingly. *See* 1/30/15 Ltr. at 3-4. In taking this tack, the government overlooks that the Court's Rule 11 obligation to determine if a plea's factual basis suffices continues "*until it has*

[6] Co-counsel operated under the same understanding expressed by Ms. Kedia and advised Mr. Persico accordingly, further confirming that his understanding was reasonable. *See* Shechtman Affirmation, Ex. A.

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page22 of 204




*entered judgment*." *U.S. v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998) (emphasis added). Where, as here, the factual basis is inadequate, the Court *must vacate the plea*. *Id. See also Libretti v. U.S.*, 516 U.S. 29, 38 (1995); *U.S. v. Gonzalez*, 420 F.3d 111, 133 (2d Cir. 2005). In any event, the government's own sentencing submission, along with additional case law, again shows that withdrawal is required in this case.

As previously discussed, the government's concession that Theodore Persico Jr. – the defendant's cousin and a "powerful captain in the Colombo family" (ECF 739 at 3) – was the beneficiary of the $100,000 loan he arranged makes it entirely unreasonable to infer that he intended to instill fear in the borrower.

Theodore Persico Jr.'s status as borrower also negates any inference that Mr. Persico understood the nature of the charge to which he pleaded. Indeed, the record reflects that he was never told such intent was necessary to convict. *See* 6/8/12 Tr.

The Seventh Circuit recently struck a guilty plea in similar circumstances, holding that the "complexity of the charge" – a "specific intent" crime – militated "against a finding that [defendant] understood exactly what he was pleading to." *U.S. v. Fard*, 2015 U.S.App. LEXIS 252, at *11 (7th Cir. Jan. 7, 2015) (citation and internal quotation marks omitted). So ruling, the court decided that, despite the defendant's age, intelligence and education, he could no better decipher intricate wire fraud elements than "an average juryperson." *Id.* at *12.

Finally, the plea founders because Mr. Persico also was not told that, to commit the charged crime, he had to *conspire* with another to make an extortionate extension of credit – not merely "arrange[] for someone to extend [a] $100,000 usurious loan," as he allocuted. 6/8/12 Tr. 23. As *Fard* instructs, "conspiracy 'is not a self-explanatory legal term or so simple in meaning that it can be expected or assumed that a lay person understands it.'" 2015 U.S.App. LEXIS 252, at *12 (quoting *U.S. v. Wetterlin*, 583 F.2d 346, 350 (7th Cir. 1978)).

For these reasons and those pressed earlier, Mr. Persico's plea is legally infirm and cannot stand.

Respectfully,

/s/

Marc Fernich

cc: All counsel (ECF)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 0 2 2015 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x
UNITED STATES OF AMERICA,

-against-

MICHAEL J. PERSICO,

Defendant.
----------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CR-147 (SLT)

**TOWNES, United States District Judge:**

In a memorandum and order dated October 29, 2014, and entered October 30, 2014—*United States v. Persico*, No. 10-CR-147 (SLT), 2014 WL 5502325 (E.D.N.Y. Oct. 30, 2014) (hereafter, "*Persico*")—this Court denied a motion by defendant Michael J. Persico ("Defendant" or "Mr. Persico") which sought to withdraw his guilty plea on the grounds (1) that the Government breached the Plea Agreement, (2) that there was no valid factual basis for his plea, and (3) that Mr. Persico was insufficiently informed about the nature of the charge to which he pled guilty. In a letter filed January 21, 2015, Defendant renews that motion, principally arguing that the Government's letter of January 19, 2015, which discussed Defendant's criminal history in the course of arguing that the Court should not impose a sentence below the guidelines range, violates the Plea Agreement. Defendant also requests reconsideration of the ruling that there was a sufficient factual basis for the plea and seeks an adjournment of a *Fatico* hearing scheduled for January 23, 2015.

In an order dated January 21, 2015, the Court granted that portion of the motion which requested adjournment of the *Fatico* hearing, rescheduling that hearing for March 3, 2015, at 10:00 a.m. The Court deferred decision on the remainder of the motion and gave the Government until January 26, 2015, in which to file a response. Having now received and

considered both the Government's response (the "Response") and Defendant's reply thereto (the "Reply"), the Court denies Defendant's motion in its entirety for the reasons set forth below.

## *BACKGROUND*

Since familiarity with *Persico* is assumed, this Court will only repeat those facts germane to the instant motion. Defendant was among nine defendants named in a 27-count superseding indictment (S-4) which was filed on February 9, 2012. Count One of the indictment alleged 25 racketeering acts, including two murders. Defendant was alleged to have been involved in one of these murders—the October 20, 1993, murder of one Joseph Scopo—and in the conspiracy to commit that murder. Defendant was also alleged to have participated in several other racketeering acts and was named in 14 other counts of the indictment. Most of the racketeering acts and counts in which Defendant was named involved extortion or conspiracies involving extortionate activities.

On June 8, 2012, shortly after jury selection commenced, Defendant pled guilty to a superseding information which charged Defendant with conspiracy in violation of 18 U.S.C. § 371. In a written plea agreement (the "Plea Agreement"), the Government promised (1) not to bring any "further criminal charges" against Defendant for his participation in various offenses, including all of the offenses with which he was charged in the superseding indictment (Plea Agreement, ¶ 11(a)); (2) to "take no position concerning where within the Guidelines range determined by the Court the sentence should fall" (*id.*, ¶ 11(b)); and (3) not to make any "motion for an upward departure under the Sentencing Guidelines" (*id.*, ¶ 11(c)).

During the course of the plea proceedings, Serita Kedia—one of two experienced, capable attorneys who represented Defendant—essentially attempted to orally modify the Plea

Agreement by placing on the record her "understanding" of portions of that agreement. Ms. Kedia stated, *inter alia*:

> [O]ur understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the guideline range or where within the Guideline range Mr. Persico should fall. That's entirely up to the Court. Of course, we will be advocating for a sentence below the Guideline range, but we understand, of course, and Mr. Persico understands that it's up to the Court to impose sentence here.

Plea Transcript, p. 27 (brackets added). Assistant United States Attorney Argentieri expressly refused to ratify Ms. Kedia's interpretation of the Plea Agreement, stating, among other things:

> [T]he reason why the agreement is in writing is because everything that we have agreed to is in the agreement, and the agreement is what controls. And I'm not going to stand here and modify verbally any part of the agreement.

*Id.* (brackets added).

During the plea allocution, the Court asked Defendant to briefly describe "what you did in connection with the offense that makes you guilty of the offense charged in the superseding Information." Defendant responded, "I arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate." *Id.*, p. 23. The Assistant United States Attorney subsequently added:

> [T]he government would ... be prepared to prove at trial that the extension of credit was made a[t] ... not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year, and that at the time that the loan was made, the two John Does who this defendant identified believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit

*Id.*, p. 24 (brackets added)).

When asked if there was anything else that the Court should inquire about, Ms. Kedia stated:

> The one thing I would say is, Your Honor went through the superseding Information, and it does charge the sole count of this 371 conspiracy, conspiracy to violate the extortionate extension credit. I recognize that it has several pages of extraneous language about the Colombo family that is not a part and parcel of the charge, and it is not something that Mr. Persico agrees to or is allocuting to here today.

*Id.*, p. 25. After some colloquy, in which the Government asserted that these allegations were not extraneous and the Court questioned whether it was necessary for Defendant to allocute to his involvement in the Colombo crime family, the Assistant United States Attorney stated:

> I don't think he has to allocute to it, Judge. I think it goes to what I said before, which is the perception by the victims that the defendant and his coconspirators—the defendant was an associate in the Colombo crime family. And his coconspirators reasonably believed at the time that they—that they would use—that these individuals would use extortionate means to collect an extension of credit. I don't think he has to specifically allocute to satisfy the 371 to being an associate in the Colombo crime family.

*Id.*, at 26.

***The Previous Motion***

On September 29, 2014—about five months after Marc Fernich replaced prior counsel for Defendant—Defendant moved to withdraw his guilty plea. Defendant principally argued that the Government breached paragraphs 11(b) and (c) of the Plea Agreement by engaging in overt sentencing advocacy before the Probation Department, telling the Probation Department it could prove by a preponderance of the evidence that Mr. Persico was involved in several additional significant crimes, including two murders. Defendant also argued, *inter alia*, that the Court was

incorrect in concluding that there was an adequate factual basis for the plea, as required by Rule 11(b)(3) of the Federal Rules of Criminal Procedure. Specifically, Defendant argued that his plea allocution established only that he committed the overt act charged in the superseding information, and that the record did not contain facts to establish that Defendant was involved in a conspiracy or that he possessed the requisite mental state.

The Court rejected both of these arguments. With respect to the first argument, the Court carefully examined the provisions of paragraph 11 of the Plea Agreement, noting that they unambiguously prohibited the Government from (1) taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall," and (2) making a "motion for an upward departure under the Sentencing Guidelines." The Court reasoned that the prohibited actions could only be taken before the Court, and that the Plea Agreement could not "reasonably be interpreted as prohibiting advocacy before the Probation Department prior to the drafting of the Pre-sentence Report." *Persico*, 2014 WL 5502325, at *7.

With respect to the second argument, the Court found there was an adequate factual basis for Defendant's plea. In the course of analyzing whether there was a basis for finding that Defendant acted with the requisite intent, the Court relied on *United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007), for the proposition that a defendant's state of mind "can reasonably be inferred from the terms of the loans that he extended." *Id.* at 71. Since Defendant admitted making usurious loans to Bombino and Marcus which, according to the Government, bore interest rates of 45 percent per annum, the Court concluded that there was a factual basis for finding that Defendant acted with the requisite intent.

Case 17-2791, Document 25-5, 09/12/2017, 2122149, Page29 of 204


***The Government's Sentencing Letter***

After handing down the decision denying Defendant's motion, the Court scheduled a *Fatico* hearing. On January 19, 2015, shortly before the scheduled date for that hearing, the Government submitted a four-page letter relating to sentencing (hereafter, the "Sentencing Letter"). That letter assumes—not necessarily correctly—that, because (1) the Government calculated that the Guidelines range will be 37 to 46 months, (2) Defendant stipulated to this calculation during the plea proceedings and (3) the Probation Department calculated the same range in its Pre-sentence report, the Court will also determine the Guidelines range to be 37 to 46 months. Sentencing Letter, p. 2. Citing to Ms. Kedia statement about seeking a sentence below the Guidelines range, the Government then argues that sentencing within that range would be appropriate. *Id.*

In support of that argument, the Government discusses, in four separate paragraphs, the "Nature and Circumstances of the Offense," "the History and Characteristics of the Defendant," and the need for the sentence to reflect "the Seriousness of the Offense" and to deter Defendant and others from future wrongdoing. In the first of these paragraphs, the Government states that Defendant provided "a loansharking loan" to "co-defendants James Bombino and Theodore Persico, Jr., as well as a third individual ...." *Id.*, pp. 2-3. The Government asserts that Defendant was able to make such loans and to expect repayment "because of his position as a powerful associate in the Colombo organized crime family," which the Government characterizes as "a powerful, violent criminal enterprise." *Id.*, p. 3. The Government further states that loansharking is a "serious crime" which allows the Colombo crime family to thrive and which "often results in violence or threats of violence." *Id.*

The second paragraph begins by citing to that portion of the plea proceedings in which Ms. Kedia stated that she intended to request a sentence below the Guidelines range. Assuming that Defendant's current counsel will employ a similar strategy, the Government argues "that a sentence below the Guidelines range would be inappropriate in light of the defendant's history and characteristics." *Id.* The remainder of the paragraph describes the proof of Defendant's prior crimes that the Government intends to offer at the *Fatico* hearing, noting that most of these crimes "were the subject of extensive testimony during the trial of co-defendant Francis Guerra"—a trial conducted before the Court in 2012. *Id.* In addition, most of the prior crimes described in that paragraph are the same crimes described in the Pre-sentence report.

The third paragraph consists of only two sentences. In the first, the Government cites to 18 U.S.C. § 3553(a)(2)(A) for the proposition that a sentence within the Guidelines range is necessary "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment." *Id.* The Government then states, "the offense of conviction is serious, and the defendant's additional crimes indicate that he lacks respect for the law." Sentencing Letter, p. 3.

The fourth paragraph cites to 18 U.S.C. § 3553(a)(2)(B) and (C) for the proposition that a sentence within the Guidelines range is necessary to afford adequate deterrence and to protect the public. The Government then concludes:

> Because the defendant has committed crimes over a long period of time, he is in need of specific deterrence. In addition, by imposing a sentence within the Guidelines range in this case, the Court can send a message to others in the defendant's position or who are considering embarking on a life of crime, and can discourage them from doing so.

Sentencing Letter, p. 4.

***The Instant Motion***

By letter dated January 21, 2015, Defendant raises several issues with respect to the Sentencing Letter. First, Defendant renews its motion to withdraw his guilty plea, arguing that the Sentencing Letter breaches the Plea Agreement. Defendant reads *Persico* as holding that the Government's statements to the Probation Department did not violate the Plea Agreement because that agreement proscribed "advocacy only before the Court," and asserts that "there is no dispute that the agreement bars the government from advocating before the Court." Letter to Hon. Sandra L. Townes from Marc Fernich, dated Jan. 21, 2015, p. 2. Defendant acknowledges that the Government claims to offer the proof of his prior crimes "simply to oppose a sentence '*below*' the stipulated 37-46 month guideline range," but argues that this is a "thin pretext that scarcely cures its breach." *Id.* (emphasis in original). Citing to *United States v. Griffin*, 510 F.3d 354, 361 (2d Cir. 2007), and other cases for the proposition that the Government cannot "insulate" itself from a finding that it breached the Plea Agreement by merely disavowing any intent to violate those provisions, Defendant urges the Court to find that the Sentencing Letter violated the Plea Agreement.

Second, Defendant argues that this Court should reconsider its finding that the Government "expressly rejected" Ms. Kedia's attempt to orally modify provisions of the Plea Agreement. Specifically, Defendant argues that the Government's reliance on Ms. Kedia's representation that Defendant would request a sentence below the Guidelines range somehow implies that the Government adopted, rather than rejected, Ms. Kedia's interpretation of the Plea Agreement. Defendant also argues that the Court must "enforce what 'the defendant reasonably understood the plea agreement to mean,'" and that "oral agreements can amplify ambiguous

terms." Letter to Hon. Sandra L. Townes from Marc Fernich, dated Jan. 21, 2015, p. 4 (citing *Stern v. Shalala*, 14 F.3d 148, 150 (2d Cir. 1994), and *United States v. MacPherson*, 590 F.3d 215, 223 (2d Cir. 2009)).

Third, Defendant argues that this Court should reconsider its finding that Defendant's plea had an adequate factual basis. That argument has two components. First, relying on a trio of Sixth Circuit cases—*United States v. McCreary-Redd*, 475 F.3d 718, 724 (6th Cir. 2007); *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995); and *United States v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988)—Defendant argues that courts are not permitted to draw reasonable inferences with respect to a defendant's state of mind in deciding whether a factual basis for a plea exists. Second, Defendant argues that even if courts were permitted to draw such inferences, it would be inappropriate to do so in this case since the Sentencing Letter discloses that the allegedly usurious loan was extended to a group of people who included Theodore Persico, Jr.—a captain in the Columbo crime family.

## ***DISCUSSION***

Defendant's first argument—that the Sentencing Letter violates the Plea Agreement—misinterprets *Persico*. In that memorandum and order, the Court emphasized that "[p]lea agreements are interpreted in accordance with contract law principles," which dictate that a court not "impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Persico*, 2014 WL 5502325, at *5. The Court then looked to the language of paragraph 11 of the Plea Agreement, and found that it unambiguously prohibited the Government from (1) taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall," and (2) making a "motion for an upward departure under the

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page33 of 204


Sentencing Guidelines." *Id.*, at *7. The Court reasoned that since these prohibited actions could only be taken before the Court, paragraph 11 could not violated through disclosures to the Probation Department, which were then incorporated into the Pre-sentence Report. *Id.* In other words, since the Plea Agreement prohibited "advocacy only before the Court, ... advocacy before the Probation Department" could not violate the Plea Agreement. *Id.*

Quoting to that portion of *Persico* which noted that the Plea Agreement prohibited "advocacy only before the Court," Defendant asserts "that there is no dispute that the agreement bars the government from advocating before the Court." Letter to Hon. Sandra L. Townes from Marc Fernich, dated Jan. 21, 2015, p. 2. That assertion is not only disputed, but inaccurate. The Plea Agreement does not prohibit the Government from engaging in *all* advocacy before the Court. Rather, it proscribes certain types of advocacy: (1) taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall," and (2) making a "motion for an upward departure under the Sentencing Guidelines." *Persico*, 2014 WL 5502325, at *7.

The Sentencing Letter does not engage in either type of prohibited advocacy. That paragraph anticipates, based on statements made by Ms. Kedia, that Defendant's current counsel will advocate for a below-Guidelines sentence. It then seeks to rebut that argument by offering various reasons why a sentence within the Guidelines range would be appropriate. Although the Sentencing Letter characterizes Defendant "as a powerful associate" in "a powerful, violent criminal enterprise," who pled guilty to a "serious crime" which "often results in violence or threats of violence" and who has demonstrated that he "lacks respect for the law" by committing "crimes over a long period of time," the Sentencing Letter repeatedly states that sentencing

within the Guidelines range would be appropriate. It takes no a position concerning where within the Guidelines range the sentence should fall or requests a sentence above the Guidelines range.[1]

This Court acknowledges that the Second Circuit has stated that, where the Government appears to seek to influence the court in a manner incompatible with the plea agreement, it "will not hesitate to find a breach, notwithstanding formal language of disclaimer." *United States v. Griffin*, 510 F.3d 354, 361 (2d Cir. 2007) (quoting *United States v. Amico*, 416 F.3d 163, 167 n. 2 (2d Cir. 2005)). Under the circumstances of this case, however, the Court does not perceive the Sentencing Letter as an attempt to circumvent the terms of the Plea Agreement. First, the Government had no need to persuade this Court to consider sentencing Mr. Persico above the Guidelines range since this Court, on its own initiative, ordered a *Fatico* hearing more than two months before the Sentencing Letter was even written. Second, the Government had no need to invent a pretext in order to inform the Court of Mr. Persico's involvement in the Colombo crime family, that crime family's reputation, or Defendant's criminal history. That information has

---

[1]In his Reply, Defendant argues that the Government violated the Plea Agreement by urging the Court to impose a sentence "within the advisory Guidelines range of 37 to 46 months." Sentencing Letter at 1, 4. Defendant argues that, because the Court has yet to determine the Guidelines range, urging the Court to impose a sentence between 37 and 46 months might later prove to violate paragraph 11(b) of the Plea Agreement, which prohibits the Government from taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall." This argument is premature. Furthermore, even assuming that the Court were later to determine that the Guidelines range was lower than 37 to 46 months, this violation of the Plea Agreement would be so "technical" as to not require a remedy. *See, e.g.*, *United States v. Paradiso*, 689 F.2d 28, 30-31 (2d Cir. 1982) (no remedy was required for a technical violation by the court of a binding plea agreement). It is clear from the Sentencing Letter that the Government is advocating a sentence within the Guidelines range, and merely assumes that the Court, like everyone else, will determine that the range is 37 to 46 months.

already been placed before the Court in the trial of Defendant's co-defendant, Francis Guerra; in Defendant's plea proceedings; and in the Pre-sentence Report. Moreover, the Court is likely to hear evidence substantiating these same facts at the upcoming *Fatico* hearing. Accordingly, the Government has no need to use any type of subterfuge to place these facts before the Court.

Defendant's second argument—that this Court should reconsider its finding that the Government "expressly rejected" Ms. Kedia's attempt to orally modify provisions of the Plea Agreement because the Government credited Ms. Kedia's contemporaneous statement that Defendant intends to seek a below-Guidelines sentence—is illogical and unpersuasive. Although Ms. Kedia announced her intention to seek a below-Guidelines sentence immediately after expressing her understanding of the Plea Agreement, her intentions were independent of her understanding of the Plea Agreement. The Government could fully credit Ms. Kedia's statement of intent while completely rejecting her attempt to orally modify the Plea Agreement. Accordingly, the fact that the Sentencing Letter anticipates that Defendant will seek a below-Guidelines sentence in accordance with Ms. Kedia's statement of intent does not imply that the Government now adopts Ms. Kedia's understanding of the Plea Agreement.

In addition, even if the Government had not expressly rejected Ms. Kedia's interpretation of the Plea Agreement, evidence of the parties' intentions would have been irrelevant because paragraph 11 is unambiguous. As the Court noted in *Persico*, "[i]f a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Persico*, 2014 WL 5502325, at *5 (quoting *Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004)). "To be sure, extrinsic evidence can illuminate the meaning of ambiguous contract

terms." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124 (2d Cir. 2013). However, when a contract is unambiguous, "the court is not to consider any extrinsic evidence as to the parties' intentions." *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).

The first portion of Defendant's third argument—which relies on a trio of Sixth Circuit cases in arguing that the Court erred in drawing an inference with respect to Defendant's state of mind—essentially seeks reconsideration of the Court's finding that Defendant's plea had an adequate factual basis. Preliminarily, this Court notes that "[n]either the Federal Rules of Criminal Procedure nor the Local Criminal Rules expressly provide for reconsiderations." *United States v. Natal*, No. 3:12-CR-164 (JBA), 2014 WL 5361469, at *3 (D.Conn. Oct. 21, 2014) (quoting *United States v. Reyes*, No. 3:10-CR-120 (VLB), 2013 WL 1882305, at *1 (D.Conn. May 3, 2013)). However, some district courts in this Circuit have read *United States v. Clark*, 984 F.2d 31 (2d Cir. 1993)—a case which held that a motion to reconsider the denial of a motion pursuant to 28 U.S.C. § 2255 should be treated as a motion pursuant to Rule 59(e) or 60(b) of the Federal Rules of Civil Procedure—as implying that motions for reconsideration "may be filed in criminal cases and are governed by the standards applied to their civil analogues." *See, e.g.*, *United States v. Little*, No. 12-CR-647 (ALC), 2014 WL 3604417, at *1 n. 1 (S.D.N.Y. July 16, 2014). Other courts in this district and in the Southern District of New York have applied the standard set forth in Local Civil Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York without expressly relying on *Clark*. *See, e.g.*, *United States v. Cean*, No. 11 CR 449 (SJ), 2014 WL 1832963, at *1 (E.D.N.Y. May 8, 2014) (noting that courts in this district have applied the standard of Local Rule 6.3 when addressing motions for reconsideration in criminal cases); *United States v. Yannotti*, 457 F. Supp. 2d 385, 388 (S.D.N.Y. 2006) (noting that "motions for reconsideration in

criminal cases have traditionally been allowed within the Second Circuit" and that "district courts have applied the standard found in Rule 6.3 of the Local Civil Rules" to such motions).

The standard for reconsideration in civil cases is "strict." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Under this standard, a motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id.* Local Civil Rule 6.3 reflects this standard, requiring that the party requesting reconsideration file "a memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked."

In this case, Defendant seeks reconsideration based on (1) out-of-Circuit cases, one of which was actually cited by this Court in *Persico* and (2) facts of which the Court was already aware. First, Defendant cites to three Sixth Circuit cases: *McCreary-Redd*, *Tunning*, and *Goldberg*. The cases are not controlling upon this Court, and none of the three has ever been cited—much less followed—by the Second Circuit.

Second, this line of Sixth Circuit cases was not overlooked. Indeed, *Persico* cited to *Tunning*, albeit for a different proposition of law. This Court read the entirety of that Sixth Circuit opinion and was aware that it contains the following sentence:

> Although we agree that a rational fact finder could infer an intent to defraud from such evidence, in the context of a challenge to the factual basis supporting a guilty plea, we have previously rejected a request by the government to infer a "critical element" of the offense charged.

*Tunning*, 69 F.3d at 113 (*Goldberg*, 862 F.2d at 106). However, after reading *Goldberg* itself, the Court interpreted this sentence as dictum, not as espousing a black-letter rule prohibiting a

court from inferring intent in the course of determining whether there exists a factual basis for a guilty plea.

In *United States v. Goldberg*, 862 F.2d 101 (6th Cir. 1988), a physician pled guilty to misprison of a felony in connection with a fraudulent scheme in which a pharmacist would add items to the physician's prescriptions. One of the elements necessary to sustain a conviction for this crime was that the physician "took affirmative steps to conceal the crime" of the pharmacist. However, while the physician admitted during the plea proceedings that he knew of the pharmacist's actions and concealed his knowledge of those actions, no one adduced evidence at the plea proceeding that the physician engaged in any affirmative steps to conceal the crime.

Faced with this deficient record, the prosecution urged the court to infer the affirmative steps from the fact that the physician was highly educated and adequately represented. As the Sixth Circuit understood it, the Government argued that one could infer from these facts that when the doctor stated that he had "concealed his knowledge," he "meant that he had 'actively' concealed his knowledge, thereby satisfying the critical element in the offense of misprision of a felony, i.e., that [he] took affirmative steps to conceal the crime of the principal." *Id.* at 106 (brackets added). The Sixth Circuit rejected this argument, stating,"to permit the district court to infer a factual basis in the absence of a record demonstrating the existence of a factual basis would tend to negate the well-established safeguards inherent in the Rule 11(f) mandate." *Id.*

In *United States v. Tunning*, 69 F.3d 107 (6th Cir. 1995), the defendant entered an *Alford* plea to a violation of 18 U.S.C. § 1029(a)(2), a statute which "makes it a crime if someone 'knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page39 of 204


more during that period.'" *Id.* at 112. To establish the defendant's guilt of this crime, "the government needed to establish that Tunning had the intent to defraud both when he obtained the [access device] and when he used [it] to obtain goods or services." *Id.* at 113 (brackets added). However, while the Government asserted at the plea proceedings that "[t]here were a variety of facts and circumstances surrounding the entire indictment that would have gone to the issue of intent," the Government relied on "bare assertions ... that evidence at trial would have established certain facts," without offering "any indication of what evidence support[ed] those facts." *Id.* at 114 (brackets added). Noting that "a bare statement from the prosecutor that he would have proven that the defendant acted with the intent to defraud does not ensure 'through some evidence' that the plea is accurate," the Sixth Circuit held "that where ... the defendant pleads guilty but refuses to admit to conduct that demonstrates a factual basis for the plea, if the government undertakes to establish the factual basis by reciting what facts it would have proven at trial, the prosecutor must also identify the evidence it has to prove those facts." *Id.*

In *United States v. McCreary-Redd*, 475 F.3d 718 (6th Cir. 2007)—another case cited by Defendant—the Sixth Circuit relied on *Goldberg* and *Tunning* in finding that a plea allocution failed to establish that the defendant possessed drugs with intent to distribute them. During the plea, the Government did not make any statements regarding the offense or the intent element of the drug charge and the district court never asked McCreary-Redd to state, in his own words, what he believed to be the crime he committed. *Id.* at 723. Rather, the finding of intent to distribute rested solely on a stipulation that "officers recovered a vial attached to McCreary-Redd's key chain which contained ... approximately 3.0 grams [of crack cocaine] that was individually wrapped and packaged for resale." *Id.* (brackets and ellipsis added). Noting

that McCreary-Redd was apprehended while exiting a building in a neighborhood with illegal drug activity, the Sixth Circuit found that "one could equally conclude that McCreary-Redd had just purchased the substance, which would have been individually wrapped and packaged 'for resale,' for personal use," and that the stipulation did not permit the inference that McCreary-Redd intended to distribute the drugs. *Id.* at 724.

In this case, in contrast, the record contains facts permitting the inference that Mr. Persico acted with the requisite intent. During his plea allocution, Defendant stated that he "arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate." *Persico*, 2014 WL 5502325, at *3. The Government corroborated this statement—noting that the loan was made "at a rate of interest in excess of the annual rate of 45 percent per year"—and stated that Bombino and Marcus "believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit." *Id.* In light of Second Circuit case law holding that the requisite state of mind could "reasonably be inferred from the terms of the loans ... extended," *United States v. Lombardozzi*, 491 F.3d 61, 71 (2d Cir. 2007), the facts set forth during the plea proceeding were sufficient to provide a factual basis for Mr. Persico's plea.

