To Be Argued By:
ALLON LIFSHITZ

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 17-2701

UNITED STATES OF AMERICA,

Appellee,

-against-

JAMES C. BOMBINO, ALICIA DIMICHELE, ALSO KNOWN AS ALICIA GAROFALO, EDWARD GAROFALO, JR., ALSO KNOWN AS BOBBLE, ALSO KNOWN AS TALL GUY, THEODORE N. PERSICO, JR., ALSO KNOWN AS SKINNY, ALSO KNOWN AS TEDDY, THOMAS PETRIZZO, LOUIS ROMEO, MICHAEL D. SCIARETTA, ALSO KNOWN AS MIKE LNU, ANTHONY PREZA, FRANCIS GUERRA, ALSO KNOWN AS BF,

Defendants,

MICHAEL J. PERSICO,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# THE GOVERNMENT'S OPPOSITION TO MOTION FOR RELEASE PENDING APPEAL AND APPENDIX

BRIDGET M. ROHDE,
Acting United States Attorney,
Eastern District of New York
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

AMY BUSA,
ALLON LIFSHITZ,
Assistant United States Attorneys,
(Of Counsel).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT....1

STATEMENT OF FACTS....3

I. Indictment and Guilty Plea....3

II. Motions to Undo the Guilty Plea....4

A. First Motion....4

B. Second Motion....5

C. Sentencing....6

D. Motion for Bail Pending Appeal....6

ARGUMENT - PERSICO IS NOT ENTITLED TO BAIL PENDING APPEAL....8

I. Legal Standards....8

A. Standard of Review....8

B. Bail Pending Appeal....8

II. The District Court Correctly Found that Persico Presents a Danger to the Community....11

III. Persico Cannot Show That the Appeal Raises a Substantial Question Likely to Result in Any Requested Relief....15

A. Persico's Guilty Plea Was Sufficient....15

B. The Government Never Breached the Plea Agreement....20

CONCLUSION....26

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 17-2701

UNITED STATES OF AMERICA,

Appellee,

-against-

JAMES C. BOMBINO, ALICIA DIMICHELE, ALSO KNOWN AS ALICIA GAROFALO, EDWARD GAROFALO, JR., ALSO KNOWN AS BOBBLE, ALSO KNOWN AS TALL GUY, THEODORE N. PERSICO, JR., ALSO KNOWN AS SKINNY, ALSO KNOWN AS TEDDY, THOMAS PETRIZZO, LOUIS ROMEO, MICHAEL D. SCIARETTA, ALSO KNOWN AS MIKE LNU, ANTHONY PREZA, FRANCIS GUERRA, ALSO KNOWN AS BF,

Defendants,

MICHAEL J. PERSICO,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

# THE GOVERNMENT'S OPPOSITION TO MOTION FOR RELEASE PENDING APPEAL

## PRELIMINARY STATEMENT

Michael J. Persico moves for release pending his appeal of a judgment of the United States District Court for the Eastern District of New York (Irizarry, C.J.), entered August 25, 2017,

following his conviction by guilty plea for conspiring to participate in an extortionate extension of credit, in violation of 18 U.S.C. § 371. Following a Fatico hearing, the district court found that Persico had also participated in, inter alia, racketeering, a murder, additional loansharking schemes and extortion. The court sentenced Persico principally to 60 months' imprisonment and permitted Persico to self-surrender on October 20, 2017. Persico then sought bail pending appeal in the district court, which was denied.

Persico argues that he should be granted bail pending appeal. In support, he argues that (1) he is neither a flight risk nor a danger to the community; and (2) his appeal will raise substantial issues regarding (a) whether his plea allocution was sufficient, and (b) whether the government breached the plea agreement by providing information to the Probation Department and the district court.

For the reasons set forth below, Persico cannot satisfy the requirements of 18 U.S.C. § 3143(b)(1), and his motion for bail pending appeal should be denied.

## STATEMENT OF FACTS

### I. Indictment and Guilty Plea

On February 9, 2012, Persico was charged in a fourth superseding indictment with participating in a racketeering conspiracy from 1987 to 2011 as an associate of the Colombo organized crime family of La Cosa Nostra, including as racketeering acts the conspiracy to murder, and murder of, Joseph Scopo; financing, extending and collecting an extortionate extension of credit as to John Doe #2 (Anthony Russo); the extortion of Russo; financing and conspiring to make an extortionate extension of credit to John Doe #8 and John Doe #9; and other crimes. (DE:376, ¶¶ 14-26, 30-33, 44-51 and 56-78).[1]

On June 8, 2012, during jury selection, Persico pled guilty to the sole count of a superseding information (the "Information") that charged him with conspiring to participate in the extortionate extension of credit to John Doe #1 and John Doe #2 (formerly John Does #8 and #9), in violation of 18 U.S.C. § 371. (A:1-8).

[1] "Br." and "A" refer to Persico's brief and appendix. "DE" refers to entries on the district court's docket sheet. "GA" refers to the government's appendix.

## II. Motions to Undo the Guilty Plea

### A. First Motion

On September 29, 2014, Persico moved to withdraw his guilty plea, asserting that (1) "the government breached its plea agreement with Persico by engaging in impermissible sentencing advocacy before the Probation Department," i.e., by advising Probation that it could prove conduct beyond the offense of conviction, and (2) "the plea lack[ed] an adequate factual basis and was otherwise insufficiently informed." (A:90-92, 100-26).

On October 29, 2014, the Honorable Sandra L. Townes, to whom the case was originally assigned, denied Persico's motion. (A:171-95). In her opinion, Judge Townes found that both the plain text of the plea agreement and statements made by counsel at the plea proceeding compelled the conclusion that there was no breach. (A:181-83). Notably, Judge Townes found that the plea agreement contained no limitations on the government's communications with Probation. (A:173, 181-82). Judge Townes further found that any contrary understanding by the defense was "not a reasonable interpretation." (A:182). Judge Townes carefully distinguished this case from cases in which a breach was found. (A:183-86). With respect to the plea allocution, Judge Townes found that there was a factual basis for the plea and that Persico understood the nature of the charge. (A:186-95).

Later that day, Judge Townes sua sponte ordered a Fatico hearing in order to determine whether Persico had committed crimes beyond the offense of conviction, although the government stated that it was not requesting such a hearing. (A:196-201).

B. Second Motion

On January 21, 2015, Persico again moved to withdraw his guilty plea. (A:211-18). Persico claimed he was renewing the motion because the government had identified to the district court -- rather than to Probation -- the crimes it intended to prove at the Fatico hearing. (A:211-12). On January 30, 2015, the government responded. (DE:805). On February 4, 2015, Persico filed a reply accompanied by an Affirmation by Paul Shechtman, Esq., who, along with Sarita Kedia, Esq., represented Persico prior to and at his guilty plea. (A:81-84, 219-29). In the Affirmation, Mr. Shechtman made certain representations about plea negotiations and wrote that he considered the government's representation as to "other crimes" to be a breach. (A:83).

On March 2, 2015, Judge Townes denied the renewed motion. (A:230-48). In doing so, Judge Townes explained that the plea agreement prohibited only two types of advocacy: taking a position concerning where within the Guidelines range determined by the Court the sentence should fall, and making a motion for an upward departure. (A:239). Judge Townes found that the government's

sentencing letter did not constitute either type of prohibited advocacy. (Id.). Notably, Judge Townes also concluded that evidence of the parties' intentions in negotiating the plea agreement was "irrelevant" because the portions of the plea agreement at issue were "unambiguous." (A:241-42).

C. Sentencing

On November 24, 2015, the case was reassigned to Chief Judge Irizarry. (DE dated Nov. 24, 2015). On June 3, 2016, the parties appeared before Judge Irizarry to address objections to the Presentence Investigation Report, and on August 10 and 24, 2016, she conducted a Fatico hearing.

On July 19, 2017, Judge Irizarry issued an opinion finding that the government had proven certain crimes at the Fatico hearing. (GA:1-20). On July 21, 2017, she sentenced Persico to a 60-month term of imprisonment, to be followed by a three-year term of supervised release, as well as a fine of $250,000. (A:333-93). She permitted Persico to self-surrender to his designated facility on October 20, 2017. (A:382-83).

D. Motion for Bail Pending Appeal

Persico moved for bail pending appeal on July 24, 2017. (DE:869). In support, he argued that his motion "to vacate his plea for legal infirmity and government breach" raised issues that could have been decided in his favor. (Id. at 1). The motion

attached a Declaration by Sarita Kedia, Esq., asserting that, during plea negotiations, a supervisory Assistant U.S. Attorney stated, in substance, that the government would be in breach of the plea agreement if it asked the court to consider a murder or murder conspiracy at sentencing. (A:87-88). On August 23, 2017, the district court denied that motion, finding that Persico is a danger to the community and that his appeal would not raise a substantial issue of fact or law. (A:398-401).