The second portion of Defendant's third argument essentially argues that this Court should reconsider its finding that there was a legal basis for Defendant's plea because the Sentencing Letter discloses that the allegedly usurious loan was extended to a group of people who included Theodore Persico, Jr., a captain in the Columbo crime family. This Court recognizes that its "obligations under Rule 11(f) continue until it has entered judgment." *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998). However, the Court also recognizes that Fed.

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page41 of 204


R. Crim. P. 11 requires only that it determine whether there is a factual basis for the plea. Rule 11 "does not require the district court to weigh any evidence or predict what a jury would do with the case," *Smith*, 160 F.3d at 121, or "replicate the trial that the prosecutor and defendant entered a plea agreement to avoid." *United States v. Lumpkins*, 845 F.2d 1444, 1451 (7th Cir.1988).

Defendant's argument regarding the terms and recipients of the loan relies exclusively on facts which were not only not adduced at the time of the plea proceedings, but which are contrary to the facts that were adduced. First, Defendant's assertion that he made an open-ended loan to Theodore Persico, Jr., and his business partners is contrary to what he stated during his plea allocution: namely, that he arranged for a "loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate." Plea Transcript, p. 23. Similarly, the assertion that Theodore Persico's partners could not have been in fear of what would happen if they failed to repay the loan is contrary to the Government representations that it was "prepared to prove at trial that [Bombino and Marcus] believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit." *Id.*, p. 24. In order to determine which version of the facts is correct—the version set forth during the plea proceedings or the version now espoused by Defendant—this Court would essentially have to have to "replicate the trial that the prosecutor and defendant entered a plea agreement to avoid." *Lumpkins*, 845 F.2d at 1451.

***CONCLUSION***

For the reasons set forth above, Defendant's renewed motion to withdraw his plea of guilty and his motion for reconsideration of this Court's ruling that there was an adequate factual basis for that plea are denied.

**SO ORDERED.**

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: February 27, 2015
Brooklyn, New York

**U.S. PRETRIAL SERVICES AGENCY φ EASTERN DISTRICT OF NEW YORK**

# PRETRIAL SUPERVISION STATUS REPORT

| Name of Defendant: | | |
|---|---|---|
| **Persico, Michael J.** | | |
| **Presiding Judge:** Honorable Dora L. Irizarry | **Date of Hearing:** January 20, 2017 | **Type of Hearing:** Sentencing |
| **Docket Number:** 10-cr-0147-005 | **Date of Initial Appearance:** March 9, 2010 | **Date of Release:** May 19, 2010 |

## SUMMARY OF RELEASE INFORMATION:

The defendant was arrested on March 9, 2010, by agents of the Federal Bureau of Investigations, having been indicted on charges of Racketeering Conspiracy, in violation of Title 18 U.S.C. § 1961, Wire Fraud Conspiracy, in violation of Title 18 U.S.C. § 1349, and Extortion Conspiracy (2 counts), in violation of Title 18 U.S.C. § 1951(a), and Attempted Extortion (2 counts), in violation of Title 18 U.S.C. § 1951(a). He made an initial appearance before Magistrate Judge James Orenstein and an order of detention was entered. On March 29, 2010, at bail review hearing before the Honorable Sandra L. Townes, the appeal of Judge Orenstein's bail decision was upheld based on dangerousness to the community.

Following an appeal to the Second Circuit and the District Court's bail decision vacated, the defendant appeared before the Honorable Carol B. Amon on May 18, 2010, and a $5 million bond with conditions was set. The defendant was released on the following day on the aforementioned bond, secured by property, and coupled with the following conditions: pretrial supervision include home detention with location monitoring with authorized exceptions for court appearances, attorney visits, medical emergencies, and to escort his children to and from school; passport restrictions; prohibited contact with members or associates of organized crime, anyone named in the indictment, victims, or potential witnesses; prohibited cellular phone usage; and subject to random home and employment contacts. Furthermore, the defendant consented to Title 3 consensual recordings of his home telephone line and he was directed to provide Pretrial Services with a list of recurring visitors to his residence.

On December 6, 2010, home detention with location monitoring was removed from the bond conditions as well as the telephone monitoring and cellular phone restriction. On June 29, 2012, the monetary amount of the bond was reduced to $3 million and the conditions were modified to permit all communication with Daniel Persico, Sean Persico, Frank Leone and telephone contact with Carmine Persico and Alphonse Persico and the travel limitations were expanded to the continental United States. On June 8, 2012, before the Judge Townes, the defendant plead guilty to a single count of a Superseding Information to the charge of Extortionate Extension of Credit Conspiracy, in violation of Title 18 U.S.C. § 371.

**COMPLIANCE WITH RELEASE CONDITIONS:**

Since his release in May 2010, the defendant appears to have complied with the above noted release conditions. The defendant, required to report in-person on a monthly basis, has done so when directed. Pretrial Services is not aware of any violations of his travel, association, or passport prohibitions. A check with federal, state and local authorities revealed no new arrests incurred during supervision.

**UPDATED SOCIAL INFORMATION:**

The defendant continues to reside in a private home at 1202 77th Street, Brooklyn, New York 11228, for the past eighteen years with his two daughters. He had been self-employed with ownership interests in several businesses and rental properties but has since sold his interests and is financially supported by recurring royalty payments. Pretrial Services is unaware of neither any physical or mental health nor substance abuse issues that require evaluation or treatment.

**VERIFICATION OF COMMUNITY TIES:**

The defendant's community ties have been verified through community contacts to his residence as well as submission of bank statements and various correspondences addressed to the defendant at the address of record.

**ADJUSTMENT TO SUPERVISION:**

The defendant appears to have satisfactorily adjusted to supervision. He has held stable residence and employment, for a period of time, throughout the course of supervision and has not incurred any supervision violations.

**CRIMINAL RECORD CHECK:**

A check with federal, state and local authorities revealed no new arrests incurred during supervision. It also revealed no known wants or warrants.

**REASSESSMENT OF RISKS:**

It appears the defendant's consistent reporting pattern and verifications of his community ties have reduced any possible risks of flight.

***Risks of Non-Appearance:***

Aside from the nature of the offense charged, there are no additional factors that indicate the defendant would pose a risk of non-appearance.

***Risks of Danger:***

There are no additional factors, aside from the nature of the offense charged, that indicate the defendant would pose a risk of danger to the community.

**CONDITIONS TO CONSIDER AT SENTENCING:**

Pretrial Services believes this defendant is a suitable candidate for voluntary surrender if a period of incarceration is imposed by the Court.

**REQUEST TO MODIFY CONDITIONS OF RELEASE:**

Pretrial Services is not aware of any modifications of the defendant's release conditions that are necessary at this time.

**COMMENTS:**

The defendant has been cooperative and exhibited a pleasant demeanor when interacting with this officer during office and community contacts and telephone conversations.

**Submitted by:**

**Robert Long III**

**U.S. Pretrial Services Officer**

**Approved by:**

**Daisy Toscano**

**Supervising U.S. Pretrial Services Officer**

**Date:** **January 13, 2017**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 10-CR-147(DLI)

Plaintiff , :

United States Courthouse

-against- : Brooklyn, New York

MICHAEL PERSICO, :

June 3, 2016

Defendant. : 2:30 o'clock p.m.

\- - - - - - - - - - - - - X

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE DORA L. IRIZARRY
UNITED STATES CHIEF DISTRICT JUDGE.

APPEARANCES:

For the Government: ROBERT L. CAPERS
United States Attorney
BY: ALLON LIFSHITZ
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: MARC A. FERNICH, ESQ.
810 Seventh Avenue, Suite 620
New York, NY 10019

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: Criminal cause for status conference, docket number 10-CR-147, United States versus Michael Persico.

Please state your appearances.

MR. LIFSHITZ: Allon Lifshitz for the United States. Good afternoon, Your Honor. And seated at counsel table are Special Agent Chance Adam with the Federal Bureau of Investigation.

THE COURT: What is last name?

MR. LIFSHITZ: Adam, A-D-A-M. And next to him is United States Probation Officer Mary Ann Betts.

THE COURT: Good afternoon to all of you.

THE PROBATION OFFICER: Good afternoon.

MR. ADAM: Good afternoon.

MR. FERNICH: Good afternoon, Your Honor. Mark Fernich for Mr. Persico who is beside me.

THE COURT: Good afternoon to both of you. I am going to ask everyone to be seated and speak into the microphone so we can all be heard.

So, as everyone is aware, this case had initially been pending before Judge Townes. The case had been reassigned to me and I did ask, according to my practice, for the parties to submit objections to the presentence report according to my practice which basically just incorporates Rule 32 of the Federal Rules of Criminal Procedure.

So what I would like to do first today is to address

those objections which have been responded to by Probation by way of an addendum. I assume everyone has received a copy of the addendum to the presentence report. Am I correct about that?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: Mr. Fernich?

MR. FERNICH: Yes, Your Honor.

THE COURT: Okay. The addendum is rather detailed and perhaps it will be helpful to the parties if you have a copy of it with you.

Starting on page three, what Probation did was that it enumerated separately after a discussion the various changes to the presentence report that it intends to make. By and large, I concur with the changes that have been made to the presentence report by Probation. In some parts, Probation has adopted the corrections that have been suggested by the government and by defense counsel and in some cases, it has rejected some of the corrections that have been submitted. Probation also made some additional corrections on its own.

So, beginning with those changes, on page one or the face page, as Probation is calling it, the only change I am submitting is that I am now Chief Judge so that change will be made. It also includes the name of Mr. Fernich as new counsel who came into the case after the presentence report had been disclosed. It incorporates the additional information

provided by both the government and defense counsel concerning dispositions of co-defendants in this case.

With respect to paragraphs 14, 15 and 38, it adds that with respect to these paragraphs concerning the murder of Joseph Scopo, that the defendant was involved in the murder by assembling part of the murder crew, ordering the murder participants to carry out the murder before Alphonse Persico was released from prison and arranging for the firearms used in the murder and the reference to the murder of Michael Devine is removed. It says from this paragraph but since it is referring to multiple paragraphs, I think it's clearer to say it is removed from paragraph number 38 which is where that reference appears.

Also, with respect to paragraphs 25, 30, 31 and 32, the government stated that while it believes that the defendant engaged in the conduct described in those paragraphs, if this case proceeds to a Fatico hearing, that it would not present evidence concerning the extortion of Testa and a furniture store owner and so the government did not object to the removal of those paragraphs. So, paragraphs 25, 30, 31 and 32 should be removed.

Now, perhaps this might be a good point. I do not want to digress too much on the Fatico issue which I would really like to discuss more after we get done addressing the objections to the presentence report. It is not clear to me

from that statement that was made by the government that if there is no Fatico hearing, that the government would still stand by the proposition that it could prove that by a preponderance of the evidence.

MR. LIFSHITZ: Your Honor, we will certainly not seek to prove it. We could -- some of those were charged crimes in the indictment. We could prove them had there been a trial. We're not seeking to prove them now. We don't intend to seek to prove them in any sentencing appearance before Your Honor.

THE COURT: Okay.

MR. LIFSHITZ: I'm not denying that the events occurred, but we're not asking the Court to find them and we certainly do not object to striking the paragraphs.

THE COURT: Okay. I just wanted that clarification.

So, with that clarification, then those paragraphs that I enumerated, 25, 30, 31 and 32 are removed.

Paragraph 39 Probation is removing for a similar reason.

Paragraph 40. All references of defendant's alleged involvement in crimes against Testa and the murders of LaLima and Black are removed. Again, this is for the same reasons that were addressed previously.

On paragraph 46, all references to the defendant in the paragraph are removed.

With respect to paragraph 59, that is with respect to Bombino and the acts that he was alleged to have done as to various Colombo crime family members which included the defendant. The defendant's name shall be removed. Again, the government indicated that it would not be seeking to prove that at any hearing and with the clarification that was just made, that reference should be removed. All the other references remain intact.

The Court agrees with the change proposed by Probation in paragraph 77 and 78 concerning his arrest as additional information was received from the defendant concerning what was listed as another arrest. Notably, it does not add any criminal history points to the defendant's criminal history which remains at 1.

As to paragraph 88, it includes some of the information provided from defense counsel with perhaps some of the advocacy type slant just indicating the change in his bond status, that he was initially detained and then subsequently released on a $5 million bond and so on with respect to other changes that were made to his bond conditions. That's fine.

Paragraph 95. The additional school records were provided by the defendant to show that he attended Kingsborough Community College in Brooklyn from September 1974 until June 1976.

There was no degree, correct, Mr. Persico?

THE DEFENDANT: Yes.

THE COURT: Paragraph 96. With respect to the defendant's ownership of Bella Luna Pizzeria in Brooklyn, counsel reported that the defendant sold his interest in the restaurant business. Although the sale amount was not specified, it seems that no other particulars were provided, although apparently he still has a one-third interest in the building that houses the restaurant and I believe he did not provide any information concerning whether or not he gets rent from his ownership of the building and the pizzeria's presence in the building. At least that information is not included in what's been drafted by Probation.

I gather Probation does not have that information?

THE PROBATION OFFICER: We do not have any further information.

THE COURT: Okay.

Paragraph 97. Same with respect to his business interest in Dyker Park Bagels. He reportedly sold his business. Again, the amount was not specified although he is still a one-third owner of the building that houses the bagel business. Again, there is no information here as to whether he gets rent or what the sale amount was.

Paragraph 98. With respect to the Romantique Limousine business, defendant still has a 20 percent interest in the business and earns $20,000 per month. Apparently, this

is his sole employment. Additionally, he receives $5,900 monthly payment from the business towards a promissory note issued from the sale of his portion of the business. I am paraphrasing, but the information as contained in the addendum is what will go in.

As to paragraph 101, apparently the IRS has not responded to the request for defendant's tax filing history. It is not clear to the Court, and I gather not to Probation either, as to why the IRS has not done that. Records were received from the New York State Department of Taxation and Finance for tax years 2010 and 2011 and no return is on file for the year 2013.

His adjusted gross income in 2010 was a negative $812,534. Then in 2011, his adjusted gross income was a negative $409,543. I don't get that. We do not have a personal financial statement from the defendant. We do not have a business financial statement which he should have provided and he should have provided that before the presentence report was disclosed already close to three years ago. I don't take too kindly to that.

MR. FERNICH: Ma'am, just so that it's clear --

THE COURT: If you could remain seated and speak into the microphone.

MR. FERNICH: Sorry, Your Honor.

THE COURT: Because it's easier to hear everyone

that way.

MR. FERNICH: Yes.

THE COURT: Thank you.

MR. FERNICH: We're not contesting Mr. Persico's ability to pay a fine should the Court see fit to impose one and also if the Court thinks it will be helpful, we'll provide the tax returns.

THE COURT: Well, that should have been done a long time ago because Probation asked for the defendant to provide a copy of the tax returns and I'll tell you what. If he doesn't provide the tax returns by the end of next week, I told Probation to come to me and I will sign a subpoena to go to the IRS.

MR. FERNICH: Okay. Well --

THE COURT: And we will subpoena his tax returns for the past ten years.

MR. FERNICH: I think that's probably a hiccup due to the replacement of counsel.

THE COURT: That is not a hiccup to the replacement of counsel. He had excellent counsel prior to your entry into the case.

MR. FERNICH: Well, irrespective, ma'am, of what happened before --

THE COURT: And he had an obligation and it's been three years. It has been three years. There is no excuse.

And he needs to provide a financial, a personal financial statement and a business financial statement. That's required of all defendants to do that.

MR. FERNICH: Yes, ma'am. I will ensure that the tax returns through 2015 are submitted forthwith to the Court and to Probation.

THE COURT: Just submit it to Probation. You do not need to submit it to me.

MR. FERNICH: Okay.

THE COURT: And he needs to provide the financial affidavits --

MR. FERNICH: Yes, I understand, Your Honor.

THE COURT: -- for both the businesses. And I am talking about he has 65 properties all around the State apparently.

MR. FERNICH: Yes. We'll make full disclosure of his financial situation, Your Honor.

THE COURT: Because I also have to determine what kind of a fine should be imposed and how much.

MR. FERNICH: Yes, ma'am.

THE COURT: Paragraph 105. Counsel supplied a Credit Karma credit history report generated by the defendant. And, again, it is customary for defendants to provide a release so that Probation can provide a more fulsome credit history for the defendant and it is very common that Probation

comes up with more judgments and liens and other aspects of a credit history than the defendant comes up with on his own.

I can only suspect that if he's not willing to be forthcoming in this information that he has something to hide. Particularly, when he allegedly had negative income, how he manages to get a car loan opened in August of 2015 for $76,171. He's got a lot of credit card debt, in the thousands of dollars. He's got a second car loan issued October of 2014 for $62,233. So how he manages to get these kinds of car loans with a negative gross income is beyond me.

With respect to paragraph 114, it indicates that while defense counsel objects to the stipulated forfeiture amount as confirmed by the government, the defendant has already paid the full forfeiture of $325,000. I would add to that, "pursuant to the terms of his written plea agreement." Quite frankly, I have to agree with the government's position with respect to that objection to the presentence report or objection to the forfeiture, in general, that was raised by defendant in the objections to the presentence report.

The defendant entered into a written plea agreement. In that written plea agreement, he agreed to the entry of a forfeiture order in the amount of $325,000 in the form of a money judgment. Moreover, as part of the written plea agreement, not only did he agree and stipulate to the fact that, admit that he owned property that was subject to

forfeiture, he consented to the forfeiture, he agreed to pay that on or before August 3rd of 2012.

He also understood and was on notice pursuant to the written plea agreement that interest would accrue on any unpaid portion if he didn't pay by August 3rd of 2012. I gather he paid timely?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: And he consented to the entry of the order of forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. He agreed to fully assist the government in effectuating the payment of the forfeiture money judgment. He agreed not to file or interpose any claim or to assist others to file or interpose any claim to the property against which the government sought to execute the forfeiture money judgment in any kind of forfeiture proceeding.

In fact, his failure to forfeit the money would have constituted a material breach of the plea agreement. Upon such breach, the defendant would not have been entitled to withdraw his guilty plea and the Office or the U.S. Attorney's Office could have brought additional criminal charges against the defendant and, notably, in paragraph nine of the plea agreement, he waived all the constitutional, legal and equitable defenses to the forfeiture of the money. There were a whole enumeration of bases for challenges that he waived in a non-exhaustive list.

In fact, in paragraph 11, at the end of that paragraph, it indicates that should it be judged by the office, meaning the U.S. Attorney's Office, that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty, but this office will be released from its obligation under this agreement including, but not limited to, the provisions of paragraph 11, subsections A through C.

So, I am not clear what the point was in contesting a forfeiture that the defendant agreed to in writing, represented by able counsel, that was discussed with him during the plea allocation with a judge of this court under oath that he indicated he understood.

MR. FERNICH: Your Honor, the crux of the objection was just so the Court would have full and complete information. I believe that the forfeiture order designates the crime of conviction as an extortionate collection conspiracy whereas, in fact, he pleaded to an extortionate extension conspiracy. So the thrust of the objection was just so the Court --

THE COURT: Well, you had an opportunity to look at that forfeiture order and object to any of the wording in there. Defense counsel had the opportunity to do that. That is why Rule 32.2 of the Federal Rules of Criminal Procedure specifies that those orders have to be issued prior to

sentence to give the defendant an opportunity to do that.

I read that as a continuation of the kind of conduct that has been engaged in by the defense in this case of trying to wheedle out of this plea agreement and, frankly, retracting from acceptance of responsibility in this case which I will get to in a moment.

MR. FERNICH: Clearly, we're not -- if Your Honor finds that the agreement has not been breached and, certainly, while I don't --

THE COURT: What do you mean finds that the agreement has not been breached? You mean by your client?

MR. FERNICH: No, ma'am. Pursuant to the motions that have been previously filed.

THE COURT: Excuse me but that has been decided and, quite frankly, if I hear from your mouth that the plea agreement has been breached by the government even once in this proceeding, I am going to impose a fine for every time I hear those words the government has breached the plea agreement. All right?

It seems to me that you have tried in a roundabout way to relitigate the law of this case, a decision that has already been made twice by Judge Townes. When she denied defendant's motion to withdraw his guilty plea, she made the finding that the government did not breach the plea agreement in any way. I reviewed her decision. Her decision is sound.

It is based on a very thorough, comprehensive and sound legal reasoning based on her examination of the facts of this case, the documents in this case, all the proceedings that were had in this case and the relevant case law and rules. Then there was a subsequent motion by the defense challenging that ruling and asking the Court to reconsider it and she reviewed it yet again and, again, the Court found that the government had not breached the plea agreement.

So, do not attempt to relitigate that in front of me because that is the law of the case and you did make an attempt to relitigate that and you cited Seventh Circuit case law which, quite frankly, is not binding in this court and, quite frankly, is in apposite to the facts in this case. So, let's forget that. There is no breach of the plea agreement here. As far as I am concerned, the information that is contained in the presentence report is all information that is validly in the presentence report.

So, in other words, based on the addendum that was provided with Probation, with the exception of certain paragraphs that I indicated essential about consent should be removed, references that should be redacted and, again, that's on consent of the government. For example, paragraphs 3 through 17 and 15, I agree with Probation's assessment that those should remain in the presentence report. Those are the paragraphs that relate to a description of the Colombo crime

family, the defendant's history and role and involvement with them, the crimes committed to support the organized crime family and so on.

I think that Probation's analysis is also consistent with the analysis that was made by Judge Townes. This is all information that is properly before the Court and, in essence, what you are trying to do is to restrict the type of information that the Court can consider. Title 18 of the United States Code, under 3661, says that there is no prohibition on the information that can be used by a sentencing court concerning a defendant's background, character and conduct when determining the sentence.

So, with these additional edits we've discussed here, the presentence report is amended. How would you like to do that, Ms. Betts? Do you want to --

THE PROBATION OFFICER: We can prepare a revised report.

THE COURT: It might be a little easier to follow, I think, if there is a revised presentence report. I hate to make more but since there is going to be some additional financial information provided by the defendant, it might be helpful to do that.

THE PROBATION OFFICER: That will be completed.

THE COURT: Okay. We will talk about a date afterward. Okay?

So. Let's move on to the question of a Fatico hearing.

In reviewing the documents that have been filed here and specifically, there was a proceeding held before Judge Townes on October 30th of 2014 which was the date on which she denied the initial motion for defendant's motion for withdrawal of the guilty plea. It is clear from viewing and reading that transcript that actually the idea of the Fatico hearing, that came from the judge herself. That it was a sua sponte decision. The government was not requesting one. It did not appear that defense counsel was requesting one.

Every judge has a different approach to sentencing. Mr. Fernich, you've appeared before me for sentencing as has Mr. Lifshitz as well. My view is that government, as officers of the court, if they make a representation to Probation that they can prove whatever facts are contained or alleged, facts and circumstances, if you will, alleged in a presentence report, that they can prove that by the preponderance of the evidence. If there is no challenge to that by the defense, the Court accepts that as true.

I would not feel a need necessarily to require a Fatico hearing. Perhaps, on occasion, on some drug cases where maybe it is not clear about drug amounts and if it is relevant, maybe there is a requirement for a lab report or something further, but I have rarely found it necessary to go

beyond that.

It is not clear to me at this point what exactly the position is of the parties in connection with the Fatico hearing. I was going on the assumption that this was something that had been requested by the parties because, in part, at the point that I got the case initially, I did not have full copies of everything that had been submitted in the case. Now having had a chance to review everything all together, I am not quite clear where the parties are with respect to a hearing. If you want to have a hearing, I am happy to schedule one, we will set a date and we will go forward with a hearing.

So, Mr. Lifshitz, I will hear from you. Then I will hear from Mr. Fernich on it.

MR. LIFSHITZ: Your Honor, we agree with Your Honor's reading of the transcript of the appearance before Judge Townes. At that appearance, we did not request a hearing and neither did defense counsel. Judge Townes ordered us to appear for one and the parties prepared to do so.

We are not seeking a Fatico hearing at this time. I can't speak to defense counsel.

THE COURT: No, I will let defense counsel speak for the defendant.

MR. LIFSHITZ: Up until now, I am not aware of him having requested one at that proceeding or since.

THE COURT: I can understand why the parties made the submissions that you made based on the ruling of Judge Townes. So, I am not saying that the parties were wrong to do that, but I just want to get an understanding of where you all are right now and how we should proceed moving forward now that we have had an opportunity to review the presentence report. I think if there is a Fatico hearing, again, we would need to fine tune it exactly as to what at issue for a Fatico hearing.

Mr. Fernich, I will hear from you. What is your client's position?

MR. LIFSHITZ: Your Honor, I'm sorry.

THE COURT: I'm sorry. I didn't mean to interrupt.

MR. LIFSHITZ: You didn't. Can I add one thing? I don't know if this is relevant to the Court or defense, but it may be.

Under the plea agreement as everyone knows, we've agreed to seek a sentence within the guidelines range. The guidelines range found by Probation is the same as that which is estimated in the plea agreement. That's still our position today.

THE COURT: I'm sorry. And thank you for reminding me.

Before maybe we move ahead, because there was an objection by defendant to the aggravated role enhancement, it

was addressed in the addendum and I'm sorry. I sort of glossed over it. I did not mean to.

In my view, I think that the analysis that was offered up by Probation as well as the government in its objections to the presentence report is one that is consistent with the guidelines and the application notes to the guidelines, specifically, the aggravated role enhancement under 3B1.1.

It is disjunctive. The aggravated role enhancement applies if the defendant is a supervisor or a manager in criminal activities under subdivision B and the criminal activity involved five or more participants or was otherwise extensive. In other words, that the criminal activity was otherwise extensive and that is increased by three levels.

Then application note 3, which is cited by both Probation and the government, says that in assessing whether an organization is otherwise extensive, all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing service of many outsiders could be considered extensive.

So, that is just an example, but I thought that Probation also addressed that well in the addendum to the presentence report. It is on page two around the middle of the second full paragraph.

I quote: The instant offense presents unique circumstances in which all of the participants engaged in illegal activities in furtherance of All Around Trucking and/or under the Colombo Family which alone has dozens of criminal participants. When viewing the offense of conviction in the full scope of its time and place, as a part of the Colombo Family's method of making money or improving their positions within the organization, there were numerous criminal participants, the defendant and Anthony Preza, several debtors and other members and associates of the Colombo family who were more distantly involved in All Around Trucking.

So, Probation adhered to the three level role enhancement under 3B1.1A. So, the Court agrees with that analysis and so the aggravating role enhancement will apply.

There is one thing that does give me pause and that is in terms of the guidelines calculation and perhaps this is good time to raise that. Given the types of argument that the defendant has made in the motions to withdraw his guilty plea, in attacking the forfeiture order, it seems to me that he has actually withdrawn from a full acceptance of responsibility in this case. As it is, he pled guilty not on the eve of trial, really during trial because I think the jury had already been selected.

Correct, Mr. Lifshitz, or was it in the process?

MR. LIFSHITZ: It was certainly in the process. People had begun voir dire.

THE COURT: And people have different definitions of the beginning of trial. As far as I am concerned, once you start picking the jury, the trial has begun. So that is why the government is not moving for a one level downward, one level reduction for acceptance of responsibility.

Correct, Mr. Lifshitz?

MR. LIFSHITZ: Correct, Your Honor. It was not contemplated.

THE COURT: Right. He was given the two level reduction for having pled guilty which under normal circumstances, he would be entitled to, but I am given pause by the level to which he has sort of extricated his acceptance of responsibility here, extricated himself from acceptance of responsibility here by claiming that, well, there wasn't really a factual basis for the plea because it wasn't really extortion and it wasn't really a usurious loan and it really wasn't his money and he really shouldn't have given $325,000 in forfeiture. I'm wondering what he is accepting responsibility for and whether he should be given the two level reduction or acceptance of responsibility.

I would like to hear, Mr. Fernich, from you about that.

MR. FERNICH: Well, ma'am, the papers were very

carefully drafted to allege a defect in the plea proceedings themselves. We are in no way backing off his acceptance of guilty, his guilty plea or allocution, the factual things that he said regarding allocution in any way. We are simply saying what was said, and I don't want to get back into relitigating what was said before, that what was said did not satisfy the mandates of Rule 11.

So, we're in no way contesting that he is guilty of what he said he is guilty to and he fully accepts consistent with the allocution in the plea agreement. We simply made the technical legal argument that the factual basis as elicited at the plea hearing did not satisfy the mandates of Rule 11. That was the second branch of the motion.