# ARGUMENT

## PERSICO IS NOT ENTITLED TO BAIL PENDING APPEAL

### I. Legal Standards

#### A. Standard of Review

This Court generally reviews detention orders for "clear error," a standard that applies broadly:

> This clear error standard applies not only to the court's specific predicate factual findings but also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release. We defer to the district court on such matters because of its unique insights into the defendant as an individual and into his personal, professional, and financial circumstances.

United States v. Abuhamra, 389 F.3d 309, 317 (2d Cir. 2004) (citations omitted). Therefore, a district court's decision will be affirmed absent a "definite and firm conviction that a mistake has been committed." United States v. Shakur, 817 F.2d 189, 195 (2d Cir. 1987) (citations and quotations marks omitted). If a due process violation is alleged, however, de novo review applies. Abuhamra, 389 F.3d at 317.

#### B. Bail Pending Appeal

Bail pending appeal is governed by 18 U.S.C. § 3143(b)(1), which provides that a court "shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment" be detained pending appeal unless the court

makes two independent findings. First, the court must find "by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released[.]" 18 U.S.C. § 3143(b)(1)(A). Second, the court must find

> that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--(i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

18 U.S.C. § 3143(b)(1)(B).

Under this statutory framework, a "substantial question" is "a 'close' question or one that very well could be decided the other way." United States v. Randell, 761 F.2d 122, 125 (2d Cir. 1985) (quoting United States v. Giancola, 754 F.2d 898, 901 (11th Cir. 1985)).

> If a court does find that a question raised on appeal is "substantial," it must then consider whether that question is "so integral to the merits of the conviction on which defendant is to be imprisoned that a contrary appellate holding is likely to require reversal of the conviction or a new trial."

Id. at 125 (quoting United States v. Miller, 753 F.2d 19, 23 (3d Cir. 1985)).

With respect to all of these issues, "the burden of persuasion rests on the defendant," Randell, 761 F.2d at 125, and

there is a "presumption in favor of detention," Abuhamra, 389 F.3d at 319. It is the defendant's burden to "rebut this presumption with clear and convincing evidence." Id. This framework and presumption give effect to Congress's view that "[o]nce a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances." Miller, 753 F.2d at 22 (quoting H. Rep. No. 907, 91st Cong., 2d Sess. 186-87 (1970)).

## II. The District Court Correctly Found that Persico Presents a Danger to the Community

In light of the extensive record in this case, which includes not only Persico's guilty plea to loansharking conspiracy, but also judicial findings made after a heavily litigated Fatico hearing, Persico cannot meet his burden of showing that he is not a danger to the community.[2] Notably, in its opinion denying his motion for bail pending appeal, the district court relied not only on the fact that Persico pled guilty to a crime of violence,[3] but also on its findings following the Fatico hearing that Persico "inter alia, directed the commission of and participated in a murder, and in other acts of extortionate extension of credit over a substantial period of time. . . . Based upon these considerations, the Court finds that Defendant repeatedly has shown himself to be a danger to the safety of the community." (A:398-99).

---

[2] The district court found that Persico was not a flight risk. (A:398).

[3] Persico argues that the crime to which he pled guilty is not a "crime of violence." (Br. 9-10). The government disagrees. (DE:871 at 4). However, in light of the applicable legal standards and the district court's extensive factual findings following a Fatico hearing, this Court need not address this issue. There can be no serious argument that the court's decision to deny bail hinged on whether the crime of conviction was technically classified as a crime of violence, rather than on Persico's history of committing murder and participating in racketeering.

In determining whether the district court erred in finding that Persico failed to show he is not a danger, it is important to consider the facts that were proven at the Fatico hearing. In an opinion issued after the hearing, at which cooperating witness Anthony Russo, a former captain in the Colombo crime family, testified and was cross-examined, and after the parties each offered many additional exhibits, the district court made a number of significant findings relevant to the question of Persico's dangerousness.

First, the court found that Persico participated in the 1993 murder of Joseph Scopo. (GA:5-11). The murder occurred during a civil war for control of the crime family. (GA:5). Persico, who is the son of the crime family's official boss, instructed Russo to find and kill Scopo, a high-ranking member of the rival "Orena faction" of the crime family. (GA:6). Persico, through an intermediary, provided Russo and a coconspirator with firearms to commit the murder. (Id.). After one failed attempt, Persico ordered Russo to complete the task before Persico's brother's trial began. (GA:7 n.11). Soon thereafter, Russo and four others murdered Scopo using a MAC-10 firearm provided by Persico. (GA:7-8).

Second, the court found that "throughout the 1990s," Persico loaned approximately $150,000 to $200,000, at an interest

rate of one percent per week, to Russo and Colombo family associate Francis Guerra, which they in turn provided to loansharking customers at a weekly interest rate of two to three percent. (GA:11). When Russo and Guerra had trouble repaying Persico, Persico demanded the full amount, which resulted in Russo's brutally assaulting several customers. (GA:11-12).

Third, the court found that in 2009 -- shortly before Persico's arrest -- Persico extorted Russo himself. (GA:13-15). More specifically, Russo and Colombo family member Anthony Stropoli sought to open a valet-parking business. (GA:13). Persico, who also operated a valet-parking business, told Russo to make his life "easier" by instead obtaining business for Persico in exchange for a commission. (GA:14).

Fourth, and significantly, the court found that Persico participated in racketeering, as part of the Colombo family, from the 1990s through 2009. (GA:16-17). This included instructing Russo, through intermediaries, not to complain about Russo's then-failure to get inducted into the crime family -- complaints that risked retribution from Persico. (Id.).

In light of Persico's ordering a murder in 1993, participating in racketeering for twenty years, and extorting Russo -- himself a powerful, violent captain -- as recently as 2009, shortly before Persico's arrest, the district court did not

commit clear error in finding that Persico presented a danger to the community. Further, Persico's longstanding participation in the Colombo crime family, a violent enterprise, also supports the conclusion that Persico continues to present a danger. See, e.g., United States v. Marino, 396 F. App'x 728, 730-31 (2d Cir. 2010) (Marino's "role in the Gambino crime family signaled that he had not separated himself from the criminal enterprise . . . ."); United States v. Bruno, 89 F. Supp. 3d 425, 432 (E.D.N.Y. 2015) (Gambino family associate defendant's continued association with a "prominent, financially well-off, and very dangerous crime family" supported detention). Under Section 3143(b)(1), this finding of dangerousness, on its own, is a sufficient basis to deny the motion for bail pending appeal.

## III. Persico Cannot Show That the Appeal Raises a Substantial Question Likely to Result in Any Requested Relief

Even if Persico had proven that he is not a danger, his motion would fail because his appeal does not raise a "substantial question," as additionally required by Section 3143(b)(1). Rather, the issues he intends to raise on appeal were carefully and correctly decided by the district court -- twice -- and there is no basis to find that his appeal is likely to succeed.

### A. Persico's Guilty Plea Was Sufficient

Persico argues that his guilty plea was legally insufficient because he did not allocute to his intent and did not understand the nature of the charge. (Br. 11-18). These arguments strain credulity and do not satisfy the standard for bail pending appeal.

Persico first argued that his plea was insufficient on September 29, 2014 -- more than two years after pleading guilty -- advancing the same arguments now made on appeal. (A:100-27). On October 30, 2014, Judge Townes issued a thorough, well-reasoned opinion in which she carefully reviewed the record and the law, and then denied the motion. (A:171-95). In reviewing the record, Judge Townes observed that the Information alleged that Persico was a Colombo family associate who knowingly and intentionally conspired to make one or more extensions of credit to two victims,

and that, as an overt act, he aided in the extension of a $100,000 loan. (A:172-73). Judge Townes further found that, at the plea proceeding, Persico stated he had read and understood the Information. (A:174). Further, the court had read to him the loansharking charge, summarized the portions of the Information alleging his role in the Colombo family and explained the elements of the charged offense, which the parties agreed were stated correctly. (A:174-75). Judge Townes also found that Persico stated that he "arranged for someone to extend [a] $100,000 loan to the trucking company run by James Bambino [sic] and Steve Marcus at a usurious interest rate," and that the government stated that the rate of interest exceeded forty-five percent per year and that the two victims believed Persico and his co-conspirators had a reputation for using extortionate means to collect extensions of credit. (A:175).