The first bunch of the motion was simply --

THE COURT: But there were also the objections to the presentence report and certainly, I think that a reading of those objections to the presentence report could be fairly made or an interpretation could be fairly made that there is a failure to accept responsibility.

He claimed the victims were not afraid. The objection to the aggravated role enhancement which is something that he stipulated to in the plea agreement. It was agreed upon by the mere fact that he signed off on it --

MR. FERNICH: Yes.

THE COURT: -- in the plea agreement. Now, granted,

the plea agreement is not binding on Probation or the court, but it does show the defendant's understanding of what his role is.

MR. FERNICH: Ma'am, maybe that wasn't phrased as well as it should have been.

We're not per se objecting to the acceptance of the responsibility enhancement because we stipulated to it, but the plea agreement does permit us to argue under 3553 for a sentence below the stipulated guidelines range. In the spirit of what Your Honor had said earlier with regard to 3661 and 1B1.4, there's no restriction on the type, I emphasize type, of information the Court can consider in sentencing.

THE COURT: But that is advocacy to the Court. That is different from objections to the presentence report and objecting to, in particular with respect to his crime of conviction, to basically step back away from the facts of that particular count.

I am not even looking at the stuff where he says, you know, I did not participate in the murders of these two people and the government says, okay, we're not going to go forward and prove that. I'm not considering that. That's been stricken. That's gone.

MR. FERNICH: Yes, I understand.

THE COURT: That's gone.

MR. FERNICH: Ma'am, I would suggest to Your Honor

that our duty of advocacy extends, in the rendering of effective assistance of counsel, to Probation as well as to the Court because it's in our interest to get as favorable a PSR as possible and not having had any trial for Mr. Persico, both the Court and the Probation Office have no real basis for writing the report other than the information that's given to them by the government. So, it's our duty as counsel to sort of amplify the facts of the case in a way that doesn't contradict his allocution.

In no way does he contradict the allocution. He's just providing a fuller account of the offense conduct, our view of the offense conduct. It doesn't mitigate his culpability in terms of what he pled to in any way, but this is just the rendering of effective assistance of counsel in my view before the Probation Department and before Your Honor, and this is a holistic analysis that the Court has to undertake under 3553 and the nature and circumstances of the offense and history and characteristics of the defendant are vital to that analysis. The information that we give to the Probation Department invariably ends up -- well, not invariably certainly not on our part -- ultimately gets to the Court.

So, ultimately, I think that's six to one, half a dozen to the other. It's all designed to the same end, Your Honor, which is to candidly achieve a sentence as low as

possible and then entails explaining the nature of the crime in a case where there was no trial involving Mr. Persico.

So let me reiterate. He fully accepts responsibility for the crime. He has a plea agreement, an allocution that he sticks to. The things that he said were in no way trying to undermine the factual representations that he made at the allocution. He's guilty of what he pled to. We made a carefully constructed legal argument to assail the nature of the plea proceeding as having not complied, in our view, with Rule 11 and we'll just leave it at that.

THE COURT: Does the government wish to be heard on this issue?

MR. LIFSHITZ: I do. Your Honor, we're not, we're not moving to negate the two level reduction contemplated in the plea agreement.

THE COURT: I am going to --

MR. FERNICH: Ma'am, can I just add one more thing?

THE COURT: I am going to allow the two point reduction to stand.

That being the case, I think the parties are all in agreement that the sentencing guideline range is as calculated by Probation which happens to be the same as that that was stipulated to by the parties in the plea agreement. That is based on a total offense level of 21, a Criminal History Category of I, and a sentence guideline range of 37 to

46 months.

So, I do not know if you remember where you stopped because I cut you off at that juncture, both with respect to the aggravating role and the guideline range calculation.

MR. LIFSHITZ: I think I do, Your Honor. I was nearly done.

All I wanted to add was that if there were a Fatico hearing and we prevailed on every issue that was disputed at the hearing, we would still be bound by the plea agreement. We would still honor the plea agreement. I would still stand up before Your Honor and say the sentence should be within -- the range is 37 to 46 months which I think is one thing that distinguishes this case from the situations Your Honor described earlier where Fatico hearings are more typical, for example, where drug weight is an issue and the government will advocate for a higher range if it proves that the weight was higher than what the defendant says it was.

That's all I have to say about that.

THE COURT: Okay. So, the ball is now in your court, Mr. Fernich. What is your position with respect to a Fatico hearing?

MR. FERNICH: Well, my position with respect to a Fatico hearing -- I thank the Court for its statements earlier because it clarifies where the Court is coming from and enables me to frame my arguments better. My position is as

follows.

With respect to the 389 allegations as I take it that are remaining, principally, the Scopo murder, that to this point, the government has met a bare burden of production with respect to the Scopo issue. Your Honor is quite right that the 3661 and 1B1.4 places no restriction on the type of information that a court may consider at sentencing, but those provisions say nothing about the quality of the information that a court may consider at sentencing because that is controlled by the due process clause as interpreted in cases like McMillan versus Pennsylvania, pre-guideline sentencing cases such as McMillan versus Pennsylvania and the Williams case out of the Supreme Court from 1949. Those are the cases that I recall that mandate the preponderance of the burden of proof at sentencing.

So, it's true the Court can consider any type of information, but it cannot consider, in my view, to enhance a sentence in any way information that has not been proven by a preponderance of the evidence and the government has not proven upon the record as it stands these allegations by a preponderance of evidence. They have met a bare burden production which is insufficient for the Court to consider --

THE COURT: But --

MR. FERNICH: Yes?

THE COURT: That's argument. All I need to know

from you is whether you want to have the Fatico hearing or not. What I am hearing from you, based on what you have said thus far, is, in a nutshell, that you challenge the government.

MR. FERNICH: We do challenge it, yes.

THE COURT: The government's statement.

MR. FERNICH: Yes.

THE COURT: That they can prove let's call these other bad acts. Okay?

MR. FERNICH: Yes.

THE COURT: By the preponderance of the evidence. So from what I said before, that puts it in a different context in which case, if I have counsel that comes to me and says, you know, I know the government said they can prove it, I'm not believing it, then that's what a Fatico hearing is for. Let's put it to the test because the parties have provided transcripts of the Guerra trial and various other trials, Basciano and some other ones or Basciano was a witness in some other trials. I'm getting the names a little confused here because some of these acts go way back where there were a bunch of other trials that were I suppose relevant in certain ways and it does not help the Court to decide the issue for a number of reasons.

To have these arguments made on cold paper, if you will, for example, the defense challenge to Russo's

credibility, right, because I don't know on what basis the jury decided the charges that it decided to convict or acquit Guerra on. I really don't know. I was not there in the deliberating room. I need to make my own credibility assessment.

Also, the burden of proof is different. It may have been that the jury thought that perhaps the government might have met a preponderance standard if that was the charge that they were given. They might have thought that, but they also might have thought maybe not beyond a reasonable doubt. The burden of proof here is by a preponderance of the evidence which is a different standard.

The other thing is that it is not fair for the defendant for me to decide whether or not the government can substantiate its preponderance case, right, based on a cold transcript where the defendant was not present as a litigant and represented by counsel and did not have the opportunity to challenge the witness himself, right? Because his interest would be different from Guerra's interest in some ways. Right? Because so long as the blame is going to somebody else and somebody else knows something, I, as defense counsel, might let them know go rambling on about what everybody else did that but you know what, you didn't hear my guy doing that, it was all these other people doing that.

So, the defendant should have the opportunity if he

wishes to have that opportunity to have his counsel challenge the witnesses and have the government put to the test. If you are challenging the government's statement that they can prove it, then we need to have the Fatico hearing and the next step is to schedule it and I want to schedule it for as soon as possible.

This case has been pending for six years now. There has been a lot of delay in the case and I do not want to delay the case further. This case was ready for trial at one point. 3500 material had been turned over a long time ago. The parties certainly have access to a lot of information. There is a lot of material here, a lot of transcripts and, obviously, for purposes of the Fatico hearing, the government will have its own 3500 material obligations to make sure that it complies in that regard.

MR. LIFSHITZ: Your Honor, we -- I apologize.

THE COURT: That's okay.

MR. LIFSHITZ: Because we were about to have the hearing before Judge Townes, we actually turned over the exhibits and 3500 material for the hearing.

THE COURT: Okay.

MR. LIFSHITZ: If there is anything additional, it will be minimal and turned over promptly, but there is anything that we've withheld that exists.

THE COURT: Okay.

MR. FERNICH: Ma'am, could I just amplify? I don't wish to antagonize Your Honor any further. I understand the Court's position that we will have a hearing. If I can just flesh this out for a moment.

My position, to be clear, is right now, it's not that we're contesting their ability to prove it by a preponderance or not. We are contesting the factual allegations that they made to date. In a case where there's a plea --

THE COURT: That's double speak.

MR. FERNICH: No, it's not.

THE COURT: Yes, it is. Yes, it is. Okay? Because they are saying based on facts A through T, this shows that he was involved in this misconduct and this misconduct and this misconduct. Okay? In particular, we are talking about participation in the Scopo murder and then there is another aspect to which is his participation in extortionate activity and loansharking. Correct?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: Extending usurious loans for a certain extended period of time as part of the criminal activities of the Colombo crime family which the government has maintained all along and consistently, what gave the victims the cause to believe that failure to pay would result in harm coming to them because of the power of this enterprise being behind the

defendant. That is the government's argument and it may not be phrased the way you would phrase it, but I think that is a nutshell of what you have been arguing all along.

MR. LIFSHITZ: Yes, that's all accurate, Your Honor, and on January 19th of 2015, we filed a short letter.

THE COURT: Yes.

MR. LIFSHITZ: Document number 802.

THE COURT: That is what I had read.

So you cannot have it both ways. You cannot tell me that you are not challenging it but that you are challenging the strength of their facts. You just cannot have it both ways.

MR. FERNICH: I'm not suggesting that at all. We are challenging it. And my final position, in a nutshell, is really twofold.

First of all, I don't think they've met a minimal burden of going forward sufficient to warrant a hearing, first of all.

THE COURT: I disagree.

MR. FERNICH: I understand.

And more fundamentally, I'd like to turn back to the last statement that Mr. Lifshitz made before I began speaking which is what, he said that even if we have a Fatico hearing and we prove everything we said we're going to prove, I'm still going to get up before Your Honor and say, and I have no

doubt that he will, the sentence should be between 37 and 46 months.

Now, it strikes me, ma'am, when there's a plea agreement --

THE COURT: Yes, but the Court --

MR. FERNICH: Can I just --

THE COURT: Let's not go back to the plea agreement.

MR. FERNICH: No.

THE COURT: The plea agreement is clear. It has been ruled on. Okay? The government has not said anything that contradicts that plea agreement today or to date. So let's be clear about that.

MR. FERNICH: I understand.

THE COURT: Regardless of what the government's position is.

MR. FERNICH: Yes.

THE COURT: To the extent that you are going to be arguing to me that your client should get a below guidelines sentence, which clearly you intend to do --

MR. FERNICH: That's something we're entitled to do.

THE COURT: You're entitled to do.

MR. FERNICH: I don't know that we are going to do that.

THE COURT: Well, your papers indicate that because part of your objections to the presentence report which

Probation did not agree to change, and I think it is correct, with respect to the position of your client as being the sole provider for two children because the mother of the children died, okay, but these children are adults now. One is 23 and the other one is 21. They are adults. One is almost graduating college already if she didn't already and the other one probably on the verge of graduating if she didn't already. So they are on their way.

The court is also entitled to consider pursuant to 3553(a) and pursuant to guideline 5K2.0 whether or not an upward departure or a variance is appropriate under all the circumstances of the case.

MR. FERNICH: Right. And for the government to put before the Court the most explosive, uncharged allegation that you can put before a court and say we can prove it at a hearing but we're not going to argue for anything other than the guidelines range is, with all respect, an invitation for the Court to do that on its own and that contravenes every known principle, respectfully, of plea jurisprudence.

THE COURT: That is ridiculous and it is rejected.

MR. FERNICH: I understand.

THE COURT: It is ridiculous. It is rejected.

MR. FERNICH: Okay.

THE COURT: It was rejected by Judge Townes. I am rejecting it now.

MR. FERNICH: I understand. I understand.

THE COURT: And I told you that I am not buying that argument.

MR. FERNICH: Okay. That's fine. I just made a record. That's all.

THE COURT: You have made that same argument now a gazillion times.

MR. FERNICH: Well, now it's being crystallized though.

THE COURT: No, you have said the same thing.

MR. FERNICH: Okay.

THE COURT: You have said the same thing.

MR. FERNICH: I understand.

THE COURT: And I am done with hearing it.

MR. FERNICH: I've said my piece.

THE COURT: That is what I am entitled to listen to. I am entitled to hear it.

So, now we are going to have a Fatico hearing July 22nd at 10 o'clock. I may interrupt briefly in the middle of that, say at 11:30. Maybe I will give the parties a break for a brief status conference, but I have the whole day free that day that we can have the hearing and maybe if the parties can give me an estimate as to how long they think it will take. I don't know how many witnesses you intend to have.

Just to be clear, as I see it, it is two areas. It's the Scopo murder and then it's the loansharking activities, correct?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: For whatever that period of time was.

MR. LIFSHITZ: I'll -- that is --

THE COURT: Early to mid 1990s to 2010. Am I reading it correctly?

MR. LIFSHITZ: Yes, Your Honor, and not necessarily every year in that period.

THE COURT: Within that time frame?

MR. LIFSHITZ: Yes.

Your Honor, if there's a Fatico hearing, the crimes we would prove are the ones set forth on page three of the letter docketed as 802.

THE COURT: That's your January 19th sentencing --

MR. LIFSHITZ: Yes, Your Honor, January 19, 2015.

So, his participation in the racketeering, his participation in the Scopo murder, his participation in loansharking extortion and participation in the conspiracy to acquire and sell video games.

THE COURT: Okay.

MR. LIFSHITZ: And as to the length of the hearing, as we have disclosed, the witnesses would be a cooperating witness who is known to the defense and one agent. The agent

would primarily put in exhibits that were introduced at the Guerra trial. They've been marked for the defense for the purpose of this hearing as well. So, it depends on the length of cross. It could take the bulk of the day. I don't think it would take more than one day.

THE COURT: Well, if we have to continue it, we will work from there.

MR. FERNICH: Ma'am, my client, Mr. Sercarz is going to be handling the hearing and he's not available on that day. I have his availability. He has a window from 8/5 through 8/15 in which he could do it and he also is available in September. He has hearings out of state through the bulk of July.

THE COURT: The bulk of July?

MR. FERNICH: 7/2 through 8/5. I imagine he has a vacation, probably, around the 4th. He did give me that ten-day window in August and then there's a also time in September.

THE COURT: Well, I don't want to put it into September.

MR. FERNICH: I understand.

THE COURT: How is Friday, August 12th, beginning at 11 o'clock?

MR. LIFSHITZ: That's fine for the government.

THE COURT: I have a sentence in the morning.

MR. FERNICH: Yes.

THE COURT: Mr. Sercarz' window is when, July when to when? August 5th?

MR. FERNICH: Yes. 8/5.

THE COURT: I'm sorry. I forgot that my trial will be over by then. So how is August 10th? That's a Wednesday. I have the whole day. We can start at 10 o'clock.

MR. FERNICH: Yes.

MR. LIFSHITZ: Fine for the government.

THE COURT: Okay.

MR. FERNICH: 8/10. 10 a.m.?

THE COURT: 10 a.m.

MR. FERNICH: Thank you.

THE COURT: And at some point, at your convenience, if you can get me a copy of the 3500 material, and I don't know if there are going to be any exhibits.

Do you expect to have any witnesses? Do you know?

MR. FERNICH: I don't believe so but I'm not 100 percent certain.

THE COURT: All right. And then if we need spillover time, right now, I have time on August 11th so we could just continue right into the next day if that's good for everybody.

MR. LIFSHITZ: Yes, Your Honor.

MR. FERNICH: Yes.

THE COURT: Okay. Anything else that the parties want to address today?

MR. FERNICH: No thank you.

MR. LIFSHITZ: I don't have any issues, Your Honor. I want to correct one thing if you'll indulge me. I think there was a reference to the government attempting to prove uncharged conduct. Everything or nearly everything we're trying to prove --

MR. FERNICH: Sorry. Unconvicted conduct. Sorry.

THE COURT: Unconvicted conduct that was alleged in the superseding indictment.

MR. LIFSHITZ: Yes. That's all, Your Honor.

THE COURT: Okay. All right. Anything else?

MR. LIFSHITZ: No, thank you.

MR. FERNICH: No, ma'am.

THE COURT: All right. Thank you.

I think, Probation, you have bank forms and releases for Mr. Persico. So, given that we are not going to have the hearing until then, Mr. Persico has to provide the tax returns by the end of next week, that will be June 10th, and by July 1st, provide Probation with the completed personal financial affidavit and business financial affidavit.

How much time do you need after that for a revised presentence report so you can put it all together?

THE PROBATION OFFICER: By July 10th.

THE COURT: I was going to give you until July 29th.

THE PROBATION OFFICER: Okay.

THE COURT: I will give you until July 29th. Okay.

MR. FERNICH: Okay. Thanks.

THE COURT: All right. Thank you.

MR. LIFSHITZ: Thank you.

(Matter concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Charleane M. Heading — June 14, 2016

CHARLEANE M. HEADING — DATE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X

UNITED STATES OF AMERICA

10 CR 147 (DLI)

-against-

MICHAEL PERSICO,

*Defendant.*

-----------------------------------------------------------X

**DEFENDANT MICHAEL PERSICO'S**
**SENTENCING SUBMISSION**

Marc Fernich
Law Office of Marc Fernich
810 Seventh Avenue
Suite 620
New York, NY 10019
(212) 446-2346

Maurice Sercarz
Sercarz & Riopelle
810 Seventh Avenue
Suite 620
New York, NY 10019
(212) 586-4900

Sarita Kedia
Sarita Kedia Law Offices
5 East 22nd Street
Suite 7B
New York, NY 10010
(212) 681-0202

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page88 of 204


# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

AN ANALYSIS OF THE SECTION 3553(a) FACTORS DEMONSTRATES THAT A BELOW-GUIDELINES SENTENCE IS WARRANTED IN THIS CASE....................................................................2

A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ................................4

1. THE OFFENSE OF CONVICTION ..........................................................................4

2. UNCONVICTED CONDUCT SHOULD NOT BE CONSIDERED ......................8

B. MICHAEL PERSICO'S HISTORY AND CHARACTERISTICS ............................12

1. A PRISON SENTENCE WOULD DEPRIVE MR. PERSICO'S TWO YOUNGEST CHILDREN OF MUCH-NEEDED PARENTAL SUPPORT..................................................13

2. MICHAEL'S PREVIOUSLY UNBLEMISHED RECORD AND HISTORY AS A HARD-WORKING AND RESPECTED BUSINESSMAN SHOW THAT THE CONDUCT AT ISSUE WAS ABERRATIONAL AND THAT A PRISON SENTENCE IS "GREATER THAN NECESSARY" ............20

3. MICHAEL'S LONG HISTORY OF CHARITABLE WORKS AND GOOD DEEDS IN HIS COMMUNITY SHOULD BE CONSIDERED ...............................................................24

4. MICHAEL PROVIDES ESSENTIAL SUPPORT TO HIS FAMILY AND FRIENDS AND IS DEEPLY ADMIRED BY ALL ...............................................................27

C. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES ...............30

CONCLUSION.........................................................................................................32

**PRELIMINARY STATEMENT**

On June 8, 2012, Michael Persico pled guilty to a superseding information charging him with one count of conspiring to extend a usurious loan in violation of 18 U.S.C. § 371. At age 60, this will be Mr. Persico's first and only felony conviction. Notably, Mr. Persico has been on pretrial supervision for more than six years and has been fully compliant.

In light of Mr. Persico's history and characteristics, family circumstances and the particular facts surrounding the offense in this case, we respectfully ask that the Court impose a sentence below the Guidelines range calculated by Probation. Specifically, we urge the Court to impose a sentence of time served in order that Mr. Persico may continue providing necessary emotional and financial support for (1) his two youngest daughters, who have already suffered the tragedy of losing their mother to cancer; (2) his elderly mother, now in her eighties; and (3) his other family members who rely on his guidance. Mr. Persico has been the girls' sole caretaker since they were 10 and 12 and to now lose him, even for a couple of years, would be too much to bear. Likewise, Mr. Persico's mother is advanced in years, suffers from emphysema and severe rheumatoid arthritis and may not survive a prison term. Mr. Persico has no criminal history, and this was clearly an aberrational occurrence. Therefore, we respectfully submit that a sentence of time served is "***sufficient but not greater than necessary.***" 18 U.S.C. § 3553(a).

In support of this sentencing request, letters have poured in from friends, family and colleagues to provide the Court with insight into Mr. Persico's character as well as the collateral consequences a prison sentence would have.[1] One group of letters describe Mr. Persico's personal and family circumstances. Many of these speak to the vital role Mr. Persico has played as the sole surviving parent of his two daughters who, as young children, suffered the heart-

[1] The bulk of the letters were written shortly after Mr. Persico's plea and are, therefore, addressed to Judge Townes. Mr. Persico's children recently revised their letters to reflect their present situations.

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page90 of 204


wrenching loss of their mother after a 15-month long battle with cancer. As the girls' only parent thereafter, Mr. Persico became literally indispensable to them, and his absence would be unbearable.

A second group of letters are written by Mr. Persico's business colleagues, many of whom have become close personal friends, to provide the Court with an understanding of his nature as a business owner and employer. It is clear from these letters that Mr. Persico has always endeavored to conduct himself in a law-abiding manner and has struggled to overcome the infamy of his last name and blood relations. A third group of letters address Mr. Persico's extraordinary good deeds and an exceptional level of commitment to his community. His generosity and philanthropy have been well documented. Finally, friends and family have written letters to express how valuable Mr. Persico is to them as he faces this very difficult sentencing day. Many of the letters are excerpted herein to illustrate specific points. The letters, however, speak eloquently for themselves. Thus, we respectfully ask that the Court consider them in their entirety.[2]

## AN ANALYSIS OF THE SECTION 3553(a) FACTORS DEMONSTRATES THAT A BELOW-GUIDELINES SENTENCE IS WARRANTED IN THIS CASE

As the Supreme Court has made clear, numerous circumstances apart from the applicable Guidelines range must be considered when imposing a sentence. *See Rita v. U.S.*, 551 U.S. 338, 347-48 (2007); *Gall v. U.S.*, 552 U.S. 38, 49 (2007); *U.S. v. Booker*, 543 U.S. 220, 245-46, 264-65 (2005); *U.S. v. Crosby*, 397 F.3d 103, 112-13, *abrogated on other grounds by U.S. v. Lake*, 419 F.3d 111, 113 n.2 (2d Cir. 2005). Although the correct Guidelines range is the starting point of the analysis (*Gall*, 552 U.S. at 49), under *Booker* and its progeny the "Guidelines are not only ***not mandatory*** on sentencing courts; they are also not to be ***presumed*** reasonable." *Nelson v.*

---

[2] All letters are arranged in alphabetical order by the author's last name and annexed as Exhibit 1.

*U.S.*, 555 U.S. 350, 352 (2009) (per curiam) (emphases in original). *See also U.S. v. Rubenstein*, 403 F.3d 93, 98-99 (2d Cir. 2005) (describing a Guidelines sentence post-*Booker* as "a benchmark or a point of reference or departure"). "Under 18 U.S.C. § 3553(a) . . . the sentencing court is required to consider a host of individual variables and characteristics excluded from those calculations called for by the Guidelines." *U.S. v. West*, 383 F.Supp.2d 517, 520 (S.D.N.Y. 2005); *see also Kimbrough v. U.S.*, 552 U.S. 85, 90 (2007) ("[T]he Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence."). Thus, in addition to the Guidelines, the Court must consider the following in fashioning an appropriate sentence: (a) the nature and circumstances of the offense; (b) the history and characteristics of the defendant; and (c) the need to avoid unwarranted sentence disparities. *See Booker*, 543 U.S. at 224; *see also Rita*, 551 U.S. at 350. Indeed, section 3553(a) specifically directs that courts "shall impose a sentence ***sufficient, but not greater than necessary***, to comply with the purposes set forth in paragraph (2) of [§ 3553(a)]." 18 U.S.C. § 3553(a) (emphasis supplied).

For the reasons discussed herein, we respectfully submit that the nature and circumstances of the offense, Mr. Persico's family circumstances – including his irreplaceable role as a single father to two young daughters, his established reputation as a law-abiding and valued businessman, his history of charitable works and devotion to his community, the vital support he provides for family and friends alike, and the need to avoid sentence disparities, when considered individually and together, warrant a significant departure or variance downward from the Guidelines. *See, e.g., U.S. v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (recognizing before *Booker* that multiple factors in combination may warrant downward departure); *U.S. v. Adelson*, 441 F.Supp.2d. 506, 513-514 (S.D.N.Y. 2006) ("[S]urely, if ever a man is to receive credit for the good deeds he has done, and his immediate misconduct assessed in the overall conduct of his life hitherto, it should be at the moment of his sentencing when his very future hangs in the balance. This

elementary principle of weighing the good with the bad, which is basic to all the great religions, moral philosophies, and systems of justice, was plainly part of what Congress had in mind when it directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of the defendant.'").

**A. THE NATURE AND CIRCUMSTANCES OF THE OFFENSE**

**1. THE OFFENSE OF CONVICTION**

The evidence regarding the instant offense comes from recordings made by Steven Marcus, a cooperating witness since 2006. Marcus operated All Around Trucking ("All Around") with co-defendants James Bombino and Theodore Persico Jr. Michael Persico is not heard on any of the recordings regarding the loan.[3] Rather, only the three debtors – Marcus, Bombino and Theodore – are heard discussing the loan's terms and its non-repayment.

The loan's necessity was first discussed in early May 2009, when Theodore (Michael's cousin) spoke to Marcus about All Around's need to raise capital so it could purchase more trucks and take on additional work. (5/7/09 T.) ("We'll get a loan. If we got to get a loan, we'll get a loan.")[4] A couple weeks later, Theodore again discussed All Around's need for a loan – this time with Bombino and Marcus. He proposed: "I could borrow the money from somebody and offer them so much money. How much do you want to offer them to lend us $150,000 for two months?". (5/22/09 T.)

On June 10, Theodore conveyed to Bombino and Marcus the terms of the loan that he had asked Michael to provide or arrange through his business contacts. Theodore explained:

---

[3] The government notes that Mr. Persico is captured on eight recordings made by Marcus in 2008 and 2009. *See* Govt. Resp. Mem. (ECF 853) at 7, n.2. But the government has not submitted them because they do not support its allegations of unconvicted conduct, nor do they speak to the offense of conviction. Further, Marcus was not "well-known" as an "organized crime associate" (*id.*), but as a knowledgeable operator in the trucking industry.

[4] All transcripts relevant to the offense conduct are annexed in chronological order as Exhibit 2. We will provide the audio recordings upon request.

"Every a hundred thousand that we take, we have to give back one ten." (6/10/09 T.) While the money's "sixty or ninety day[ ]" return was contemplated, Theodore made clear: "It doesn't cost ten thousand a month. It's just the ten thousand for the [duration of the loan]." *Id.* Theodore explained the loan was being given to ***him*** (*i.e.*, Theodore, along with Bombino and Marcus, was a borrower) and that ***he*** – not the lenders – set its terms, emphasizing: "Nobody's shaking us down."[5] *Id.* Marcus commented: "Perfect.... It's better than the bank, better than the bank." *Id.*

The same day, Anthony Preza, the business associate Michael had asked to extend the loan, gave the trucking company a $100,000 check. In a conversation outside Theodore's presence later that day, Bombino told Marcus: "The guy did nothing wrong to us, are you kidding me? It's a free loan." (6/10/09 T.) Marcus responded, "Exactly… That's what I'm saying." *Id.*

Six weeks later, Bombino told Marcus that in ***four months' time***, he expected to repay ***only the interest on the loan*** – not its principal – and that the company would need to retain the principal for ***another four months***. (7/22/09 T.) Approximately two weeks following that discussion, Marcus asked Bombino if Michael or anybody else had said anything about getting the money back. Bombino replied, "No." (8/11/09 T.) A month later, Marcus, Bombino and Bombino's brother Patrick again discussed the loan. (9/15/09 T.) Patrick asked if they were paying "juice," to which Bombino responded: "No, we're paying a ***flat fee***, not juice. They want 10,000 on 100,000. We pay it back, we give 'em 110, that's what they want. They never said an ongoing juice thing." *Id.* Asked if it mattered how long they held the principal, Bombino replied, "Well, they said 4, 5 months." *Id.*

[5] The government alleges that Theodore was a "powerful Colombo captain" and "administration member" when he borrowed the funds, while identifying Michael Persico and Anthony Preza as "associates."