Judge Townes correctly stated the applicable legal standards, noting, inter alia, the following:

> In determining whether an adequate factual basis exists, a court is "not limited to an examination of the defendant's plea allocution, but may look more broadly to 'any facts on the record at the time of the plea proceeding.'" [United States v. Garcia, 587 F.3d 509, 514 (2d Cir. 2009) (quoting United States v. Adams, 448 F.3d 492, 499 (2d Cir. 2006)).] In other words, "so long as the facts relied on are placed on the record at the time of the plea, 'the district court, in determining whether there was a factual basis

> for the plea, [i]s free to rely on any facts at its disposal-not just the admissions of the defendant." [United States v Maher, 108 F.3d 1513, 1524-25 (quoting Irizarry v. United States, 508 F.2d 960, 967 (2d Cir. 1975)). . . . However, a court cannot "find that a factual basis exists when the defendant actively contests a fact constituting an element of the offense in the absence of circumstances warranting the conclusion that the defendant's protestations are 'unworthy of belief.'" Id. (quoting Godwin v. United States, 687 F.2d 585, 590 (2d Cir. 1982)).

(A:187); accord United States v. Culbertson, 670 F.3d 183, 190 (2d Cir. 2012) (court "may use 'whatever means is appropriate in a specific case'") (quoting Maher, 108 F.3d at 1524)).

Judge Townes found that although the defendant's allocution, considered in a vacuum, did not satisfy all elements of the offense, the totality of the record made clear that the elements were satisfied. (A:186-92). More specifically, Judge Townes considered 18 U.S.C. § 892(b), which provides that an extension of credit can be proven "extortionate" based on four enumerated factors: that repayment was legally unenforceable, that the annual rate of interest exceeded 45 percent, that the debtor reasonably believed that the creditor had previously used extortionate means to collect credit or had a reputation for doing so, and that total extensions by the creditor to the debtor exceeded $100. (A:189-90). Judge Townes correctly found that Persico's allocution, read together with the full record, satisfied all four factors, and therefore that the record supported

a finding of intent. (A:191-92). Judge Townes relied on United States v. Lombardozzi, 491 F.3d 61 (2d Cir. 2007), which held that "a jury may permissibly infer that someone who makes an unsecured loan and charges exorbitant interest rates surely intends to back up the loan with threats of violence." (A:191 (quoting Lombardozzi at 71)).

Further, Judge Townes explained that Persico's "admission that he 'arranged for someone' to make the loan implies that he conspired to make an extortionate extension of credit." (A:191).[4] Judge Townes' reasoning was correct. "The government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence." United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (citations omitted). Notably, where, as here, a defendant "arranged" for the commission of a substantive crime, an inference of conspiratorial intent is particularly warranted. In United States v. Davis, 690 F.3d 127 (2d Cir. 2012), this Court found a critical distinction between a principal who arranges for the commission of a crime and a subordinate who

[4] At the plea, Judge Townes explained the elements of a Section 371 conspiracy to Persico. (A:16-17). Thus, United States v. Darling, 766 F.2d 1095 (7th Cir. 1985), upon which Persico relies (Br. 15), is not dispositive. There, the defendant was never instructed about the elements of conspiracy, nor was there any mention of conduct that could involve a conspiracy. Id. at 1097-1100 ("it is only from outside sources that we know that Darling was charged with conspiracy and not the underlying substantive offense").

"plausibly could have fulfilled that role without knowing the scheme's criminal nature." Id. at 131. Conspiratorial intent can be easily inferred where evidence established that a defendant "played a principal role, even a managerial one, in [a] conspiracy and for that reason would have reasonably possessed the requisite criminal knowledge." Id. at 132; see also id. at 133 ("because it logically can be inferred that one who arranges a shipment knows its contents, the jury here easily could have found from the totality of the evidence that Davis knew precisely what was in the shipped packages"). Because Persico allocuted to arranging for the extension of a usurious loan, Judge Townes did not err in finding his plea sufficient as to the crime of conspiracy.

In light of the record in this case, therefore, the guilty plea was correctly held to be sufficient.

Judge Townes next considered whether Persico understood the nature of the charge to which he pled guilty, as required by Fed. R. Crim. P. 11(b)(1). (A:192-95). This Court has held that, although it is not required, "[i]t is usually the better practice for the district court in conducting plea allocutions to detail the elements of the offenses charged in the counts to which the defendants are pleading guilty or to read those counts of the indictment to them." Maher, 108 F.3d at 1524. In this case, Judge Townes found that this "better practice" was applied, and even

exceeded, at the plea proceeding, including by securing representations from Persico that he understood the charge and had no questions about it. (A:193-94). Because this finding is amply supported by the record, there is no basis to credit Persico's assertion that he did not understand the charge, and no basis to disturb the district court's conclusion.[5]

In sum, Persico's argument that his guilty plea was insufficient lacks merit and does not rise to the level of a "substantial question" on appeal warranting bail pending appeal.

B. The Government Never Breached the Plea Agreement

Persico also argues that he has raised a "substantial question" on appeal by challenging the finding that the government never breached the plea agreement. Persico initially argued below that the government breached the agreement by providing information to Probation about crimes beyond the crime of conviction. (A:91-92). Judge Townes carefully considered this

[5] Persico subsequently asked the district court to reconsider this conclusion, based in part on facts that he proffered long after the plea proceeding. (A:214-16). On appeal, Persico advances this argument again. (Br. 13-16). Judge Townes considered and correctly rejected this argument because "Rule 11 'does not require the district court to weigh any evidence or predict what a jury would do with the case,' [United States v. Smith, 160 F.3d 117, 121 (2d Cir. 1998)], or 'replicate the trial that the prosecutor and defendant entered a plea agreement to avoid.' United States v. Lumpkins, 845 F.2d 1444, 1451 (7th Cir. 1988)." (A:247). This issue, like the others raised on appeal, was correctly decided in light of that precedent, and does not constitute a "substantial question" for bail purposes.

argument and correctly rejected it. With respect to the plea agreement, Judge Townes found that the government had agreed not to bring certain enumerated charges, to take no position as to where within the Guidelines range the sentence should fall, and not to make a motion for an upward departure. (A:173). However, Judge Townes found, the government not only never agreed to withhold information from Probation, but in fact provided in the agreement that it would advise Probation and the district court of "information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence." (Id. (quoting Plea Agreement)). Judge Townes then correctly found that under the plain language of the agreement, there was no breach. (A:179-83). Indeed, to interpret the agreement to keep Probation and thus the sentencing court ignorant of relevant information would render the agreement unenforceable. See United States v. Williamsburg Check Cashing Corp., 905 F.2d 25, 28 (2d Cir. 1990).

Judge Townes also carefully considered the precedent advanced by Persico. Notably, Judge Townes found that United States v. Vaval, 404 F.3d 144 (2d Cir. 2005), was distinguishable because it involved improper statements by a prosecutor to a sentencing judge, including that the government believed it could move for an upward departure, that simply were not present in this

case. (A:183-84). Judge Townes also found that United States v. Wyatt, 06 CR 782 (DLI), 2008 WL 2433613 (E.D.N.Y. June 12, 2008), was inapposite because in that case, the government provided the sentencing judge with information about an uncharged murder allegedly committed by the defendant, and then used that information to seek a sentence near the top of the Guidelines range, even though the plea agreement "prohibited the government from using information already in its possession at the time of the plea to advocate for a specific sentence within the guidelines range or to move for an upward departure." (A:185 (quoting Wyatt at *7)). Because there was no such advocacy in this case, Judge Townes correctly concluded that Wyatt did not apply. (A:185-86).

Subsequently, Persico again moved for a finding of breach, this time on the purported basis that the government had somehow "induced" the district court to order a Fatico hearing and then, after being ordered to prove additional crimes, stating in a letter that it could do so. (A:211-12). Judge Townes again carefully considered the facts and precedent, distinguished the cases relied upon by Persico, and denied the motion in a well-reasoned opinion. (A:231-42). Notably, Judge Townes found that the government did not, and could not have, "invent[ed] a pretext" in order to inform the court of additional crimes because that information had been placed before the court during the trial of

co-defendant Francis Guerra, and because the district court had, on its own initiative, ordered the Fatico hearing.[6] (A:240-41). Furthermore, in considering defense counsel's assertions as to its understanding of the plea agreement, Judge Townes found that "evidence of the parties' intentions would have been irrelevant because paragraph 11 [of the plea agreement] is unambiguous." (A:241).

On appeal, Persico argues that the district court erred, largely on the basis of the case law that Judge Townes considered, principally the Vaval and Wyatt cases. (Br. 18-23).[7] However,

---

[6] It is important to note that, in addition, the most significant of the additional crimes -- twenty years of racketeering activity, including the 1993 murder of Joseph Scopo, loansharking, extortion and other crimes -- were actually charged against Persico in this case. (DE:376, ¶¶ 14-26, 30-33, 44-51 and 56-78). Furthermore, the heavily negotiated plea agreement provided him with "coverage" for these crimes and others. (A:76-78). In light of this record, it is clear that the district court was aware long before sentencing that the government believed Persico had committed additional crimes. Thus, the government did not "induce" the district court to order a Fatico hearing, and it is not likely that Persico or his counsel were surprised when the government stated it could prove these crimes by a preponderance.