At the end of October, Marcus remarked to Bombino that he was "surprised that they ha[d]n't asked for their money back" or "at least 10" for the interest. (10/29/09 T.) Bombino responded, "How could he [referring to Michael Persico]? How could he ask for it back? He knows I ain't got it." *Id.* A couple weeks later, Marcus and Bombino discussed All Around's finances, including outstanding debts. (11/11/09 T.) Referencing the interest owed on the loan, Marcus told Bombino, "Take another 10,000 off for Michael," to which Bombino replied, "Oh, yeah, the interest. I forgot.... I think Michael, honestly, I think Michael might say, 'Just give me back the money. Just pay Anthony back the money you owe him. Don't worry about [the interest].'" *Id.*

In late January 2010, more than seven months after the $100,000 loan was extended, neither the principal nor any interest had been paid. Bombino explained to Marcus that he was more concerned with his credit and reputation – his "name" – than repaying Michael's colleague, Anthony Preza:

> Michael's guy is the next order of business, before everybody else but not before the creditors and my fuckin' name. I already said that to Michael…. I said, "Do you have a problem if I give Anthony, you know, 20 thousand, 25 thousand at a time?" He says, "Well, you know, nobody wants to get money back like that, but you know, at this point, yeah, that's fine, that's fine." I says, "Okay, cause the way Testa [the company for which All Around was working] did it to me, unfortunately, I gotta do it back that way. I don't have … 100,000 to pay Anthony. So let me straighten out my name and the lawsuits and the union." … So that's how I left that. So Anthony's third after the creditors and the union. Then Anthony.

(1/22/10 T.)

As late as February 15, 2010, Marcus asked Bombino how much interest they would have to pay on the loan. Bombino responded: "I don't think I want to pay anything." Bombino then offered that Preza would "without a doubt" be happy with $10,000, adding that if he wanted

more, Bombino would "let Michael deal with that" since "10,000 was what [Michael] told [Bombino]." (2/15/10 T.)

Ultimately, when Mr. Persico was indicted in early March 2010, no principal or interest had been paid on the $100,000 loan; no threats, express or implied, had ever issued with respect to it; and neither Bombino nor Marcus had ever voiced any concern that harm might befall them due to their failure or delay in repayment. Notably, though the government possessed all these recordings, this loan was not initially charged but was added in a superseding indictment eight months later.

Finally, as noted in our *Fatico* brief, multiple recordings captured Bombino expressing his view of Michael Persico.[6] *See* Def. Br. (ECF 848) at 21-22 and Exs. TTT and UUU (ECF 849). In particular, Bombino proclaimed that "Michael's as squeaky clean as they come" and discussed conversations during which Michael tried to teach Bombino to behave in a professional, businesslike manner. *Id.*

In sum, the evidence demonstrates that, although Michael Persico admittedly exercised poor judgment in arranging the loan by Preza to All Around at the usurious rate that the borrowers initially offered, this conduct is far removed from the typical extortionate loan where weekly interest payments are expected and threats ensue when payments are not made.[7] As such, the Guidelines here clearly overstate the severity of the offense, and a downward departure or variance is appropriate. *Cf. U.S. v. Restrepo*, 936 F.2d 661, 667 (2d Cir. 1991) (downward

---

[6] In several recordings James Bombino also discussed his and his brother Patrick's relationship with Theodore Persico. *E.g.*, 10/16/09 ("Teddy's closer to Pat[rick] than to his father."); 1/22/10 (Teddy told Bombino to give Teddy's share of company money to Patrick); 2/15/10 ("Teddy and I grew up together. I knew him all my life. He's like my brother. He's my partner.").

[7] Though we do not challenge the 3-point leadership enhancement calculated by the Probation Office, we ask that, when assessing the appropriate sentence under Section 3553(a), the Court take the enhancement into account. *See U.S. v. Kent*, 821 F.3d 362 (2d Cir. 2016).

departure appropriate where Guidelines overstated defendant's culpability); *U.S. v. Broderson*, 67 F.3d 452, 459 (2d Cir. 1995) (affirming district court's conclusion that loss amount overstated the seriousness of defendant's offense); *Adelson*, 441 F.Supp.2d. at 515 (where Guidelines not in line with severity of the offense, court should place greater reliance on Section 3553(a) factors).

**2. UNCONVICTED CONDUCT SHOULD NOT BE CONSIDERED**

For the reasons set forth in our *Fatico* briefs, we respectfully submit that the Court should not consider for sentencing purposes the unconvicted conduct the government alleges, since it has failed to prove such conduct by any standard of judicial scrutiny, let alone one of preponderant proof. Indeed, given the benign nature of the offense of conviction, consideration of the unconvicted conduct would become "the tail which wags the dog of the [convicted] offense," *U.S. v. Gigante*, 94 F.3d 53, 55 (1996) (quoting *McMillan v. Pennsylvania*, 477 U.S. 79, 88 (1986)), a particularly unjust result in light of the contradictory and wholly unsubstantiated evidence presented here. *See id.* at 56 ("the weight of the evidence … should be considered with regard to upward adjustments and upward departures"). Further, no unconvicted conduct was considered in sentencing Mr. Persico's co-defendants who pleaded guilty, including Anthony Preza (charged as a conspirator in the offense of conviction), nor did the government request such conduct be considered. Thus, Mr. Persico should not be treated disparately.

Though the government argues that Anthony Russo's current testimony should be credited because (a) he had no reason to falsely implicate Michael Persico and (b) Russo's cooperation agreement incentivized him to tell the truth rather than lie, Russo's recorded statements before he began cooperating belie both assertions. First, Russo's statements show clearly his firm belief that the government wanted evidence on ***Michael*** Persico in particular and sought it from anyone willing to offer it. *See, e.g.*, Def. Br., Ex. KK and KK(T) (The feds are "***going after Michael***" and "anybody they think" is "close to him."); Ex. B and B(T) ("If you … ***tell us about Michael***, we'll have you out of here by the weekend."); Ex. LL and LL(T) ("The[ ]

***agents want Michael***.”); Ex. MM and MM(T) (Agents pitched Teddy Persico Jr. to ***cooperate against Michael***); Ex. E and E(T) (Feds “think” ***Michael*** does “other things” because “he’s the last Persico” and his “father’s the boss.”). Russo does not single out anyone else as a key government target – not Theodore Persico Jr., Frank Guerra, Thomas Gioeli, Andrew Russo or Benjamin Castellazzo. Further, the three high-ranking Colombo members who, according to cooperating witness Dino Basciano, gave Curcio the order to kill Scopo are already serving life sentences, as is Michael’s brother Alphonse Persico. Thus, Russo well knew that implicating them would not provide the requisite “substantial assistance” he needed to deliver to obtain his cooperation agreement and U.S.S.G. § 5K1.1 downward departure motion.

Second, the recordings show that Russo was motivated to give the government what it wanted, whether or not it was truthful. Indeed, Russo’s pre-cooperation statements made plain his view that agents do not care whether or not a cooperator is truthful, so long as he’s telling them what they want to hear. *See id.*, Ex. E and E(T) (“The [ ] feds… don’t care if you’re innocent.” They operate like this: “If you help us out, we’ll let you go,” even if you “don’t know nothing.”); Ex. RR and RR(T) (The feds will sign up a lying “psycho” who tells them what they want to hear and will “piece it all together …[and] tell him what to say and how to say it.”).

Further, the fact that Russo only implicated Mr. Persico in some, but not all, of Russo’s crimes certainly does not mean he’s being truthful. As his recorded statements show, Russo well knew how to go about implicating someone falsely. *See, e.g.*, Def. Br., Ex. E and E(T) (Russo discussing how to implicate someone in a conspiracy even if they were not involved); Ex. SS and SS(T) (Feds are telling prospective cooperators that Teddy ordered a murder from prison and Michael relayed it to others.). Indeed, because Russo knew that his limited contact with Michael Persico in recent years could readily be proven, he confined Michael’s alleged involvement in Russo’s crimes to the mid-1990s, save the purported valet-related interaction, which does not constitute a crime in any event. Additionally, Russo limited the crimes to ones in which Russo

was personally involved since, given Michael's distance from Russo, the notion that Michael would casually confess involvement in crime to Russo is exceptionally far-fetched. And tellingly, Russo well knew that the best way to implicate Michael was to simply say that he and Michael had discussions about a crime. *See id.*, Ex. RR and RR(T) ("***If [a cooperator] wants to go tell the[ ] [feds] that I told him something that I never did, there's nothing I can do about that.***").

Ironically, the government argues that Russo should be believed – despite his wholly contradictory recorded statements about Michael – but a ***different*** cooperator who disclosed that the guns used in the Scopo murder were purchased from Basciano cannot be trusted because he "***was never signed up as a cooperating witness***, [despite which] the government [ ] disclosed the statement as potential *Brady* information." Govt. Resp. Mem. (ECF 853) at 12 n.5. This is simply false. First, the FBI report itself identifies the individual providing information as a "***cooperating witness***," not as a confidential informant or other source, as it would if the witness were not "signed up." *See* Def. Br., Ex. PPP. Second, in its *Brady* disclosure, the government identified the person who provided this information as Salvatore Miciotta. Not only was Miciotta "signed up as a cooperating witness," he testified for the government at the March 1994 trial of Theodore Persico Sr. and his co-defendants (*see* Miciotta Testimony Excerpt in *U.S. v. Theodore Persico Sr.*, 92 CR 351 (Exhibit 3)) and the October 1994 trial of "Wild Bill" Cutolo and others. *See* Miciotta Testimony Excerpt in *U.S. v. William Cutolo*, 93 CR 1230 (Exhibit 4). Further, he secretly made recordings on the government's behalf from April until December 1993 (*id.* at 1631) – *i.e.*, during the time when Scopo was murdered. And critically, Miciotta testified that he purchased guns during the war from Curcio's friend and partner-in-crime Dino Basciano (*id.* at 1816), the very person Miciotta identified as having sold the guns used for the Scopo murder. *See* Def. Br., Ex. PPP.

The government also argues that the testimony of Alan Quattrache, a Persico loyalist during the war who testified that Michael Persico was not involved in the war or even in the Colombo family "life," should be disregarded because he did not testify about the Scopo murder. *See* Govt. Resp. Mem. at 9 n.3. But Quattrache was heavily involved throughout the Colombo war period – indeed, apart from Scopo, all the war-related violence occurred between 1991 and mid-1992 (*see* Def. Br. at 11 n.11 and Ex. TT) – and certainly knew the others aligned with the Persico side. He knew Michael Persico was not even involved in that "life," much less in the war – obviously a critical point. *See id.*, Ex. UU at 1461-62, 1648.[8]

Similarly, despite having paraded a "hit list" found in an Orena loyalists' stash house as critical evidence against Guerra (*see id.*, Ex. SSS), the government argues that the absence of Michael Persico's name on it is insignificant, since other names – including Anthony Russo's – were not on the list. *See* Govt. Resp. Mem. at 9 n.3. But law enforcement found the list in March 1992 (*see* Def. Br., Ex. RRR), when Russo was still in prison. And more fundamentally, Michael Persico was the son of the Persico faction head. He would undeniably have been a prime Orena target had he been involved in the "life" and the war. Thus, his absence from the hit list speaks volumes.

Unable to even offer an explanation for the majority of Russo's contradictory testimony, the government perversely claims that the defense appears to suggest that Russo was not involved in the Scopo murder. *See* Govt. Resp. Mem. at 11. To the contrary, we emphasized that Russo was recorded implicating himself in the murder repeatedly – precisely why he cooperated.

---

[8] The government speciously argues that defense counsel suggested that the case in which Quattrache testified about Michael Persico's lack of involvement in the Colombo family life and the war was tried in 2002, since the brief inadvertently contained a typo as to the docket number. Govt. Resp. Mem. at 9 n.2. Not only did counsel attach Quattrache's testimony showing that he testified in July 1994 (Def. Br., Ex. UU), but earlier in its brief, counsel specifically noted that Quattrache testified in Alphonse Persico's trial, which occurred in 1994. *Id.* at 11 n.11-12.

*See* Def. Br. at 3-4 and Resp. Br. (ECF 854) at 1. As noted in our *Fatico* briefs, however, Russo's contradictions and lack of memory between even his testimony on direct and cross during both the *Fatico* hearing and the *Guerra* trial show that Russo remembered only the script he rehearsed. Def. Br. at 19 and Resp. Br. at 8. He had little true recollection of events surrounding the Scopo murder, so he invented details to make it appear as though he did. *Id.*

Finally, the government's argument that Russo's recorded observations describing Michael as "truly legitimate" should not be considered because (a) they are not inconsistent with Russo's testimony (Govt. Resp. Mem. at 5) and (b) Michael pleaded guilty to a crime (*id.* at 6) is plainly daft. No one, including Russo, would describe someone who helped plan or provided guns for a murder as "truly legitimate" or as having "nothing to do with anything" in the Colombo family, much less repeatedly complain that person had an aversion to violence. And the government's explanation that Russo did not discuss Michael's involvement in Scopo because "he could get killed for discussing murders" (Govt. Resp. Mem. at 5) is not only weak, given that he is in fact recorded discussing the Scopo murder (*see, e.g.*, Def. Br., Ex. L and L(T)), it is entirely irrational.

**B. MICHAEL PERSICO'S HISTORY AND CHARACTERISTICS**

As previously noted, the instant offense constitutes Mr. Persico's first and only felony conviction. He was born and raised in Brooklyn and has resided in New York his entire life. He is the father of five children – two young daughters, JoyceAnn and Patricia, whom he has raised alone since they lost their mother to cancer at ages 12 and 10; a son, Michael Jr., and daughter, Carmen, from an earlier marriage; and a step-son Joseph. Michael also has two grandchildren – Kylie, age 2, and Michael III, a newborn baby. Michael's two youngest daughters live with him and are enrolled in college. He continues to provide both with necessary emotional stability and financial support.

As reflected in the numerous letters submitted herewith, Mr. Persico has endeavored to lead his life in an honest, law-abiding fashion and to overcome the stigma of his last name. For the reasons discussed herein, we respectfully ask that he not be unduly punished for the lapse in judgment that led to the offense of conviction here.

**1. A PRISON SENTENCE WOULD DEPRIVE MR. PERSICO'S TWO YOUNGEST CHILDREN OF MUCH-NEEDED PARENTAL SUPPORT**

Numerous courts in this Circuit have considered family circumstances and the need for the defendant's presence as the basis for a below-Guidelines sentence. *See, e.g.*, *U.S. v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (court implied that extraordinary family circumstances alone may justify a downward departure); *U.S. v. Alatsas*, No. 06 CR 473, 2008 WL 238559 (E.D.N.Y. Jan. 16, 2008) (court noted defendant's good relationship with his wife and three children when imposing a below-Guidelines, probationary sentence); *U.S. v. Aristizabal*, No. 07 CR 101-01, 2007 WL 4555900, at *2 (E.D.N.Y. Dec. 20, 2007) (court imposed below-Guidelines sentence based in part on defendant's "good relationship with his wife and children" whom "he has been trying to support"); *U.S. v. Kon*, No. 04 CR 271-03, 2006 WL 3208555 (S.D.N.Y. Nov. 2, 2006) (in imposing below-Guidelines sentence, court noted defendant's extraordinary family circumstances in that she was the only caretaker for her daughter); *U.S. v. Gamez*, 1 F.Supp.2d 176, 184-85 (E.D.N.Y. 1998); *U.S. v. Handy*, 752 F. Supp. 561, 564 (E.D.N.Y. 1990) (downward departure based on the effect of prolonged incarceration on the future of defendant's children).

Even when the Guidelines were mandatory, the Second Circuit routinely upheld a district court's imposition of a below-Guidelines sentence based on extraordinary family ties and relationships. *See, e.g.*, *U.S. v. Alba*, 933 F.2d 1117, 1122 (2d Cir. 1991) (Court upheld downward departure based on family circumstances where the family was "close-knit" and its stability depended on the defendant's continued presence); *U.S. v. Sharpsteen*, 913 F.2d 59, 63 (2d Cir. 1990) ("family ties and responsibilities" warrant a downward departure).

Further, as discussed above, a court no longer needs to find the circumstances of a defendant's situation extraordinary but has the option of imposing a below-Guidelines sentence without finding specific departure grounds. *See, e.g., U.S. v. Selioutsky*, 409 F.3d 114, 119-20 (2d Cir. 2005) (case remanded for findings as to whether a departure or non-Guidelines sentence should be imposed based on defendant's aged parents' needs). Thus, courts may downwardly depart or vary below the Guidelines to reduce a sentence for the family's benefit when the absence of defendant's emotional or financial contribution would cause them significant hardship.

Particularly compelling in Mr. Persico's case are the needs of his two youngest daughters, Patricia and JoyceAnn, who have already suffered irreparably after losing their mother Darlene to cancer at such a young age. Those present during this horrific ordeal recall the endless love and support Michael provided to Darlene and their children. Dr. John DeLuca, Michael's family physician, notes: "During Mrs. Persico's illness, Michael was a compassionate, caring and loving husband to his ailing wife; at the same time he never wa[]vered from his duty as a father to his two young daughters, especially after the death of their mother." Rosalind Innucci, a close family friend for 20 years, writes: "When Michael's wife … became ill … Michael was her rock. He took care of her like you would care for a baby. I watched him carry her when she was too weak to walk. He was always attentive, always kind and compassionate. He spent days and hours by her side until she passed." Gina Caleca, Michael's close friend for over 30 years writes: "When [Michael's] wife Darlene got sick … he had to be the most devoted man I could have ever imagined. The way he took care of her at home is a testament to the kind and loving man he is…. [H]is strength for his family was remarkable." Michael's mother-in-law, Patricia Rava, who suffered a parent's worst nightmare – the loss of a child – describes her view of Michael: "In 2005, my daughter Darlene took ill. Michael took care of her throughout her

illness. He was compassionate and loving to my very sick daughter. He never left her side for a year and a half. I know, because I was right there beside him."

After Darlene's death, Michael was forced to cope with the loss of his life partner while simultaneously being thrust into the role of a single father to his two young daughters. One can hardly imagine a more painful age for the girls to lose their mother, and Michael became their emotional support system in addition to their caretaker. Although the girls, 21 and 23, are now entering young adulthood, the trauma of their mother's death is still acutely felt and has caused them to have a profound emotional attachment to their father. Michael's longtime friend and neighbor of more than 40 years, Ronald Beiter, comments: "After the loss of Michael's wife to cancer … everyone was concerned for Michael and his family. Not only did he show pure strength during his wife's battle, but again afterwards for his children. Michael was a great husband and is a wonderful father." Rosalind Innucci recalls, "When [Michael] became a single parent, he was always available for the needs of his [two] daughters. He took on the challenge of raising them without any complaints…. I find Michael Persico to be of the finest character."

Michael fully embraced his role as a single father and devoted himself to properly raising his two daughters. JoyceAnn, the older of the two girls, explains the fear of losing her father after the devastating loss of her mother:

> It [ ] became the sole job of my father to care for two young girls. Me being 12 and my sister being 10 years old, it was the toughest time of our lives. My dad had to do it all alone, make a living and make a home. As hard as it was, being under the great amount of stress he was under, all while still grieving, there wasn't a moment where my dad gave up. He still took care of us. He drove us to school every morning, dropped us off lunch, took us to our friends' houses, etc.
>
> It has now been ten years since we lost my mother, and the pain is still strong as ever. We will truly never get over the loss of her, and I can't bear to have to lose another parent. My father is the only parent I have. Although I am getting older, it is never fair to

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page104 of 204


> have to be left without parents – one taken way too soon and one taken when he is needed the most.

Letter of JoyceAnn Persico. Further revealing her deep emotional bond to her father, she adds: "I don't know what I would do or where I would be if it wasn't for my dad…. [He] means everything to me."

Michael's absence would deprive his daughters of the positive parental guidance that is essential during early adulthood, when the support of a loving parent is vital to fostering confidence and independence. Michael's oldest daughter expresses this concern for her sisters: "I [ ] think about my poor younger sisters all the time. They have already experienced so much loss at such a young age. My father took care of them and raised them since they were little, but they are still at very young impressionable ages and need him in their lives. They are still learning right from wrong…. My sisters need a parent around; they need my father there to help them and guide them to become the strongest, most positive, and successful women they can be." Letter of Carmen Persico. Her brother Michael Persico Jr. echoes this anxiety: "Both of my younger sisters lost their mother at an early age, and I feel that their development and transition into full adulthood is still extremely fragile, and they most definitely need the security and guidance of their father."

It is no surprise, then, to hear those fears expressed in the poignant words of Michael's youngest daughter, Patricia:

> My father is the most influential person in my life. To say my father has been a best friend to me is an understatement, he is truly a blessing….
>
> I was only ten years old when my mom passed away. Although I was young, I remember every moment like it was yesterday. I watched my father do everything in his power to help my mother feel like she was not alone in her battle with cancer. The day she passed away was the absolute worst day of my life. I remember thinking I'm ten years old now; this is going to be a very long life

> without my mom…. I truly thank God for the type of person my father is because I know I wouldn't have made it through without him.
>
> ***
>
> I still have so much more growing up to do, and I need to be able to go to him for everything…. I know from experience the relationship I have with my dad is rare. It scares me and kills me inside thinking that I might not be able to go into the living room and be with the one person who got me through all these years. Time is so precious and I have seen how short life is first hand. I truly need my dad every single day, just the thought of him being away physically hurts my heart.

Letter of Patricia Persico. Patricia praises her father as "the smartest, best, kindest man" and "the only person [she] ha[s] ever wanted advice from." She knows and recognizes that "[e]verything [she] learned from him was by example and experience."

Patricia's and JoyceAnn's closest relatives reiterate their worries if he were absent from their lives. As Michael's mother writes: "[Michael's daughters] are both at the age where [Michael's] support and guidance is important and necessary in their life." Letter of Joyce Persico. The girls' maternal grandmother remarks: "Michael is one of the best dads I have ever known….[H]e does everything for them…. Michael is … raising his children to be good, honest and decent citizens." Letter of Patricia Rava. She expresses the "great impact" Michael's presence has on them. Michael's sister Barbara writes: "[Michael's daughters] are both in school and very good students all because Michael is doing a great job raising them. It is very important for these girls to have their dad around to help them continue the path they are on…." Letter of Barbara Piazza. Reflecting on her experience as a New York City public school teacher for over 20 years, Michael's sister Susan notes: "As an educator, I unfortunately see families torn apart for many different reasons. When this happens, I see grades drop and these children often give up on life. It would be a shame for this to happen to Michael's children who have their whole lives ahead of them." Letter of Susan Spata. She continues: "Michael is a terrific father

and a good person. He should not be taken away from his children." *Id.* Michael's daughter-in-law, who lost her father at a young age and perhaps understands the severity of the situation best, explains: "I know what my two younger sister-in-laws … face on a daily basis having a deceased parent…. They need [Michael's] guidance and support as they make essential decisions in their lives…. He is a role model and care taker for these girls." Letter of Tara Persico.

Michael's extended family members have also witnessed the special bond he has with his youngest daughters. His nephew Thomas Lippolis writes: "There isn't much left for [Michael's daughters] regarding family and they will need all the support they can get from their only remaining parent who has always loved and supported [them] through[out] every aspect of their childhood." Michael's brother-in-law James Mannino likewise expresses: "I truly hope you [will] take into account Michael being a single parent [whose] daughters … truly need his loving guidance … when you make your decision."

The girls' emotional connection to Michael is so evident that even many of his friends voiced concern for their welfare if he were taken away. Mary Kosta, who has known Michael his entire life, notes: "The importance of a father's role in his daughters' lives is irreplaceable at any point during development. It is also crucial now during … the transition into young adulthood." Reiterating this concern, Louis Bonino, a friend of over 35 years, writes: "Since their mother passed away, Michael is both father and mother to their children. They would be devastated without their father. Michael is always working very hard to help his family…. I hope before you sentence him, you think of his children and family." Cecilia Yulo, an attorney and friend for over 30 years, credits Michael with having "raised [his daughters] to be kind, considerate, and respectful toward others," adding: "He has worked especially hard to be both father and mother to his two young daughters…. He has been everything to them."

John DiLeo, whose children attended school with Michael's youngest daughter, explains: "I'm concerned about the effect any prison time will have on his children, especially his younger

daughters. They have already lost a parent and not to have their father close to them will be devastating…. [N]o one can take his place." James Donofrio, a friend for 25 years, writes: "[Michael's] relationship with his late wife, who passed away far too soon, and his two children, has been exemplary. He always put his family first, even before any personal goals or aspirations…. [Michael's] children need a father, especially since their mother is no longer with them to provide the love, stability, and guidance that is essential to their development. A long prison term for Michael [ ] may prove unduly traumatic for his children."

As his friend for more than three decades, Georgette Flecha reflects: "I've always known [Michael] to be a loving, caring devoted father to his children. It has been especially hard for them all since [the] passing of their mother…. I believe that any jail time … will be a tremendous hardship for his children." Gina Caleca likewise expresses: "JoyceAnn and Patricia are too young to be left without a hands on parent…. They really need their dad. Please consider them when you are imposing a sentence." Margaret Maliga, Michael's employee for over 15 years, writes: "If Michael gets sentenced to prison, it will be very devastating, heartbreaking and painful for everyone that knows him but most of all to his daughters. They already lost one parent so please don't let them lose another one." Theresa Fearon, a longtime friend and business associate, similarly comments: "[Michael's] girls need their father even more so than other children would because they are without their mother. As a parent in that situation … I know they will be devastated without him."

Other long-time friends attest that Michael has been nothing short of an exemplary single parent. Friends who have known Michael since birth observe: "Since the death of [Michael's] wife, he has dedicated himself to his children, striving always to be both Mother and Father to them." Letter of Joan and Joseph Guido. John Barese, a friend of more than 20 years, writes: "Michael's strength as a single parent is admirable and inspirational to all. He realizes his daughters are most important and has always accepted his responsibility lovingly and willingly."

David Fine, Michael's friend and a father to two teenage sons, describes Michael as "[a] great friend, a loyal family man, and most important[ly] one of the best fathers I have ever had the pleasure of meeting." Dr. Michael Giasullo, Chief of Urology at Lutheran Medical Center in Brooklyn, observes: "I frequently see Michael … with his children and always comment to my wife about what a wonderful job he has done as a solo parent." A close friend of over 40 years describes Michael as "a good provider for his children, the best role model, [and] a great Father…. His children love him." Letter of Frank Leone. Rino Aprea, who has known Michael for nearly 30 years, likewise calls him as "a wonderful father who is a hands-on dad [and] always there for all his children no matter what he is going through." Michael's cousin Annette Iacono mirrors this sentiment: "[Michael] is a good and decent person but more than that he is a hand[]s on Dad who cares for his wonderful daughters."

### 2. MICHAEL'S PREVIOUSLY UNBLEMISHED RECORD AND HISTORY AS A HARD-WORKING AND RESPECTED BUSINESSMAN SHOW THAT THE CONDUCT AT ISSUE WAS ABERRATIONAL AND THAT A PRISON SENTENCE IS "GREATER THAN NECESSARY"

Mr. Persico has been steadily employed in numerous businesses throughout his life. He has owned a coffee business, several restaurants, a car service business and has worked diligently in each of his undertakings to make them successful establishments with favorable work environments. He now manages his real estate holdings, a full time task. Through years of hard work and dedication, Michael has earned a reputation as an esteemed and valuable member of his business community, and those who know Michael best recognize the conduct at issue here to be aberrant. Theresa Fearon, who works in the wedding industry and had numerous customers in common with Michael when he worked in the car service industry, writes: "Michael is a very good businessman and [is] always [ ] spoken about in the highest regard[ ] in our industry." Dr. Michael Giasullo, who has known Michael for more than a decade, comments: "[Michael's] reputation in the community [is] that of a prominent businessman with the highest ethical

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page109 of 204


standards…. He ha[s] chose[n] to lead a life of honesty, integrity, and hard work." Joseph Hommel Jr., a business associate and close friend for over 20 years, notes: "[Michael] is known as a caring, but strong businessman by many and highly respected in our town…. For as long as I've known Michael, I continue to view him as an honest, upstanding man who strives for the best." Ronald Beiter also describes Michael as a "well established and respected family and business man." Vincent and Lorraine Blandino, friends of Michael for more than a decade, describe Michael as an "intelligent businessman" and "fine gentleman" whom they feel "extremely fortunate to have met."