[7] Persico argues that the government also breached by using "highly inflammatory language in its sentencing submission." (Br. 20 n.5). However, he cites no particular statement by the government in support of this conclusory assertion. Furthermore, the only case he cites in support, United States v. Heredia, 768 F.3d 1220, 1224 (9th Cir. 2014), was decided in another Circuit and involved a statement that was not characterized in the opinion as inflammatory. Respectfully, no sound legal basis was offered for deeming that statement to be a breach, and, in any event, in this case the government did not

because the government did nothing to violate any provision of the unambiguous agreement, and because Judge Townes carefully and correctly distinguished the relied-upon cases, this does not constitute a "substantial question" that would support bail pending appeal.

Indeed, as Judge Irizarry, the author of Wyatt, observed when Persico attempted to re-raise these issues again, Judge Townes' opinions were thorough, well-reasoned and correct:

> Her decision [finding no breach of the agreement] is sound. It is based on a very thorough, comprehensive and sound legal reasoning based on her examination of the

---

make any statements that this Circuit has previously deemed "highly inflammatory" or otherwise in breach of a similar agreement.

Persico also argues that the government breached by advocating for a sentence within the range of 37-46 months before the district court determined the proper range, because "[g]iven the loan facts, the court could easily have found the three-point role enhancement inapplicable[.]" (Br. 20 n.5). To the contrary, Persico stipulated in the plea agreement that the three-level role enhancement under U.S.S.G. § 3B1.1(b) applied and that the Guidelines range was 37-46 months. Further, while Persico subsequently argued that the enhancement might not apply, that argument was specious. As Judge Irizarry explained, Persico argued that the enhancement applied only if the criminal activity involved five or more participants. (A:270-71). However, the enhancement plainly applies if "the criminal activity involved five or more participants or was otherwise extensive," and determining whether a crime was "otherwise extensive" requires considering "all persons involved." U.S.S.G. § 3B1.1(b) & App. Note 3 (emphasis added). Given that the loansharking loan he admittedly extended was made when he was a Colombo family associate, Persico cannot seriously dispute that the enhancement to which he stipulated applies, or that the government breached by advocating for a sentence within the Guidelines range that incorporated the enhancement.

> facts of this case, the documents in this case, all the proceedings that were had in this case and the relevant case law and rules. Then there was a subsequent motion by the defense challenging that ruling and asking the Court to reconsider it and she reviewed it yet again and, again, the Court found that the government had not breached the plea agreement. . . . There is no breach of the plea agreement here.

(A:265-66).

Judge Townes has twice carefully considered and rejected the arguments advanced on appeal. Judge Irizarry reviewed those decisions and found that they were correct. There is simply no basis at this time to find that Persico has raised a "substantial question" on appeal.

* * *

Persico has failed to show that he is not a danger to the community, which is, on its own, a sufficient basis to deny his motion for bail. In addition, he has failed to raise a substantial question on appeal, a separate and independent basis to deny the motion. Therefore, his motion for bail pending appeal should be denied.

## CONCLUSION

For the reasons stated above, the motion for bail pending appeal should be denied.

Dated: Brooklyn, New York
September 18, 2017

Respectfully submitted,

BRIDGET M. ROHDE,
Acting United States Attorney,
Eastern District of New York.

By: /s/
ALLON LIFSHITZ
Assistant U.S. Attorney

AMY BUSA,
ALLON LIFSHITZ,
Assistant United States Attorneys,
(Of Counsel).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This response complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because the response contains 5,197 words, exclusive of captions, tables and certificates.

2. This response complies with the typeface requirements of Fed. R. App. P. 27(d)(1)(E) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated: Brooklyn, New York
September 18, 2017

/s/
AMY BUSA
Assistant U.S. Attorney

# A P P E N D I X

TABLE OF CONTENTS

Page

Opinion and Order,
United States v. Michael Persico, 10-CR-147 (DLI),
Dated July 19, 2017........................................GA 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
UNITED STATES OF AMERICA, :
:
-against- :
:
MICHAEL PERSICO, *et al.*, :
:
Defendant. :
---------------------------------------------------------------x

**OPINION AND ORDER**
10-CR-147 (DLI)

**DORA L. IRIZARRY, Chief United States District Judge:**

On June 8, 2012, Michael Persico ("Defendant") pled guilty to the Sixth Superseding Information, which charged him with a single count of conspiracy to engage in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892. *See* Superseding Info., Dkt. Entry No. 565; Change of Plea Hr'g, Dkt. Entry No. 566 at 1. On October 30, 2014, the Court ordered a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) (the "*Fatico* Hearing") as "to those acts that the [G]overnment allege[d] they can prove by a preponderance of the evidence . . . in order to make an informed decision" for sentencing. Oct. 30, 2014 Tr. of Crim. Cause for Sent'g ("Oct. 2014 Tr."), Dkt. Entry No. 823-1 at 4. At the time of his guilty plea and that pre-sentence conference, this case was assigned to the Hon. Sandra L. Townes, U.S.D.J. This matter was reassigned to this Court on November 24, 2015. *See* Nov. 24, 2015 Min. Entry.[1]

Upon reassignment to this Court, both the Government and Defendant claimed that no *Fatico* hearing was necessary. However, as Defendant continued to dispute that the Government could prove certain facts by a preponderance of the evidence, this Court determined that a *Fatico* hearing was necessary. Specifically, Defendant contested the Government's assertions that it could prove, by a preponderance of the evidence, that he participated in: (1) the 1993 murder of Joseph

---

[1] Notably, prior to the reassignment of this case to this Court, Judge Townes had denied various defense motions in connection with Defendant's attempts to withdraw his guilty plea. *See, e.g.*, Oct. 29, 2014 Mem. & Ord., Dkt. Entry No. 791; Feb. 27, 2015 Mem. & Ord., Dkt. Entry No. 811.

Scopo; (2) loansharking; (3) extortion; (4) a conspiracy to buy and sell stolen video games; and (5) racketeering. *See* Gov't Jan. 19, 2015 Ltr., Dkt. Entry No. 823, at 3; Def. Jan. 21, 2015 Ltr., Dkt. Entry No. 803, at 6-7.[2]

The *Fatico* Hearing was held on August 10 and 24, 2016. *See* Gov't Ex. A ("Hr'g Tr.").[3] During the *Fatico* Hearing, the Government presented testimony from Anthony Russo ("Russo"), an acting captain of the Colombo Crime Family ("Colombo Family") in New York City at the time of his arrest and indictment in 2011 in this District for, *inter alia*, participating in the murder of Joseph Scopo, receiving stolen video games, and conspiracies to commit extortionate extensions and collections of credit, illegal sports betting, and marijuana distribution. *See* Def. Ex. H; Hr'g Tr. at 12, 114. Defendant attempted to introduce testimony from Ronald Dwyer, a private investigator, pertaining to the physical condition of Joseph Scopo's former residence in Brooklyn at the time Scopo was murdered. Hr'g Tr. at 311-14. The Court precluded this testimony after determining that Mr. Dwyer would have no knowledge of the condition of the structure at the time of the murder over two decades ago. *Id.* at 314.

After the *Fatico* Hearing, the Court accepted additional briefing and evidence from the parties on the alleged acts. *See* Gov't *Fatico* Hr'g Br. ("Gov't Br."), Dkt. Entry No. 846; Def. *Fatico* Hr'g Br. ("Def. Br."), Dkt. Entry No. 849; Gov't Resp. to Def. *Fatico* Hr'g Br. ("Gov't Resp."), Dkt. Entry No. 853; Def. Resp. to Gov't *Fatico* Hr'g Br. ("Def. Resp."), Dkt. Entry No. 854; Def. May 9, 2017 Ltr., Dkt. Entry No. 863; Gov't May 31, 2017 Ltr., Dkt. Entry No. 865.

---

[2] The Government previously claimed it could prove other acts by a preponderance of the evidence, but decided not to pursue them (*e.g.*, participation in the 1992 murder of Michael Devine). *See* PSR, Dkt. Entry No. 667, at ¶¶ 38-39.

[3] Unless otherwise noted, the Court refers to the exhibits annexed to the Government's post-hearing submissions with the prefix "Gov't Ex.," and to those annexed to Defendant's post-hearing filings with the prefix "Def. Ex." throughout this Opinion and Order.

For the reasons set forth below, based upon Russo's testimony, which the Court finds credible, and upon due consideration of all the parties' submissions, the Court finds, by more than a preponderance of the evidence, that Michael Persico did participate in the five alleged activities. Accordingly, the Court shall consider all five activities in fashioning a reasonable sentence.