Michael's demonstrable commitment to living a law-abiding and productive life, despite his last name and family ties to illicit activity, has earned him the admiration of friends and colleagues, who routinely describe him as intelligent, honest and hard-working. Donna and Robert Ottofaro, who have known Michael his entire life, write: "[Michael] is his own person, not a product of his family's past…. [He is] a kind, gentle and smart man with a warm smile and [ ] always ready to lend an ear. He helps support his community and neighborhood." Michael's close friend of many years Jennifer Patafio writes: "Born to a name that prejudiced and scrutinized [Michael's] every move … [h]e quietly took the high road and became a man I hope someday my own son will emulate. Hardworking, loving, caregiver, loyal, honest and respectful, these are the words that describe a great man." Linda Lippolis, Michael's sister-in-law, laments: "[U]nfortunately the reputation of other family members may now suggest the tarnishing of Michael's good name. [However, Michael has] prided himself as a businessman and a law-abiding citizen."

Those who have worked and interacted with Michael professionally similarly attest to his honorable character. John Manning, a mortgage broker in Brooklyn, recounts: "I have done business with Michael Persico on several occasions over the past few years. I have known him to be nothing other than polite, professional, and courteous to myself and my staff. He has always

been honest and forthright with me." Howard Simowitz, Michael's longtime accountant, comments:

> [Michael] has earned my respect, both as a professional and as a friend, in the manner that he has handled all aspects of our relationship…. He ranks with the best that I have met and I have been fortunate to meet some very kind, honorable and successful people in my lifetime.

Roy Brigagliano, a certified public accountant who also handled Mr. Persico's financial affairs for several years, states: "[Michael] has been held in the highest esteem by those who have come into contact with him[,]" noting that "[h]e has been audited by the IRS and has proven to be law abiding in his tax filings." Angelo Corva, an architect who collaborated with Michael on several projects describes Michael "as a fine example of a law-abiding[,] kind [and] caring gentleman" and "commend[s] him for his outstanding qualities and fine character." Michael Miranda, a friend and business associate of Mr. Persico for over 20 years, likewise characterizes him as "an honorable businessman, loyal friend, and loving family man… [who] has always tried to live his life in accordance with the law."

So too, Michael's close friends unequivocally describe him as a hard-working and upright citizen. Louis Bonino, a retired NYPD officer who has known Michael for nearly four decades, comments: "Michael has never been in trouble before and has always led a peaceful li[f]e. Michael is one of the most decent and respectful people I know." Joseph and Faith Trunk, who have known Michael since he was a teenager, write: "I hope you take into consideration the way in which [Michael] cares for people and for his life's past record being a law abiding business man and family man…. He is loved and respected by many people from all walks of life." Long-time friend Rino Aprea similarly writes: "Since 1988 I [have] only know[n] Michael to be a law abiding person whom I have spent a lot of time with. Michael has always made clear that he is a person who lives according to the law…." Marilyn Caruso, a neighbor and friend of 30 years, notes: "Michael has always tried to live his life in a law-abiding manner and has always

encouraged others to do the same. Michael possesses a great deal of integrity and constantly strives to make sure he is doing the right thing." Another longtime neighbor and friend comments: "I have [ ] known Michael to be a concerned, law-abiding citizen, contributing to the community. He has always acted in 'upright' fashion." Letter of Mary Anne Marullo. Dino Iacuzzo, Michael's close friend of nearly 20 years, likewise conveys: "Michael has continuously expressed remorse over any involvement with those events charged. It was an aberration of character[.] Michael is one of those good men who went to work everyday, raised a family and lived his life. He is an honest man who made a mistake."

Not only is Michael an admired businessman, he has also served as a role model and supporter for employees and colleagues. Michael LoDolce, a business associate and friend for 25 years, describes Michael as "a local business man providing jobs and a good working environment for his employees." He continues: "Michael's friendship, advice and mentoring has [ ] had a positive impact on the decisions I have made in regards to growing the business and treating our employees with respect and appreciation. I can't say enough about his character and fabric as a compassionate person." Rino Aprea also views Michael as a role model: "Michael is a great inspiration in my business ventures, watching him … and listening to how he would constantly try to better them or better his workers so that they could one day open or run businesses of their own. Four of his employees to this day … have their own businesses." Steven Caso, who owns several businesses in Brooklyn and has known Michael for many years, describes "what a positive influence [Michael] has had on the community whether [ ] it[']s serving the community through his business or by creating employment opportunity for fellow members of the community." Mr. Caso continues: "I have several businesses in the area and Michael has always been a positive influence in his willingness to grant advice as well [as] to be supportive and lend a helping hand to everyone in the community…. He has always conducted himself, both professionally and personally, with the utmost character and integrity."

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page112 of 204


Michael's employees similarly praise him as a man of high character. Margaret Maliga writes: "In all the time I've known Michael, I've never seen him display any act of anger or aggression to myself or any other of my co-workers…. He's not only a great boss but an excellent businessman, a wonderful friend and a great father." During the 10 years that Rosario Ferrara worked for Michael, her relationship with him was "warm and hospitable." Ms. Ferrara describes Michael as an employer who was always "fair and honest[,]" not "given to anger," and nothing but "respectful and reserved."

Michael has even made financial sacrifices in order to help colleagues in need. Joseph Hommel Jr., who purchased a floral business from Michael, writes: "[Michael has] always stressed his desire to see us succeed. Michael always understood if a payment was not made on time and would not accept any interest. To this day I am grateful for his offer and assistance in supporting a business that has helped me and my family grow."

### 3. MICHAEL'S LONG HISTORY OF CHARITABLE WORKS AND GOOD DEEDS IN HIS COMMUNITY SHOULD BE CONSIDERED

Michael is widely regarded as a generous and valuable contributor to his community. Retired NYPD officer Louis Bonino writes: "Michael has always tried to help people in both business and their personal lives. Michael does not know how to say no when it comes to helping others." Mary Kosta likewise notes: "I have known Michael his whole life…. Michael is a caring, thoughtful person who always goes out of his way to help others. He is a gentleman [ ] and [ ] an asset to the community." Barry Levin, an attorney who has known Michael for more than 20 years, comments: "I have always known Michael to be a generous and charitable person who is always available to help."

Charles Marullo, a retired New York City school teacher who has known Michael for 15 years, describes him as "a contributing factor to our community [who] has always acted in a respectable manner." Other close friends also describe Michael's genuine concern for and active

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page113 of 204


participation in his community. *See, e.g.*, Letter of Perry Ferrara ("Michael is a good person. I have seen him do so much for so many."); Letter of James Donofrio ("Mr. Persico has always tried to help people in need…. He [has] always [been] a community oriented man who [gives] generously of himself for worthy causes.").

After enduring the tragic loss of his wife to cancer, Michael committed fundraising efforts to support medical research in the hopes of sparing other families from suffering similar hardship. Steven Caso recalls: "I have personally witnessed [Michael's] charitable nature and genuine compassion by attending charitable events held by Michael to raise money for cancer." Recognizing Michael's commitment to cancer research, Donna Guiga, a registered nurse who has known Michael for 25 years, often sought his assistance with fundraising efforts: "[W]hen I turn to [Michael] for [] help whether it is financially or just giving of his time, he never refuses. He always comes from a place of yes[,] never no…. He is truly an asset to his family, friends and community."

Michael has also served his community through his work with young children who are underprivileged or have special needs. For years he was actively involved in the GRACE Foundation of NY, a non-profit that helps children with autism and their families. Kathleen Tramontana, a board member and chairperson of GRACE, writes: "Michael was always there to help in any capacity he [could]. Whether it be giving me his time, helping with the organization or running such an event, or donating gifts and funds[,] it did not matter…. His kindness, compassion and honesty [were] always apparent." Several lifelong friends also describe Michael's charitable work over the years. Peter Thristino writes: "Michael [ ] unselfishly offered his time and services to the community[,]" recalling that "[Michael] volunteered to assist the Community Mayors with the handling of handicapped children at special events." Florence Della Rocca writes about how "[Michael] manages to thanklessly give [ ] his time and considerable amount of energy to help in the nurturing and development of underprivileged young children."

Case 17-2701, Document 25-5, 09/12/2017, 2122149, Page114 of 204


Georgette Flecha, who is involved with several charitable organizations, notes: "[Michael] has been an asset to some of the charitable work I am involved in[.] [H]e has contributed significant[ly] to Toys for Tots during the Christmas holidays [and] has supported [m]any charitable organizations with time and donations, to help those less fortunate."

In addition, Michael has always recognized the importance of sharing personal financial success for the betterment of the community. Ronald Beiter reveals that: "Michael is known as a 'philanthropist' in the Saugerties community. Always giving and NEVER expecting anything in return." Several friends recall generous acts that were done simply to uplift his community. For example, Louis Soto comments: "I have seen how Michael puts the needs of others before his own which is evident through his substantial endeavors to community work, in particular our elementary school children. He dedicated many things including a new scoreboard that the school so longed for but could not afford to purchase." Michael has also received numerous notes over the years thanking him for his assistance to various children's organizations. *See, e.g.*, Letters of Charles and Rosane Farcher.

Noting the support he has shown for his church, Michael's friends and fellow congregants write: "Michael [is] always there to offer his help one way or another…. In a fundraising campaign to memorialize Christmas trees, Michael, without hesitation, donated ten live Christmas trees [ ] which are still in front of the main entrance to the Rectory." Letter of Vincent and Lorraine Blandino. *See also* Letter from Atonement Lutheran Church.

Michael has selflessly helped both friends and strangers alike. Paul Dordal, who met Michael after spending time in prison, writes: "[Michael's] faith, trust and business acumen took me from an uncertain path to a road with direction and purpose…. Michael's offer and generosity of being a working partner allowed me to reconcile my life and that of my family." Rocky Armacida, a friend of Michael's for many years who has struggled with various health issues, recounts: "Michael [is] always caring, charitable and generous helping anyone in need….

With his financial support and asking nothing in return I was able to get off disability and go back to work."

Undoubtedly, Michael's community would suffer a great loss in his absence. As Nicholas DiLeo, a business associate and friend of Michael's, writes: "In thirty years I have never witnessed Michael turn his back on anyone that needed some type of assistance or advice. These are qualities of a giving and kind person, a quality that will be greatly missed if he is absent." In light of these attributes, Michael's brother-in-law Robert Lippolis asks that "the [C]ourt take into consideration the positive effect that [Michael] has [had] on the many lives that he [has] touche[d], and the void his absence would create."

**4. MICHAEL PROVIDES ESSENTIAL SUPPORT TO HIS FAMILY AND FRIENDS AND IS DEEPLY ADMIRED BY ALL**

In addition to raising his two daughters since preadolescence as a single father, running several businesses and serving his community, Michael also plays a vital role in the lives of his friends and relatives. Alvin and Joyce Green, who have known Michael his entire life, write: "Michael's [] family members rely heavily on Michael's presence…. Michael is the caregiver for not only his children, but for his mother, sister and brother, as well." Michael Miranda likewise observes: "[Michael's] guidance, leadership and financial support are crucial to his family's survival. He has been supporting his mother and siblings for many years. He is fully committed to providing for all members of his family." *See also* Letter of Marilyn Caruso ("[Michael] has been an integral part in the caring of his mother and family members."). In summarizing how Michael prioritizes support of his family, attorney Barry Levin writes: "[Michael] is a person that always puts his life last and spends most of his time raising his children, assist[ing] his nieces and nephews and helping his family and friends."

If Michael were absent for any period of time, his family would certainly suffer. MaryBeth DiLeo, who has been friends with Michael for more than 20 years, writes: "I'm

concerned about what might happen not only to [Michael's] children, but his mother and other family members as well…. He is the one who takes care of everyone else. There's always a person who family members seem to count on more than others for support and advice and Michael is that person in his family." Indeed, Michael also provides support to his former wife, the mother of his two older children, Michael Jr. and Carmen. Michael's son writes: "I am [] concerned for my mother as she is disabled and depends on my father's support. As well, my Grandmother, my father's mother, is [in] her eighties and needs [his] support too." Letter of Michael Persico Jr. Michael's sister-in-law notes that, in addition to "two young daughters who already ache from losing their mother to cancer," Michael's "elderly mother depends on him [and his] absence will weigh heavy on her well-being." Letter of Linda Lippolis.

Michael's older children also speak of how important he is in their lives and the lives of his grandchildren. Michael Persico Jr. writes: "The coming years … seem unclear and dark as my father's guidance, which has always been an integral part of my development, may be absent. My father has always guided me in the right direction." Carmen Persico similarly explains her need for her father's guidance, especially during times of trauma and uncertainty: "Without my father during these times and so many more, I honestly do not know if I would have made it through all of the pain." Michael Jr., Carmen and JoyceAnn also speak at length about the extraordinary bond Michael has formed with his older grandchild, Kylie, who is two, and how they cannot imagine the devastation she will feel if he is removed from her life. They also urge the Court to allow Michael's newborn grandchild to have the opportunity to bond with him in the way that Kylie has. *See* Letters of Michael Persico Jr., Carmen Persico and JoyceAnn Persico.

Many in Michael's extended family describe the importance of his support as well. To his nieces and nephews, he continues to be a role model even in their adult lives. Michael's niece Dominique Lippolis observes: "For my entire life, [Michael] has been there for me and my family…. [He] has made a huge impact on my life, and the respect I have for him is limitless….

He is the best example of what an uncle should be like." His niece Danielle Mannino similarly writes: "I have never seen [Michael] raise his voice or be disrespectful to anyone. He always said 'treat people the way you would like to be treated.' I have lived in that sense and am proud to say I learned these valuable lessons from him." Thomas Lippolis, Michael's nephew, likewise comments: "[Michael] has always inspired me to go far in life and [ ] do the best I can with what I have…. [Michael is] a mentor that has taught and cared for me for most of my life."

It is apparent to everyone around Michael how much his family truly depends on him. His business associate Michael LoDolce describes him as "the glue that bonds his family together." Michael's daughter-in-law writes: "[Michael's] family depends on [him] in many ways and there would be a big puzzle piece missing if he was taken away." Letter of Tara Persico. Noting that "[t]here are also many other family members and friends who depend on his [father's] guidance and help," Michael's son implores the Court to "[p]lease consider heavily the impact of removing [his] father from the lives of family and friends." Letter of Michael Persico Jr. Jessica Montgomery, a close friend of Michael's eldest daughter Carmen, observes: "Mr. Persico [is] [ ] there any time a family member, his children, or their friends needs him…. [I] hope [ ] you will consider Michael's children, who will certainly suffer and miss their father, as well as the other members of his family who count on him." Julie Nicotra, a friend of Carmen's since childhood, likewise expresses that "the damage [Michael's] absence would cause them breaks my heart because he raised some of the most generous, kind, loving and hard-working people I have had the privilege of knowing all these years."

The value Michael places on his family and friends is also evident in the support he provides during difficult times. As someone who knows the pain in losing a close loved one, Michael has always provided support for those experiencing similar difficulties. Rino Aprea recounts: "When my mother got sick, [Michael] was there for me. He made sure that we were ok and he brought our family food and coffee to the hospital every day." Similarly, Barry Levin

confides: "When tragedy has struck my own family, Michael has always reached out and offered his assistance to both myself and my family."

As evidenced by the overwhelming number of letters attesting to his admirable qualities, it is clear that Michael is deeply valued by all who know him. *See, e.g.*, Letter of Frank Leone Jr. ("I have known Michael for many years and always found him to be a gentleman, a good son, brother, father and friend. I know that he plays a very important role in his family life."); Letter of John DiLeo ("Michael is one of the most decent and respectful people I know…. a good man not only to his family and friends, but to everyone. He has a way of making you feel better about yourself."); Letter of Gina Caleca ("Michael is a good man and I hope that you consider all of the people that love him when you impose his sentence."); Letter of Gigi Gambino ("[Michael is] a decent, polite wonderful human being who treats everyone with dignity and respect."); Letter of Donna and Robert Ottofaro (crediting Michael as "someone [we] feel make[ ] [us] better Christian[s] by the examples of his patience, trust, love and sincerity [that] he shows everyone individually."); Letter of Vincent DeMaggio ("As to Michael Persico's character I can say without reservation that I have found him always to be kind, polite and gracious…. Michael is a good man and I personally am grateful to know him."). As MaryBeth DiLeo insightfully observes: "[Michael's] family and friends are so supportive because he is a good man with a good heart. He is always willing to help a friend or family member in need. He puts the needs of others ahead of his own…. Michael is such a special person."

### C. THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

When sentencing Mr. Persico, the Court must also consider the need to avoid unwarranted sentence disparities. Most notably, Anthony Preza, convicted of financing the $100,000 loan at issue in this case, received a sentence of probation. In fact, each of Mr. Persico's co-defendants who pleaded guilty instead of proceeding to trial received a sentence below (or, where the range was 0-6 months, at the lowest end of) the Guidelines range for his or

her offense of conviction. And despite the fact that all of these co-defendants were charged with crimes in addition to those to which they pleaded guilty, the Court did not consider the unconvicted conduct in determining their sentences. To be sure, even when sentencing Francis Guerra, who proceeded to trial and thus had no plea agreement, the Court only considered unconvicted conduct to determine where within the Guidelines range for his offense of conviction the sentence should fall, imposing a substantially lower sentence than that requested by the government. Further – and over the government's objection – the Court later reduced Guerra's sentence based upon a subsequent guidelines amendment.

Taking the co-defendants' sentences and the need to avoid disparity into account, then, we respectfully submit that the Court should also impose a below-Guidelines sentence on Mr. Persico. Strikingly, the government maintains that, even taking into consideration the unconvicted conduct it has alleged against Mr. Persico, a sentence of 37-46 months is appropriate. *See, e.g.*, Govt. Ltr. dated 1/19/15 (ECF 823). Of course, implicit in this position is a concession that a significantly below-Guidelines sentence is warranted if the unconvicted (and unproven) conduct is not considered.

## CONCLUSION

The extraordinary letters submitted on Mr. Persico's behalf speak volumes about his character. To everyone who knows him – friends, family and community leaders – Mr. Persico is a generous and remarkable man who has deeply affected all those who have entered his life. What is clear from these letters is that Mr. Persico is greatly needed by his family, especially his children, and he has positively impacted countless lives.

Mr. Persico accepts responsibility for and sincerely regrets his lapse in judgment in arranging the loan at issue. Recognizing this conduct to be aberrational, however, his friends and family continue to treasure him and attest to his innate good character. Thus, we respectfully ask that, in consideration for Mr. Persico's young daughters and other family members who need him desperately, and in light of his unique and compelling circumstances, this Court show compassion and mercy by imposing a sentence of time served, which in this case is undoubtedly "sufficient, but not greater than necessary."

Dated: New York, New York
October 12, 2016

Respectfully submitted,
/s/
Marc Fernich
Maurice Sercarz
Sarita Kedia

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X

UNITED STATES OF AMERICA

10 CR 147 (DLI)

-against-

MICHAEL PERSICO,

*Defendant.*

----------------------------------------------------------X

**DEFENDANT MICHAEL PERSICO'S**
**REPLY SENTENCING SUBMISSION**

Marc Fernich
Law Office of Marc Fernich
810 Seventh Avenue
Suite 620
New York, NY 10019
(212) 446-2346

Maurice Sercarz
Sercarz & Riopelle
810 Seventh Avenue
Suite 620
New York, NY 10019
(212) 586-4900

Sarita Kedia
Sarita Kedia Law Offices
5 East 22nd Street
Suite 7B
New York, NY 10010
(212) 681-0202

## PRELIMINARY STATEMENT

We respectfully submit numerous additional letters of support written on behalf of Michael Persico and briefly reply to the government's sentencing submission.[1]

### I. MICHAEL PERSICO'S HISTORY AND CHARACTERISTICS

Though more than a hundred letters from friends, family and colleagues unanimously describe Mr. Persico as an honest, hard-working and loving father who has always endeavored to lead a law-abiding life, the government argues that the offense of conviction was not aberrational because loansharking is "a staple LCN crime" which Mr. Persico "committed over a long period of time." Govt. Sent. Ltr. (ECF 857) at 3. First, as the evidence shows, the loan at issue was not the type of "loansharking" advance that is "a staple LCN crime." As we previously explained, at Theodore Persico Jr.'s request, Michael Persico asked a business associate, Anthony Preza, to provide a $100,000 loan to a trucking company owned by Theodore, James Bombino and Steven Marcus to enable the company to buy additional trucks and take on more work. *See* Def. Sent. Sub. (ECF 856) at 4-7. The borrowers initially agreed that the principal plus $10,000 would be returned in sixty to ninety days. *Id.* No principal or interest payments were ever made, however, and no threats, express or implied, ensued – facts the government does not contest. *Id.* Neither Mr. Persico nor Mr. Preza profited from this transaction; rather, Mr. Preza lost $100,000. *Id.*[2]

Second, the only evidence the government offered to prove Mr. Persico's purported involvement in loansharking prior to this occasion was the testimony of Anthony Russo, a patently unreliable witness. Not only was his testimony wholly contradictory, Russo intentionally destroyed his loansharking records after he began cooperating, undoubtedly

---

[1] The additional letters of support are annexed in alphabetical order by the author's last name as Ex. 5.

[2] The government erroneously states that Mr. Persico extended the loan through Mr. Preza. Though Mr. Persico made various business investments with Mr. Preza, they were not associated with the loan. It was Mr. Preza who extended the loan and ultimately lost the money.

because they did not substantiate his claims regarding Michael Persico's involvement. *See* Def. Br. (ECF 848) at 22-23 and Def. Resp. Br. (ECF 854) at 4, 8-9. Indeed, neither Russo nor the government even offered an alternate explanation for Russo's post-cooperation destruction of this critical evidence. Though the government attempted to discount Russo's obstructive act, arguing that the records would "not likely" have dated back to the mid-90's (Govt. Resp. Mem. (ECF 853) at 15), Russo contradicted this assertion. To be sure, Russo admitted that a $10,000 debt by "Lenny," whom Russo lent money he purportedly borrowed from Michael Persico, had been documented in the destroyed records. *See* Def. Resp. Br. at 8-9. Further, the government's decision to give Russo a cooperation agreement and make a downward departure motion on his behalf despite its knowledge of Russo's post-cooperation obstruction substantiates Russo's pre-cooperation view that the government would reward anyone who was willing to implicate Michael Persico, even if falsely. *See* Def. Br. at 8-10; Def. Sent. Sub. at 8-9. In truth, Russo's recorded pre-cooperation admissions that Michael is "truly legitimate" and "has nothing to do with anything" in the Colombo family (*see* Def. Br. at 4-7, Ex. E and E(T) (ECF 849)) – statements supported by the voluminous letters submitted on Mr. Persico's behalf – are far more credible than the fabrications Russo later invented to save himself from dying in prison.

In support of its bid for a 37-46 month prison sentence, the government then recites Mr. Persico's alleged involvement in additional crimes. Again, it offers ***nothing*** but Russo's testimony to support its claims, and it disregards entirely Russo's numerous acknowledgements, made when confiding in criminal cohorts, that belie his current contentions. *See id.* Indeed, the government even continues to maintain that in 2008 Mr. Persico gave advice to Russo about how to behave after he was inducted into the Colombo family (Govt. Sent. Ltr. at 4), despite the facts that (1) Mr. Persico himself is not an inducted member – ***which in itself speaks volumes*** – and (2) the telephone records show that Mr. Persico did not speak to Russo in 2008 and barely spoke with him after. *See* Def. Resp. Br. at 2, Ex. YYY and Ex. ZZZ (ECF 854).

The government also continues to argue that Michael Persico provided the firearms used in the Scopo murder even though its cooperating witness Salvatore Miciotta (whom it initially tried to renounce) controverts Russo's claims. Though Miciotta may not have been privy to each and every detail regarding the Scopo murder, he most certainly had significant information about the people involved. And critically, Miciotta, who knew Basciano well, purchased guns from Basciano himself and had no reason to falsely implicate Basciano, categorically informed that "the gun(s) utilized in the [Scopo] murder were p[ur]chased from Dino Basciano." Def. Br. at 20 and Ex. PPP. Further, Miciotta's information is far more plausible than Russo's given that (1) Basciano and Eric Curcio (who planned and participated in the hit) were partners in numerous crimes and (2) Basciano conceded that he sold guns exactly like that used in the Scopo murder and quite possibly that very one. *See* Def. Br. at 20-21. Additionally, it is clear from Russo's testimony that he already possessed the Mac-10 used in the Scopo homicide during attempts to kill Cutolo, which occurred before any Scopo attempts and before Michael Persico's ostensible involvement. *See id.* at 12-13; Def. Resp. Br. at 7.

Perplexingly, while claiming that Michael Persico assisted Russo in starting a car-detailing business to demonstrate Michael's involvement in "racketeering" (Govt. Sent. Ltr. at 4), the government also contends that Michael simultaneously "extorted" Russo and Anthony Stropoli out of the valet parking business. *Id.* at 5. As an initial matter, the government has still not shown how the facts Russo described on the valet issue – even if true – constitute extortion or any crime. The government also fails to explain why the indictment and the sworn affidavit submitted by FBI Agent Adam place the valet interaction at an entirely different time period than that to which Russo testified. *See* Def. Resp. Br. at 9. And notably, at the time of the alleged extortion, Russo was an inducted member of the Colombo family (FH 113); Stropoli was acting as captain on behalf of Theodore Persico Jr. (Def. Br., Ex. U and U(T)); and Michael Persico had no status, hence being labelled an "associate" by the government.

## II. THE COURT SHOULD NOT SENTENCE MR. PERSICO DISPARATELY

The government does not deny that the Court did not consider – nor did the government ask it to – unconvicted conduct with respect to any other defendant who pleaded guilty in this case. Nor does it contest that each and every co-defendant who pleaded guilty was sentenced below the Guidelines or at the bottom end where the Guidelines range was 0-6 months. Rather, the government claims that Preza (who received a below-Guidelines sentence of probation) is not similarly situated to Mr. Persico principally because "Preza does not share [Mr. Persico's] lengthy history of committing serious crimes." Govt. Sent. Ltr. at 6. First, the government charged Preza with crimes in addition to that to which he pleaded guilty – including "racketeering" and the "extortion" the government asks the Court to consider here – but did not ask the Court to consider them in sentencing Preza. And second, Mr. Persico has no prior criminal record and, despite its best efforts over 25 years due to his last name and blood relations, the government has thoroughly failed to prove him guilty of any unconvicted conduct.

Likewise, the comparison to Guerra is hardly "strained" (*id.*), for the sole point made regarding Guerra is that even he received a Guidelines sentence despite having proceeded to trial. *See* Def. Sent. Sub. at 31. Indeed, though the Court found Guerra's direct participation in multiple murders proven, it still imposed a sentence within the Guidelines range for his offenses of conviction rather than the 20-year sentence sought by the government. *Id.*

Thus, there is no question that imposing even a Guidelines sentence upon Mr. Persico would be treating him disparately.

## III. MR. PERSICO'S FAMILY CIRCUMSTANCES WARRANT A SENTENCE OF TIME SERVED

While acknowledging that the circumstances suffered by Mr. Persico's two youngest daughters are "extremely sympathetic," the government argues that the loss of their mother is not "sufficiently extraordinary" to support a sentence of time served because they are in their early

20s. *See* Govt. Sent. Ltr. at 5. But the fact remains that these two girls have suffered a loss no child should endure and they continue to be wholly reliant upon their only remaining parent – their father. Both girls still live at home with Michael as their solitary source of emotional and financial support and to lose him for any period of time would simply be cruel and unjust.