## DISCUSSION

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing Guidelines ("U.S.S.G.")] range." *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations omitted). This calculation provides "the starting point and initial benchmark." *Id.* However, the range provided by the U.S.S.G. is only advisory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The Court "may not presume that the Guidelines range is reasonable" for the facts and circumstances in every case. *Gall*, 552 U.S. at 50 (internal citations omitted). Rather, the Court must assess and consider, among other things, "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

To this end, sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure[] that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)); *See also United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013). This inquiry is "largely unlimited . . . as to the kind of information . . . consider[ed], or the source from which it may come." *Witte v. United States*, 515 U.S. 389, 398 (1995) (internal citations and quotation marks omitted). Indeed, the Court "may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment[,] and criminal activity resulting in an acquittal in determining sentence." *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)). "No limitation

shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Any conduct considered must be proven by a preponderance of the evidence. *See Witte*, 515 U.S. at 401. In this Circuit, courts may conduct this inquiry by way of a *Fatico* hearing, during which, "the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *Fatico*, 603 F.2d at 1053).

## I. Findings of Fact

Russo's career in organized crime began as a teenager in the 1970s and ended with his arrest in 2011. Hr'g Tr. at 11-12. For over thirty years, he was associated with both the Gambino and Colombo Families in New York City.[4] *Id.* at 12-13. His association with the Colombo Family began when he was incarcerated with Theodore Persico, Jr. ("Theodore, Jr."), the nephew of the Colombo Family Boss, Carmine Persico ("Carmine"), in Coxsackie, New York.[5] *Id.* 18-20, 23-24.

Upon his release from prison in 1992, Russo joined the Colombo Family as an associate[6] and reported directly to Theodore Persico, Sr. ("Theodore, Sr."). *Id.* at 23-24, 26-28, 30. This reporting structure lasted until 1993 when Theodore, Sr. and other leaders of the Colombo Family were arrested. *Id.* at 31-32. With the leadership decapitated, Russo, along with his close friend and fellow Colombo Family associate Frank Guerra ("Guerra"), reported to Defendant. *Id.* at 29, 32.

[4] Russo explained that there are five "crime families" operating in New York City; the other three are the Bonanno, Genovese, and Lucchese Families. Hr'g Tr. at 13.

[5] Carmine is Defendant's father; Theodore, Jr. is Defendant's cousin. *Id.* at 21.

[6] Russo outlined the general crime family hierarchy along with the roles and responsibilities associated with each level. In ascending order, the positions are: (1) associate; (2) soldier; (3) captain; (4) consigliere; (5) underboss; and (6) boss. *Id.* at 13. Upon becoming a "soldier," individuals were formally inducted into, and made a member of, the particular family. *See Id.* at 14-17.

Although it was unusual for individuals to report to others with the same rank, Russo explained that reporting to Defendant made sense given Defendant's familial ties to the group's leaders. *Id.* at 32. Russo regularly met with Defendant and others at various locations[7] in Brooklyn, New York, to discuss loansharking. *Id.* at 33. He consistently observed other criminal associates of Theodore, Jr. follow a similar pattern and meet with Defendant as well. *Id.* at 33-34. Russo reported to Defendant until Alphonse Persico ("Al"), Defendant's brother, was released from jail in 1994. *Id.* at 68-69.

### A. *The 1993 Murder of Joseph Scopo*

When Russo joined the Colombo Family, it was in the midst of a civil war among family factions that required the organization's members to align themselves with either Carmine or Vic Orena ("Orena"), an acting boss who was trying to wrest control of the syndicate from the Persico family. *Id.* at 30-31; *See also* Def. Ex. C ("*Guerra* Tr.") at 186-87.[8] Russo sided with those loyal to Carmine, choosing to oppose the Orena faction led by Joseph Scopo ("Scopo") and "Wild Bill" Cutolo ("Cutolo"). Hr'g Tr. at 30-31. Shortly after joining the Colombo Family, Russo and other Persico loyalists began plotting to kill Cutolo.[9] *Id.* at 34.

---

[7] These locations included Defendant's limousine business in Brooklyn ("Romantique"), a bus company in Coney Island, and others. *Id.* at 27, 33.

[8] This exhibit contains Russo's testimony in *United States v. Guerra*, No. 10-CR-145 (SLT) (E.D.N.Y.).

[9] Defendant claims that Russo contradicted himself by testifying both that he participated in the war "the minute he got home" (Hr'g Tr. at 34) and "[s]ometime in '93" (*Guerra* Tr. at 204). *See* Def. Br. at 11-12. Any such disparity is trivial and inconsequential. It is undisputed that Russo was associated with the Colombo Family upon his release from prison. *Compare* Hr'g Tr. at 26-30, 34-35, *with Guerra* Tr. at 182, 204-05. Nor is there any incongruity between Russo's testimony that a "cease fire" existed from the time of his release until Scopo was murdered (*Guerra* Tr. at 578-79), and joining the war as soon as he came home (Hr'g Tr. at 34). *See* George James, *Man Tied to Crime Family Is Shot to Death in Queens*, N.Y. TIMES, Oct. 22, 1993, http://www.nytimes.com/1993/10/22/nyregion/man-tied-to-crime-family-is-shot-to-death-in-queens.html (noting that the murder "signaled a resumption of hostilities in the bloody civil war between factions" of the Colombo Family).

Following a few botched attempts to kill Cutolo,[10] Russo mentioned the failures to Defendant who, in turn, advised that Eric Curcio ("Curcio"), another Colombo Family member, "had a line" on (*i.e.*, knew where to find) Scopo. *Id.* at 35-36. Russo understood this as an instruction to contact Curcio, find Scopo, and kill him. *Id.* at 36. Russo followed the direction. Both he and Guerra visited Curcio, who told them that he knew where Scopo was, and asked if they would be willing to assemble "a crew" for the murder. *Id.* at 38. Russo and Guerra agreed to do so. *Id.* Shortly after that meeting, Russo and Guerra told Defendant of their plan to kill Scopo and asked for weapons. *Id.* at 40. Defendant directed them to "Smiley," another Colombo Family associate, who would "bring them a bag" of guns. *Id.* Later that day, Guerra received a black duffle bag containing a "MAC-10 with a silencer" and "a couple of pistols" from Smiley. *Id.* at 40-41.

Separate from Defendant's role in pushing the murder forward, Theodore, Jr. actively advocated for it as well. *See Id.* at 42, 45-46. In fact, during Russo's testimony, he recalled a particularly notable meeting during the summer of 1993. That summer, Theodore, Jr., who was incarcerated at the time, was transported to Brooklyn so that he could attend his grandmother's funeral. *See Id.* at 45-46; Gov't Ex. 861 (death certificate of Eleanor Avena); Gov't Ex. 862 (bill for funeral services for Eleanor Avena); Gov't Ex. 863 (a manifest noting that an inmate named Persico was transported to Brooklyn for funeral services on August 18, 1993). While meeting with his family and friends at the funeral home, Theodore, Jr. pressured Russo and others to murder Scopo. Hr'g Tr. at 46; *See also* Superseding Info., Dkt. Entry No. 562; Theodore, Jr. Guilty Plea, Dkt. Entry No. 563 (pleading guilty to a single count of conspiracy to murder Joseph Scopo in-aid-of racketeering).

[10] Defendant argues that Russo has not reliably testified about the order in which he planned to kill Cutolo and Scopo. *See* Def. Br. at 12-13. Any issue with the order of intended murders does not assail Russo's testimony vis-à-vis Defendant's role.

On the night of the murder in October 1993,[11] the "crew" consisted of Russo, Guerra, Curcio, Johnny Pappa ("Pappa"), and John Sparacino ("Sparacino") (collectively, the "Hit Crew"). Hr'g Tr. at 46-47. The murder occurred outside Scopo's home, around 111th or 110th Street and 109th Avenue, in Ozone Park, Queens. *Id.* at 52. Curcio provided Scopo's location. *Id.* The plan included the use of three vehicles: Curcio and Guerra each drove a "crash"[12] car and Russo drove the third (the "Hit Car"). *Id.* at 52-53. Pappa and Sparacino, the designated shooter who was armed with the MAC-10 Defendant helped procure, rode in the Hit Car. *Id.* at 53. While he could not recall the make or model of the car he drove during the murder, Russo testified that the Hit Car was a stolen, brown or beige, four-door vehicle. *Id.* at 53-54; Gov't Ex. 17(c) (a photograph of a brown, four-door Buick with a shattered windshield found on 106th Street after the murder). It was started with a screwdriver. Hr'g Tr. at 54; *See also* Gov't Ex. 20(d) (a photograph of the Buick's driver's seat, showing an exposed steering column and screwdriver).