With respect to Michael's elderly mother, although he does have two sisters to assist in caring for her, his sister Barbara works full-time and has a single daughter with an infant child, whom she helps raise. Michael's other sister Susan is a full-time school teacher and raises three young children. Michael's two older children, both of whom are also employed full-time, do not even reside in Brooklyn. Therefore, Michael's assistance is essential.

## **CONCLUSION**

Through the various submissions made in advance of Mr. Persico's sentencing, the Court can undoubtedly see that Mr. Persico's true character is far removed from that which the offense of conviction would suggest. Indeed, the extraordinary letters submitted on his behalf show that he is not the person the government portrays him to be. He has endeavored to live his life in a law-abiding manner and to hold himself to the highest morals and standards. He has been generous, kind and incredibly charitable throughout his life. In light of these remarkable character traits, we respectfully ask the Court to impose a sentence of time-served, which is "sufficient, but not greater than necessary," so that Mr. Persico can continue caring for his family, serving his community and contributing positively to society.

Dated: New York, New York
October 25, 2016

Respectfully submitted,
/s/
Marc Fernich
Maurice Sercarz
Sarita Kedia

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA, : 10-CR-147 (DI)
:
Plaintiff, :
: United States Courthouse
-against- : Brooklyn, New York
:
MICHAEL J. PERSICO, :
: Friday, July 21, 2017
Defendant. : 2:15 p.m.
- - - - - - - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE DORA IRIZARRY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BRIDGET ROHDE, ESQ.
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: ALLON LIFSHITZ, ESQ.
ASSISTANT UNITED STATES ATTORNEY

For the Defendant: SERCARZ & RIOPELLE
810 Seventh Avenue, Suite 620
New York, New York 10019
BY: MAURICE H. SERCARZ, ESQ.

LAW OFFICES OF MARC A. FERNICH
810 Seventh Avenue, Suite 620
New York, New York 10019
BY: MARC FERNICH

LAW OFFICES OF SARITA KEDIA
5 East 22nd Street, Suite 7B
New York, New York 10010
BY: SARITA KEDIA

Court Reporter: DAVID R. ROY, RPR
225 Cadman Plaza East/Brooklyn, NY 11201
DRROYOFCR@GMAIL.COM

Proceedings recorded by Stenographic machine shorthand, transcript produced by Computer-Aided Transcription.

(In open court.)

THE COURTROOM DEPUTY: Criminal cause for sentencing, Docket Number 10-CR-147, United States versus Michael Persico.

Please state your appearances.

MR. LIFSHITZ: Allon Lifshitz for the United States. Good afternoon, Your Honor.

And also at counsel table are FBI Special Agent Chance Adam --

THE COURT: Good afternoon.

MR. LIFSHITZ: -- and United States Probation Officer Michael Dorra.

MR. DORRA: Good afternoon.

THE COURT: Good afternoon to all of you. You can have a seat.

MR. LIFSHITZ: Thank you.

MR. SERCARZ: Good afternoon, Your Honor. For the Defendant Michael Persico, Maurice Sercarz, S-E-R-C-A-R-Z; Sarita Kedia; and Mark Fernich. The defendant is present in court.

THE COURT: Yes. Thank you. Good afternoon to all of you.

Good afternoon, Mr. Persico.

MS. KEDIA: Good afternoon.

THE COURT: All right. And good afternoon to,

what I guess, are a lot of family members, friends, and observer.

All right. We are here today for sentencing. I am assuming that the parties have received the Court's decision concerning the Fatico hearing that was held in this case. The Court issued that opinion a little earlier in the week. And the Court has found that the Government proved by more than a preponderance of the evidence that the defendant participated in the murder, specifically, that of Joseph Scopo, of conspiracy to by and sell stolen property, specifically involving some stolen -- a truckload of stolen video games, loan shark, extortion, and racketeering. These crimes were all part of an overall racketeering scheme. And as such, the Court is free to consider such relevant conduct in its fashioning an appropriate sentence in this case.

Now, before we actually get to the heart of this sentencing, Mr. Persico, first for your benefit and also for the benefit of the observers, I just want to outline how we are going proceed this afternoon, all right? First, I want to make sure that all of us have received all the same documents and information relevant to sentencing, that all of your -- you are assured that I have received what I should have received, and that all of you also have copies of what I have received so that we are all working with the same set of facts; so that we are all on the same page.

Next, I also want to address any other outstanding objections to the presentence report. I do not think that there are any, except that, perhaps, the defense may have a continuing objection to the Court's Fatico ruling, but I will let Counsel address that.

And next as I am required to do under the current state of federal sentencing laws and as an initial matter, I have to make a determination as to what the appropriate sentence guideline range is in this case. The guidelines are advisory. They are not mandatory. Nevertheless, the Court is required to make that determination as to what the guideline range should be in this particular case, as a starting point.

The Court has to consider within that advisory guideline structure not only the policies and public considerations embodied in the guidelines, but also whether any departures, either upwardly or downwardly, from the guidelines and within that guideline structure. And the Court also has to consider what are called 3553 factors, which I am sure there will be more discussion about during this hearing, to determine whether or not a variance from that, the guideline range is appropriate, again, either upwards or downwardly from what the guidelines say.

In that regard, because I do have all of these other things to consider, the Court has considered the

voluminous sentencing submissions that have been provided by the parties in this case. But the Court certainly will give the attorneys an opportunity to address the Court and address anything that they may not have already addressed in their papers.

The law also gives you the right, Mr. Persico, to make a statement to the Court. And if you wish to make a statement, I will be happy to give you the opportunity to do that.

It is not until after we have gone through all of that that I actually will impose sentence.

Do you understand that process, sir?

THE DEFENDANT: I do.

THE COURT: Okay. So needless to say, of course, there was the Fatico hearing itself, and then there was a lot of briefing in connection with that. I am not going to go through chapter and verse. But what was submitted in connection with the briefing itself, I did consider because there was a lot of discussion in the sentencing submissions argument about the issues under consideration pursuant to the Fatico hearing. The Court did consider those in fashioning the decision, you know, with respect to the Fatico hearing.

There was a revised presentence investigation report. And moving forward, during this proceeding when I

refer to the presentence report, I am referring to that updated, revised presentence report, which incorporated the rulings that I had made previously as to some objections that were raised by the defense to the original presentence report and clarifications also that were made by the Government to the original presentence report. So, for example, there was certain alleged relevant conduct that the Government stated it was not prepared to prove by a preponderance of the evidence that wound up being omitted in the revised presentence report pursuant to my ruling. And that report, along with a revised sentence recommendation, was filed on July 29th of 2016.

There is the defendant's sentencing submission dated October 12th of 2016, which had a number of exhibits. There were -- I did not count them, but there were a great many letters that were submitted on your behalf, Mr. Persico, by family members, friends, people from the community, and so on, people who wished to attest to your character. Some of the letters were -- had been addressed originally to Judge Townes, who originally had this case. Others were addressed to me.

There were some transcripts that were submitted as well. Some were trial transcripts and others were transcripts of recordings.

There was the Government's sentencing memorandum

of October 19th of 2016.

The defendant's reply sentencing memorandum.

There were additional exhibits that were attached consisting of additional letters, again, from family members, friends, community people. It seems to me that a couple of letters had been repeated -- letters from the same individuals were put in twice, but that is neither here nor there.

There was a second addendum to the revised presentence report addressing arguments made by the parties in their sentencing briefs. And with respect to the defendant's arguments that really were geared towards the issues discussed or resolved by the Fatico hearing, the probation deferred to the Court. An argument has been made repeatedly by the defendant that because the Court in sentencing Anthony Preza, did not use any evidence of, either uncharged or unconvicted offenses in sentencing him, that it should not be used -- that the defendant should -- the Court -- this Court should not use that type of evidence in sentencing Mr. Persico to avoid this treatment.

The Court agrees with Probation that, first of all, there is no information that Preza, P-R-E-Z-A, engaged in similar conduct as was alleged against Mr. Persico. He was not similarly situated. The Government argued that as well.

And then Probation, essentially, agrees with the Government that there is no exceptional family circumstance that applies here warranting a downward departure or a downward variance at sentence.

There is the defendant's May 9th submission, which in essence is yet another mini briefing with respect to the Fatico issue, again, attacking the witness, the one who testified at the hearing.

There are exhibits. Exhibit 6 contains more letters from, again, more family members, business associates, community people in support.

Exhibit 7 appears to be an FBI interview report, which really has no identifying information. It is one page. It has a highlight. I do not particularly care for that. If you want to submit something, submit it clean. Request was made by Defendant to file under seal. However, apparently, the person who was the source of this information that is alleged to be contained in this report openly testified at two trials. So there is no need to file that under seal; and in any event, it was discussed in an unsealed portion of Defendant's submission of the Government's submission.

With respect to the contents of the May 9th letter, that has all been addressed in the Court's Fatico opinion.

And the Government's letter of May 31st letter is a response to that submission by the defendant clarifying the circumstances under which that Exhibit 7 statement was made.

There was a pretrial supervision status conference. I require that in all of my sentencing matters. The initial report was filed on January 18th of 2017 indicating that Mr. Persico has been compliant with all of the conditions of supervision. And the Court did receive on two dates, on February 20th, 2017 and on June 22, 2017, an email from Probation -- or excuse me, from Pretrial Services saying there is nothing to add to the status conference from Michael Persico. So that is the extent of those emails.

And that is everything that I have.

Is that everything that I should have? I have reviewed the docket and I did not see anything else.

MR. LIFSHITZ: I believe it is, Your Honor.

THE COURT: Mr. Sercarz?

MR. SERCARZ: We're in agreement, Your Honor.

MR. DORRA: Judge?

THE COURT: Yes, sir.

MR. DORRA: I may have -- there wasn't the first addendum to the revised PSR.

THE COURT: Did I not mention that?

MR. DORRA: It was dated August 9th, and that just

updated the PSR regarding the defendant's tax filing history.

THE COURT: I do not have that.

Did you all receive that?

MR. LIFSHITZ: Your Honor --

THE COURT: It should be on the docket.

MR. LIFSHITZ: Your Honor, we did. I believe it was dated August 9th of 2016.

I'm happy to hand up a copy if the Court doesn't have it.

THE COURT: Oh, you know what? I may have misspoken. Just on one second. Bear with me for just one second.

Yes. There was an addendum -- thank you. There was an addendum to the revised presentence report which was dated August 10th which contained information about Mr. Persico's IRS tax filing history, explaining why there was a discrepancy between IRS information and so on.

And then there was a second addendum to the revised presentence report that was filed on October 26th of 2016. That one discusses, again, the sentencing submission by the parties.

The only edit, if you will, that I have in connection with the second addendum is in the first section relating to objections by the Government. The second

paragraph, four lines down from the top of that second paragraph, and the sentence reads: The Court had previously directed the Probation Department to revise the PSR by removing information about the defendant's historical criminal conduct within the Colombo family apart from the Scopo murder conspiracy.

That is not quite accurate. It was only a removal about some of the defendant's historical criminal conduct. So the word "some" should be inserted in there because not all of it was removed. There were just certain specific incidents that were described that were omitted because the Government did not pursue to prove that at the Fatico hearing.

MR. LIFSHITZ: Your Honor, one more thing.

THE COURT: Yes.

MR. LIFSHITZ: Since I -- I just looked in my PSR file. There were also sentencing recommendations issued Probation that the parties received. I think they're relevant.

THE COURT: Yes. They are attached to presentence report. There was a second revised, second recommendation attached to the revised presentence report. And there were two prior sentence recommendations relating to the original presentence report that had been provided.

MR. SERCARZ: Your Honor, the defense is in

possession of all of those documents.

THE COURT: All of those. Okay. So thank you for making that notation.

And the Government has those as well, correct?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: So, Mr. Persico, I know I have mentioned an awful lot of documents here. Have you had an opportunity to review all of these with your attorneys?

THE DEFENDANT: Yes.

THE COURT: And do you understand and are you familiar with the objections that have been raised on your behalf by your attorneys?

THE DEFENDANT: Yes.

THE COURT: Asides from those objections that they raised, is there anything in the revised presentence report as it stands now that you think is incorrect, anything about personal history or anything like that that you think needs to be corrected?

THE DEFENDANT: I'm good with that.

THE COURT: Okay.

Now, notably -- well, with respect to the -- let's first address any objections to the revised presentence report. Does the Government have any objections to the revised presentence report?

MR. LIFSHITZ: No, Your Honor.

THE COURT: Mr. Sercarz, from the defense's view?

MR. SERCARZ: None beyond any previously stated.

THE COURT: Okay.

And obviously the Court by its ruling on the Fatico issue, that means that the conduct that is described therein pertaining to the activities that were the subject of the Fatico hearing remain included in the presentence report.

Anything that the Government wishes to state about that?

MR. LIFSHITZ: No, Your Honor.

THE COURT: Mr. Sercarz?

MR. SERCARZ: No, not on that schooling, Your Honor.

THE COURT: Okay.

Everyone has been in agreement, I think, from the beginning. There was the original presentence report that the sentence guideline range is calculated by Probation, and which has remained the same both in the original presentence report and the revised presentence report was correctly calculated, and in fact is consistent with the guideline range that was estimated in the plea agreement that was entered into by the parties. Although, obviously, the Court has independently calculate the guideline range, and neither Probation nor the Court are bound by the plea agreement.

But that sentence guideline range is calculated based on a total offense level of 21, a Criminal History Category of 1, and that results in a sentence guideline range of 37 to 46 months.

Is the Government in agreement that that is the appropriate guideline range here?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: Mr. Sercarz, the defense --

MR. SERCARZ: We're in agreement, Your Honor.

THE COURT: Okay.

All right. So that being said, as I mentioned, the submissions have been quite extensive in this case. I will give the parties an opportunity to address the Court if there is anything besides what is in your sentencing submissions that you would like to add for the record.

Mr. Lifshitz, is there anything that you would like to state for the record?

MR. LIFSHITZ: Your Honor, I'm generally content to rely on the written records. I think the letter we submitted on October 19th of 2016 is the most recent and complete statement of our position. As to sentencing, it precedes the Court's recent opinion, but it advocates for finding the Court made. So we're asking for a sentence in the guidelines range which the Court just articulated. A fine in the guidelines range is also appropriate.

At this time, I don't -- I don't think I have anything to add, unless the defense says something I may ask permission to respond.

THE COURT: Of course.

And just so that we are clear for the record, the fine range is: There is a maximum fine of $250,000, and the guideline range on the fine is 7,500 to 75,000.

MR. LIFSHITZ: The Government agrees.

THE COURT: Mr. Sercarz?

MR. SERCARZ: We're in agreement as to the fine range, Your Honor. And needless to say, there are some comments that I wish to make when the Court's ready to hear them.

THE COURT: Yes.

MR. SERCARZ: Now is the time?

THE COURT: Yes, sir.

MR. SERCARZ: Your Honor, do you want me here or would you like me at the podium?

THE COURT: If you would remain seated and speaking into the microphone, then all of us can hear you, including all the people all the way in the back.

MR. SERCARZ: Your Honor, the Court has gone to great lengths to talk about the amount of ink that has been spilled in litigating this case, and I am going to make it my mission not to repeat any of the arguments already made.

The Court has made its Fatico findings, and I am not going to seek to relitigate them. But I am concerned about the remaining issue of how the Court is going to consider this uncharged, or more appropriately, the conduct to which the defendant did not plea, and what it is that the Court gains as an impression of my client as a result.

In that regard I want to tell the Court in all candor that my abiding regret is that before that hearing ended, I didn't grab Ms. Kedia and suggest to her that she offer into evidence at the Fatico hearing the letters that this Court has read on my client's behalf.

THE COURT: And that would not have been appropriate, sir. The Fatico hearing was limited to certain issues. You have submitted the letters. I have read each and every last one of them. There must be close to 200 letters there --

MR. SERCARZ: Here's --

THE COURT: -- if not more.

MR. SERCARZ: Your Honor, here's what I want to say --

THE COURT: And I would have rejected them at that time.

MR. SERCARZ: I'm sorry.

THE COURT: That would not have been appropriate. So it is a good thing you did not.

MR. SERCARZ: Here's what I want to say at this point about those letters because they paint a picture of my client, a consistent picture which is at odds with the portrayal that was offered on the witness stand. I am not relitigating the Fatico issue, but I respectfully submit to the Court that when the Court is in possession of extraordinary letters such as this, a volume of letters such as this, letters that speak consistently to the defendant's exemplary character such as this that they're worthy of greet consideration if not on the Fatico issues, than in consideration of what an appropriate sentence would be and how the Court would appropriately make use of the information that it obtained from the Fatico hearing. These letters speak volumes about the defendant's ability to comport his life to the requirements of law enforcement, his love and engagement with his family, and the many good deeds that he has offered to the members of his community both in Brooklyn and in Saugerties, New York.

With regard to presentence report, we are in agreement with the findings in the report and if guidelines calculation. But this is one perspective that I do not feel has received adequate attention, Your Honor, and that is what I would like to talk about just for the few minutes that I intend to spend with the Court. The report is extensive and it goes into the facts underlying my client's

offenses and personal history and circumstances. But I did note the following, and I don't mean just to jump on a couple of words in the report, but for the sake of making a point, I hope that the Court bears with me. The report at -- I believe it's Paragraph 82 indicates that the defendant reported an unremarkable childhood, and I was struck by that word. In a subsequent pleading, similar language was used. I believe the words were that the defendant -- this is in the U.S. Probation Department's second revised sentence recommendation. That the defendant came from an impact home. And all due respect, that's not the full story, Your Honor.

It's undisputed in this case that my client grew up with a father who has been convicted of being a boss of the Colombo crime family, and is doing 139-year sentence of imprisonment. By my calculation according to what is contained in the report, Mr. Persico was at home with his son for four years, only four years after my client reached the age of 16. My client's brother, Alphonse Persico, Jr., is serving a life sentence in a Pennsylvania penitentiary for his involvement in the Colombo crime family. My client's brother, Lawrence Persico, has served stretches of imprisonment. He has been diagnosed as bi-polar. And with all due respect to the author of the presentence report, my client did not have an unremarkable childhood in an impact

family.

And the point that I want to make is best made by contrasting these circumstances with the circumstances of my client's four children: Michael Persico, age either 33 or 34, gainfully employed in an auto parts business; my client's daughter, Carmen Persico, age 32, third grade teacher in the New York City Department of Education; my client's daughter, Joyce Ann Persico, age 24, student at St. John's University, a junior, who's currently taking a period off to work as a paraprofessional in the New York Public School System; my client's daughter, Patricia Persico, age 22, student at Kingsborough Community College, a sophomore. Four children gainfully employed, making their way through life. And if anyone asks the question why or to what they can attribute the success of these children in life, it's absolutely clear from the letters that they wrote on behalf of their father, and the Court has said it's read them. I'm not going to belabor the issue. But a couple of sentences from each one, Your Honor, just to make this point if you will indulge me.

THE COURT: I have read them. Not only did I read them, you practically rewrote them in your written submission.

MR. SERCARZ: Your Honor, the point then has been made. How did it happen? My client was present. He was

present for their children. He was present in this hard times. The letters indicate that he taught them, their words, not to wear a grudge; to deal with life with a sense of equanimity; never to show their temper; always to try and look on the bright side.

My client was there for his children. For the five years that we have been litigating this case, he has gone about the business of conforming his life to the scriptures of the law, taking care of his children, and acting as an ethical businessman in the community. And my client's legacy is that the linkage between the Colombo crime family and the --

THE COURT: If he is such an ethical businessman, then what were the concerns with him providing a personal financial statement to Probation and a business financial statement? He has got a number of businesses. The letters support the fact that he is partners with a number of different people. Some businesses he sold. He sold a deli. He sold a pizzeria. He has got rental property, and essentially asserting the Fifth Amendment has decided not to submit a complete financial picture.

MR. FERNICH: Judge, if I may, I'll address that issue.

THE COURT: If you could remain seated and speak into the microphone. None of them will hear a word if you

do not do that. There is a reason why I have you do that.

MR. FERNICH: Judge, I'll address that, if I may. Because Mr. Persico invoked the Fifth Amendment on my advice as he's legally entitled to do. So if Your Honor --

THE COURT: I am not contesting that he is not legally entitled do that. But he was requested to provide it. It is an important piece of the presentence report because it does assist the Court in making determinations about fines and so on. This would be restitution case, but my understand is that the victims did not suffer loss, so there is no restitution. But had there been a loss, all of that is relevant for the Court's consideration. And considering that there was an initial disparity as to what the IRS records show and what his records show, I think it is an appropriate concern of the Court.

MR. FERNICH: Your Honor, it may well be an appropriate concern of the Court, and I will address the law on that if it becomes relevant later in the proceeding.

But I would point out to the Court that it's my understanding from the lengthy history of this case that the putative discrepancy the Court is referring to was some sort of the Governmental glitch.

Mr. Persico provided ten full years of tax returns that is more extensive and more forthcoming than what the President of the United States has currently provided.

THE COURT: Excuse me. You provided --

MR FERNICH: So there's nothing --

THE COURT: From 2012 to 2015 was what he provided to Probation.

MR. FERNICH: Sorry. Five -- five --

THE COURT: And the president is not on trial in this courtroom nor is he subject to sentencing right now.

MR. FERNICH: Judge, we're not going to relitigate and belabor the papers, but there's been an extensive history, part of which was elicited at the Fatico hearing, about an ongoing antagonistic relationship between the Persico family and the United States Government. I don't reasonably think that's a matter subject to dispute.

There are any number of inferences, fair or unfair, that could be drawn from even the most robust and fully scrupulously accurate financial disclosure form in this case. Given the nature of the inferences and the tendency of the United States Government to draw the worst inferences that could possibly be drawn from anything that Mr. Persico would write on that form given that it would be under oath, even an accidental mistake could turn around and redound to Mr. Persico's detriment in a future criminal proceeding, be it for false statement, be it for perjury, be it for any number of things. So there's clearly under ***Hoffman*** and his progeny, a legitimate basis for the

assertion of the Fifth Amendment Privilege.

The Court has his tax returns before him that, again, are robust and extensive. And I recognize the Court's concern. We stipulated at the outset that Mr. Persico could pay whatever the Court was inclined to impose. There's a tension in the law between Rule 32 and what it requests and the Fifth Amendment right to refrain from incriminating oneself in the sentencing proceeding -- in the sentencing context I should say. I'm not responsible for that tension. I just have to navigate it in the best way possible for my client.

The constitutional prerogative has to trump Rule 32. And there is extensive case law which we've referred previously to the Court about drawing negative inferences or penalizing the defendant at sentencing to the assertion of his Fifth Amendment rights. And that case law applies both in the 3553 context and in the context of selecting an appropriate sentence within the guideline range that the Court determines to be applicable.

THE COURT: You may have briefed that with another judge but not here because the issue was not raised here.

MR. FERNICH: Well, if it's going to be raised, I would like the opportunity to be --

THE COURT: I have heard enough briefing from all of you.

MR. FERNICH: Then I will cite for the record the DC Circuit case from 2011 of ***U.S. versus Sani***, S-A-N-I, that holds it is constitutionally suspect -- suspect, it's not a clear holding -- to use the assertion of the Fifth Amendment privilege in a way that enhances the sentence under 3553.

I would cite the case of --

THE COURT: I do not need to rely on the tax returns for any aspect of sentencing here, so let's be clear about that.

MR. FERNICH: Well, Your Honor, respectfully, you did question Mr. Sercarz as to if Mr. Persico was such an outstanding businessman, why he was loathed to make --

THE COURT: I thought that was --

MR. FERNICH: -- a disclosure --

THE COURT: -- a fair question.

MR FERNICH: -- that Your Honor would be --

THE COURT: I thought that was a fair question --

MR. FERNICH: And I'm giving you --

THE COURT: -- in response to his argument.

MR. FERNICH: -- essentially what I think is a fair response.

THE COURT: And in the response to his argument.

MR. FERNICH: It may or may not be a fair question. Certainly if you used -- Your Honor used the word

"concern," and I knowledge that it's a fair concern.

Whether it is a fair consideration on which Your Honor could draw any kind of adverse inference in sentencing or use it in any way to guide the determination --

THE COURT: I do not need to rely --

MR FERNICH: -- of sentence implicitly --

THE COURT: Excuse me. Enough.

MR FERNICH: -- or explicitly --

THE COURT: Excuse me. That is enough.

MR. FERNICH: Well, Your Honor --

THE COURT: That is enough.

MR FERNICH: Okay.

THE COURT: I have heard enough. When I am talking, you do not talk. I have heard enough.

Let me make it abundantly clear: I do not need to rely on anything relating to his tax returns in fashioning an appropriate sentence here, nor do I intend to rely on anything concerning his tax returns in fashioning the sentence here.

MR. FERNICH: I understand the Court's point, and of course, I -- I accept it. I would just say for the purposes of the record that the record will speak for itself and the matter was already -- already been raised in a way --

THE COURT: Enough of this.

MR FERNICH: -- that --

THE COURT: I want to stop you right there.

MR FERNICH: Yes.

THE COURT: Because one of the things that judges do --

MR. FERNICH: Uh-huh.

THE COURT: -- in -- for example, in deciding a hearing, issues at a hearing, a suppression hearing, lawyers may try to introduce evidence that is not necessarily admissible. The Court hears argument. This is what judges do. Judges consider what is appropriate evidence and what is not. We set aside what is not appropriate and we considering what is appropriate. And I take a fair amount of umbrage, sir, that you might be implying that I cannot do that.

So I have heard enough argument on this. I think the record is clear that I have said that I do not intend to rely on any information concerning his tax returns, reliance on the Fifth Amendment, or even his initial failure to comply with Probations request in fashioning a sentence here.

Mr. Sercarz, you may continue.

MR. SERCARZ: Thank you, Your Honor. I'm near the end. The Court will be happy to know. I just want to

attempt to tweak the 3553 factors, and I will be done, Your Honor.

With regard to Section 3553A(2)(c), the need to protect the public from further crimes by the defendant, I would urge the Court, once again, to consider the portrayal of my client in these letters. I would urge the Court to consider what you have heard from Pretrial Services over this five year period about the ability of my client to conform his behavior to the requirements of law with only minimal supervision requirement.

And it may be worthy of note to recall that the defendant was originally detained in this case on grounds of dangerousness, and as I understand it, had to litigate aggressively in order to win his release about three months after he was first locked up. And ever since then, he has -- he has maintained a record of compliance, and indeed, after only a few months the monitoring restrictions were relaxed after observing the way that this defendant conducted himself.

With regard to the kinds of sentences available, and I am speaking now to 3553(a)(3), I would ask the Court not to lose sight of to defendant's age. He is 60 years old. This defendant, I would respectfully submit, he's a very good candidate for a short period of incarceration, shorter than the guidelines call for under circumstances

such as this with monitoring and -- and supervised release conditions, which will provide the Court with all needed reassurance regarding the defendant's behavior once he is released.

I also submit, Your Honor, that a short sentence of imprisonment, and I'm talking about a six-month sentence to be followed by terms of supervised release, would have the benefit of allowing the defendant to remain close to his family members. And, Your Honor, you have read the -- the poignant letters from family members who are relying on Michael Persico for their continued guidance and welfare. The Court can impose such a sentence and at one in the same time reflect the seriousness of the offense charged and its findings regarding the unconvicted conduct before an adequate deterrence, both general deterrence and specific deterrence.

The message will emanate from this courtroom that remaining too close to members of organized crime will not be tolerated. Conduct that furthers the goals of organized crime will not be tolerated in these Courts. And yet, the Court is capable of recognizing the legacy of this defendant, the role he has played in the lives of his children, his efforts to conform his conduct to law, his rehabilitation during the period between the time that these crimes occurred and the present.

And, Your Honor, one footnote here, and I would note with regard to the findings that the Court made regarding the conduct to which the defendant did not plead guilty. All of these acts took place in the 1990s with the exception of what is described as the valet parking extortion, which frankly, with hindsight seems like it even, according to the testimony of Mr. Russo, was not an extortion at all. And I'm not relitigating the facts, Your Honor. I would urge upon the Court that kind of the sentence.

And I have one other thing to propose to the Court before I'm finished. I was approached by a gentleman. He's here. He would like to address the Court briefly on behalf of the broader community --

THE COURT: Denied.

MR. SERCARZ: Understood, Your Honor.

THE COURT: Does the Government wish to respond at all?

MR. LIFSHITZ: I do, Your Honor. Thank you. I'll try to be brief, as well.