That night, the Hit Crew waited outside their cars at a corner near Scopo's home. Hr'g Tr. at 54. Eventually, Curcio saw Scopo's car approaching, and the men entered their designated vehicles. *Id.* Russo testified that Scopo appeared in a small, light-colored Nissan Altima (the "Scopo Car"). *Id.*; *See also* Gov't Exs. 18(a), 18(c) (photographs of a white Nissan Altima with shattered windows and bullet damage found on 110th Street after the murder). Scopo was in the front passenger seat, and an unidentified youth drove the vehicle. Hr'g Tr. at 55. Russo planned to pull the Hit Car up alongside the Scopo Car, have Sparacino "kick [his] door open and . . . empty

[11] There were two attempts on Scopo's life before the actual murder. *See* Hr'g Tr. at 47-52. After Russo reported the first bungled attempt to Defendant, Defendant ordered, "You got to get this thing done before my brother [Al] goes to trial." *Id.* at 49. Defendant's challenge to the veracity of this statement (*See* Def. Br. at 13-14) is unavailing, as the Court finds Russo's testimony credible and there is other evidence tending to show that Defendant orchestrated Scopo's murder.

[12] A "crash" car is used to block off the street, prevent any unanticipated party from getting involved, and allow shooters to get away. Hr'g Tr. at 48.

that [MAC-10] . . . into the car." *Id.* at 54. As the Scopo Car was being parked, Russo pulled alongside, and positioned the backend of the Hit Car's rear passenger door along the Scopo Car's front bumper. *Id.* at 55. Sparacino then opened the rear passenger door and fired the MAC-10 into the Scopo Car. *Id.* at 55-57; *See also* Gov't Exs. 21(e), 21(i) (photographs of the Altima's rear passenger side and backseat). As Sparacino fired, a bullet "came through the back window of" the Hit Car and went through its windshield. Hr'g Tr. at 56; *See also* Gov't Ex. 20(c) (photograph of the Buick's shattered rear windshield); Gov't Ex. 20(g) (photograph of bullet casings on the Buick's backseat).

Russo fled the scene and drove to a prearranged spot a few blocks away, where the Hit Crew planned to abandon the Hit Car. Hr'g Tr. at 57; *See also* Gov't Ex. 17(c). After parking, Russo told Sparacino to leave the MAC-10 in the Hit Car, per Defendant's direction.[13] Hr'g Tr. at 57-58; *See also* Gov't Exs. 19(a), 19(b) (photographs of a weapon with a silencer found in the backseat of the Buick). Russo also testified that he took a ski mask off Sparacino's head, and threw it, along with a pair of gloves he was wearing, into a nearby bush. Hr'g Tr. at 57-58. Guerra pulled up nearby and the group fled the area. *Id.* at 58. Scopo died later that night. *Id.*

A few days after the murder, Russo was approached by members of the Colombo and Lucchese Families who asked about the murder. *Id.* at 59. Although Russo denied any knowledge of the incident, both he and Guerra complained to Defendant that Curcio was speaking openly about the murder.[14] *Id.* at 59-61. Defendant ordered Russo and Guerra to speak with Curcio about

[13] Defendant asserts that any testimony as to an instruction to leave the murder weapon in the vehicle is suspect based upon Russo's testimony in *Guerra*. Def. Br. at 14-15. The Court finds just the opposite. In *Guerra*, Russo testified that he told Sparacino to leave the weapon in the vehicle. *See Guerra* Tr. at 735-37. Here, he simply elaborated that Defendant was original source of the order. *See* Hr'g Tr. at 58.

[14] Defendant contends that the Colombo associate who approached Russo, another informant, claims Russo stated to him that "he, Guerra, John Sparacino and John Pappa were involved in the murder" of Joseph Scopo. Def. May 9, 2017 Ltr. This exchange allegedly occurred after the murder of Carmine Gargano, which was committed in July 1994. Gov't May 31, 2017 Ltr. at 2 n.2. This does not impugn Russo's testimony and, as the statement does not

his indiscretions, directly. *Id.* at 61. Additional testimony from Russo also demonstrated that those persons who had participated in Scopo's murder, and were talking about it or complaining that they were not properly recognized or compensated for the job, were murdered. *Id.* at 63-64.

Defendant suggests that much of Russo's testimony consists of outright lies, particularly as to: (1) whether Russo carried a gun during the murder (Def. Br. at 16-17); (2) what Russo did with his gloves and Sparacino's ski mask after the murder (*Id.* at 16); (3) when Pappa first became involved in the plot (*Id.* at 17); (4) when the Hit Car was stolen (*Id.* at 19); (5) the date and circumstances of Theodore Jr.'s grandmother's funeral (*Id.* at 17); (6) the failed attempt to kill Scopo at his home and whether Russo recognized him (*Id.* at 17-18); (7) Orena's liberty status in 1992 (*Id.* at 16); and (8) Defendant's role (*Id.* at 19).

The first seven points have no bearing on *Defendant's* role in the murder. Inconsistencies about tangential details unconnected to Defendant's participation, such as whether Russo carried a gun while driving the Hit Car (it is undisputed that he was not the shooter) or when Eleanor Avena's funeral was and who was near Russo when Theodore, Jr. approached him (it is undisputed that the meeting occurred), more than two decades after the fact, are irrelevant. The Court finds unavailing Defendant's eighth point, that Russo is incredible because, during his testimony in *Guerra*, he completely failed to mention Defendant's name "in connection with the Scopo murder." *Id.* at 19. The testimony cited by Defendant reads, in pertinent part:

> Q: And the only person that gave you the order to kill Joseph Scopo was Theodore Persico, Junior?
>
> A: He told us that day, yes.
>
> Q: Is he the only person that told you?

---

appear to proffer a comprehensive list of murder participants, it does not exonerate Defendant. There is no dispute that Defendant was not present at the murder scene. However, this detail does not alter the fact that he directed and facilitated the murder.

A: I mean, basically, yes.

*Guerra* Tr. at 684. However, Russo also testified in *Guerra*, consistent with his *Fatico* Hearing testimony that, when Defendant told him that Curcio "ha[d] a line on" Scopo, he understood that Defendant "wanted [Russo] to help him kill [Scopo]." *Id.* at 205. Also consistent with his *Fatico* Hearing testimony, Russo testified in *Guerra* that Defendant helped procure the weapons for the murder. *Id.* at 208. There is no contradiction between Russo's testimony in *Guerra* and his testimony in this matter. While the "order" to kill Scopo "basically" may have come from Theodore, Jr. "that day," there is no deviation from the fact that Defendant advocated for and helped plan the murder.

Defendant also argues that the evidence accompanying the briefs defeats the Government's claims because: (1) Theodore, Jr. did not identify Defendant as a participant in the murder during his guilty plea allocution (Def. Resp. at 5); (2) Russo had the MAC-10 before Defendant allegedly got involved (*Id.* at 7); and (3) Judge Townes commented that Defendant's role in the murder seemed "vague" (*Id.* at 9-10). These arguments lack merit.

First, the fact that Defendant was not mentioned in Theodore, Jr.'s guilty plea allocution is inconsequential. In fact, Theodore, Jr. did not identify any other participants in the cited excerpt. Rather, he clearly admitted, "In or about 1993, for the purpose of maintaining my position in the charged enterprise, *I agreed with others* that members of the Arena [sic] side, including Joe Scopo, should be killed because they were trying to kill my family." Def. Ex. KKKK at 25 (emphasis added). This statement neither implicates nor exonerates any particular person.[15]

Second, Defendant argues that Russo could not have received the murder weapon from

[15] Defendant also argues that Theodore, Jr. "did not plead to participating in Scopo's murder." Yet, Defendant submitted a portion of the guilty plea transcript in which Theodore, Jr. confessed to doing just that. *See* Def. Ex. KKKK.

him *after* looking for Cutolo because Russo testified that a MAC-10 was used while searching for Cutolo. Def. Resp. at 7. This argument does not corrupt the core of Russo's testimony: the MAC-10 used in the Scopo murder was obtained with Defendant's help during the course of planning the murder. *See* Hr'g Tr. at 40-41, 43, 57; *Guerra* Tr. at 208-09, 226-29. Russo consistently has explained Defendant's role in procuring the MAC-10 that was used in the murder and was left in the backseat of the Hit Car, per Defendant's instructions.

Finally, the Court declines Defendant's invitation to rely on Judge Townes' 2011 characterization of Defendant's role to support his claim that the Government has failed to offer any "corroboration." At the time Judge Townes made her observations, she did not have the benefit, as this Court does, of having presided over the *Fatico* Hearing and having reviewed the additional submissions of the parties, consisting of over a thousand pages of argument, records, testimony, photographs, and recordings. Indeed, it was for just such a reason that Judge Townes had ordered that a *Fatico* hearing be held.