As I said our position is stated fully in the sentencing letter we filed last October. I would like to just respond to the theme presented by defense counsel that the defense submissions paint a picture that the defendant that's inconsistent with the evidence the Court has heard,

as well as the defendant's guilty plea in this case.

There are people in this community who are able to maintain some sort of double-life, and I am sure the Court has sentenced people who have operated a legitimate business or have been successful in raising their family while at the same time committing very serious crimes. I agree, the Court should consider all aspects of his life. But since the defense highlighted some of what they believe is positive. I would just like to very briefly highlight a few things on the other side.

First of all, the record is so big in this case I don't want to lose sight of the crime of conviction, conspiracy to extend a loan sharking loan. That's a very serious crime. It's a staple of organized crime. When it's done consistently, it inevitably leads to violence, as was proven at the Fatico hearing. That's how crime families perpetuate themselves and that's why they exist. To the extent the defense suggests that it was somehow an aberration in the context of an otherwise law-abiding life, that's been proven not to be true.

It's now clear after the Fatico hearing that the loan sharking loan was made in the context of a long participation in racketeering with the Colombo family. That included violence, which included ordering the murder of Joseph Scopo, the ultimate crime. The defendant can't blame

his father for that. He can't blame the Government for pursuing him when he's committed a crime of that magnitude.

The context also includes what he was doing in 2009 and 2010. That's when he committed the crime he pled guilty to. It's also when he committed the extortion of Anthony Russo relating to the valet business, and that was clearly an extortion. Anthony Russo was a -- was a -- and Anthony Strapoli, another soldier in the crime family refrained from opening a business because they were afraid of Michael Persico. That's how he was acting in the community right before he was arrested. And that should matter a lot more than how he's behaved since his arrest. It's no feat to refrain from committing crimes when he's under the scrutiny of Pretrial Services and the Court.

For all of these reasons, the requested sentence, a sentence below the guidelines range would not be sufficient, and a sentence within the guidelines range is necessary to satisfy all of the purposes of Section 3553(a).

MR. FERNICH: Judge, if I may, I would just like to complete the record on what I said about the glitch, because it has been such a long time and I forgot what happened, and I am reminded with regard to tax returns --

THE COURT: That subject is dead.

MR. FERNICH: Right. But --

THE COURT: No, not right. That means that you

stop talking about it.

You know, your entire team subscribes to that style of litigation where you think that by continuing to repeat the same arguments over and over and over again, and once a judge has said that they have had enough, you continue to re -- to argue your same position. You think that somehow you are unmeritorious arguments are going to become meritorious or that somehow you are going succeed, sir.

I can tell you that that is not a successful way of litigating. We get it the first time around. And I have already said it is over. It is not relevant any longer.

MR. FERNICH: Well, with respect to --

THE COURT: No. I have said --

MR. FERNICH: -- settling an argument --

THE COURT: Enough. Enough.

MR. FERNICH: I'm going to objection to the way the sentencing proceeding is being conducted. I think that --

THE COURT: You can. So noted.

MR. FERNICH: I think that the sentencing proceeding is deny Mr. Persico his right to due process at sentencing, and I don't think the Court --

THE COURT: Mr. Fernich --

MR. FERNICH: -- is giving Mr. Persico an ample

opportunity --

THE COURT: Mr. Fernich, you know what --

MR FERNICH: -- to make a record in accordance with the scriptures of due process.

THE COURT: You know what, Mr. Fernich? I have accepted all of the filings that have been made, which were quite extensive. I have --

MR. FERNICH: Just doing our job, Your Honor.

THE COURT: Excuse me -- and I am doing mine.

MR. FERNICH: I appreciate that.

THE COURT: And I am doing mine.

MR. FERNICH: This is the job of a defense attorney.

THE COURT: Excuse me, sir. I know full well what the job of a defense attorney is, and I do think that it is one of the most important protections that our constitution guarantees to people.

MR. FERNICH: And that's what we're trying to do here.

THE COURT: And I really wish that you would desist already, because I tell you now that you want to persist in discussing something that is not an issue at this point, and I have said that I have heard enough. I have given everybody their opportunity to be heard. I have yet to give Mr. Persico his opportunity to be heard, and he will

be given his opportunity to be heard as is his right to do so. It is also my prerogative to tell attorneys when they have overstepped, when it is time for them to stop arguing, and when the Court has heard enough to enable it to make whatever decision it has to make.

The record will speak for itself, sir.

I do have a question for you, Mr. Sercarz. Since you have addressed generally the sentencing factors here. There was a great deal of space devoted to discussing what I can only characterize as what the defense believes to be a paucity of evidence in connection with the -- or perhaps maybe quantity is not the right word -- perhaps weaknesses in the Government's case in connection with the crime of conviction here, the crime to which Mr. Persico pled, the trucking business loan.

MR. SERCARZ: Yes, Your Honor.

THE COURT: Okay?

And that and in the scheme of the history of this case, given that he seems by those arguments to be in some way denying his responsibility for the crime to which he has pled guilty. And I am wondering whether or not, in fact, he should be entitled to the three points of responsibility, the reduction of three points of responsibility.

MR. SERCARZ: Your Honor --

THE COURT: Because in essence he said, Well, I am

pleading guilty. But you know what? It really was not extortion, and it really was not a loan. And I really did not give the money. The money came from somebody else.

MR. SERCARZ: May I have a moment to consult with my colleague, Your Honor.

THE COURT: Absolutely.

MR. LIFSHITZ: Your Honor, I would just note that the acceptance reduction here is only 2 points because he pled during jury selection.

THE COURT: I am sorry, two points, yes.

(Pause in proceedings.)

MR. FERNICH: Judge, in drafting the breach motion, we were careful not to deny --

THE COURT: I am not talking about the breach motion.

MR. FERNICH: Right.

THE COURT: The breach motion is over and done with.

MR. FERNICH: So this is the --

THE COURT: And I told you before I do not want to talk anymore about the breach --

MR. FERNICH: Excuse me.

THE COURT: -- of the pleading --

MR FERNICH: I misspoke.

THE COURT: -- or anything else.

MR FERNICH: I meant the plea withdrawal motion.

THE COURT: I am talking about the sentencing submission.

MR. FERNICH: No. The sentencing submissions reference the facts underpinning the crime without denying responsibility for them to address the 3553(a) factor of the nature and circumstances of the offense to point out that it was an atypical extortion in the context of what Mr. Lifshitz just referred to, and it's the staple mob-tried crimes of loan sharking, extortion, et cetera. So it's in no way an effort to deny responsibility for the conduct underlying the crime, but simply to point out that the nature of the crime categorically on the facts of this case is different from the garden variety loan shark and extortion crime, and that should bear on the 3553(a) factor of the nature and circumstances of the offense. As contrasted with a denial of responsibility for Mr. Persico's having engaged in the conduct underlying the offense. And it's my bad. I misspoke about breach. I meant to say plea withdrawal motion. We were careful to walk that line of saying that the allocution --

THE COURT: But I am not talking about that motion. I am --

MR. FERNICH: But then I will rest on my --

THE COURT: -- relying on --

MR FERNICH: -- my comments on --

THE COURT: Excuse me, sir --

MR FERNICH: -- 3553.

THE COURT: Why do you persist in talking over me. That is exceptionally rude and not protocol. I did not interrupt you, sir.

Are you done?

MR. FERNICH: Yes.

THE COURT: I am relying on the sentencing submission, the discussions that were contained in the opening brief, the opening sentencing brief, and the exhibits, the transcripts relating to that effect. That is what I was referring to.

MR. FERNICH: To reiterate, Mr. Persico fully accepts responsibility for the conduct underlying the offense and fully accepts the conduct to which he allocuted, again, the nature and circumstances of the offense itself as opposed to Mr. Persico's culpable for that conduct. His statutorily required for the Court to consider under 3553, and that was the nature -- the context in which the nature of the offense was discussed. Give the Court a full picture of the offense conduct in order to properly assess the 3553(a) factors.

THE COURT: Anything else that any of you would like to add?

MR. SERCARZ: No, thank you, Your Honor.

THE COURT: From the Government, anything that you would like to add?

MR. LIFSHITZ: No, thank you, Your Honor.

THE COURT: Mr. Persico, like I told you earlier, you have the right to address the Court if you wish. If you would like to do that, you may do that now, sir.

Would you like to make a statement?

THE DEFENDANT: Could I have a second?

THE COURT: Of course.

(Pause in proceedings.)

THE DEFENDANT: No, thank you, Your Honor.

THE COURT: So, Mr. Persico, as you can see just from the history of the cases everything that has gone into the sentencing from the very beginning, sentencing by the Court is a very complicated process. It is not a simple process.

The Court has an obligation to consider many things. As I explained earlier, we start with the sentencing guidelines, but they are not mandatory. They are advisory only. They are guidelines. They are exactly that, a guide but not the end point. So the Court has to give them due consideration to start with. But the Court does have to consider other things, including whether there are departures that are appropriate within that system, either

below the guidelines or above the guidelines. And of course the Court has to consider what has been discussed in the last few minutes here, the 3553(a) factors.

And very simply, so that the folks in the audience will understand, what the 3553(a) factors are, very simply, Congress made a determination that there were certain goals that should be accomplished whenever a federal judge imposes a sentence. And they put those goals into a statute in Title 18 of the United States Code, Section 3553(a). And it is those goals that we call the 3553(a) factors.

Now, the statute does start with what is called a parsimony clause that says that whatever sentence a Court imposes should not be greater than necessary to achieve those goals of sentencing that are listed in that statute. Not all of the goals necessarily apply in every case. In particular, here the Court has considered the nature and circumstances of the offense, and I am talking about the offense of conviction. The Court has considered the history and characteristics of the defendant before the Court, Mr. Persico.

The sentence should reflect the seriousness of the offense. It should promote respect for the law. The sentence should provide just punishment for the offense. The sentence should afford adequate deterrence to criminal conduct generally and to society as a whole. It should also

protect the public from any further crime of the defendant. It should provide the defendant with any needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, and to provide restitution for victims of the offense.

This normally would be an offense that would require restitution made to victims if there were losses to the victims, that's the loss. However my understanding, and I think the Government confirmed that earlier, there were no losses to any victims here, so restitution will not play a party in the sentence here today.

Any judge of this court -- any judge of any court, will tell you, and I tell you, that sentencing is the hardest part of our job. I guarantee you I loss sleep every time I have to sentence somebody. And that is because I am not sentencing a piece of paper, a case, a docket number, but a living, breathing human being. I take it very seriously.

If I am hard on the lawyers, it is because I expect them -- expect much from them, because the more information they gave me, the better information they give me, the more informed my decision can be. And I do hope that they do not take offense if I am hard on them, because as Mr. Fernich said, it is their job to make sure that I have the information that I need to make the best decision

possible under all the circumstances.

The offense that you pled guilty to is, indeed, a serious one. Perhaps it is not, as Mr. Fernich explained and as is discussed in the defense sentencing memorandum, completely typical of the way extortionate extensions of credit are handled in the types of cases that, certainly, I have handled myself and that have come through the court, and as described by the Government today and in its paper. It does not, in my view, make it a benign crime, a word that was used in the defense papers to describe the offense.

It is still a serious crime. It was clear from the Fatico hearing that Mr. Persico grew up and was involved in this kind of extortion, extensions of credit for a sustained period of time, a factor that is relevant to the Court in fashioning a sentence here. And while much of what was the subject of the Fatico hearing occurred in the '90s, the offense conduct here occurred more or less about seven or eight years ago, during which time he was being a single dad to his two youngest daughters, engaging in his various businesses as described by the many letters that were submitted on his behalf, being a good friend and being a good neighbor.

And in many of those cases, ultimately there was a resort to violence when people did not pay. And you were responsible for that. And all of this is part of the

racketeering enterprise. The Scopo murder was part of protecting your family and your family's role in the Colombo crime family. That is what that was about, and I am sure Mr. Scopo had a family of his own.

Did he have children?

MR. LIFSHITZ: Yes, he did.

THE COURT: So those children grew up without a father. There was a wife without a husband. I do not know what his extended family was.

And there was involvement in the other offenses that were the subject of the Fatico hearing, the stolen video games and so on. I have seen it often enough. As the Government says, that all too often people present two sides. It is like Dr. Jekyll and Mr. Hyde. The family and friends see one side, but there is the other side that engages in criminal conduct that the family cannot each fathom. It is unbelievable to them.

I have no reason to doubt the utter sincerity of to letters that have been written to the Court, especially the family letters. I have no doubt Mr. Persico may have been a wonderful dad. The success of his children certainly are a testament to that. Caring for his wife while she was suffering with cancer. And then being a single dad to his two youngest daughters because the other ones, I think, were much older then, but then finishing the process of raising

the rest of the children on his own.

It is not clear to me to what extent he cares for his mother who is about 80 years old. Given that the letters seem to indicate that he is all over the place participating, helping people out establishing their businesses; making sure his daughters are driven to school or to work; helping people out in their time of need, whenever that may be. One thing is apparent, that with a busy schedule like that, with so many properties to look after and to be involved in, that certainly he is not with his mother 24/7 caring for her. So somebody must be caring for her. And there is nothing in the writings that indicate that she is that infirmed that she requires people do absolutely everything for her. In this court we have a number of judges who are over 90 and many more who are over 80 that come to work every day and they perform their duties. Age alone does not mean that a person cannot at least help themselves in some way. And I am not saying that she is not in need of assistance.

His daughters are grown. He has got grown children, adult children in their thirties. He has got two sisters. He has got other family members who can help with the care of his mom. And one thing is very apparent, I agree with you Mr. Sercarz, that the letters do show that this is a very -- it is a large family. It is a closely

knit family. And then there is the grander definition of family, the family that you grow from the community from your friendships.

There were letters from people who have been close to Mr. Persico for 30, 40 years. Some went to grammar school with him. Their children played together, have grown up together. And then there is the community in which he lives and works that attest to his philanthropy. And what I have to say to them is if you are indeed grateful to the good deeds that Mr. Persico has done, according to what you have attested to this Court, then it is time for you to step up to the plate for him. There are others who can be there to help with family. This is not a situation where family circumstances crying out for a nonjail sentence.

The guidelines here are 37 to 46 months. The statutory maximum is five years or 60 months. As to the uncharged or unconvicted crimes, as I said, not only do they show a pattern of continuing the same type of offense conduct as the offense of conviction, but the fact that to preserve the family's racketeering enterprise, which in a large part did rely on this loan sharking, that he would authorize a murder and facilitate a murder, in my view, in weighing the good deeds with all of that, that offense conduct outweighs the good deed. What value do you put on a human life?

The sentence of the Court is that Mr. Persico will serve 60 months in custody of the attorney general followed by three years of supervised release.

I understand, Mr. Sercarz, that he has complied with the forfeiture agreement in the forfeiture order and has paid already the $325,000 that was --

MR. SERCARZ: Yes, Your Honor.

THE COURT: Okay.

As I said, there is no restitution. A fine is imposed of $250,000 payable -- it is due immediately and payable at the rate of $25 per quarter while in custody and 10 percent of the gross monthly income while under supervised release.

As special conditions of supervised release, the Court imposes the following: No possession of any firearm ammunition or destructive device.

You must hold verifiable full-time employment.

You must cooperate with the Department of Probation in the investigation and approval of any position of self-employment, including any independent, entrepreneurial or freelance employment or business activity. If approved for self-employment, you must provide the Department of Probation with full disclosure of your self-employment and other business records, including but not limited to, all of the records identified in the

probation Form 48-F, which is a request for self-employment records, or as otherwise requested by the Probation Department.

Also, upon request by the Department of Probation, you must provide full disclosure of all your financial records, including any commingled income, expenses, assets and liabilities, to include yearly income tax returns with the exception of the financial accounts that have been reported and noted within the presentence report.

You are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial account for other personal or business purposes without the knowledge and approval of the U.S. Probation Department. You must cooperate with the probation department in the investigation of your financial dealings, and provide truthful monthly statements of your income and expenses. You must cooperate in the signing of any necessary authorization to release information forms permitting the Probation Department to access your financial information and records.

You must refrain from contacting any of the victims of the instance offense. And orders of protection are issued for the victims.

There is an association prohibition; in other words, you must not associate any person through the mail,

electronic mail, or telephone with any individual within an affiliation to any organized crime groups, gangs, or any other criminal enterprise. Nor shall you frequent any establishment or other locale where these groups may meet pursuant, but not limited to a prohibition list provided by the Probation Department.

I know that during the pendency of this case, there has been a prohibition from him speaking to his father and Alphonse, I believe?

MR. SERCARZ: Yes, Your Honor.

THE COURT: And I think that that has been lifted?

MR. LIFSHITZ: I think that's right, as noted in the pretrial report issued in January of this year. It listed some relatives who he was given permission to contact as a carveout.

THE COURT: Is there any objection to continuing that carveout?

MR. LIFSHITZ: No objection to that carveout.

THE COURT: Okay. So that carveout is continued. And I think I did see that somewhere in the presentence report.

If you have any questions about that, you need to check with your probation officer about that. Any questions about any of this, you need to clarify with your probation officer.

Do you understand that, sir?

THE DEFENDANT: I do.

THE COURT: All right. There was -- probation had recommended participation in an outpatient drug treatment; however, based on the prior DUI's that you had in your background, I do note that you had completed a program in connection with one of those incidents. And pretrial has not noted any need for any drug treatment or has made any recommendation for any. So I am not going to recommend any. Obviously, you need to make sure that -- to the extent that you have wine or something at dinner, that it is reasonable and that you do not drive intoxicated, obviously. If you commit a new crime, you are going to be in violation of your supervised release, and I do not think you want that, okay?

Also, Probation had recommended a search condition. However, I am not going to impose one because I do not see -- the Circuit has made it clear that conditions -- special conditions of supervised release must bear some relation to the offense of conviction, and I could not see a relationship between the search condition and the offense of conviction. So I am not going to impose a search condition here.

And I believe that there are open indictments in this case?

MR. LIFSHITZ: Yes, Your Honor. We would move to

dismiss the underlying indictments. He plead guilty to a one-count information. There are no open counts there. But he would dismiss -- we would move to dismiss the indictments that preceded it.

THE COURT: Okay. Those are dismissed.

You must also, as a special condition of your supervised release, comply with the fine order. And the condition of full financial disclosure has already been imposed, so I do not need to impose that, again, in connection with the fine.

I do not recall if there was a plea waiver in the plea agreement. It may have been found on the topic of the guideline range. Nonetheless, I do advise you, sir, that if you do -- you may be entitled to appeal from the sentence imposed by the Court. And if you do wish to do so, you must do so within 14 days of the final entry of judgment.

You may be entitled to be represented by counsel. If you cannot -- on your appeal if you cannot afford counsel, you may ask for the Court to appoint counsel for you at no cost to you. If you cannot afford the fees and the cost of the appeal, you may also ask for leave to proceed by way of poor person relief from the Court. I would ask counsel to remain on the case for that requisite 14-day period and file such a notice on behalf of your client, if that is what he wishes to do.

The other question is whether or not the Government has any objection to Mr. Persico voluntarily surrendering himself to the designated institution?

MR. LIFSHITZ: Your Honor, we don't object to a reasonable surrender date. I defer to the Court as to how long in the Court's experience the BOP needs to designate a facility, but we don't object to the principal.

THE COURT: There is also -- by the way, before I forget and before I address that, there is a special assessment of $100 that must be imposed.

The Bureau of Prisons says a normal matter can take anywhere from eight to ten weeks to make a designation. I am going to -- under the circumstances here, I am going to give Mr. Persico a few extra weeks so that he can celebrate his birthday with his family, and he shall self-surrender at 9:30 at the designated facility on October 20th, which is a Friday.

MR. SERCARZ: October 20th? I'm sorry.

THE COURT: October 20th of 2017.

MS. KEDIA: Judge, just with respect to the time, depending on the institution that he is designated to, could we make that time 2:00 p.m., because it may be that he's designated to New Jersey or Allenwood. It may take a few hours to drive there. So he doesn't have to go -- I typically hear 12:00 or 2:00, I believe.

THE COURT: He has to self-surrender before noon.

MR. LIFSHITZ: Before noon?

THE COURT: Yes.

MS. KEDIA: That's fine.

THE COURT: Yes. 12:00, 12:00 p.m.

MS. KEDIA: Okay. Thank you, Judge.

MR. SERCARZ: Your Honor, will the Court hear me on the subject of designation or recommendation?

THE COURT: Yes, please, any recommendation that you would like to make to me.

MR. SERCARZ: We would ask the Court to recommend that the defendant be housed at FCI Danbury.

THE COURT: Okay. I will make that recommendation with the understanding -- I am happy to make that recommendation for you, sir -- with the understanding that at the end of the day, ultimately, it is up to the Bureau of Prisons to make the designation. A lot of things go into consideration, including something as simple as the availability of space, not -- that being said, the Court has been informed by the Bureau of Prisons that it does try to comply with the recommendations that are made by the Court. So the Court will make that recommendation.

If that is not -- if that is not possible, is there any other close to the New York City area?

MR. SERCARZ: Closest available consistent with

the defendant's security rating, Your Honor.

THE COURT: Okay. Anything else? Anything from Probation?

MR. DORRA: No, Your Honor.

THE COURT: The Government?

MR. LIFSHITZ: No, Your Honor, thank you.

MR. FERNICH: Judge?

THE COURT: Yes.

MR. FERNICH: We do have an objection. I tried to get every one of the conditions that Your Honor imposed to supervised release conditions.

THE COURT: Yes.

MR. FERNICH: We have -- and the objection is the same one that Your Honor stated in declining to impose the search condition under 3583(d). We don't think the following conditions are reasonably related to the 3553 factors or reasonably necessary deprivations of liberty and property, and that's the same sort of parsimony provision that you find in 3553. And the condition that we object to are the reporting of self-employment, the business records, the financial records, the account preapproval requirement, the financial statement requirement -- and I'm trying to decode my own handwriting, something about an information release I caught. And --

THE COURT: The signing of any necessary

authorizations to release information form.

MR. FERNICH: Yes. In addition to those stated objections, we're relying on the ***Jenkins*** case, the recent ***Jenkins*** case from Judge Parker in the Second Circuit on that. And also I'm afraid that we're going to go down the same Fifth Amendment road with some of these conditions that we had during the litigation of this case, for the same reasons that I articulated earlier. I'm not -- not interesting in belaboring that, but those are the grounds on which we object. Principally for the same reason that Your Honor stated in declining to impose the search condition.

THE COURT: Given that the offense conduct is an extortionate extension of credit in connection with the businesses, given the testimony that I heard during the Fatico hearing about the same in connection with for example the valet parking extorsion, and there were various others extortionate extensions of credit, it is certainly relevant and pertinent to the offense conduct.

So your objection is noted for the record.

MR. FERNICH: Thank you.

THE COURT: Anything else?

MR. LIFSHITZ: Not from the Government.

THE COURT: All right. Thank you all very much.

MR. LIFSHITZ: Thank you.

MS. KEDIA: Judge, I apologize. One other recommendation we would request.

THE COURT: Yes.

MR. LIFSHITZ: If I may? For the Bureau of Prisons to consider maximum term of placement in community confinement facility or home detention pursuant to the Second Chance Act, this applies to the end of his release -- the end of the term of imprisonment. There's, as Your Honor I'm sure is well aware, there was a Second Change Act enacted by Congress.

THE COURT: I am very familiar with the Second Chance Act, yes.

MR. LIFSHITZ: And my understanding is that the Bureau of Prisons will make that decision, of course, on its own; but it does consider a recommendation from the Court as well.

THE COURT: I am not going to weigh in on that now. If they want me to weigh in on it at the relevant time, then I will.

MS. KEDIA: Very well.

(Matter concluded.)

--ooOoo--

*I (we) certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

*/s/ David R. Roy* — *24th Day of July, 2017*

*DAVID R. ROY* — *Date*

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 1

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ AUG 25 2017 ★
BROOKLYN OFFICE

# UNITED STATES DISTRICT COURT

Eastern District of New York

UNITED STATES OF AMERICA
v.
MICHAEL J. PERSICO

**JUDGMENT IN A CRIMINAL CASE**

Case Number: 10-CR-147(S-6)-01

USM Number: 03014-748

Maurice Sercarz, Sarita Kedia, Marc Fernich, Esqs.
Defendant's Attorney

**THE DEFENDANT:**

☑ pleaded guilty to count(s) single-count of sixth superseding information

☐ pleaded nolo contendere to count(s) ______ which was accepted by the court.

☐ was found guilty on count(s) ______ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Extortionate extension of credit conspiracy, a Class D felony | 2/28/2010 | 1 |

The defendant is sentenced as provided in pages 2 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) ______

☑ Count(s) all of underlying indictment(s) ☐ is ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

7/21/2017
Date of Imposition of Judgment

s/Dora L. Irizarry
Signature of Judge

Dora L. Irizarry, Chief U.S. District Judge
Name and Title of Judge

August 24, 2017
Date

AO 245B (Rev. 11/16) Judgment in Criminal Case
Sheet 2 — Imprisonment



DEFENDANT: MICHAEL J. PERSICO
CASE NUMBER: 10-CR-147(S-6)-01

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

60 months

☑ The court makes the following recommendations to the Bureau of Prisons:

Designation to FCI Danbury or another facility in/near New York City.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

☐ at ______________ ☐ a.m. ☐ p.m. on ______________ .

☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

☑ before 2 p.m. on 10/20/2017 .

☐ as notified by the United States Marshal.

☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on ______________ to ______________

a ______________ , with a certified copy of this judgment.

______________
UNITED STATES MARSHAL

By ______________
DEPUTY UNITED STATES MARSHAL

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 3 — Supervised Release



DEFENDANT: MICHAEL J. PERSICO
CASE NUMBER: 10-CR-147(S-6)-01

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of: 3 years

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   - ☐ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (42 U.S.C. § 16901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
6. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B (Rev. 11/16) Judgment in a Criminal Case
Sheet 3A — Supervised Release



DEFENDANT: MICHAEL J. PERSICO
CASE NUMBER: 10-CR-147(S-6)-01

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature ______________________________ Date ________________

Case 17-2781, Document 25-5, 09/12/2017, 2122149, Page185 of 204


DEFENDANT: MICHAEL J. PERSICO
CASE NUMBER: 10-CR-147(S-6)-01

## SPECIAL CONDITIONS OF SUPERVISION

(1) The defendant shall not possess a firearm, ammunition, destructive device, or other dangerous weapon;

(2) The defendant shall hold verifiable, full-time employment. The defendant shall cooperate with the U.S. Probation Department in the investigation and approval of any position of self-employment, including any independent, entrepreneurial, or freelance employment or business activity. If approved for self-employment, the defendant shall provide the U.S. Probation Department with full disclosure of his self-employment and other business records, including, but not limited to, all of the records identified in the Probation Form 48F (Request for Self-Employment Records), or as otherwise requested by the U.S. Probation Department;

(3) Upon request, the defendant shall provide the U.S. Probation Department with full disclosure of his financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the pre-sentence report, the defendant is prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Department. The defendant shall cooperate with the Probation Department in the investigation of his financial dealings and shall provide truthful monthly statements of his/her income and expenses. The defendant shall cooperate in the signing of any necessary authorization to release information forms permitting the U.S. Probation Department access to your financial information and records;

(4) The defendant shall refrain from contacting the victims of the instant offense, and orders of protection for the victims;

(5) The defendant shall not associate in person, through mail, electronic mail or telephone with any individual with an affiliation to any organized crime groups, gangs or any other criminal enterprise; nor shall the defendant frequent any establishment, or other locale where these groups may meet pursuant, but not limited to, a prohibition list provided by the Probation Department. This condition shall not apply to the defendant's father, Carmine Persico, or brother, Alphonse Persico;

(6) The defendant shall comply with the fine payment schedule.

DEFENDANT: MICHAEL J. PERSICO
CASE NUMBER: 10-CR-147(S-6)-01

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | JVTA Assessment* | Fine | Restitution |
|---|---|---|---|---|
| TOTALS | $ 100.00 | $ N/A | $ 250,000.00 | $ 0.00 |

☐ The determination of restitution is deferred until ________ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| TOTALS | $ ________ | $ ________ | |

☐ Restitution amount ordered pursuant to plea agreement $ ________

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the ☐ fine ☐ restitution.