**B. *Loansharking Activities***

Russo made money throughout the 1990s by loansharking or "shylocking" with and for the Colombo Family.[16] *See* Hr'g Tr. at 33, 72-73. The procedure was simple. He and Guerra would borrow money from Defendant at the weekly interest rate of one percent, and then lend that money to their customers at a weekly interest rate of two to three percent. *Id.* 73-74. From 1993 until 1996 or 1997, Russo and Guerra had borrowed approximately $150,000 to $200,000 from Defendant for loansharking.[17] *Id.* at 74. However, in the mid-1990s, when the pair had difficulty paying the

---

[16] Defendant claims that Russo contradicted himself as to the identity of the person who supplied the money for his loansharking activities with the Gambino Family in the 1980s. Def. Br. at 22. This has no bearing on his loansharking activities with the Colombo Family.

[17] Defendant attacks these approximations. Def. Br. at 22. In *Guerra*, Russo testified that he received approximately $100,000 between 1993 and either 1995 or 1996. *Guerra* Tr. at 259-60. Here, he testified that he received approximately $150,000 to $200,000 between 1993 to either 1996 or 1997. Hr'g Tr. at 74. These

one percent tribute, Defendant demanded that the entire amount owed be repaid. *Id.* at 75-76. With this order, Russo and Guerra began to collect the outstanding debts, and a number of assaults to effectuate the collections followed. *Id.* at 76. In one instance, Russo assaulted "Fat Lenny" in order to collect a loan of $30,000, but Defendant intervened and arranged for repayment through a member of the Gambino Family. *Id.* at 76-77. In another incident, Russo assaulted "Tony," who owed $7,000 or $8,000. *Id.* at 77. In this situation, members of the Genovese Family interceded on Tony's behalf and asked Russo to reduce the debt to $2,000 or $3,000, but Russo refused to do so, as he lacked authority to negotiate debts owed to Defendant. *Id.* at 77-78. However, Russo relayed the information to Al, who, in turn, met with members of the Gambino Family to arrange repayment. *Id.* at 78-79.

On a separate, related occasion, Russo assaulted a stockbroker who owed a Colombo Family associate $100,000. *Id.* at 98-99. After the beating, Russo was approached by a member of the Gambino Family who negotiated a payment plan consisting of two installments of $50,000. *Id.* at 99-101. After receiving the first payment, Russo pocketed $5,000 and gave Al the remaining $45,000. *Id.* at 101-02. Al was enraged when he discovered that Russo took any part of the payment without prior authorization. *Id.* at 101-02. When Russo offered to return the money, Al stated, "[Y]ou owe my brother [Defendant] money. Give it to him." *Id.* at 102. During this exchange, Russo still had an outstanding debt to Defendant connected to loansharking. *Id.*

In 2000, Russo was arrested and federally prosecuted in the Southern District of New York. *Id.* at 102-03. While Russo was out on bail, Defendant contacted him "to make sure [he] was all right and if [he] had anything to look after," and to discuss his outstanding debt of approximately $60,000 to $70,000. *Id.* at 103-04. Defendant forgave the debt. *Id.* at 104. By making this gesture,

discrepancies are not jarring and they do not "indicate[] that [Russo] has concocted [Defendant]'s involvement in loansharking." Def. Br. at 23.

Russo felt that Defendant was recognizing the role he played in Scopo's murder and subtly asking that he "keep [his] mouth shut." *Id.* Later on, while serving his sentence, the Colombo Family provided Russo's then-girlfriend with hundreds of dollars every month so that she could deposit funds into his prison commissary account. *Id.* at 104-05. Sometime after his release, Russo learned that the monthly payments came from Defendant. *Id.* at 106.

Defendant claims that, since Russo's loansharking books were destroyed after his 2011 arrest, there is an "inference" that the records did not implicate him as a loan originator. Def. Br. at 22. Defendant is in error. There is no indication that the records contained any information as to whom Russo was indebted. All that was established is that the records noted who *received* loans and needed to make payments. *See* Hr'g Tr. at 261 (noting that Fat Lenny had a debt of $10,000 in the ledger). Defendant also argues that three recordings from 2009 establish that Russo was actually indebted to, and forgiven by, Al, Defendant's brother, at the time of his 2000 arrest. Def. Br. at 23; *See also* Def. Exs. D(T), VV(T), WWW(T). However, the recordings do not contradict the testimony concerning Defendant's participation. At most, the recordings indicate that Russo was indebted to Al and that Al forgave that debt. Notably, the debt associated with Al in the recordings is not connected definitively to loansharking. Nonetheless, even if the only debt owed and discharged in 2000 belonged to Al, that fact does not rebut the testimony that Defendant provided Russo with loansharking funds and received interest payments on those loans, and that those loans were collected in a violent manner at his bidding during prior years.

**C. *Valet Company Extortion***

In approximately 2010, Russo planned to start a valet parking company with Anthony Stropoli ("Stropoli"), an affiliate of the Colombo Family who sold fish to restaurants in New Jersey. Hr'g Tr. at 121-22. The two intended to use Stropoli's preexisting contacts to build their

business. *Id.* at 122. Before the endeavor began, Stropoli suggested that Russo speak with another "Anthony" who "ran a couple of valet parking systems." *Id.* at 122. Russo arranged to meet Anthony and, when he arrived, found Defendant waiting for him. *Id.* at 123. Defendant was upset because Russo's enterprise would compete with his own valet company. He asked Russo, "[H]ow would [Stropoli] and you like it if I opened up a -- a fish company?" *Id.* Instead of striking out on their own, Defendant suggested that Russo "make [his own] life easier" by selling Defendant's business to Stropoli's contacts in exchange for twenty percent of the profit from every customer brought on. *Id.* at 124.

Russo secured at least one restaurant for Defendant's valet business, an Italian restaurant in Red Bank, New Jersey. *Id.*; *See also* Gov't Ex. 7002 (sealed FBI report containing an interview with a restauranteur who was approached, and used a valet company suggested, by Russo for approximately six months); Gov't Exs. 838(a), 838(b) (sealed business records showing payments from the restaurant to two valet companies, located at the same address, on various dates between June 2009 and February 2011); Rev. PSR, Dkt. Entry No. 833 at ¶ 101 (Defendant's 2012 tax returns identify him as a co-owner of a valet company that invoiced the restaurant from June 2009 through June 2010). Russo's business never materialized because he "didn't want problems" with Defendant. Hr'g Tr. at 125.

Here, Defendant attacks Russo's testimony because, on cross-examination, he could not recall if he ever referred a business and took a percentage. Def. Br. at 24. Yet, the testimony cited by Defendant does not contain any indication that Russo "could not recall" if he referred any valet business; Russo said only that he did not remember whether he took a percentage of the profit. *See* Hr'g Tr. at 272-73. That does not undercut the testimony and substantial evidence supporting the conclusion that he *did*, in fact, refer a customer. Defendant further takes issue with the

Government's initial claim that the extortionate activity took place between 2007 and 2009 but now, with Russo's testimony, places the activity in 2009 or 2010. Def. Resp. at 9. This discrepancy is diminutive in light of the fact that 2009 was confirmed by Defendant's own tax returns as a year when his valet business invoiced the subject restaurant.[18]

**D. *Conspiracy to Sell Stolen Video Games***

Defendant also participated in a plan to procure and sell stolen handheld video games in late 1994. The plan first came into existence when Russo's father told him about a man named "Spider" who wanted to unload a truckload of stolen video games. Hr'g Tr. at 81. Russo met Spider and agreed to pay $70,000 for a "tractor trailer load" of video games. *Id.* at 82-83. Russo approached Defendant about this scheme and Defendant, in turn, referred him to a "friend" who provided the purchasing capital. *Id.* at 82-83. Defendant also agreed to store the stolen games in the garage of a bus company he owned. *Id.* at 83. Russo had his father rent a truck for Spider to use and deliver the games in two shipments, with a payment of $35,000 upon delivery. *Id.* at 83; *See also* Gov't Ex. 864 (lease agreement for a U-Haul truck dated October 26, 1994 and signed by "Anthony Russo").

However, when Spider arrived with the first load of games, Russo thought federal agents were monitoring the transaction. Hr'g Tr. at 84; *See also* Gov't Exs. 212(a), 212(b), 212(c) (photographs of Russo at the intended meeting location taken by FBI Special Agent Kevin Wevodau). After becoming suspicious, Russo took Spider into a nearby business to check and see if he was wearing a microphone. Hr'g Tr. at 84. After confirming that Spider was not an informant,

---

[18] Defendant makes a passing conclusory argument that it would be improper for the Court to consider his unconvicted conduct because "Judge Townes only considered the unconvicted conduct . . . to determine . . . the Guidelines range" for Guerra's sentence. Def. Resp. at 10. As already noted *supra*, this Court may consider all relevant conduct, whether Defendant is uncharged, or convicted or acquitted of it, in determining an appropriate sentence for Defendant.