☐ the interest requirement for the ☐ fine ☐ restitution is modified as follows:

* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

DEFENDANT: MICHAEL J. PERSICO
CASE NUMBER: 10-CR-147(S-6)-01

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ 100.00 due immediately, balance due

☐ not later than ________, or
☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after the date of this judgment; or

D ☐ Payment in equal ________ *(e.g., weekly, monthly, quarterly)* installments of $ ________ over a period of ________ *(e.g., months or years)*, to commence ________ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

E ☐ Payment during the term of supervised release will commence within ________ *(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☑ Special instructions regarding the payment of criminal monetary penalties:

Fine shall be made payable to the Clerk of Court for the Eastern District of New York at the rate of $25 per quarter while in custody and 10% gross income per month while on supervised release.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Defendant and Co-Defendant Names and Case Numbers *(including defendant number)*, Total Amount, Joint and Several Amount, and corresponding payee, if appropriate.

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
See attached order; forfeiture has been satisfied.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>-against-<br><br>MICHAEL PERSICO,<br><br>Defendant. | : | **MEMORANDUM AND ORDER**<br>10-CR-147 (DLI) |

**DORA L. IRIZARRY, Chief United States District Judge:**

On June 8, 2012, Michael Persico ("Defendant") pled guilty to the Sixth Superseding Information, which charged him with a single count of conspiracy to participate in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892. *See* Superseding Info., Dkt. Entry No. 565; Change of Plea Hr'g, Dkt. Entry No. 566 at 1. On July 21, 2017, the Court sentenced Defendant to sixty months of imprisonment, followed by three years of supervised release, and a $250,000 fine. *See* Jul. 21, 2017 Min. Entry. The Court permitted Defendant to self-surrender to the United States Bureau of Prisons on October 20, 2017. *Id*. For the purposes of this Memorandum and Order, the Court presumes the parties' familiarity with the facts and circumstances of this case, as outlined in its previous decisions. *See* Jul. 19, 2017 Op. & Ord. ("*Factio* Op."), Dkt. Entry No. 868; Feb. 27, 2015 Mem. & Ord., Dkt. Entry No. 811; Oct. 29, 2014 Mem. & Ord., Dkt. Entry No. 791. The holdings and conclusions of these decisions are fully incorporated herein.

Presently before the Court is Defendant's application for bail pending appeal. *See* Mot. for Bond Pending App. ("Bail Mot."), Dkt. Entry No. 869; Opp. to Mot. for Bond Pending App. ("Opp."), Dkt. Entry No. 871; Reply to Opp. to Mot. for Bond Pending App. ("Reply"), Dkt. Entry No. 873. For the following reasons, Defendant's application is denied.

## I. DEFENDANT'S LEGAL ARGUMENTS WERE MADE FOR THE FIRST TIME ON REPLY

As an initial matter, it bears noting that Defendant's opening brief consists of *one paragraph on one page* where defense counsel states in conclusory fashion, "Well before sentencing, Persico moved Judge Townes to vacate his plea for legal infirmity and government breach of the plea agreement. Both issues are substantial, non-frivolous, and very well could be decided the other way." Bail Mot. at 1 (internal citations and quotation marks omitted). There is no legal argument whatsoever. Attached to this single page are two exhibits: a copy of the transcript of a status conference held on June 3, 2016 before this Court, and an undated affirmation by one of Defendant's attorneys, Sarita Kedia, concerning the circumstances surrounding Defendant's guilty plea.

The only legal arguments made by Defendant were in reply to the Government's opposition brief. Notably, in Footnote 1 of Defendant's reply brief, he raises for the first time due process concerns regarding the Bail Reform Act's reference to a "crime of violence." The Government had no opportunity to respond to this meritless argument at any time, nor did the Court, as it was never raised during any prior Court proceeding. Indeed, the Court is entitled to disregard all of Defendant's legal arguments because they were raised for the first time on reply. *See In re Harris*, 464 F.3d 263, 268 n.3 (2d Cir. 2006); *Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999) (*per curiam*). Nonetheless, out of an abundance of caution, the Court has considered Defendant's legal arguments and finds them meritless. *See* discussion *infra*.

## II. THE CRIME OF CONVICTION DOES NOT COMPEL DEFENDANT'S DETENTION

Pursuant to 18 U.S.C. § 3143(b)(2), the Court:

> *shall* order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.

(emphasis added). Under 18 U.S.C. § 3142(f)(1)(A), the listed offenses are "a crime of violence, a violation of section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of [ten] years or more is prescribed." In this chapter, a "crime of violence" includes, *inter alia*, "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 3156(a)(4)(A). Relying upon this definition, the Government argues that § 3143(b)(2) compels Defendant's detention because conspiracy to participate in an extortionate extension of credit qualifies as a crime of violence. *See* Opp. at 4-5. Defendant opposes, responding that § 3143(b)(2) is inapplicable to his crime of conviction because: (1) it is not a "crime of violence;" and (2) the maximum term of imprisonment was less than ten years. *See* Reply at 1, n.1.

As to the first point, Defendant previously conceded that his crime of conviction qualifies as one of violence for the purposes of § 3156(a)(4)(A). At his sworn guilty plea allocution before the Honorable Sandra L. Townes, U.S.D.J., Judge Townes stated that, in order to prove a violation of 18 U.S.C. § 892, the Government would have to prove beyond a reasonable doubt that:

> [D]efendant knowingly made an extension of credit; [and] . . . that there was an understanding between . . . [D]efendant and the borrower, express or implied, tacet [sic] or otherwise, that if the borrower delayed in making his repayments or if there was a total failure to repay, violence or other criminal means would be used to force payment.

Jun. 8, 2012 Tr. of Crim. Cause for Guilty Plea ("Guilty Plea Tr."), Dkt. Entry No. 789-2 at 9; *See also* 18 U.S.C. § 891(6) (an extortionate extension of credit is defined as one in which there is an "understanding . . . that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of another person."). When Judge Townes asked defense counsel whether the Court had properly

stated the elements of the underlying offense, counsel responded, "[T]hat's our understanding, as well." Guilty Plea Tr. at 9.

As the elements of the underlying offense include an express or implied threat of violence upon the debtor's person or property, it falls squarely within the "crime of violence" definition outlined in § 3156(a)(4)(A). *See United States v. Santora*, 225 F. App'x 21, 22 (2d Cir. 2007) (upholding the district court's finding for pretrial purposes that the defendant "had committed a crime of violence, specifically conspiracy to commit extortion.") (internal citations omitted); *See also United States v. Patino*, 962 F.2d 263, 267 (2d Cir. 1992) (conspiracy to commit a crime of violence is, itself, a crime of violence) (internal citations omitted); *United States v. Simone*, 317 F. Supp.2d 38, 42 (D. Mass. 2004) (an extortionate extension of credit is a crime of violence under 18 U.S.C. § 3142(f)(1)(A)).[1]

However, despite the fact that conspiracy to participate in an extortionate extension of credit properly is identified as a crime of violence for purposes of the instant motion, the Court agrees with Defendant that this subsection of the statute is inapplicable because the crime's maximum term of imprisonment is less than ten years. *See United States v. Madoff*, 586 F. Supp.2d 240, 247 (S.D.N.Y. 2009) (explaining that 18 U.S.C. § 3142(f)(1) requires that the underlying crime of violence "carr[y] a maximum term of ten years or more").

---

[1] As referenced above, for the first time, Defendant also argues in his reply that the definition of "crime of violence" in § 3156(a)(4)(A) is unconstitutionally vague in a manner similar to the residual clause of the Armed Career Criminal Act ("ACCA"). *See* Reply at n.1 (citing *Johnson v. United States*, 135 S. Ct. 2551 (2015)). The Court rejects this argument. The language in § 3156(a)(4)(A) mirrors the force clause of the ACCA, which was left undisturbed by the *Johnson* Court's ruling. *See Johnson*, 135 S. Ct. at 2563 ("Today's decision does not call into question application of the Act to the four enumerated offenses, or the remainder of the Act's definition of a violent felony.").

## III. Defendant Is a Danger to the Safety of the Community and His Appeal Does Not Raise a Substantial Issue of Law or Fact

Applications for bail pending appeal also are governed by 18 U.S.C. § 3143(b)(1), which states in relevant part:

> [a] judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained, unless the judicial officer finds—
>
> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and
>
> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—
>
> (i) reversal,
>
> (ii) an order for a new trial,
>
> (iii) a sentence that does not include a term of imprisonment, or
>
> (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

"It is [D]efendant's burden to rebut the presumption in favor of detention by clear and convincing evidence." *United States v. Bodouva*, No. 16-CR-214 (VEC), 2016 WL 7351634, at *2 (S.D.N.Y. Dec. 16, 2016) (citing *United States v. Aburhamra*, 389 F.3d 309, 310 (2d Cir. 2004)). "If a defendant meets this substantial burden, bail pending appeal is required." *Id.*

Defendant argues that he is neither a flight risk nor a danger to his community because the Court granted him the ability to surrender himself at a designated date and time. *See* Reply at 2. Although the Court agrees that Defendant is not a flight risk, it rejects the conclusion that he is not a danger to the community. The reasoning for this determination is twofold. First, the crime of conviction is a "crime of violence" under the Bail Reform Act. *See* discussion *supra*. Second, the Court has considered its findings from the *Fatico* Hearing. Indeed, the Court has concluded that Defendant, *inter alia*, directed the commission of and participated in a murder, and in other acts

of extortionate extension of credit over a substantial period of time. *See Fatico* Op. Based upon these considerations, the Court finds that Defendant repeatedly has shown himself to be a danger to the safety of the community. *See United States v. Seminerio*, No. 08-CR-1238 (NRB), 2010 WL 3341887, at *3-4 (S.D.N.Y. Aug. 20, 2010) (considering the findings of a *Fatico* hearing in determining whether to grant a defendant's application for bail pending appeal).

Yet, even if the Court assumes, *arguendo*, that Defendant is neither a flight risk nor a danger to the safety of other people or the community, he still fails to raise a "substantial question of law or fact" that likely would result in a more favorable outcome under § 3143(b)(1)(B). In determining whether any question raised on appeal is a "substantial" one, the Court must find that the issue presents "a close question or one that very well could be decided the other way." *United States v. Randell*, 761 F.2d 122, 125 (2d Cir. 1985), *cert. denied*, 474 U.S. 1008 (1985) (internal citations and quotation marks omitted). Indeed, it must be "one which is either novel, which has not been decided by controlling precedent, or which is fairly doubtful." *Id.* (internal citations omitted). The Court finds that none of the issues presented in Defendant's appeal qualify as a "substantial question."

Defendant argues that, "[i]n addition to the reasons set forth in [Defendant's] motions to withdraw his guilty plea," there are four "substantial questions" being appealed to the Second Circuit. *See* Reply at 3. Those issues are: (1) the "factual basis" of his plea; (2) his "legal innocence" as to the crime of conviction; (3) the sufficiency of his plea allocution; and (4) the Government's alleged breach of the plea agreement. *See Id.* at 3-5. None of these arguments are new. Defendant has argued each of these points repeatedly in a number of prior submissions. *See, e.g.*, Mem. in Supp. of Plea Withdrawal, Dkt. Entry No. 788 at 2-11 (maintaining that the Government violated the plea agreement), 11-37 (arguing that there is no factual basis for the crime

charged and that Defendant did not understand the nature of the crime), n.11 (claiming that Defendant is "legally innocent" of the crime charged); Reply Mem. in Supp. of Plea Withdrawal, Dkt. Entry No. 790 at 2-23 (discussing the Government's alleged breach of the plea agreement), 24-33 (asserting that facts Defendant admitted to in his plea were insufficient to comprise the crime charged), 33-39 (alleging that Defendant did not understand the charge to which he pled), 39-42 (reiterating the claim that Defendant is "legally innocent"); *See also* Def. Jan. 21, 2015 Ltr., Dkt. Entry No. 803; Def. Feb. 3, 2015 Ltr., Dkt. Entry No. 806.

The arguments outlined in Defendant's submissions underwent two thorough and thoughtful reviews by Judge Townes. These careful examinations resulted in two robust, well-reasoned discussions of those arguments alongside controlling precedent. *See* Oct. 29, 2014 Mem. & Ord. (denying Defendant's motion to withdraw his guilty plea); Feb. 27, 2015 Mem. & Ord. (denying Defendant's motion for reconsideration). In addition to the review performed by Judge Townes, with this Summary Order, this Court has performed two additional, independent reviews of the same arguments made to Judge Townes. *See* Tr. of Jun. 3, 2016 Status Conf., Dkt. Entry No. 834 at 14-15. Defendant has failed to carry his heavy burden of establishing the merits of these arguments by clear and convincing evidence. Accordingly, although Defendant insists on rearguing and rehashing his unmeritorious arguments repeatedly, the Court remains unpersuaded that any of these arguments raise a "substantial question of law or fact" under § 3143(b)(1)(B).

**CONCLUSION**

Based upon the foregoing, the Court finds that Defendant poses a danger to the community and that the issues he intends to raise on appeal do not raise substantial questions of law or fact that likely would result in a more favorable outcome under § 3143(b)(1)(B). Accordingly, Defendant's motion for bail pending appeal is denied. As previously directed, Defendant shall surrender to a facility designated by the United States Bureau of Prisons before 12:00 p.m. on October 20, 2017.

SO ORDERED.

Dated: Brooklyn, New York
August 23, 2017

/s/
DORA L. IRIZARRY
Chief Judge

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

United States District Court

Eastern District of New York

Caption:
United States of America v.

Michael Persico

Docket No.: 10-CR-147
Dora L. Irizarry
(District Court Judge)

Notice is hereby given that Michael Persico appeals to the United States Court of Appeals for the Second Circuit from the judgment [✓], other [ ] ______ (specify)
entered in this action on 8/25/17 (date).

This appeal concerns: Conviction only [ ] Sentence only [ ] Conviction & Sentence [✓] Other [ ]

Defendant found guilty by plea [✓] trial [ ] N/A [ ].

Offense occurred after November 1, 1987? Yes [✓] No [ ] N/A [ ]

Date of sentence: 7/21/2017 N/A [ ]

Bail/Jail Disposition: Committed [ ] Not committed [ ] N/A [ ]

Appellant is represented by counsel? Yes [✓] No [ ] If yes, provide the following information:

Defendant's Counsel: Sarita Kedia

Counsel's Address: 5 East 22nd Street, Suite 7B
New York, New York 10010

Counsel's Phone: 212-681-0202

Assistant U.S. Attorney: Allon Lifshitz

AUSA's Address: 271 Cadman Plaza East
Brooklyn, NY 11201

AUSA's Phone: 718-254-6164

[signature]
Signature

LAW OFFICE OF
MARC FERNICH

MARC FERNICH maf@fernichlaw.com
ALSO ADMITTED IN MASSACHUSETTS

810 SEVENTH AVENUE, SUITE 620
NEW YORK, NEW YORK 10019
212-446-2346
FAX: 212-459-2299
www.fernichlaw.com

February 12, 2016

**BY EMAIL**

Mary Ann Betts
Senior U.S. Probation Officer
Eastern District of New York
147 Pierrepont Street
Brooklyn, New York 11201

Re: *US v. Michael Persico*, 10 CR 147 (DLI) (EDNY)

Dear Ms. Betts:

On behalf of Michael Persico, I respectfully submit our objections, corrections and clarifications to the Presentence Investigation Report.

**Page 1:** All other defendants have been sentenced, as follows:

Theodore N. Persico, Jr. – 144 months' imprisonment, no fine
Thomas Petrizzo – one month of prison, $10,000 fine
Edward Garofalo, Jr. – 84 months' imprisonment, no fine
Francis Guerra – 135 months' imprisonment, no fine
Anthony Preza – three years' probation, $15,000 fine
Alicia DiMichele – four years' probation, $40,000 restitution, no fine

**Page 2, ¶¶ 3-17; Page 20, ¶ 56:** We object to these paragraphs, particularly their references to Michael Persico's alleged "role in the Colombo Family" and "longtime loan sharking activities." The offense at issue did not involve the Colombo family. Indeed, as defense counsel specifically noted at the plea hearing,

Persico disputes allegations regarding the Colombo family and denies involvement in it – as an associate or otherwise. *See* 6/8/12 Tr. 25.

**Page 6, ¶¶ 14-15; Page 14, ¶ 38:** Michael Persico was not involved in the murder of Joe Scopo and had no advance knowledge of any murder plan. What's more, we view the government's representation that it can prove by preponderant evidence allegations beyond the offense of conviction – especially allegations known to it beforehand – as breaching the plea agreement. *See* defense submissions dated 9/29/14 [ECF 788]; 10/21/14 [ECF 790]; 1/21/15 [ECF 803]; 2/3/15 [ECF 806]; *see also US v. Wyatt*, No. 06 CR 782 (DLI), 2008 WL 2433613 (EDNY June 12, 2008).[1]

**Page 10, ¶ 25; Page 12, ¶¶ 30-31:** Mr. Persico neither extorted, conspired to extort nor participated in defrauding Testa Corp. Based on its January 19, 2015, sentencing submission [ECF 802], the government appears to have abandoned these claims. We will elaborate our position if it continues to press them. Notably, the government did not seek to prove these accusations, and they were not considered, in connection with the sentencing of codefendant Thomas Petrizzo.

**Page 13, ¶ 32:** Mr. Persico did not attempt or conspire to extort the furniture store owner. Based on its January 19, 2015, sentencing submission [ECF 802], the government appears to have abandoned these claims. We will elaborate our position if it seeks to press or prove them. Notably, John Doe #10, the furniture store owner, is Frank Leone, Mr. Persico's close friend. Leone, as an alleged victim, was once on a government list of people Persico was forbidden to see. At the plea hearing, however, the government agreed that visits could resume, recognizing that Leone was not in fact a Persico victim. *See* 6/8/12 Tr. 29-30.

**Page 14, ¶ 37; Page 23, ¶ 67:** The offense did not involve "more than five criminal participants." Michael Persico asked Anthony Preza to extend a loan and Preza agreed. The only others involved were the trucking company's owner-operators: James Bombino, Steven Marcus and Theodore Persico, Jr. As the government has acknowledged, these three individuals were *borrowers* and alleged

---

[1] Please let us know if you need hard copies of any documents cited here.

*victims*. *See* 1/19/15 Govt. Ltr. [ECF 802] at 2. Notably, the guidelines for Preza's involvement in this offense were calculated at 10-16 months and he received a probationary sentence.

The facts surrounding the charge, culled from various submissions, are these:

Relevant evidence came from recordings made by Marcus, who operated All Around Trucking with codefendants James Bombino and Theodore Persico, Jr. and began cooperating with the government in 2006. Michael Persico is not heard on any of the recordings regarding the loan. Rather, only the three debtors – Marcus, Bombino and Theodore – are heard discussing the loan's terms and its non-repayment.

On May 7, 2009, Theodore, Michael's cousin, speaks to Marcus about All Around's need to raise capital so it can buy more trucks and take on additional work: "We'll get a loan. If we got to get a loan, we'll get a loan." A couple weeks later, on May 22, Theodore again discusses All Around's need for a loan – this time with Bombino and Marcus. He proposes: "I could borrow the money from somebody and offer them so much money. How much do you want to offer them to lend us $150,000 for two months?"

On June 10, Theodore spells out for Bombino and Marcus the terms of a loan he had asked Michael to provide the trucking company or arrange through business colleagues. Theodore explains: "Every a hundred thousand that we take, we have to give back one ten." While the money's "sixty or ninety day[]" return is contemplated, Theodore makes clear, "it doesn't cost ten thousand a month. It's just the ten thousand for the thing." Theodore explains the loan is being given to *him* (i.e., Theodore, along with Bombino and Marcus, is a borrower) and that *he* – not the lenders – set its terms, emphasizing: "Nobody's shaking us down."[2] Marcus comments: "Perfect.... It's better than the bank, better than the bank."

[2] The government alleges that Theodore was a powerful Colombo captain and administration member when he borrowed the funds.

The same day, June 10, the trucking company received a $100,000 check from Preza, the colleague Michael had asked to extend the loan. Notably, in a conversation outside Theodore's presence later that day, Bombino tells Marcus: "The guy did nothing wrong to us, are you kidding me? It's a free loan." Marcus responds, "Exactly… That's what I'm saying."

Six weeks later, on July 22, Bombino is heard telling Marcus that in *four months' time,* he expects to repay only the interest on the loan – not its principal – and that the company will need to retain the principal for *another four months*. On Aug. 11, Marcus asks Bombino if Michael or anybody else has said anything about getting the money back. Bombino replies, "No." On Sept. 15, Marcus, Bombino and Bombino's brother Patrick again discuss the loan. When Patrick asks if they're paying "juice," Bombino answers: "No, we're paying a flat fee, not juice. They want 10,000 on 100,000. We pay it back, we give 'em 110, that's what they want. They never said an ongoing juice thing." Asked if it mattered how long they held the principal, Bombino responds, "Well, they said 4, 5 months."

On Oct. 29, Marcus remarks to Bombino that he's "surprised that they haven't asked for their money back." Bombino responds, "How could he [referring to Michael Persico]? How could he ask for it back? He knows I ain't got it…. How could he ask – how could he have the balls?" A couple weeks later, during a Nov. 11 conversation about All Around's finances, Marcus and Bombino discuss outstanding debts. Referring to the interest owed on the loan, Marcus says, "Take another 10,000 off for Michael," to which Bombino responds, "Oh, yeah, the interest. I forgot. He's really gonna have the balls to charge us that, after this is all said and done?.... We got to offer it, there's no doubt. But if he takes it that would be a fucking cold thing to do…. I think Michael, honestly, I think Michael might say, 'Just give me back the money. Just pay Anthony back the money you owe him. Don't worry about it [the interest].'"

On Jan. 22, 2010, more than seven months after the $100,000 loan was extended, neither the principal nor any interest has been paid. Bombino explains to Marcus that he's more concerned with his credit and reputation – his "name" – than repaying Michael's colleague:

> Michael's guy is the next order of business, before everybody else but not before the creditors and my fuckin' name. I already said that to Michael…. I said, "Do you have a problem if I give Anthony, you know, 20 thousand, 25 thousand at a time?" He says, "Well, you know, nobody wants to get money back like that, but you know, at this point, yeah, that's fine, that's fine." I says, "Okay, cause the way Testa did it to me, unfortunately, I gotta do it back that way. I don't have … 100,000 to pay Anthony. So let me straighten out my name and the lawsuits and the union." … So that's how I left that. So Anthony's third after the creditors and the union. Then Anthony.

As late as Feb. 15, Marcus asks Bombino how much interest they'll have to pay on the loan. Bombino responds: "I don't think I want to pay anything." Bombino then offers that the lender will "without a doubt" be happy with $10,000, adding that if he wants more, Bombino would "let Michael deal with that" since "10,000 was what [Michael] told [Bombino]." Ultimately, when Persico was indicted in early March 2010, no principal or interest had been paid on the $100,000 loan; no threats, express or implied, had ever issued with respect to it; and neither Bombino nor Marcus had ever voiced any concern that violence might ensue due to their failure or delay in repayment.

Notably, multiple recordings capture the Bombino brothers expressing their view of Michael Persico.[3] On Sept. 1, 2009, for example, Bombino tells Marcus that Michael wouldn't associate with Bombino if he thought Bombino were mistreating anyone. Indeed, according to Bombino, Michael did everything possible to dispel any notion that he was someone to be feared and even tried to teach Bombino to behave in a gentlemanly, professional manner. In this regard, Bombino recalls: "[Michael] said, 'We're not gangsters. We don't do gangster things. We're running a legitimate business.'" Bombino concludes: "If you do right

[3] In several recordings James Bombino also discusses the brothers' relationship with Theodore Persico. *E.g.*, 10/16/09 ("Teddy's closer to Pat[rick] than to his father."); 1/22/10 (Teddy told Bombino to give Teddy's share of company money to Patrick); 2/15/10 ("Teddy and I grew up together. I knew him all my life. He's like my brother. He's my partner.").

by Michael, Michael will do anything for you. Michael is really a good-hearted guy." Marcus concurs: "He sure is."

In another conversation recorded Feb. 11, 2010, Bombino tells Marcus:

> I know Michael. Michael wears a cardigan sweater with elbow patches. I mean, the guy ain't no fuckin' gangster. Michael's as squeaky clean as they come. More than likely he ain't getting convicted. They'll indict him because of who his father is, who his brother is. I mean, naturally, his last name is a curse.

In still another conversation with his brother and Marcus, this one on Dec. 17, 2009, Bombino explains that he "feel[s] safe around Michael" and "like[s] hanging around [him]."

Transcripts of the referenced recordings are annexed for review. Based on the allocution and relevant background, the plea's factual basis appears suspect. *See* defense submissions dated 9/29/14 [ECF 788]; 10/21/14 [ECF 790]; 1/21/15 [ECF 803]; 2/3/15 [ECF 806].

**PP. 14-15, ¶¶ 38-39; PP. 17-18, ¶ 46:** Mr. Persico was not involved in the murder of Michael Devine. Though previously advising that it could prove otherwise by preponderant evidence, the government appears to have dropped this claim. *See* 1/19/15 Govt. Ltr. [ECF 802]. As such, the allegation should be stricken and discounted.

**Page 15, ¶ 40:** Though previously maintaining that Mr. Persico played some part in the murder of Joseph Lalima and a purported conspiracy to murder Bruce Black, the government appears to have dropped these claims – plus those regarding his involvement with Testa and Joker Poker machines. *Id.* As such, these allegations too should be stricken and discounted.

**Page 15, ¶ 40; Page 18, ¶ 47:** Persico denies involvement in extending extortionate loans in the early 1990s. What's more, we view the government's

advocacy regarding this allegation as breaching the plea agreement. *See* defense submissions dated 9/29/14 [ECF 788]; 10/21/14 [ECF 790]; 1/21/15 [ECF 803]; 2/3/15 [ECF 806]; *see also Wyatt*, 2008 WL 2433613.

**Page 21, ¶ 59:** We dispute the assertion that Bombino "was working at [Persico's] behest and guidance" with respect to the racketeering offenses. Based on its Jan. 19, 2015, sentencing submission [ECF 802], the government appears not to press any claim that Persico was involved in Bombino's criminal activity. Accordingly, this allegation also should be stricken and discounted.

**Pages 26-27, ¶ 85:** Michael Persico, Jr., has one child born May 2014. She is around 20 months old. Carmen Persico now works as a third grade teacher in the New York City public school system. She holds a master's degree in education from Adelphi University.

**Page 28, ¶ 88:** Mr. Persico was detained following his arrest in this case. The Second Circuit, however, reversed the detention order (*see US v. Persico*, 10 CR 1200 (2d Cir. May 12, 2010) [ECF 102]), and he was released on the conditions noted in this paragraph. In December 2010, after receiving significant additional information about Mr. Persico and the charges lodged against him, the district court modified his release terms, lifting the condition of home detention with electronic monitoring and canceling the telephone restrictions. In June 2012, the district court reduced Persico's bond to $3 million and four properties securing it were removed. *See* 6/8/12 Tr. 29.

**PP. 28-29, ¶¶ 91, 95-101, 105:** We are in the process of gathering medical and financial information as referenced in these paragraphs.

**Page 32, ¶ 114:** The plea agreement's forfeiture provision – based on Persico's "participation in an extortionate *collection* of credit conspiracy" – seems rooted in a count absent from both the Superseding Information to which he pleaded and the underlying Indictment. In fact, there was no collection of even the loan's $100,000 principal, let alone any interest. Nonetheless, Mr. Persico did pay $325,000 following the plea, even though the foundation for such forfeiture appears shaky at best.

**Page 33, ¶ 119:** Again, the government's advocacy regarding significant additional crimes allegedly involving Persico breaches the plea agreement and should be disregarded. *See* defense submissions dated 9/29/14 [ECF 788]; 10/21/14 [ECF 790]; 1/21/15 [ECF 803]; 2/3/15 [ECF 806]; *see also Wyatt*, 2008 WL 2433613.

**Page 33, ¶ 120:** Mr. Persico's personal circumstances call for a sentence below the advisory guidelines. As the PSR notes, his two youngest children, Patricia and Joyce, lost their mother to cancer at ages 10 and 12, leaving Persico as their sole caretaker and exclusive source of emotional and financial support.

Respectfully,

/s/

Marc Fernich

cc: Hon. Dora L. Irizarry
(by hand)

AUSA Allon Lifshitz
(by email)