Russo told Spider to abandon the truck, which still contained the games, so that he could report it as stolen. *Id.*; *See also* Gov't Exs. 865(a)-(e) (photographs of the truck and its contents); Gov't Exs. 7009, 7010, 7011 (reports concerning the truck and its contents completed by FBI Special Agent Matthew Tormey). The transaction never materialized. Hr'g Tr. at 84. A few days later, Defendant asked Russo to return the loan and he agreed to do so. *Id.* at 85.

Defendant's efforts to undermine Russo's testimony concerning this activity fall flat. Defendant argues that he has never owned a bus company, and when Russo identified the garage he planned to use for storage, Russo took federal agents to an address that was owned by an unknown third party from 1980 to 2002. Def. Br. at 24. Even if these arguments are true, they do not impugn Russo's testimony as to Defendant's role in securing the purchasing capital.

E. ***Other Racketeering Activities***

In addition to the actions outlined above that were geared toward making money and maintaining power, Russo offered various other anecdotes about the Colombo Family's activities. For example, during the 1990s, Russo owned and operated a liquor store on Staten Island which was registered in the name of his girlfriend's father. *See* Hr'g Tr. at 85, 88-89. His start-up capital for that endeavor came from Defendant, Frank Persico (Defendant's cousin), and Stropoli. *Id.* at 85-86. Russo ran the store until he was arrested in 2000, at which point he turned the business over to Defendant, who continued to run it with another Colombo Family member. *Id.* at 87-89. Defendant ultimately sold the store and Russo was not given any share of the proceeds. *Id.* at 89.

Russo also testified about the use of violence and intimidation that defined the Colombo Family during his tenure. For this, he offered an anecdote from the late 1990s, when he was angry that other people were being inducted into the Colombo Family before him, despite his role in the Scopo murder and his demonstration of loyalty to the Persicos. *Id.* at 90-91. He voiced his

frustrations to Guerra, who, in turn, informed Defendant. *Id.* at 91-92. The next day, Frank Persico and Stropoli confronted Russo about his commentary, suggesting such opinions would get him into "trouble." *Id.* at 92. By openly insinuating that Defendant and the Colombo Family had done wrong by him, Russo had insulted them and risked retribution; by informing Defendant about these statements, Guerra hoped to stop Russo from speaking in a way that "could get [him] killed."[19] *Id.*

Beyond illegal activities, Russo and Guerra tried to start a legitimate car detailing business in 2009. *Id.* at 115. The pair approached Defendant, who helped secure the business' initial capital by directing them to Scott Reback ("Reback"), who provided the money. *Id.* at 115-16. Defendant also assisted them in securing business from Colombo Family members who owned car dealerships. *Id.* at 117-18. The detailing business was opened at a space provided by Defendant. *Id.* at 116. Shortly thereafter, Russo approached Reback for additional help. *Id.* at 118-19. After Reback notified Defendant of the request, Colombo members met with Russo and cautioned him about acting outside the chain of command. *Id.* at 119-21.

## II. FINDINGS OF CREDIBILITY

Russo is a Colombo Family associate turned informant. Throughout his cooperation with the Government, he has outlined the Colombo Family's hierarchy, identified actors along with their positions and responsibilities within that organization, provided information concerning two additional murders (beyond that of Joseph Scopo), and testified at trial. *See generally*, Hr'g Tr.; *Guerra* Tr. By providing this information and cooperating with the Government, Russo placed his life, and those of his loved ones, in peril. In fact, at his sentencing, the Hon. Kiyo A. Matsumoto, U.S.D.J., noted that the decision to become an informant rendered Russo "a marked man[,] and

[19] The issue of induction cropped up again in 2008, when Defendant informed Russo that Al finally wanted to induct him into the Colombo Family. Hr'g Tr. at 109-10. Defendant coached Russo on how to behave and carry himself in his new role. *Id.* at 110.

there are many who will take pride in killing him [or his family] as a result of his cooperation." Def. Ex. VVV at 39. At the present juncture, if Russo were to fabricate testimony or refuse to cooperate with the Government, he would risk all incentives and protections he negotiated in exchange for his guilty plea. *See* Hr'g Tr. at 149-50, 281; *See also United States v. Russo*, No. 11-CR-30 (KAM) (RER) (E.D.N.Y.), Gov't Mot. for D'wrd Depart., Dkt. Entry No. 1221, at 2; *Id.*, J'gmt as to A. Russo, Dkt. Entry No. 1233, at 4. This was the context within which Russo's testimony was proffered in this matter.

Nevertheless, Defendant launches a number of attacks to discredit Russo as a liar and a killer who is out to save himself. *See generally* Def. Br. at 3-10. In support of this position, Defendant argues that, if Defendant had been implicated in any criminal activity, he would have been mentioned alongside other "Persico loyalists" in a number of recordings from 2009 and 2010.[20] *See Id.* at 4-7. This argument is unpersuasive, as the cited recordings have little to do with the testimony and evidence provided by the Government on Defendant's activities at issue here. The recordings concern general Colombo Family administration and Russo's promotion (Def. Exs. Q(T), U(T), V(T), W(T), Z(T), FF(T)), Russo's son's behavior and participation in organized crime (Def. Exs. X(T), EE(T)), Russo's belief that there was a "rat" in their ranks (Def. Ex. Y(T)), the procedure for contacting him (Def. Ex. T(T)), and a brief reference to the night of the Scopo murder (Def. Ex. L(T)). None of these subjects necessarily would require mentioning Defendant. Furthermore, Defendant has not explained why Russo would volunteer information about Defendant's particular criminal conduct when: (a) the topics do not seem to naturally lend

[20] Defendant cites a recording from 2010 in which Russo told Peter Tagliavia, a Colombo Family member, that Defendant is "truly legitimate" and "has nothing to do with anything." Def. Br. at 4-5; *See also* Def. Ex. E(T) at 2. He also cites a recording in which James Bombino, another Colombo Family member, called Defendant "as squeaky clean as they come." Def. Br. at 22; *See also* Def. Ex. TTT(T). When considered alongside Russo's testimony here and in *Guerra*, the Court finds that these statements merely support the notion that Defendant also made money for the Colombo Family "through legitimate businesses, too." *Guerra* Tr. at 154.

themselves to discussing Defendant; (b) Russo feared the consequences of speaking liberally about crimes he committed or disrespecting Colombo Family leaders; and (c) Defendant is closely tethered to Colombo Family leadership. It seems logical to assume that Russo would not disclose any interaction with Defendant unless absolutely required to do so.

Defendant also claims that Russo had "substantial motive to implicate" Defendant (Def. Br. at 8) and that he "knew what to say" to prosecutors (*Id.* at 9). These arguments also are unconvincing. Defendant cites to various recordings wherein Russo allegedly is aware that the Government sought to prosecute Defendant (*See* Def. Exs. B(T), KK(T), LL(T), MM(T), NN(T), OO(T), PP(T)) and declares that cooperating witnesses are inherently untrustworthy and are coached on their testimony (*See* Def. Exs. E(T), QQ(T), RR(T), SS(T)).[21] Yet, no matter how Russo might have described the Government's objective or informants before he became one, the simple fact that he was not a "disinterested party" is insufficient, on its own, to "deprive [his] statements of probative value." *United States v. Chang*, 59 F. App'x 361, 364 (2d Cir. 2003).

Having conducted the *Fatico* Hearing and evaluated Russo's credibility alongside the other evidence submitted, the Court finds Russo's testimony credible, consistent, and detailed. As discussed throughout this opinion, Defendant's repeated attempts to attack Russo's testimony are, at times, irrelevant, or unpersuasive. *See United States v. Messina*, 806 F.3d 55, 64 (2d Cir. 2015) ("The law affords a factfinder considerable discretion in resolving evidentiary inconsistencies.").

---

[21] In one recording, Russo stated, "even if [Defendant] blows trial, he's only facing a couple of years." Def. Ex. PP(T) at 1. Defendant does not explain how Russo could believe Defendant risked "blow[ing] trial" if Russo knew Defendant was innocent of any wrongdoing.

## CONCLUSION

For the reasons stated above, the Court finds, by more than a preponderance of the evidence, that Defendant participated in a murder, a conspiracy to buy and sell stolen property, loansharking, extortion, and racketeering. Consequently, the Court shall consider these five activities in connection with the factors listed under 18 U.S.C. § 3553(a), in fashioning a reasonable sentence on Defendant's conviction for conspiracy to participate in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892.

SO ORDERED.

Dated: Brooklyn, New York
July 19, 2017

/s/
DORA L. IRIZARRY
Chief Judge