# 17-2701-cr

In the

## United States Court of Appeals

### For the Second Circuit

UNITED STATES OF AMERICA,

*Appellee*,

v.

MICHAEL J. PERSICO,

*Defendant-Appellant*.

*On Appeal from the United States District Court*
*for the Eastern District of New York*

**APPENDIX**
**VOLUME II OF II**
**A190 – A357**

MARC FERNICH, ESQ.
LAW OFFICE OF MARC FERNICH
810 Seventh Avenue
Suite 620
New York, New York 10019
(212) 446-2346

SARITA KEDIA, ESQ.
SARITA KEDIA LAW OFFICES
5 East 22nd Street
Suite 7B
New York, New York 10010
(212) 681-0202

*Attorneys for Defendant-Appellant*
*Michael J. Persico*

# TABLE OF CONTENTS

**Page**

**VOLUME I:**

Docket Sheet…………………………………………………………………...A1

Superseding Information………………………………………………………A101

Plea Agreement……………………………………………………………….A109

Transcript of Plea Proceedings dated 6/8/12…………………………………..A119

Affirmation of Paul Shechtman, Esq…………………………………………..A150

Affirmation of Sarita Kedia, Esq………………………………………………A154

Transcripts of Government Recordings Made by Steven Marcus…………………A158

**VOLUME II:**

Memorandum and Order Denying Motion to Withdraw Plea dated 10/29/14……………..A190

Transcript of Proceedings dated 10/30/14……………………………………….A215

Government Sentencing Letter dated 1/19/15…………………………………...A221

Memorandum and Order Denying Motion to Withdraw Plea dated 2/27/15…..…………..A225

Transcript of Proceedings dated 6/3/16………………………………………….A244

Government Objections to Presentence Report dated 2/12/16…………………………….A285

Government Submissions regarding Fatico Hearing………...…………………………….A286

Transcript of Sentencing Proceeding dated 7/21/17……………………………….……A292

Transcript of Oral Argument on Motion for Bail Pending Appeal dated 10/17/17…......…A346

Notice of Appeal…………………………………………….……………………......A357

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x
UNITED STATES OF AMERICA,

-against-

MICHAEL J. PERSICO,

Defendant.
------------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CR-147 (SLT)

**TOWNES, United States District Judge:**

On June 8, 2012, during voir dire to select the jurors to try him on an indictment charging multiple felony offenses, including racketeering conspiracy, defendant Michael J. Persico ("Defendant" or "Persico") pled guilty to a superseding information charging him with a single count of conspiracy to commit extortionate extension of credit. Now, more than two years later, Defendant moves to withdraw that plea, arguing (1) that the Government breached the Plea Agreement, (2) that there was no valid factual basis for the plea, and (3) that he was insufficiently informed about the nature of the charge to which he pled guilty. For the reasons set forth below, Defendant's motion is denied.

## *BACKGROUND*

Defendant was among nine defendants named in a 27-count superseding indictment (S-4) which was filed on February 9, 2012. Six of the nine defendants, including Persico, were alleged to be members or associates of the Colombo organized crime family of La Cosa Nostra who, collectively, constituted an "enterprise" as defined by 18 U.S.C. § 1961(4). Each of the six defendants were charged in Count One of the indictment with a racketeering conspiracy in violation of 18 U.S.C. §1962(d) and with at least some of the other 26 offenses charged in the indictment.

Count One of the indictment alleged 25 racketeering acts, including two murders. Defendant was alleged to have been involved in one of these murders—the October 20, 1993, murder of one Joseph Scopo—and in the conspiracy to commit that murder. Defendant was also alleged to have participated in several other racketeering acts and was named in 14 other counts of the indictment. Most of the racketeering acts and counts in which Defendant was named involved extortion or conspiracies involving extortionate activities.

Defendant pled not guilty to this indictment and proceeded to trial with two co-defendants: Theodore N. Persico, Jr., and Francis Guerra. However, shortly after jury selection commenced, Defendant entered into a Plea Agreement with the United States Attorney's Office for the Eastern District of New York (the "Office"), which provided that Defendant would plead guilty to a superseding information (S-6) that was to be filed with the Court. That information, which was filed on June 8, 2012, was similar to the superseding indictment in some respects. Like the superseding indictment, it alleged that Defendant was an associate within the Colombo crime family and that the members and associates of the Colombo crime family constituted an "enterprise" as defined in 18 U.S.C. § 1961(4). In addition, both the enterprise and the methods and means allegedly used by that enterprise were described in the superseding information in the exact same manner as in the superseding indictment. But unlike the indictment, the superseding information contained only one count, which charged Defendant with conspiracy in violation of 18 U.S.C. § 371. That charge read, in pertinent part:

> In or about and between May 2009 and February 2010, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. PERSICO, together with others, did knowingly and intentionally conspire to make one or more extortionate extensions of credit to John Doe #1

and John Doe #2, individuals whose identities are known to the United States Attorney, contrary to Title 18, United States Code, Section 892(a).

In furtherance of the conspiracy and to effect its objectives, within the Eastern District of New York and elsewhere, the defendant MICHAEL J. PERSICO, together with others, committed and caused to be committed, among others, the following:

OVERT ACT

(a) in or about June 2009, the defendant MICHAEL J. PERSICO aided in the extension of a $100,000 usurious loan.

In exchange for Defendant's agreement to, among other things, waive indictment and plead guilty to the superseding information, the Office made several promises. First, it agreed not to bring any "further criminal charges" against Defendant for his participation in various offenses, including all of the offenses with which he was charged in the superseding indictment. Plea Agreement, ¶ 11(a). Second, it agreed to "take no position concerning where within the Guidelines range determined by the Court the sentence should fall." *Id.*, ¶ 11(b). Third, it agreed not to make any "motion for an upward departure under the Sentencing Guidelines." *Id.*, ¶ 11(c).

The Office did not agree, however, to any limitations regarding its communications with the Probation Department. To the contrary, paragraph 2 of the Plea Agreement stated:

> The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines"...) is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.

***The Plea Allocution***

On the afternoon of June 8, 2012, Defendant appeared before the Court to enter his plea. He was represented by two experienced, retained attorneys: Serita Kedia and Paul Schectman. Ms. Kedia represented that she had discussed the plea with Defendant and believed that Defendant was competent to proceed and understood the rights he was waiving by pleading guilty (T. 4-5).[1] Defendant stated that he was satisfied with his attorneys' representation and did not need more time to discuss with them his decision to plead guilty (T. 6).

After ascertaining that Defendant, then 55, had been to college and was not under the influence of drugs or alcohol (T. 4-5), the Court probed his understanding of the charge contained in the superseding information. Under oath, Defendant stated that he had read and reviewed the superseding information with counsel prior to the proceeding and understood the charge contained therein (T. 6). Nonetheless, the Court read the entire charge to Defendant and summarized those portions of the information which alleged that Defendant was an associate in the Colombo crime family and that the members and associates of the Colombo crime family constituted a criminal enterprise (T. 7-8). The Court then asked again, "[D]o you understand what the charge is?" (T. 8). Defendant answered in the affirmative (T. 8).

The Court then explained the elements which the Government would have to prove in order to establish that he was guilty of conspiracy to violate 18 U.S.C. § 892(a). First, the Court read the provisions of 18 U.S.C. § 371 and laid out the elements which the Government would have to prove beyond a reasonable doubt in order to establish that he was guilty of violating that

---

[1]Numbers in parentheses, preceded by "T," refer to pages in the "Transcript of Criminal Cause for Guilty Plea," dated June 8, 2012.

statute (T. 8-9). In explaining the first of these elements—"[t]hat two or more persons entered into the unlawful agreement charged in the information"—the Court noted that "the government would have to establish beyond a reasonable doubt that two or more persons entered into an unlawful agreement to commit the crime of extortionate extension of credit, in violation of Title 18, Section 892(a) of the United States Code" (T. 9). After reading 18 U.S.C. § 892(a) and explaining the elements of that offense, the Court asked both the prosecution and the defense if its explanation was consistent with their understanding of the elements (T. 9). Both answered in the affirmative (T. 9).

Several minutes later—after the Court questioned Defendant about the Waiver of Indictment, the Constitutional rights which Defendant was relinquishing by pleading guilty, and the Plea Agreement (T. 10-21)—the Court asked Defendant, "[D]o you have any questions that you would like to ask me about the charge in the superseding Information or about your rights or anything else related to this matter that may not be clear to you?" (T. 21-22). Defendant responded, "Everything is clear. No questions" (T. 22).

Defendant then pled guilty to the charge contained in the superseding information (T. 22). When asked by the Court to briefly describe "what you did in connection with the offense that makes you guilty of the offense charged in the superseding Information," Defendant responded, "I arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate" (T. 23). At the Government's request, Defendant subsequently clarified that his actions took place between May 2009 and February 2010 in the Eastern District of New York (T. 24). The Assistant United States Attorney then stated:

> I'm not going to make him allocute to it, but I will just proffer that the government would prove—be prepared to prove at trial that the extension of credit was made a[t]—not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year, and that at the time that the loan was made, the two John Does who this defendant identified believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit (T. 24 (brackets added)).

When asked if there was anything else that the Court should inquire about, Ms. Kedia initially responded, "No, I don't believe so" (T. 25). However, she then added:

> The one thing I would say is, Your Honor went through the superseding Information, and it does charge the sole count of this 371 conspiracy, conspiracy to violation the extortionate extension credit. I recognize that it has several pages of extraneous language about the Colombo family that is not a part and parcel of the charge, and it is not something that Mr. Persico agrees to or is allocuting to here today (T. 25).

After some colloquy in which the Government asserted that these allegations were not extraneous and the Court questioned whether it was necessary for Defendant to allocute to his involvement in the Colombo crime family, the Assistant United States Attorney stated:

> I don't think he has to allocute to it, Judge. I think it goes to what I said before, which is the perception by the victims that the defendant and his coconspirators—the defendant was an associate in the Colombo crime family. And his coconspirators reasonably believed at the time that they—that they would use—that these individuals would use extortionate means to collect an extension of credit. I don't think he has to specifically allocute to satisfy the 371 to being an associate in the Colombo crime family (T. 26).

At the very end of the end of the plea proceedings, Ms. Kedia placed on the record her "understanding" of portions of the Plea Agreement. Ms. Kedia stated, *inter alia*, "our understanding is that the government is not going to advocate in any way to the Probation Office

or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall" (T. 27). In response, the Government stated, among other things:

> Judge, the reason why the agreement is in writing is because everything that we have agreed to is in the agreement, and the agreement is what controls. And I'm not going to stand here and modify verbally any part of the agreement (T. 27).

After some further colloquy, in which Ms. Kedia stated that she was "just stating our understandings as a whole with respect to the plea agreement" (T. 28), the Court noted, "[T]he plea agreement speaks for itself. So if it ever becomes an issue, we'll have to go back to the plea agreement" (T. 28). The Court then concluded:

> Based upon the information provided today by Mr. Persico, I find that he is acting voluntarily, that he fully understands the charge in the superseding Information, and his rights and the consequences of his plea, and that there is a factual basis for the plea. I therefore accept Mr. Persico's plea of guilty to the charge in the superseding Information (T. 28).

The Court scheduled Defendant's sentencing for September 21, 2012 (T. 28). However, that date has been adjourned on numerous occasions, often at the request of Defendant's counsel, and sentencing has not yet taken place.

***The Pre-sentence Report***

In late June 2013, the Probation Department issued a 34-page Pre-sentence Investigation Report relating to Defendant (the "Pre-sentence Report"). One of the 120 paragraphs in that report states, in pertinent part:

> In addition to the single count to which he pleaded guilty, the Government maintains it can prove by a preponderance of the evidence that Michael J. Persico was involved in several additional significant crimes. These offenses cannot be considered in the guidelines calculations for the count of conviction; however, the

> conduct can nevertheless be considered additional criminal conduct and worthy of sentencing consideration per Guideline 5K2.0. The additional criminal activity includes involvement in the murders of John Scopo and Michael Devine, and Persico's longtime operation of a loansharking business.

Pre-sentence Report, ¶ 38 (emphasis omitted). The Pre-sentence Report then details Defendant's involvement in the murders of Scopo and Devine, as well as his involvement in a conspiracy to murder two other men: Joseph Lalima and Bruce Black. *Id.*, ¶¶ 38-40.

***The Instant Motion***

On September 29, 2014—about five months after Marc Fernich replaced prior counsel for Defendant—Defendant moved to withdraw his plea. Defendant's motion papers consist of a single document: a 38-page memorandum of law ("Defendant's Memo") which contains two points. In Point I, Defendant argues that the Government breached the Plea Agreement by "engaging in overt sentencing advocacy before the Probation Department." Defendant's Memo, p. 2. Citing to paragraph 38 of the Pre-sentence Report, Defendant argues that the Government breached paragraphs 11(b) and (c) of the Plea Agreement by telling the Probation Department it could "prove by a preponderance of the evidence that Michael J. Persico was involved in several additional significant crimes," including two murders.

Point II contains two separate arguments relating to the requirements of Rule 11 of the Federal Rules of Criminal Procedure. First, Defendant argues that the Court was incorrect in concluding that there was an adequate factual basis for the plea, as required by Rule 11(b)(3). Defendant argues that his plea allocution established only that he committed the overt act charged in the superseding information, and that the record does not contain facts to establish that Defendant was involved in a conspiracy or that he possessed the requisite mental state.

Case 17-2701, Document 72, 11/08/2017, 2168489, Page11 of 170


Second, Defendant argues that the Court failed to ascertain that he understood the nature of the charge to which he was pleading, as required by Rule 11(b)(1)(G). These arguments and the Government's response to them—contained in 19-page letter to the Court dated October 14, 2014 (the "Government's Response")—are described in more detail in the Discussion below.

## *DISCUSSION*

### *The Alleged Breach of the Plea Agreement*

"Plea agreements are interpreted in accordance with contract law principles." *United States v. Colon*, 220 F.3d 48, 51 (2d Cir. 2000) (citing cases). In accordance with those principles, courts "look[ ] to the reasonable understanding of the parties as to the terms of the agreement" in order to determine whether a plea agreement has been breached. *United States v. Riera*, 298 F.3d 128, 133 (2d Cir. 2002) (quoting *Colon*, 220 F.3d at 51) (brackets added in *Riera*). "If a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004) (quoting *Red Ball Interior Demolition Corp. v. Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)). "Moreover, a party cannot create an ambiguity in an otherwise plain agreement merely by urg[ing] different interpretations in the litigation." *Id.* (brackets in *Red Ball*; internal quotation marks in *Red Ball* omitted).

Although plea agreements are to be interpreted in accordance with these general contract principles, the Second Circuit has noted that plea agreements are "unique contracts in which special due process concerns for fairness and the adequacy of procedural safeguards obtain." *United States v. Padilla*, 186 F.3d 136, 140 (2d Cir. 1999) (quoting *United States v. Ready*, 82

F.3d 551, 558 (2d Cir. 1996)) (internal citations and quotation marks in *Ready* omitted). The Second Circuit has observed:

> Several rules of interpretation, consistent with general contract law principles, are suited to the delicate private and public interests that are implicated in plea agreements. First, courts construe plea agreements strictly against the Government. This is done for a variety of reasons, including the fact that the Government is usually the party that drafts the agreement, and the fact that the Government ordinarily has certain awesome advantages in bargaining power.
>
> Second, we construe the agreement against a general background understanding of legality. That is, we presume that both parties to the plea agreements contemplated that all promises made were legal, and that the non-contracting "party" who implements the agreement (the district judge) will act legally in executing the agreement.
>
> Finally, courts may apply general fairness principles to invalidate particular terms of a plea agreement.

*Id.* (quoting *Ready*, 82 F.3d at 558-59) (internal citations in *Ready* omitted).

In this case, Defendant asserts that the United States Attorney's Office violated the terms of the Plea Agreement by telling the Probation Department that it could "prove by a preponderance of the evidence that [Defendant] was involved in several additional significant crimes." Defendants asserts that this conduct was forbidden by paragraphs 11(b) and (c) of the Plea Agreement or, in the alternative, was conduct which "Persico reasonably understood [the Plea Agreement] to preclude." Defendant's Memo, p. 5.

Preliminarily, this Court notes that it is unclear precisely what the United States Attorney's Office told the Probation Department. The sole basis for Defendant's argument appears to be a single line in the Pre-sentence Report which states, in pertinent part, that "the

Government maintains it can prove by a preponderance of the evidence that Michael J. Persico was involved in several additional significant crimes." Pre-sentence Report, ¶ 38 (emphasis omitted). While the Government argues that Defendant has not filed an affidavit in support of its motion, Government's Response, p. 1, n. 1, the Government does not argue that this argument lacks a factual basis. Accordingly, the Court will assume, for purposes of this motion, that a representative of the United States Attorney's Office expressly told the Probation Department that the Government could prove by a preponderance of the evidence that Defendant was involved in "several additional significant crimes," including the murders of Joseph Scopo and Michael Devine.

Even assuming it took place, this conduct would not violate the express terms of terms of paragraphs 11(b) and (c) of the Plea Agreement. Although Defendant paraphrases those provisions as stating that the "government will take no position concerning where within the guideline range sentence should fall and seek no upward departure," Defendant's Memo, p. 5, n. 2, that paraphrasing eliminates important nuances. Paragraph 11(b) actually provides that the United States Attorney's Office will "take no position concerning where within the Guidelines range *determined by the Court* the sentence should fall." (Italics added). Paragraph 11(c) only prohibits the United States Attorney's Office from making a "*motion* for an upward departure under the Sentencing Guidelines." (Italics added).

The language italicized by the Court above unambiguously prohibits advocacy only before the Court. It cannot reasonably be interpreted as prohibiting advocacy before the Probation Department prior to the drafting of the Pre-sentence Report. After all, a court cannot determine the Guidelines range until after it receives the Pre-sentence Report and adjudicates any

objections thereto. Similarly, a motion for an upward departure from the Guidelines range must be addressed to the sentencing court.

Although Defendant and his attorneys may have understood the Plea Agreement as prohibiting advocacy before the Probation Department, their understanding was not a reasonable interpretation of the language of paragraphs 11(b) and (c). Moreover, it became readily apparent during the plea proceedings that Defendant's understanding was not shared by the Government. Near the end of the plea proceedings, Ms. Kedia stated, "our understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall" (T. 27). The Government not only refused to endorse that statement, but expressly rejected it as an attempt to "modify verbally ... part of the agreement" (T. 27).

Furthermore, paragraph 2 of the Plea Agreement authorizes the Government to engage in the conduct which allegedly violated paragraphs 11(b) and (c). That paragraph notes that "the Court is required to consider ... factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case," and states that "[t]he Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant ...." Although paragraph 2 does not expressly authorize the Office to characterize the strength of its evidence of criminal activity, that authorization is implicit in the rationale for providing the information to the Probation Department in the first place. The Probation Department must be informed of the quantity and strength of the evidence of a defendant's criminal activity in order to properly advise the sentencing court.

Moreover, the fact that the language of paragraph 2 does not explicitly authorize the Government to characterize the strength of its evidence does not imply that paragraph 2 prohibits the Government from doing so. Paragraph 2 does not set any limitations on the information which can be provided to the Court with respect to sentencing. Indeed, any such limitations might well violate 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

The cases on which Defendant principally relies in support of Point I are readily distinguishable. In *United States v. Vaval*, 404 F.3d 144 (2d Cir. 2005), the Government had entered into a plea agreement which "prohibited it from seeking an upward departure or taking a position on the appropriate sentence within the applicable Guidelines range." *Id.* at 153. At sentencing, however, the prosecutor "volunteered highly negative characterizations of the appellant's criminal history as 'appalling' and his purported contrition as 'disingenuous.'" *Id.* Then, after noting that the guidelines prohibited the Government from "looking at or calculating certain offenses," the prosecutor "went on to do just that by stating, '[b]ut certainly this is not this defendant's first or second offense.'" *Id.* Finally, while acknowledging that the plea agreement prohibited the Government from seeking an upward departure, the prosecutor stated, "I think, technically, I could make an upward departure [argument]." *Id.*

In light of these repeated, improper comments to the sentencing court, the Second Circuit concurred with the appellant's view that "the government breached the plea agreement by its argumentative relating of the facts of appellant's crime and the seriousness of his criminal

history." *Id.* at 152. The Second Circuit noted, *inter alia*, that it was "difficult to draw a principled distinction between the government actually moving for an upward departure and stating that it 'technically' could move for such a departure and then adding arguments that would support such a departure." *Id.* at 153. However, the facts of *Vaval* are not comparable to the facts of this case, in which the Government made a single comment to the Probation Department.

*United States v. Griffin*, 510 F.3d 354 (2d Cir. 2007)—a case frequently cited in Defendant's Memo—also involved comments made by the prosecutor to the sentencing court, not comments made to the Probation Department. Defendant's counsel attempts to disguise this fact by cobbling together quotes from *Griffin* in a misleading manner. Defendant's counsel represents that the *Griffin* Court "warned: 'Where the government's commentary reasonably appears to seek to influence' Probation 'in a manner incompatible with the agreement, we will not hesitate to find a breach, notwithstanding formal language of disclaimer." Defendant's Memo, p. 7 (quoting *Griffin*, 510 F.3d at 361). In fact, that quoted portion of *Griffin* was part of a paragraph addressing the question of "[w]hether the government breaches a plea agreement by making allegedly impermissible comments *to the sentencing court*." *Griffin*, 510 F.3d at 361 (emphasis added). After noting that this question had been "the subject of substantial discussion in this Circuit," the Second Circuit stated:

> Our cases have not yielded a bright-line rule as to the leeway the government has with respect to what it tells *the court* while operating under such an agreement. "[The] circumstances must [therefore] be carefully studied in context, and where the government's commentary reasonably appears to seek to influence *the court* in a manner incompatible with the agreement, we will not hesitate to find a breach, notwithstanding formal language of

> disclaimer." *United States v. Amico*, 416 F.3d 163, 167 n. 2 (2d Cir. 2005).

*Id.* (brackets in original; emphasis added).

In *United States v. Wyatt*, No. 06-cr-782 (DLI), 2008 WL 2433613 (E.D.N.Y. June 12, 2008)—a case discussed extensively in Defendant's reply papers—the Government also engaged in advocacy before the sentencing court. In that case, the question before Judge Irizarry was whether the Government had violated a provision of a plea agreement which "prohibited the government from using information already in its possession at the time of the plea to advocate for a specific sentence within the guidelines range or to move for an upward departure." *Id.* at *7. At the time the plea was entered, the Government had information regarding the defendant's involvement in a murder perpetrated by the Folk Nation gang, although the prosecutor in the *Wyatt* case was apparently unaware of that fact. That prosecutor included information concerning the defendant's involvement in the murder in a sentencing submission sent directly to Judge Irizarry. At a subsequent conference, the prosecutor argued that he had disclosed the information in light of the Government's "obligation to bring to the Court all of the information that was known to it about this defendant," so that the judge "could consider it both [ ] for 3553(a) consideration in general and for whatever other purpose or effect it might have." *Id.* at *11. However, the prosecutor then used the information to advocate for a sentence near the top of the guidelines range. *Id.* Judge Irizarry noted:

> [T]he first reason given by the government, to fulfill its obligation to inform the court, is consistent with the plea agreement. ... The second reason, however, shows that the government was also using the Folk Nation information to oppose defense counsel's request for a non-guidelines sentence below the recommended range and argue in favor of the 63-78-month guidelines range.

*Id.* (ellipsis added; internal quotations omitted). Judge Irizarry concluded that this conduct violated the plea agreement.

*Wyatt* is distinguishable from this case. In *Wyatt*, as in *Vaval*, the Government engaged in advocacy before the sentencing court which violated the express terms of a provision of the plea agreement. In this case, in contrast, the Government's allegedly impermissible conduct served only to "inform the court" in a manner "consistent with the plea agreement." *See id.*, at *11. Accordingly, the argument raised in Point I of Defendant's Memo is without merit.

***The Factual Basis for the Plea***

The first argument raised in Point II of Defendant's Memo alleges a violation of Rule 11(b)(3) of the Federal Rules of Criminal Procedure, which provides that "[b]efore entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." In accepting Defendant's guilty plea, this Court found that there was "a factual basis for the plea" (T. 28). Although neither Defendant nor his two experienced attorneys contested that finding during the plea proceedings, Defendant now argues that there was no valid factual basis for the plea.

Rule 11(b)(3) and its predecessors were "designed to protect a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the charge." *United States v. Garcia*, 587 F.3d 509, 514 (2d Cir. 2009) (internal quotations and citations omitted). Under this rule, a court must "assure itself simply that the conduct to which the defendant admits is in fact an offense under the statutory provision under which he is pleading guilty." *United States v. Maher*, 108 F.3d 1513, 1524 (2d Cir. 1997). "The ideal means to establish the factual basis for a guilty

plea is for the district court to ask the defendant to state, in the defendant's own words, what the defendant did that he believes constitutes the crime to which he is pleading guilty." *United States v. Tunning*, 69 F.3d 107, 112 (2d Cir. 1995). If "the district court ensures that the defendant's statement includes conduct—and mental state if necessary—that satisfy every element of the offense, there should be no question concerning the sufficiency of the factual basis for the guilty plea." *Id.*

"This 'ideal' method is by no means the only method, however." *Id.* In determining whether an adequate factual basis exists, a court is "not limited to an examination of the defendant's plea allocution, but may look more broadly to 'any facts on the record at the time of the plea proceeding.'" *Garcia*, 587 F.3d at 514 (quoting *United States v. Adams*, 448 F.3d 492, 499 (2d Cir. 2006)). In other words, "so long as the facts relied on are placed on the record at the time of the plea, 'the district court, in determining whether there was a factual basis for the plea, [i]s free to rely on any facts at its disposal—not just the admissions of the defendant.'" *Maher*, 108 F.3d at 1524-25 (quoting *Irizarry v. United States*, 508 F.2d 960, 967 (2d Cir. 1975)) (brackets added in *Maher*). Thus, "the district court may rely on representations of ... the attorneys for the government and the defense ... and indeed may use 'whatever means is appropriate in a specific case.'" *United States v. Culbertson*, 670 F.3d 183, 190 (2d Cir. 2012) (quoting *Maher*, 108 F.3d at 1524 (internal quotations omitted; ellipses added). However, a court cannot "find that a factual basis exists when the defendant actively contests a fact constituting an element of the offense in the absence of circumstances warranting the conclusion that the defendant's protestations are 'unworthy of belief.'" *Id.* (quoting *Godwin v. United States*, 687 F.2d 585, 590 (2d Cir. 1982)).

In this case, Defendant pled guilty to a single count of conspiracy to commit an offense against the United States, a violation of 18 U.S.C. § 371. "The elements of a § 371 conspiracy are clearly established: (1) an agreement between two or more persons to commit a specified federal offense, (2) the defendant's knowing and willful joinder in that common agreement, and (3) some conspirator's commission of an overt act in furtherance of the agreement." *United States v. Snype*, 441 F.3d 119, 142 (2d Cir. 2006). The "federal offense" specified in the charge to which Defendant pled guilty is 18 U.S.C. § 892(a), which prohibits making, or conspiring to make, an "extortionate extension of credit." The term "extortionate extension of credit" is defined in 18 U.S.C. § 891(6) to mean "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." The count to which Defendant pled guilty charged only one overt act, alleging that "[i]n or about June 2009," Defendant "aided in the extension of a $100,000 usurious loan."

Defendant's statement alone did not make out all three elements of a conspiracy to commit an extortionate extension of credit. When the Court asked him what he had done that made him "guilty of the offense charged in the superseding information," Defendant stated only that he "arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate" (T. 23). Upon subsequent inquiry, Defendant added that his actions took place between May 2009 and February 2010 in the Eastern District of New York (T. 24).

Defendant asserts that these admissions, taken together, established only the third element: commission of the overt act alleged in the superseding information. *See* Defendant's Memo, p. 28. Defendant argues that the Court failed to "elicit a factual basis demonstrating (a) the existence of a conspiracy to make an extortionate extension of credit, (b) that Persico knowingly and willfully joined such a conspiracy or (c) that at the time the loan was extended, Persico had the requisite intent to make him guilty of the crime." *Id.*, p. 29 (emphasis omitted). Defendant's analysis, however, largely ignores the proffer made by the Government during the plea allocution. The Government represented that it was "prepared to prove at trial that the extension of credit was made a[t]—not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year" (T. 24 (brackets added)). In addition, the Government stated that "at the time that the loan was made, the two John Does [*i.e.*, Bombino and Marcus] ... believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit" (T. 24).

In order to understand the significance of the Government's representations, this Court must briefly discuss the provisions of 18 U.S.C. § 892(b). This subsection provides that the Government can make out a prima facie case that a particular extension of credit was extortionate by proving that four "factors were present in connection with the extension of credit in question ...." The four factors are as follows:

> (1) The repayment of the extension of credit, or the performance of any promise given in consideration thereof, would be unenforceable, through civil judicial processes against the debtor ... in the jurisdiction within which the debtor, if a natural person, resided ... at the time the extension of credit was made.

(2) The extension of credit was made at a rate of interest in excess of an annual rate of 45 per centum calculated according to the actuarial method of allocating payments made on a debt between principal and interest, pursuant to which a payment is applied first to the accumulated interest and the balance is applied to the unpaid principal.

(3) At the time the extension of credit was made, the debtor reasonably believed that either (A) one or more extensions of credit by the creditor had been collected or attempted to be collected by extortionate means, or the nonrepayment thereof had been punished by extortionate means; or (B) the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof.

(4) Upon the making of the extension of credit, the total of the extensions of credit by the creditor to the debtor then outstanding, including any unpaid interest or similar charges, exceeded $100.

The Government's representations, coupled with Defendant's own admissions, made out all four of these elements. First, Defendant himself admitted that he arranged for the extension of a loan "at a usurious interest rate" (T. 23). Since usurious contracts are unenforceable, *see, e.g.*, N.Y. Gen. Oblig. Law §§ 5-511; N.Y. Penal Law § 190.40; *Lloyd Capital Corp. v. Pat Henchar, Inc.*, 80 N.Y.2d 124, 127 (N.Y. 1992), Defendant's own characterization of the loan as "usurious" was sufficient to establish the first factor.

The Government's representations specifically addressed the second and third factors. With respect to the second factor, the Government stated that the rate of interest on the loan which Defendant arranged was "in excess of the annual rate of 45 percent per year" (T. 24). With respect to the third factor, the Government stated that "at the time that the loan was made, the two John Does [*i.e.*, the debtors alleged in the count to which Defendant pled guilty] ...

believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit" (T. 24).

Finally, the fourth factor, like the first, was made out by Defendant's allocution. Defendant represented that he had arranged a loan of $100,000, which was 1,000 times the amount required under the fourth factor. Accordingly, Defendant's allocution, together with the Government's representations, provided a factual basis for finding that the loan which Defendant "arranged" to make constituted an "extortionate extension of credit" in violation of 18 U.S.C. § 892. Moreover, Defendant's admission that he "arranged for someone" to make the loan implies that he conspired to make the extortionate extension of credit.

The same facts that make out a prima facie case of extortionate extension of credit also support the inference that Defendant acted with the requisite intent. Citing to *United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007), among other cases, Defendant argues that "nothing in the record demonstrates that *Persico possessed the requisite intent* to cause the borrowers to believe that delinquency or default in payment could prompt the use of violence—an indispensible element for the offense of conviction." Defendant's Memo, p. 32 (emphasis in original). However, *Lombardozzi* itself noted that a defendant's state of mind "can reasonably be inferred from the terms of the loans that he extended." *Lombardozzi*, 491 F.3d at 71. As the Second Circuit noted, "a jury may permissibly infer that someone who makes an unsecured loan and charges exorbitant interest rates surely intends to back up the loan with threats of violence." *Id.* (citing *United States v. Polizzi*, 801 F.2d 1543, 1555 (9th Cir. 1986)).

In sum, Defendant's admissions, coupled with the Government's representations, establish a factual basis for finding that Defendant conspired with another to make an

extortionate extension of credit. The Government's representations about terms of the loan—notably, the whopping 45% annual interest rate—and the borrower's beliefs regarding Defendant's reputation establish a factual basis for finding that Defendant acted with the requisite mental state. Finally, Defendant concedes that his plea allocution established that he committed an overt act in furtherance of the conspiracy. Accordingly, there was a factual basis for Defendant's plea (T. 28).

***Defendant's Understanding of the Nature of the Charge***

The second argument raised in Point II of Defendant's Memo alleges a violation of Rule 11(b)(1) of the Federal Rules of Criminal Procedure, which provides, in pertinent part:

> Before the court accepts a plea of guilty ... , the defendant may be placed under oath, and the court must address the defendant personally in open court. During this address, the court must inform the defendant of, and determine that the defendant understands, ... (G) the nature of each charge to which the defendant is pleading.

Fed. R. Civ. P. 11(b)(1) (ellipses added). However, Rule 11 does not tell district courts "precisely *how* to perform this important task in the great variety of cases that ... come before them." *Maher*, 108 F.3d at 1521 (quoting *United States v. Saft*, 558 F.2d 1073, 1079 (2d Cir. 1977)) (ellipsis in *Maher*; emphasis in *Saft*). In addition, the Supreme Court, noting that "[t]he nature of the inquiry required by Rule 11 must necessarily vary from case to case," has declined to "establish any general guidelines other than those expressed in the Rule itself," noting that "(m)atters of reality, and not mere ritual, should be controlling." *McCarthy v. United States*, 394 U.S. 459, 467 n. 20 (1969) (brackets added; parentheses in original; internal quotations and citation omitted).

The Second Circuit has opined that "[i]t is usually the better practice for the district court in conducting plea allocutions to detail the elements of the offenses charged in the counts to which the defendants are pleading guilty or to read those counts of the indictment to them." *Maher*, 108 F.3d at 1524. Yet, the Second Circuit has upheld guilty pleas in which a defendant merely told the court that he had read the indictment, discussed it with counsel, and understood the charges to which he was pleading guilty. *See id.*, 108 F.3d at 1523 (upholding guilty pleas under Rule 11 where "each defendant acknowledged that he had read the indictment, had discussed the charges with his attorney, and knew that he was pleading guilty to counts charging money laundering and conspiracy to launder money"); *United States v. Parkins*, 25 F.3d 114, 118 (2d Cir. 1994) (holding that defendant received requisite notice under Rule 11 where, *inter alia*, he acknowledged at plea hearing that he had "read [the Information], understood it, and discussed it with his attorney"); *see also United States v. Obiorah*, 536 Fed. Appx. 53, 56 (2d Cir. 2013) (summary order) (upholding a guilty plea to drug conspiracy charges where the defendant stated that he had read and understood the indictment and had conferred with his attorney about the indictment, the Government summarized the elements of the conspiracy charges, and the defendant then stated that he understood the elements of those charges and that he had consulted with counsel about them).

In this case, the Court went beyond even the "better practice" recommended in *Maher*. First, the Court established, through Defendant's testimony under oath, that he had read and reviewed the superseding information with counsel prior to the plea proceeding and that he understood the charge contained therein (T. 6). The Court then read the entire charge to Defendant, summarized those portions of the information which alleged that Defendant was an

Case 17-2701, Document 72, 11/08/2017, 2168489, Page26 of 170


associate in the Colombo crime family and that the Colombo crime family was a criminal enterprise, and asked, "[D]o you understand what the charge is?" (T. 7-8). Although Defendant answered in the affirmative (T. 8), the Court explained the elements which the Government would have to prove in order to establish that he was guilty of conspiracy to violate 18 U.S.C. § 892(a), and asked both the prosecution and the defense if its explanation was consistent with their understanding of the elements (T. 9). Both answered in the affirmative (T. 9).

Although the Court's inquiry to that point went well beyond the inquiries which were held to satisfy Rule 11(b)(1)(G)'s requirements in *Maher*, *Parkins* and *Obiorah*, Defendant nonetheless asserts that the inquiry was defective because "[a]t no time *after* reading part of the information or stating the offense elements did the Court ask if Persico understood the charge, the requisite elements or 'the law in relation to the facts.'" Defendant's Memo, pp. 36-37 (emphasis in original). Defendant is mistaken. Several minutes *after* the Court explained the elements of the charge to which Defendant was pleading guilty, the Court asked Defendant, "[D]o you have any questions that you would like to ask me about the charge in the superseding information or about your rights or anything else related to this matter that may not be clear to you?" (T. 21-22). Defendant responded, "Everything is clear. No questions" (T. 22).

Such '[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (brackets added). Defendant, who has not provided an affidavit in support of his motion, has not adduced any evidence to suggest that he did not understand the nature of the charge to which he pled guilty. At most, Defendant has provided "conclusory allegations unsupported by specifics," which are "subject to summary

dismissal." *Id.* Accordingly, Defendant's argument that the Court did not satisfy the requirements of Rule 11(b)(1)(G) is entirely without merit.

***CONCLUSION***

For the reasons set forth above, Defendant's motion to withdraw his plea of guilty to the charge contained in the superseding information is denied.

**SO ORDERED.**

S/
SANDRA L. TOWNES
United States District Judge

Dated: October 29, 2014
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------x
UNITED STATES OF AMERICA,

Plaintiff, Docket No.: 10 CR 147

versus

U.S. Courthouse
225 Cadman Plaza East
Brooklyn, NY 11201

MICHAEL PERSICO,

Defendant.
-------------------------------------x

October 30, 2014
12:00 p.m.

Transcript of Criminal Cause for Sentencing

Before: HONORABLE SANDRA L. TOWNES,
District Court Judge

APPEARANCES

For the Government: LORETTA E. LYNCH, ESQ.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: NICOLE M. ARGENTIERI, ESQ.,
ALLON LIFSHITZ, ESQ.,
Assistant U.S. Attorneys

For the Defendant: MARC FERNICH, ESQ.

Also Present: CHANCE ADAMS, FBI
MARYANN BETTS, Probation

Court Reporter: MICHELE NARDONE, CSR, RPR, CRR
Official Court Reporter
Phone: 718-613-2601
Fax: 718-613-2631
Email: Mishrpr@aol.com

Proceedings recorded by mechanical stenography. Transcript produced by computer-aided transcription.

(In open court.)

(Defendant present.)

THE CLERK: All rise.

THE COURT: Be seated, please.

THE CLERK: Criminal cause for sentencing, docket number 10 CR 147, United States of America versus Michael Persico.

Counsel, please state your names for the record, beginning with the government.

MS. ARGENTIERI: Nicole Argentieri and Allon Lifshitz. Good morning, your Honor.

MR. LIFSHITZ: Good morning.

MR. FERNICH: Good morning, your Honor. Marc Fernich for Michael Persico, and I will let these fine people introduce themselves.

MS. BETTS: Maryann Betts of the U.S. Probation Department.

MR. ADAMS: Chance Adams, Special Agent with the FBI. Good afternoon, your Honor.

THE COURT: All right. I filed the memorandum and order denying Mr. Persico's motion to withdraw his guilty plea.

Prior to sentencing, I do have to schedule a hearing with regard to information about the history and characteristics of Mr. Persico that the government says that they can prove that. So I'm scheduling the hearing, and the

parties have agreed on the date, January 23 at 10:00 a.m.

Let me ask the government: Is that your agreement?

MS. ARGENTIERI: Yes, judge.

I just wanted to note for the record that we will at sentencing be requesting a guideline sentence, which is what we agreed to under the plea agreement, and we are not specifically requesting the Fatico hearing.

THE COURT: I know. I am requesting it.

I have an obligation under the law to consider the factors pursuant to 18 U.S.C. 3553(a), and I am scheduling this for that purpose.

Mr. Fernich?

MR. FERNICH: Judge, I have very little to add. I rest on my papers at this point.

THE COURT: All right. I mean as far as the scheduling date.

MR. FERNICH: I certainly consent to the date, yes.

THE COURT: All right. Now, with regard to sentencing submissions, if you are going to file sentencing submissions, you can do it before the hearing or, if you request, after; but I would rather have it before. Let me --

MR. FERNICH: May I just clarify one thing?

THE COURT: Yes.

MR. FERNICH: I have not formulated a position with respect to the hearing at this point, but in the --

THE COURT: What do you mean a position?

MR. FERNICH: Well, that's going to -- this is what I'm seeking to clarify. In the event that neither party requested a Fatico hearing, in that event, we already heard that the government is not requesting one.

THE COURT: Correct.

MR. FERNICH: In the event that neither party requested a Fatico hearing, would the court order such a hearing notwithstanding that?

THE COURT: Yes, yes.

MR. FERNICH: Understood.

THE COURT: I have to find out information about your client; and with regard to those acts that the government alleges they can prove by a preponderance of the evidence, I would have to hear that in order to make an informed decision with regard to sentencing.

MR. FERNICH: I understand this, and this is to cast no personal aspersions on your Honor, but I make this statement for the record. I believe that what I have characterized as the breach, the government's breach of the plea agreement in my submission, has indelibly tainted your Honor, and, to quote the case law --

THE COURT: Oh, please.

MR. FERNICH: -- the government rung bell in this case cannot be unrung. So, strictly for the record, I'm not

relitigating the motion.

THE COURT: But pursuant to statute, I, as the sentencing judge, am entitled to this information.

MR. FERNICH: Yes, your Honor.

THE COURT: And, you know, I have no idea what the proof is, I have no idea whether the government can prove it by a preponderance of the evidence. We are going to have the hearing for me to make that determination with regard to sentencing.

MR. FERNICH: Understood, ma'am. I cast no aspersions on your Honor. This statement is being made, with all respect, for another audience.

I believe that the government --

THE COURT: For another audience?

MR. FERNICH: Yes, ma'am, another audience, a future audience, an appellate audience; and I believe that the government has goaded your Honor by virtue of its representations that it can prove these extrinsic allegations by a preponderance of the evidence, goaded your Honor into doing what sua sponte what appears on its face to be a sua sponte request for a Fatico hearing that neither party in the absence of those government representations would have requested.

THE COURT: It's not really a Fatico hearing. It's a hearing with regard to information that the government

allegedly has that could affect this court's sentencing decisions pursuant to 18 U.S.C. 3553(a).

As the sentencing judge, I am entitled, pursuant to statute, to know as much as there is from any source about this defendant. I don't take the government's word for it in considering this. That's why I'm scheduling a hearing.

MR. FERNICH: I understand, ma'am. I believe I have said my piece on that.

THE COURT: All right. January 23, 2015 at 10:00 a.m.

MR. FERNICH: Thank you.

THE COURT: We are adjourned until that time.

(End of proceedings.)

o O o

Certified to be a true and accurate transcript.
/s/ Michele Nardone
MICHELE NARDONE, CSR, RPR, CRR -- Official Court Reporter

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:NMA/AL
F.#2010R00195

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 19, 2015

By Hand and ECF

The Honorable Sandra L. Townes
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Michael Persico
Criminal Docket No. 10-147 (S-6) (SLT)

Dear Judge Townes:

The government respectfully submits this letter in anticipation of sentencing in the above-captioned case, in which a Fatico hearing is scheduled for January 23, 2015. For the reasons set forth below, the government respectfully asks the Court to impose a term of imprisonment within the advisory Guidelines range of 37 to 46 months and a fine within the advisory Guidelines range of $7,500 to $75,000.

## Background

On June 8, 2012, the defendant pled guilty to the sole count of the above-captioned superseding information, which charged him with conspiring to participate in an extortionate extension of credit, in violation of 18 U.S.C. § 371. (Docket Entry No. 566.) On October 30, 2014, after briefing by the parties, the Court denied the defendant's motion to withdraw his guilty plea. (Docket Entry No. 791.) Later that day, the parties appeared before the Court, and the Court ordered a Fatico hearing in order to hear proof regarding the defendant's history and characteristics. (Docket Entry dated Oct. 30, 2014; Transcript dated Oct. 30, 2014 at 2-6.)

Discussion

The government respectfully submits that, in this case, a term of imprisonment within the Guidelines range of 37 to 46 months is appropriate in light of all relevant sentencing factors, and also respectfully requests that the sentence include a fine within the advisory Guidelines range of $7,500 to $75,000.

I. Legal Standard

The Sentencing Guidelines are advisory, not mandatory. United States v. Booker, 125 S. Ct. 738, 764-65 (2005). However, the Supreme Court held in Booker that the sentencing court must consider the Guidelines in formulating an appropriate sentence. Id. In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure for sentencing courts to follow in light of Booker:

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted). Next, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the district court] may not presume that the Guidelines range is reasonable. [The district court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

II. The Guidelines Range of Imprisonment Is 37 to 46 Months

In the plea agreement, the government estimated that the advisory Guidelines range of imprisonment is 37 to 46 months. (Plea Agreement ¶ 2.) The defendant stipulated to this calculation (id.; see also Transcript dated June 8, 2012 ("Guilty Plea Tr.") at 19) and the Probation Department agrees with it (Presentence Investigation Report ("PSR") ¶ 109).

III. A Sentence Within the Guidelines Range Is Appropriate

The defendant has indicated that he will seek a sentence below 37 months. (Guilty Plea Tr. at 27 ("Of course, we will be advocating for a sentence below the Guideline range[.]").) However, the government respectfully submits that a sentence within the Guidelines range is appropriate in light of all relevant sentencing factors.

A. The Nature and Circumstance of the Offense

In 2009, the defendant provided $100,000 to co-defendant Anthony Preza, who in turn provided it to co-defendants James Bombino and Theodore Persico, Jr., as well as a third individual who was cooperating with the government. (PSR ¶ 37.) The $100,000

was a loansharking loan extended by the defendant, and it was conveyed through Preza because the defendant wanted to disguise his role in extending the loan. This is a serious crime committed under the auspices of a powerful, violent criminal enterprise. In particular, the defendant was able to make loansharking loans – and to expect to obtain repayment of those loans – because of his position as a powerful associate in the Colombo organized crime family of La Cosa Nostra (the "Colombo family" and "LCN," respectively). Loansharking is a staple LCN crime that allows the Colombo family and other LCN crime families to thrive, and that often results in violence or threats of violence.

B. The History and Characteristics of the Defendant

As noted above, the defendant intends to seek a sentence below the Guidelines range. (Guilty Plea Tr. at 27.) The government respectfully submits that a sentence below the Guidelines range would be inappropriate in light of the defendant's history and characteristics. In addition to the crime of conviction, the defendant's history includes participation in additional crimes. In light of the Court having ordered a Fatico hearing, the government will offer proof at the hearing of several such crimes, most of which were the subject of extensive testimony during the trial of co-defendant Francis Guerra in June and July of 2012. First, the defendant has participated in racketeering as a long-time associate of the Colombo family and has, at times, been involved in managing the crime family's members and associates. (Guerra Trial Tr. at 181-82, 203-04.) Second, the defendant has participated in murder because he provided firearms to be used in the 1993 murder of Joseph Scopo and participated in assembling the crew that carried out that murder. (Id. at 204-09, 217-18.) Third, the defendant participated in loansharking (id. at 257-70), and fourth, the defendant participated in extortion (see, e.g., 3500-AR-22 at 21-24, 36-37, 43-45). These crimes are staples of organized crime and – because they are difficult to commit without the protection of an organized crime family – reflect the defendant's role in the Colombo family. Fifth, the defendant participated in a conspiracy to acquire and sell stolen video games with associates of the Colombo family, indicating that he has been willing to profit not just from the staple crimes of the Colombo family but also from the wide variety of crimes committed by its members and associates as opportunities arise. (Guerra Trial tr. at 270-76.) Because of this history, a sentence below the Guidelines range would be inappropriate in this case.

C. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

A sentence within the advisory Guidelines range is necessary to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As noted above, the offense of conviction is serious, and the defendant's additional crimes indicate that he lacks respect for the law.

D. Affording Deterrence and Protecting the Public

A sentence within the advisory Guidelines range is necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(B) & (C). "Under section 3553(a)(2)(B), there are two

major considerations: specific and general deterrence." United States v. Davis, 08 CR 332 (JBW), 2010 WL 1221709, at *2 (E.D.N.Y. March 29, 2010). Because the defendant has committed crimes over a long period of time, he is in need of specific deterrence. In addition, by imposing a sentence within the Guidelines range in this case, the Court can send a message to others in the defendant's position, or who are considering embarking on a life of crime, and can discourage them from doing so.

IV. A Fine Within the Guidelines Range Is Warranted

Section 5E1.2(a) of the Guidelines provides that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." The defendant bears the burden of proving an inability to pay. United States v. Tocco, 135 F.3d 116, 133 (2d Cir. 1998). In this case the Probation Department found that the defendant has not satisfied that burden. (PSR ¶ 107.) Based on an adjusted offense level of 21, the Guideline fine range is $7,500 to $75,000. (Id. ¶ 117 (citing U.S.S.G. § 5E1.2(c)(3) & (c)(4).) It is appropriate that the defendant "reimburse society for the drain on economic resources" that he has caused, as well as for "the high costs of [his] own necessary imprisonment" should a term of imprisonment be imposed. United States v. Sessa, 821 F. Supp. 870, 875 (E.D.N.Y. 1993) (Weinstein, J.). The government therefore respectfully requests that the defendant be required to pay a fine within the Guidelines range.

Conclusion

For the reasons set forth above, the government respectfully asks the Court to impose a term of imprisonment within the advisory Guidelines range of 37 to 46 months and a fine within the advisory Guidelines range of $7,500 to $75,000.

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney

By: /s/
Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
(718) 254-6232/6164

cc: Clerk of the Court (SLT) (by ECF)
Marc Fernich, Esq. (by ECF)
John L. Almanza, U.S. Probation Officer (by email)

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ MAR 02 2015 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------x
UNITED STATES OF AMERICA,

-against-

MICHAEL J. PERSICO,

Defendant.
---------------------------------------------------x

**MEMORANDUM AND ORDER**

10-CR-147 (SLT)

**TOWNES, United States District Judge:**

In a memorandum and order dated October 29, 2014, and entered October 30, 2014—*United States v. Persico*, No. 10-CR-147 (SLT), 2014 WL 5502325 (E.D.N.Y. Oct. 30, 2014) (hereafter, "*Persico*")—this Court denied a motion by defendant Michael J. Persico ("Defendant" or "Mr. Persico") which sought to withdraw his guilty plea on the grounds (1) that the Government breached the Plea Agreement, (2) that there was no valid factual basis for his plea, and (3) that Mr. Persico was insufficiently informed about the nature of the charge to which he pled guilty. In a letter filed January 21, 2015, Defendant renews that motion, principally arguing that the Government's letter of January 19, 2015, which discussed Defendant's criminal history in the course of arguing that the Court should not impose a sentence below the guidelines range, violates the Plea Agreement. Defendant also requests reconsideration of the ruling that there was a sufficient factual basis for the plea and seeks an adjournment of a *Fatico* hearing scheduled for January 23, 2015.

In an order dated January 21, 2015, the Court granted that portion of the motion which requested adjournment of the *Fatico* hearing, rescheduling that hearing for March 3, 2015, at 10:00 a.m. The Court deferred decision on the remainder of the motion and gave the Government until January 26, 2015, in which to file a response. Having now received and

considered both the Government's response (the "Response") and Defendant's reply thereto (the "Reply"), the Court denies Defendant's motion in its entirety for the reasons set forth below.

***BACKGROUND***

Since familiarity with *Persico* is assumed, this Court will only repeat those facts germane to the instant motion. Defendant was among nine defendants named in a 27-count superseding indictment (S-4) which was filed on February 9, 2012. Count One of the indictment alleged 25 racketeering acts, including two murders. Defendant was alleged to have been involved in one of these murders—the October 20, 1993, murder of one Joseph Scopo—and in the conspiracy to commit that murder. Defendant was also alleged to have participated in several other racketeering acts and was named in 14 other counts of the indictment. Most of the racketeering acts and counts in which Defendant was named involved extortion or conspiracies involving extortionate activities.

On June 8, 2012, shortly after jury selection commenced, Defendant pled guilty to a superseding information which charged Defendant with conspiracy in violation of 18 U.S.C. § 371. In a written plea agreement (the "Plea Agreement"), the Government promised (1) not to bring any "further criminal charges" against Defendant for his participation in various offenses, including all of the offenses with which he was charged in the superseding indictment (Plea Agreement, ¶ 11(a)); (2) to "take no position concerning where within the Guidelines range determined by the Court the sentence should fall" (*id.*, ¶ 11(b)); and (3) not to make any "motion for an upward departure under the Sentencing Guidelines" (*id.*, ¶ 11(c)).

During the course of the plea proceedings, Serita Kedia—one of two experienced, capable attorneys who represented Defendant—essentially attempted to orally modify the Plea

Agreement by placing on the record her "understanding" of portions of that agreement. Ms. Kedia stated, *inter alia*:

> [O]ur understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the guideline range or where within the Guideline range Mr. Persico should fall. That's entirely up to the Court. Of course, we will be advocating for a sentence below the Guideline range, but we understand, of course, and Mr. Persico understands that it's up to the Court to impose sentence here.

Plea Transcript, p. 27 (brackets added). Assistant United States Attorney Argentieri expressly refused to ratify Ms. Kedia's interpretation of the Plea Agreement, stating, among other things:

> [T]he reason why the agreement is in writing is because everything that we have agreed to is in the agreement, and the agreement is what controls. And I'm not going to stand here and modify verbally any part of the agreement.

*Id.* (brackets added).

During the plea allocution, the Court asked Defendant to briefly describe "what you did in connection with the offense that makes you guilty of the offense charged in the superseding Information." Defendant responded, "I arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate." *Id.*, p. 23. The Assistant United States Attorney subsequently added:

> [T]he government would ... be prepared to prove at trial that the extension of credit was made a[t] ... not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year, and that at the time that the loan was made, the two John Does who this defendant identified believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit

*Id.*, p. 24 (brackets added)).

When asked if there was anything else that the Court should inquire about, Ms. Kedia stated:

> The one thing I would say is, Your Honor went through the superseding Information, and it does charge the sole count of this 371 conspiracy, conspiracy to violate the extortionate extension credit. I recognize that it has several pages of extraneous language about the Colombo family that is not a part and parcel of the charge, and it is not something that Mr. Persico agrees to or is allocuting to here today.

*Id.*, p. 25. After some colloquy, in which the Government asserted that these allegations were not extraneous and the Court questioned whether it was necessary for Defendant to allocute to his involvement in the Colombo crime family, the Assistant United States Attorney stated:

> I don't think he has to allocute to it, Judge. I think it goes to what I said before, which is the perception by the victims that the defendant and his coconspirators—the defendant was an associate in the Colombo crime family. And his coconspirators reasonably believed at the time that they—that they would use—that these individuals would use extortionate means to collect an extension of credit. I don't think he has to specifically allocute to satisfy the 371 to being an associate in the Colombo crime family.

*Id.*, at 26.

***The Previous Motion***

On September 29, 2014—about five months after Marc Fernich replaced prior counsel for Defendant—Defendant moved to withdraw his guilty plea. Defendant principally argued that the Government breached paragraphs 11(b) and (c) of the Plea Agreement by engaging in overt sentencing advocacy before the Probation Department, telling the Probation Department it could prove by a preponderance of the evidence that Mr. Persico was involved in several additional significant crimes, including two murders. Defendant also argued, *inter alia*, that the Court was

incorrect in concluding that there was an adequate factual basis for the plea, as required by Rule 11(b)(3) of the Federal Rules of Criminal Procedure. Specifically, Defendant argued that his plea allocution established only that he committed the overt act charged in the superseding information, and that the record did not contain facts to establish that Defendant was involved in a conspiracy or that he possessed the requisite mental state.

The Court rejected both of these arguments. With respect to the first argument, the Court carefully examined the provisions of paragraph 11 of the Plea Agreement, noting that they unambiguously prohibited the Government from (1) taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall," and (2) making a "motion for an upward departure under the Sentencing Guidelines." The Court reasoned that the prohibited actions could only be taken before the Court, and that the Plea Agreement could not "reasonably be interpreted as prohibiting advocacy before the Probation Department prior to the drafting of the Pre-sentence Report." *Persico*, 2014 WL 5502325, at *7.

With respect to the second argument, the Court found there was an adequate factual basis for Defendant's plea. In the course of analyzing whether there was a basis for finding that Defendant acted with the requisite intent, the Court relied on *United States v. Lombardozzi*, 491 F.3d 61 (2d Cir. 2007), for the proposition that a defendant's state of mind "can reasonably be inferred from the terms of the loans that he extended." *Id.* at 71. Since Defendant admitted making usurious loans to Bombino and Marcus which, according to the Government, bore interest rates of 45 percent per annum, the Court concluded that there was a factual basis for finding that Defendant acted with the requisite intent.

***The Government's Sentencing Letter***

After handing down the decision denying Defendant's motion, the Court scheduled a *Fatico* hearing. On January 19, 2015, shortly before the scheduled date for that hearing, the Government submitted a four-page letter relating to sentencing (hereafter, the "Sentencing Letter"). That letter assumes—not necessarily correctly—that, because (1) the Government calculated that the Guidelines range will be 37 to 46 months, (2) Defendant stipulated to this calculation during the plea proceedings and (3) the Probation Department calculated the same range in its Pre-sentence report, the Court will also determine the Guidelines range to be 37 to 46 months. Sentencing Letter, p. 2. Citing to Ms. Kedia statement about seeking a sentence below the Guidelines range, the Government then argues that sentencing within that range would be appropriate. *Id.*

In support of that argument, the Government discusses, in four separate paragraphs, the "Nature and Circumstances of the Offense," "the History and Characteristics of the Defendant," and the need for the sentence to reflect "the Seriousness of the Offense" and to deter Defendant and others from future wrongdoing. In the first of these paragraphs, the Government states that Defendant provided "a loansharking loan" to "co-defendants James Bombino and Theodore Persico, Jr., as well as a third individual ...." *Id.*, pp. 2-3. The Government asserts that Defendant was able to make such loans and to expect repayment "because of his position as a powerful associate in the Colombo organized crime family," which the Government characterizes as "a powerful, violent criminal enterprise." *Id.*, p. 3. The Government further states that loansharking is a "serious crime" which allows the Colombo crime family to thrive and which "often results in violence or threats of violence." *Id.*

The second paragraph begins by citing to that portion of the plea proceedings in which Ms. Kedia stated that she intended to request a sentence below the Guidelines range. Assuming that Defendant's current counsel will employ a similar strategy, the Government argues "that a sentence below the Guidelines range would be inappropriate in light of the defendant's history and characteristics." *Id.* The remainder of the paragraph describes the proof of Defendant's prior crimes that the Government intends to offer at the *Fatico* hearing, noting that most of these crimes "were the subject of extensive testimony during the trial of co-defendant Francis Guerra"—a trial conducted before the Court in 2012. *Id.* In addition, most of the prior crimes described in that paragraph are the same crimes described in the Pre-sentence report.

The third paragraph consists of only two sentences. In the first, the Government cites to 18 U.S.C. § 3553(a)(2)(A) for the proposition that a sentence within the Guidelines range is necessary "to reflect the seriousness of the offense, to promote respect for the law and to provide just punishment." *Id.* The Government then states, "the offense of conviction is serious, and the defendant's additional crimes indicate that he lacks respect for the law." Sentencing Letter, p. 3.

The fourth paragraph cites to 18 U.S.C. § 3553(a)(2)(B) and (C) for the proposition that a sentence within the Guidelines range is necessary to afford adequate deterrence and to protect the public. The Government then concludes:

> Because the defendant has committed crimes over a long period of time, he is in need of specific deterrence. In addition, by imposing a sentence within the Guidelines range in this case, the Court can send a message to others in the defendant's position or who are considering embarking on a life of crime, and can discourage them from doing so.

Sentencing Letter, p. 4.

***The Instant Motion***

By letter dated January 21, 2015, Defendant raises several issues with respect to the Sentencing Letter. First, Defendant renews its motion to withdraw his guilty plea, arguing that the Sentencing Letter breaches the Plea Agreement. Defendant reads *Persico* as holding that the Government's statements to the Probation Department did not violate the Plea Agreement because that agreement proscribed "advocacy only before the Court," and asserts that "there is no dispute that the agreement bars the government from advocating before the Court." Letter to Hon. Sandra L. Townes from Marc Fernich, dated Jan. 21, 2015, p. 2. Defendant acknowledges that the Government claims to offer the proof of his prior crimes "simply to oppose a sentence '*below*' the stipulated 37-46 month guideline range," but argues that this is a "thin pretext that scarcely cures its breach." *Id.* (emphasis in original). Citing to *United States v. Griffin*, 510 F.3d 354, 361 (2d Cir. 2007), and other cases for the proposition that the Government cannot "insulate" itself from a finding that it breached the Plea Agreement by merely disavowing any intent to violate those provisions, Defendant urges the Court to find that the Sentencing Letter violated the Plea Agreement.

Second, Defendant argues that this Court should reconsider its finding that the Government "expressly rejected" Ms. Kedia's attempt to orally modify provisions of the Plea Agreement. Specifically, Defendant argues that the Government's reliance on Ms. Kedia's representation that Defendant would request a sentence below the Guidelines range somehow implies that the Government adopted, rather than rejected, Ms. Kedia's interpretation of the Plea Agreement. Defendant also argues that the Court must "enforce what 'the defendant reasonably understood the plea agreement to mean,'" and that "oral agreements can amplify ambiguous

terms." Letter to Hon. Sandra L. Townes from Marc Fernich, dated Jan. 21, 2015, p. 4 (citing *Stern v. Shalala*, 14 F.3d 148, 150 (2d Cir. 1994), and *United States v. MacPherson*, 590 F.3d 215, 223 (2d Cir. 2009)).

Third, Defendant argues that this Court should reconsider its finding that Defendant's plea had an adequate factual basis. That argument has two components. First, relying on a trio of Sixth Circuit cases—*United States v. McCreary-Redd*, 475 F.3d 718, 724 (6th Cir. 2007); *United States v. Tunning*, 69 F.3d 107, 111 (6th Cir. 1995); and *United States v. Goldberg*, 862 F.2d 101, 106 (6th Cir. 1988)—Defendant argues that courts are not permitted to draw reasonable inferences with respect to a defendant's state of mind in deciding whether a factual basis for a plea exists. Second, Defendant argues that even if courts were permitted to draw such inferences, it would be inappropriate to do so in this case since the Sentencing Letter discloses that the allegedly usurious loan was extended to a group of people who included Theodore Persico, Jr.—a captain in the Columbo crime family.

***DISCUSSION***

Defendant's first argument—that the Sentencing Letter violates the Plea Agreement—misinterprets *Persico*. In that memorandum and order, the Court emphasized that "[p]lea agreements are interpreted in accordance with contract law principles," which dictate that a court not "impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Persico*, 2014 WL 5502325, at *5. The Court then looked to the language of paragraph 11 of the Plea Agreement, and found that it unambiguously prohibited the Government from (1) taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall," and (2) making a "motion for an upward departure under the

Sentencing Guidelines." *Id.*, at *7. The Court reasoned that since these prohibited actions could only be taken before the Court, paragraph 11 could not violated through disclosures to the Probation Department, which were then incorporated into the Pre-sentence Report. *Id.* In other words, since the Plea Agreement prohibited "advocacy only before the Court, ... advocacy before the Probation Department" could not violate the Plea Agreement. *Id.*

Quoting to that portion of *Persico* which noted that the Plea Agreement prohibited "advocacy only before the Court," Defendant asserts "that there is no dispute that the agreement bars the government from advocating before the Court." Letter to Hon. Sandra L. Townes from Marc Fernich, dated Jan. 21, 2015, p. 2. That assertion is not only disputed, but inaccurate. The Plea Agreement does not prohibit the Government from engaging in *all* advocacy before the Court. Rather, it proscribes certain types of advocacy: (1) taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall," and (2) making a "motion for an upward departure under the Sentencing Guidelines." *Persico*, 2014 WL 5502325, at *7.

The Sentencing Letter does not engage in either type of prohibited advocacy. That paragraph anticipates, based on statements made by Ms. Kedia, that Defendant's current counsel will advocate for a below-Guidelines sentence. It then seeks to rebut that argument by offering various reasons why a sentence within the Guidelines range would be appropriate. Although the Sentencing Letter characterizes Defendant "as a powerful associate" in "a powerful, violent criminal enterprise," who pled guilty to a "serious crime" which "often results in violence or threats of violence" and who has demonstrated that he "lacks respect for the law" by committing "crimes over a long period of time," the Sentencing Letter repeatedly states that sentencing

within the Guidelines range would be appropriate. It takes no a position concerning where within the Guidelines range the sentence should fall or requests a sentence above the Guidelines range.[1]

This Court acknowledges that the Second Circuit has stated that, where the Government appears to seek to influence the court in a manner incompatible with the plea agreement, it "will not hesitate to find a breach, notwithstanding formal language of disclaimer." *United States v. Griffin*, 510 F.3d 354, 361 (2d Cir. 2007) (quoting *United States v. Amico*, 416 F.3d 163, 167 n. 2 (2d Cir. 2005)). Under the circumstances of this case, however, the Court does not perceive the Sentencing Letter as an attempt to circumvent the terms of the Plea Agreement. First, the Government had no need to persuade this Court to consider sentencing Mr. Persico above the Guidelines range since this Court, on its own initiative, ordered a *Fatico* hearing more than two months before the Sentencing Letter was even written. Second, the Government had no need to invent a pretext in order to inform the Court of Mr. Persico's involvement in the Colombo crime family, that crime family's reputation, or Defendant's criminal history. That information has

---

[1]In his Reply, Defendant argues that the Government violated the Plea Agreement by urging the Court to impose a sentence "within the advisory Guidelines range of 37 to 46 months." Sentencing Letter at 1, 4. Defendant argues that, because the Court has yet to determine the Guidelines range, urging the Court to impose a sentence between 37 and 46 months might later prove to violate paragraph 11(b) of the Plea Agreement, which prohibits the Government from taking a "position concerning where within the Guidelines range determined by the Court the sentence should fall." This argument is premature. Furthermore, even assuming that the Court were later to determine that the Guidelines range was lower than 37 to 46 months, this violation of the Plea Agreement would be so "technical" as to not require a remedy. *See, e.g.*, *United States v. Paradiso*, 689 F.2d 28, 30-31 (2d Cir. 1982) (no remedy was required for a technical violation by the court of a binding plea agreement). It is clear from the Sentencing Letter that the Government is advocating a sentence within the Guidelines range, and merely assumes that the Court, like everyone else, will determine that the range is 37 to 46 months.

already been placed before the Court in the trial of Defendant's co-defendant, Francis Guerra; in Defendant's plea proceedings; and in the Pre-sentence Report. Moreover, the Court is likely to hear evidence substantiating these same facts at the upcoming *Fatico* hearing. Accordingly, the Government has no need to use any type of subterfuge to place these facts before the Court.

Defendant's second argument—that this Court should reconsider its finding that the Government "expressly rejected" Ms. Kedia's attempt to orally modify provisions of the Plea Agreement because the Government credited Ms. Kedia's contemporaneous statement that Defendant intends to seek a below-Guidelines sentence—is illogical and unpersuasive. Although Ms. Kedia announced her intention to seek a below-Guidelines sentence immediately after expressing her understanding of the Plea Agreement, her intentions were independent of her understanding of the Plea Agreement. The Government could fully credit Ms. Kedia's statement of intent while completely rejecting her attempt to orally modify the Plea Agreement. Accordingly, the fact that the Sentencing Letter anticipates that Defendant will seek a below-Guidelines sentence in accordance with Ms. Kedia's statement of intent does not imply that the Government now adopts Ms. Kedia's understanding of the Plea Agreement.

In addition, even if the Government had not expressly rejected Ms. Kedia's interpretation of the Plea Agreement, evidence of the parties' intentions would have been irrelevant because paragraph 11 is unambiguous. As the Court noted in *Persico*, "[i]f a contract is clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." *Persico*, 2014 WL 5502325, at *5 (quoting *Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004)). "To be sure, extrinsic evidence can illuminate the meaning of ambiguous contract

terms." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 124 (2d Cir. 2013). However, when a contract is unambiguous, "the court is not to consider any extrinsic evidence as to the parties' intentions." *See JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009).

The first portion of Defendant's third argument—which relies on a trio of Sixth Circuit cases in arguing that the Court erred in drawing an inference with respect to Defendant's state of mind—essentially seeks reconsideration of the Court's finding that Defendant's plea had an adequate factual basis. Preliminarily, this Court notes that "[n]either the Federal Rules of Criminal Procedure nor the Local Criminal Rules expressly provide for reconsiderations." *United States v. Natal*, No. 3:12-CR-164 (JBA), 2014 WL 5361469, at *3 (D.Conn. Oct. 21, 2014) (quoting *United States v. Reyes*, No. 3:10-CR-120 (VLB), 2013 WL 1882305, at *1 (D.Conn. May 3, 2013)). However, some district courts in this Circuit have read *United States v. Clark*, 984 F.2d 31 (2d Cir. 1993)—a case which held that a motion to reconsider the denial of a motion pursuant to 28 U.S.C. § 2255 should be treated as a motion pursuant to Rule 59(e) or 60(b) of the Federal Rules of Civil Procedure—as implying that motions for reconsideration "may be filed in criminal cases and are governed by the standards applied to their civil analogues." *See, e.g.*, *United States v. Little*, No. 12-CR-647 (ALC), 2014 WL 3604417, at *1 n. 1 (S.D.N.Y. July 16, 2014). Other courts in this district and in the Southern District of New York have applied the standard set forth in Local Civil Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York without expressly relying on *Clark*. *See, e.g.*, *United States v. Cean*, No. 11 CR 449 (SJ), 2014 WL 1832963, at *1 (E.D.N.Y. May 8, 2014) (noting that courts in this district have applied the standard of Local Rule 6.3 when addressing motions for reconsideration in criminal cases); *United States v. Yannotti*, 457 F. Supp. 2d 385, 388 (S.D.N.Y. 2006) (noting that "motions for reconsideration in

criminal cases have traditionally been allowed within the Second Circuit" and that "district courts have applied the standard found in Rule 6.3 of the Local Civil Rules" to such motions).

The standard for reconsideration in civil cases is "strict." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). Under this standard, a motion for reconsideration "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Id.* Local Civil Rule 6.3 reflects this standard, requiring that the party requesting reconsideration file "a memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court has overlooked."

In this case, Defendant seeks reconsideration based on (1) out-of-Circuit cases, one of which was actually cited by this Court in *Persico* and (2) facts of which the Court was already aware. First, Defendant cites to three Sixth Circuit cases: *McCreary-Redd*, *Tunning*, and *Goldberg*. The cases are not controlling upon this Court, and none of the three has ever been cited—much less followed—by the Second Circuit.

Second, this line of Sixth Circuit cases was not overlooked. Indeed, *Persico* cited to *Tunning*, albeit for a different proposition of law. This Court read the entirety of that Sixth Circuit opinion and was aware that it contains the following sentence:

> Although we agree that a rational fact finder could infer an intent to defraud from such evidence, in the context of a challenge to the factual basis supporting a guilty plea, we have previously rejected a request by the government to infer a "critical element" of the offense charged.

*Tunning*, 69 F.3d at 113 (*Goldberg*, 862 F.2d at 106). However, after reading *Goldberg* itself, the Court interpreted this sentence as dictum, not as espousing a black-letter rule prohibiting a

court from inferring intent in the course of determining whether there exists a factual basis for a guilty plea.

In *United States v. Goldberg*, 862 F.2d 101 (6th Cir. 1988), a physician pled guilty to misprison of a felony in connection with a fraudulent scheme in which a pharmacist would add items to the physician's prescriptions. One of the elements necessary to sustain a conviction for this crime was that the physician "took affirmative steps to conceal the crime" of the pharmacist. However, while the physician admitted during the plea proceedings that he knew of the pharmacist's actions and concealed his knowledge of those actions, no one adduced evidence at the plea proceeding that the physician engaged in any affirmative steps to conceal the crime.

Faced with this deficient record, the prosecution urged the court to infer the affirmative steps from the fact that the physician was highly educated and adequately represented. As the Sixth Circuit understood it, the Government argued that one could infer from these facts that when the doctor stated that he had "concealed his knowledge," he "meant that he had 'actively' concealed his knowledge, thereby satisfying the critical element in the offense of misprision of a felony, i.e., that [he] took affirmative steps to conceal the crime of the principal." *Id.* at 106 (brackets added). The Sixth Circuit rejected this argument, stating,"to permit the district court to infer a factual basis in the absence of a record demonstrating the existence of a factual basis would tend to negate the well-established safeguards inherent in the Rule 11(f) mandate." *Id.*

In *United States v. Tunning*, 69 F.3d 107 (6th Cir. 1995), the defendant entered an *Alford* plea to a violation of 18 U.S.C. § 1029(a)(2), a statute which "makes it a crime if someone 'knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or

more during that period.'" *Id.* at 112. To establish the defendant's guilt of this crime, "the government needed to establish that Tunning had the intent to defraud both when he obtained the [access device] and when he used [it] to obtain goods or services." *Id.* at 113 (brackets added). However, while the Government asserted at the plea proceedings that "[t]here were a variety of facts and circumstances surrounding the entire indictment that would have gone to the issue of intent," the Government relied on "bare assertions ... that evidence at trial would have established certain facts," without offering "any indication of what evidence support[ed] those facts." *Id.* at 114 (brackets added). Noting that "a bare statement from the prosecutor that he would have proven that the defendant acted with the intent to defraud does not ensure 'through some evidence' that the plea is accurate," the Sixth Circuit held "that where ... the defendant pleads guilty but refuses to admit to conduct that demonstrates a factual basis for the plea, if the government undertakes to establish the factual basis by reciting what facts it would have proven at trial, the prosecutor must also identify the evidence it has to prove those facts." *Id.*

In *United States v. McCreary-Redd*, 475 F.3d 718 (6th Cir. 2007)—another case cited by Defendant—the Sixth Circuit relied on *Goldberg* and *Tunning* in finding that a plea allocution failed to establish that the defendant possessed drugs with intent to distribute them. During the plea, the Government did not make any statements regarding the offense or the intent element of the drug charge and the district court never asked McCreary-Redd to state, in his own words, what he believed to be the crime he committed. *Id.* at 723. Rather, the finding of intent to distribute rested solely on a stipulation that "officers recovered a vial attached to McCreary-Redd's key chain which contained ... approximately 3.0 grams [of crack cocaine] that was individually wrapped and packaged for resale." *Id.* (brackets and ellipsis added). Noting

Case 17-2701, Document 72, 11/08/2017, 2168489, Page54 of 170


that McCreary-Redd was apprehended while exiting a building in a neighborhood with illegal drug activity, the Sixth Circuit found that "one could equally conclude that McCreary-Redd had just purchased the substance, which would have been individually wrapped and packaged 'for resale,' for personal use," and that the stipulation did not permit the inference that McCreary-Redd intended to distribute the drugs. *Id.* at 724.

In this case, in contrast, the record contains facts permitting the inference that Mr. Persico acted with the requisite intent. During his plea allocution, Defendant stated that he "arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate." *Persico*, 2014 WL 5502325, at *3. The Government corroborated this statement—noting that the loan was made "at a rate of interest in excess of the annual rate of 45 percent per year"—and stated that Bombino and Marcus "believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit." *Id.* In light of Second Circuit case law holding that the requisite state of mind could "reasonably be inferred from the terms of the loans ... extended," *United States v. Lombardozzi*, 491 F.3d 61, 71 (2d Cir. 2007), the facts set forth during the plea proceeding were sufficient to provide a factual basis for Mr. Persico's plea.

The second portion of Defendant's third argument essentially argues that this Court should reconsider its finding that there was a legal basis for Defendant's plea because the Sentencing Letter discloses that the allegedly usurious loan was extended to a group of people who included Theodore Persico, Jr., a captain in the Columbo crime family. This Court recognizes that its "obligations under Rule 11(f) continue until it has entered judgment." *United States v. Smith*, 160 F.3d 117, 121 (2d Cir. 1998). However, the Court also recognizes that Fed.

R. Crim. P. 11 requires only that it determine whether there is a factual basis for the plea. Rule 11 "does not require the district court to weigh any evidence or predict what a jury would do with the case," *Smith*, 160 F.3d at 121, or "replicate the trial that the prosecutor and defendant entered a plea agreement to avoid." *United States v. Lumpkins*, 845 F.2d 1444, 1451 (7th Cir.1988).

Defendant's argument regarding the terms and recipients of the loan relies exclusively on facts which were not only not adduced at the time of the plea proceedings, but which are contrary to the facts that were adduced. First, Defendant's assertion that he made an open-ended loan to Theodore Persico, Jr., and his business partners is contrary to what he stated during his plea allocution: namely, that he arranged for a "loan to the trucking company run by James Bambino [*sic*] and Steve Marcus at a usurious interest rate." Plea Transcript, p. 23. Similarly, the assertion that Theodore Persico's partners could not have been in fear of what would happen if they failed to repay the loan is contrary to the Government representations that it was "prepared to prove at trial that [Bombino and Marcus] believed that Mr. Persico and his coconspirators had a reputation for the use of extortionate means to collect extensions of credit." *Id.*, p. 24. In order to determine which version of the facts is correct—the version set forth during the plea proceedings or the version now espoused by Defendant—this Court would essentially have to have to "replicate the trial that the prosecutor and defendant entered a plea agreement to avoid." *Lumpkins*, 845 F.2d at 1451.

***CONCLUSION***

For the reasons set forth above, Defendant's renewed motion to withdraw his plea of guilty and his motion for reconsideration of this Court's ruling that there was an adequate factual basis for that plea are denied.

**SO ORDERED**.

/s/ Sandra L. Townes
SANDRA L. TOWNES
United States District Judge

Dated: February 27, 2015
Brooklyn, New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X

UNITED STATES OF AMERICA, : 10-CR-147(DLI)

Plaintiff , :
United States Courthouse
-against- : Brooklyn, New York

MICHAEL PERSICO, :
June 3, 2016
Defendant. : 2:30 o'clock p.m.

- - - - - - - - - - - - X

TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE DORA L. IRIZARRY
UNITED STATES CHIEF DISTRICT JUDGE.

APPEARANCES:

For the Government: ROBERT L. CAPERS
United States Attorney
BY: ALLON LIFSHITZ
Assistant United States Attorney
271 Cadman Plaza East
Brooklyn, New York

For the Defendant: MARC A. FERNICH, ESQ.
810 Seventh Avenue, Suite 620
New York, NY 10019

Court Reporter: Charleane M. Heading
225 Cadman Plaza East
Brooklyn, New York
(718) 613-2643

Proceedings recorded by mechanical stenography, transcript produced by computer-aided transcription.

THE CLERK: Criminal cause for status conference, docket number 10-CR-147, United States versus Michael Persico.

Please state your appearances.

MR. LIFSHITZ: Allon Lifshitz for the United States. Good afternoon, Your Honor. And seated at counsel table are Special Agent Chance Adam with the Federal Bureau of Investigation.

THE COURT: What is last name?

MR. LIFSHITZ: Adam, A-D-A-M. And next to him is United States Probation Officer Mary Ann Betts.

THE COURT: Good afternoon to all of you.

THE PROBATION OFFICER: Good afternoon.

MR. ADAM: Good afternoon.

MR. FERNICH: Good afternoon, Your Honor. Mark Fernich for Mr. Persico who is beside me.

THE COURT: Good afternoon to both of you. I am going to ask everyone to be seated and speak into the microphone so we can all be heard.

So, as everyone is aware, this case had initially been pending before Judge Townes. The case had been reassigned to me and I did ask, according to my practice, for the parties to submit objections to the presentence report according to my practice which basically just incorporates Rule 32 of the Federal Rules of Criminal Procedure.

So what I would like to do first today is to address

those objections which have been responded to by Probation by way of an addendum. I assume everyone has received a copy of the addendum to the presentence report. Am I correct about that?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: Mr. Fernich?

MR. FERNICH: Yes, Your Honor.

THE COURT: Okay. The addendum is rather detailed and perhaps it will be helpful to the parties if you have a copy of it with you.

Starting on page three, what Probation did was that it enumerated separately after a discussion the various changes to the presentence report that it intends to make. By and large, I concur with the changes that have been made to the presentence report by Probation. In some parts, Probation has adopted the corrections that have been suggested by the government and by defense counsel and in some cases, it has rejected some of the corrections that have been submitted. Probation also made some additional corrections on its own.

So, beginning with those changes, on page one or the face page, as Probation is calling it, the only change I am submitting is that I am now Chief Judge so that change will be made. It also includes the name of Mr. Fernich as new counsel who came into the case after the presentence report had been disclosed. It incorporates the additional information

provided by both the government and defense counsel concerning dispositions of co-defendants in this case.

With respect to paragraphs 14, 15 and 38, it adds that with respect to these paragraphs concerning the murder of Joseph Scopo, that the defendant was involved in the murder by assembling part of the murder crew, ordering the murder participants to carry out the murder before Alphonse Persico was released from prison and arranging for the firearms used in the murder and the reference to the murder of Michael Devine is removed. It says from this paragraph but since it is referring to multiple paragraphs, I think it's clearer to say it is removed from paragraph number 38 which is where that reference appears.

Also, with respect to paragraphs 25, 30, 31 and 32, the government stated that while it believes that the defendant engaged in the conduct described in those paragraphs, if this case proceeds to a Fatico hearing, that it would not present evidence concerning the extortion of Testa and a furniture store owner and so the government did not object to the removal of those paragraphs. So, paragraphs 25, 30, 31 and 32 should be removed.

Now, perhaps this might be a good point. I do not want to digress too much on the Fatico issue which I would really like to discuss more after we get done addressing the objections to the presentence report. It is not clear to me

from that statement that was made by the government that if there is no Fatico hearing, that the government would still stand by the proposition that it could prove that by a preponderance of the evidence.

MR. LIFSHITZ: Your Honor, we will certainly not seek to prove it. We could -- some of those were charged crimes in the indictment. We could prove them had there been a trial. We're not seeking to prove them now. We don't intend to seek to prove them in any sentencing appearance before Your Honor.

THE COURT: Okay.

MR. LIFSHITZ: I'm not denying that the events occurred, but we're not asking the Court to find them and we certainly do not object to striking the paragraphs.

THE COURT: Okay. I just wanted that clarification.

So, with that clarification, then those paragraphs that I enumerated, 25, 30, 31 and 32 are removed.

Paragraph 39 Probation is removing for a similar reason.

Paragraph 40. All references of defendant's alleged involvement in crimes against Testa and the murders of LaLima and Black are removed. Again, this is for the same reasons that were addressed previously.

On paragraph 46, all references to the defendant in the paragraph are removed.

With respect to paragraph 59, that is with respect to Bombino and the acts that he was alleged to have done as to various Colombo crime family members which included the defendant. The defendant's name shall be removed. Again, the government indicated that it would not be seeking to prove that at any hearing and with the clarification that was just made, that reference should be removed. All the other references remain intact.

The Court agrees with the change proposed by Probation in paragraph 77 and 78 concerning his arrest as additional information was received from the defendant concerning what was listed as another arrest. Notably, it does not add any criminal history points to the defendant's criminal history which remains at 1.

As to paragraph 88, it includes some of the information provided from defense counsel with perhaps some of the advocacy type slant just indicating the change in his bond status, that he was initially detained and then subsequently released on a $5 million bond and so on with respect to other changes that were made to his bond conditions. That's fine.

Paragraph 95. The additional school records were provided by the defendant to show that he attended Kingsborough Community College in Brooklyn from September 1974 until June 1976.

There was no degree, correct, Mr. Persico?

THE DEFENDANT: Yes.

THE COURT: Paragraph 96. With respect to the defendant's ownership of Bella Luna Pizzeria in Brooklyn, counsel reported that the defendant sold his interest in the restaurant business. Although the sale amount was not specified, it seems that no other particulars were provided, although apparently he still has a one-third interest in the building that houses the restaurant and I believe he did not provide any information concerning whether or not he gets rent from his ownership of the building and the pizzeria's presence in the building. At least that information is not included in what's been drafted by Probation.

I gather Probation does not have that information?

THE PROBATION OFFICER: We do not have any further information.

THE COURT: Okay.

Paragraph 97. Same with respect to his business interest in Dyker Park Bagels. He reportedly sold his business. Again, the amount was not specified although he is still a one-third owner of the building that houses the bagel business. Again, there is no information here as to whether he gets rent or what the sale amount was.

Paragraph 98. With respect to the Romantique Limousine business, defendant still has a 20 percent interest in the business and earns $20,000 per month. Apparently, this

is his sole employment. Additionally, he receives $5,900 monthly payment from the business towards a promissory note issued from the sale of his portion of the business. I am paraphrasing, but the information as contained in the addendum is what will go in.

As to paragraph 101, apparently the IRS has not responded to the request for defendant's tax filing history. It is not clear to the Court, and I gather not to Probation either, as to why the IRS has not done that. Records were received from the New York State Department of Taxation and Finance for tax years 2010 and 2011 and no return is on file for the year 2013.

His adjusted gross income in 2010 was a negative $812,534. Then in 2011, his adjusted gross income was a negative $409,543. I don't get that. We do not have a personal financial statement from the defendant. We do not have a business financial statement which he should have provided and he should have provided that before the presentence report was disclosed already close to three years ago. I don't take too kindly to that.

MR. FERNICH: Ma'am, just so that it's clear --

THE COURT: If you could remain seated and speak into the microphone.

MR. FERNICH: Sorry, Your Honor.

THE COURT: Because it's easier to hear everyone

that way.

MR. FERNICH: Yes.

THE COURT: Thank you.

MR. FERNICH: We're not contesting Mr. Persico's ability to pay a fine should the Court see fit to impose one and also if the Court thinks it will be helpful, we'll provide the tax returns.

THE COURT: Well, that should have been done a long time ago because Probation asked for the defendant to provide a copy of the tax returns and I'll tell you what. If he doesn't provide the tax returns by the end of next week, I told Probation to come to me and I will sign a subpoena to go to the IRS.

MR. FERNICH: Okay. Well --

THE COURT: And we will subpoena his tax returns for the past ten years.

MR. FERNICH: I think that's probably a hiccup due to the replacement of counsel.

THE COURT: That is not a hiccup to the replacement of counsel. He had excellent counsel prior to your entry into the case.

MR. FERNICH: Well, irrespective, ma'am, of what happened before --

THE COURT: And he had an obligation and it's been three years. It has been three years. There is no excuse.

And he needs to provide a financial, a personal financial statement and a business financial statement. That's required of all defendants to do that.

MR. FERNICH: Yes, ma'am. I will ensure that the tax returns through 2015 are submitted forthwith to the Court and to Probation.

THE COURT: Just submit it to Probation. You do not need to submit it to me.

MR. FERNICH: Okay.

THE COURT: And he needs to provide the financial affidavits --

MR. FERNICH: Yes, I understand, Your Honor.

THE COURT: -- for both the businesses. And I am talking about he has 65 properties all around the State apparently.

MR. FERNICH: Yes. We'll make full disclosure of his financial situation, Your Honor.

THE COURT: Because I also have to determine what kind of a fine should be imposed and how much.

MR. FERNICH: Yes, ma'am.

THE COURT: Paragraph 105. Counsel supplied a Credit Karma credit history report generated by the defendant. And, again, it is customary for defendants to provide a release so that Probation can provide a more fulsome credit history for the defendant and it is very common that Probation

comes up with more judgments and liens and other aspects of a credit history than the defendant comes up with on his own.

I can only suspect that if he's not willing to be forthcoming in this information that he has something to hide. Particularly, when he allegedly had negative income, how he manages to get a car loan opened in August of 2015 for $76,171. He's got a lot of credit card debt, in the thousands of dollars. He's got a second car loan issued October of 2014 for $62,233. So how he manages to get these kinds of car loans with a negative gross income is beyond me.

With respect to paragraph 114, it indicates that while defense counsel objects to the stipulated forfeiture amount as confirmed by the government, the defendant has already paid the full forfeiture of $325,000. I would add to that, "pursuant to the terms of his written plea agreement." Quite frankly, I have to agree with the government's position with respect to that objection to the presentence report or objection to the forfeiture, in general, that was raised by defendant in the objections to the presentence report.

The defendant entered into a written plea agreement. In that written plea agreement, he agreed to the entry of a forfeiture order in the amount of $325,000 in the form of a money judgment. Moreover, as part of the written plea agreement, not only did he agree and stipulate to the fact that, admit that he owned property that was subject to

forfeiture, he consented to the forfeiture, he agreed to pay that on or before August 3rd of 2012.

He also understood and was on notice pursuant to the written plea agreement that interest would accrue on any unpaid portion if he didn't pay by August 3rd of 2012. I gather he paid timely?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: And he consented to the entry of the order of forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure. He agreed to fully assist the government in effectuating the payment of the forfeiture money judgment. He agreed not to file or interpose any claim or to assist others to file or interpose any claim to the property against which the government sought to execute the forfeiture money judgment in any kind of forfeiture proceeding.

In fact, his failure to forfeit the money would have constituted a material breach of the plea agreement. Upon such breach, the defendant would not have been entitled to withdraw his guilty plea and the Office or the U.S. Attorney's Office could have brought additional criminal charges against the defendant and, notably, in paragraph nine of the plea agreement, he waived all the constitutional, legal and equitable defenses to the forfeiture of the money. There were a whole enumeration of bases for challenges that he waived in a non-exhaustive list.

In fact, in paragraph 11, at the end of that paragraph, it indicates that should it be judged by the office, meaning the U.S. Attorney's Office, that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty, but this office will be released from its obligation under this agreement including, but not limited to, the provisions of paragraph 11, subsections A through C.

So, I am not clear what the point was in contesting a forfeiture that the defendant agreed to in writing, represented by able counsel, that was discussed with him during the plea allocation with a judge of this court under oath that he indicated he understood.

MR. FERNICH: Your Honor, the crux of the objection was just so the Court would have full and complete information. I believe that the forfeiture order designates the crime of conviction as an extortionate collection conspiracy whereas, in fact, he pleaded to an extortionate extension conspiracy. So the thrust of the objection was just so the Court --

THE COURT: Well, you had an opportunity to look at that forfeiture order and object to any of the wording in there. Defense counsel had the opportunity to do that. That is why Rule 32.2 of the Federal Rules of Criminal Procedure specifies that those orders have to be issued prior to

sentence to give the defendant an opportunity to do that.

I read that as a continuation of the kind of conduct that has been engaged in by the defense in this case of trying to wheedle out of this plea agreement and, frankly, retracting from acceptance of responsibility in this case which I will get to in a moment.

MR. FERNICH: Clearly, we're not -- if Your Honor finds that the agreement has not been breached and, certainly, while I don't --

THE COURT: What do you mean finds that the agreement has not been breached? You mean by your client?

MR. FERNICH: No, ma'am. Pursuant to the motions that have been previously filed.

THE COURT: Excuse me but that has been decided and, quite frankly, if I hear from your mouth that the plea agreement has been breached by the government even once in this proceeding, I am going to impose a fine for every time I hear those words the government has breached the plea agreement. All right?

It seems to me that you have tried in a roundabout way to relitigate the law of this case, a decision that has already been made twice by Judge Townes. When she denied defendant's motion to withdraw his guilty plea, she made the finding that the government did not breach the plea agreement in any way. I reviewed her decision. Her decision is sound.

It is based on a very thorough, comprehensive and sound legal reasoning based on her examination of the facts of this case, the documents in this case, all the proceedings that were had in this case and the relevant case law and rules. Then there was a subsequent motion by the defense challenging that ruling and asking the Court to reconsider it and she reviewed it yet again and, again, the Court found that the government had not breached the plea agreement.

So, do not attempt to relitigate that in front of me because that is the law of the case and you did make an attempt to relitigate that and you cited Seventh Circuit case law which, quite frankly, is not binding in this court and, quite frankly, is in apposite to the facts in this case. So, let's forget that. There is no breach of the plea agreement here. As far as I am concerned, the information that is contained in the presentence report is all information that is validly in the presentence report.

So, in other words, based on the addendum that was provided with Probation, with the exception of certain paragraphs that I indicated essential about consent should be removed, references that should be redacted and, again, that's on consent of the government. For example, paragraphs 3 through 17 and 15, I agree with Probation's assessment that those should remain in the presentence report. Those are the paragraphs that relate to a description of the Colombo crime

family, the defendant's history and role and involvement with them, the crimes committed to support the organized crime family and so on.

I think that Probation's analysis is also consistent with the analysis that was made by Judge Townes. This is all information that is properly before the Court and, in essence, what you are trying to do is to restrict the type of information that the Court can consider. Title 18 of the United States Code, under 3661, says that there is no prohibition on the information that can be used by a sentencing court concerning a defendant's background, character and conduct when determining the sentence.

So, with these additional edits we've discussed here, the presentence report is amended. How would you like to do that, Ms. Betts? Do you want to --

THE PROBATION OFFICER: We can prepare a revised report.

THE COURT: It might be a little easier to follow, I think, if there is a revised presentence report. I hate to make more but since there is going to be some additional financial information provided by the defendant, it might be helpful to do that.

THE PROBATION OFFICER: That will be completed.

THE COURT: Okay. We will talk about a date afterward. Okay?

So. Let's move on to the question of a Fatico hearing.

In reviewing the documents that have been filed here and specifically, there was a proceeding held before Judge Townes on October 30th of 2014 which was the date on which she denied the initial motion for defendant's motion for withdrawal of the guilty plea. It is clear from viewing and reading that transcript that actually the idea of the Fatico hearing, that came from the judge herself. That it was a sua sponte decision. The government was not requesting one. It did not appear that defense counsel was requesting one.

Every judge has a different approach to sentencing. Mr. Fernich, you've appeared before me for sentencing as has Mr. Lifshitz as well. My view is that government, as officers of the court, if they make a representation to Probation that they can prove whatever facts are contained or alleged, facts and circumstances, if you will, alleged in a presentence report, that they can prove that by the preponderance of the evidence. If there is no challenge to that by the defense, the Court accepts that as true.

I would not feel a need necessarily to require a Fatico hearing. Perhaps, on occasion, on some drug cases where maybe it is not clear about drug amounts and if it is relevant, maybe there is a requirement for a lab report or something further, but I have rarely found it necessary to go

beyond that.

It is not clear to me at this point what exactly the position is of the parties in connection with the Fatico hearing. I was going on the assumption that this was something that had been requested by the parties because, in part, at the point that I got the case initially, I did not have full copies of everything that had been submitted in the case. Now having had a chance to review everything all together, I am not quite clear where the parties are with respect to a hearing. If you want to have a hearing, I am happy to schedule one, we will set a date and we will go forward with a hearing.

So, Mr. Lifshitz, I will hear from you. Then I will hear from Mr. Fernich on it.

MR. LIFSHITZ: Your Honor, we agree with Your Honor's reading of the transcript of the appearance before Judge Townes. At that appearance, we did not request a hearing and neither did defense counsel. Judge Townes ordered us to appear for one and the parties prepared to do so.

We are not seeking a Fatico hearing at this time. I can't speak to defense counsel.

THE COURT: No, I will let defense counsel speak for the defendant.

MR. LIFSHITZ: Up until now, I am not aware of him having requested one at that proceeding or since.

THE COURT: I can understand why the parties made the submissions that you made based on the ruling of Judge Townes. So, I am not saying that the parties were wrong to do that, but I just want to get an understanding of where you all are right now and how we should proceed moving forward now that we have had an opportunity to review the presentence report. I think if there is a Fatico hearing, again, we would need to fine tune it exactly as to what at issue for a Fatico hearing.

Mr. Fernich, I will hear from you. What is your client's position?

MR. LIFSHITZ: Your Honor, I'm sorry.

THE COURT: I'm sorry. I didn't mean to interrupt.

MR. LIFSHITZ: You didn't. Can I add one thing? I don't know if this is relevant to the Court or defense, but it may be.

Under the plea agreement as everyone knows, we've agreed to seek a sentence within the guidelines range. The guidelines range found by Probation is the same as that which is estimated in the plea agreement. That's still our position today.

THE COURT: I'm sorry. And thank you for reminding me.

Before maybe we move ahead, because there was an objection by defendant to the aggravated role enhancement, it

was addressed in the addendum and I'm sorry. I sort of glossed over it. I did not mean to.

In my view, I think that the analysis that was offered up by Probation as well as the government in its objections to the presentence report is one that is consistent with the guidelines and the application notes to the guidelines, specifically, the aggravated role enhancement under 3B1.1.

It is disjunctive. The aggravated role enhancement applies if the defendant is a supervisor or a manager in criminal activities under subdivision B and the criminal activity involved five or more participants or was otherwise extensive. In other words, that the criminal activity was otherwise extensive and that is increased by three levels.

Then application note 3, which is cited by both Probation and the government, says that in assessing whether an organization is otherwise extensive, all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing service of many outsiders could be considered extensive.

So, that is just an example, but I thought that Probation also addressed that well in the addendum to the presentence report. It is on page two around the middle of the second full paragraph.

I quote: The instant offense presents unique circumstances in which all of the participants engaged in illegal activities in furtherance of All Around Trucking and/or under the Colombo Family which alone has dozens of criminal participants. When viewing the offense of conviction in the full scope of its time and place, as a part of the Colombo Family's method of making money or improving their positions within the organization, there were numerous criminal participants, the defendant and Anthony Preza, several debtors and other members and associates of the Colombo family who were more distantly involved in All Around Trucking.

So, Probation adhered to the three level role enhancement under 3B1.1A. So, the Court agrees with that analysis and so the aggravating role enhancement will apply.

There is one thing that does give me pause and that is in terms of the guidelines calculation and perhaps this is good time to raise that. Given the types of argument that the defendant has made in the motions to withdraw his guilty plea, in attacking the forfeiture order, it seems to me that he has actually withdrawn from a full acceptance of responsibility in this case. As it is, he pled guilty not on the eve of trial, really during trial because I think the jury had already been selected.

Correct, Mr. Lifshitz, or was it in the process?

MR. LIFSHITZ: It was certainly in the process. People had begun voir dire.

THE COURT: And people have different definitions of the beginning of trial. As far as I am concerned, once you start picking the jury, the trial has begun. So that is why the government is not moving for a one level downward, one level reduction for acceptance of responsibility.

Correct, Mr. Lifshitz?

MR. LIFSHITZ: Correct, Your Honor. It was not contemplated.

THE COURT: Right. He was given the two level reduction for having pled guilty which under normal circumstances, he would be entitled to, but I am given pause by the level to which he has sort of extricated his acceptance of responsibility here, extricated himself from acceptance of responsibility here by claiming that, well, there wasn't really a factual basis for the plea because it wasn't really extortion and it wasn't really a usurious loan and it really wasn't his money and he really shouldn't have given $325,000 in forfeiture. I'm wondering what he is accepting responsibility for and whether he should be given the two level reduction or acceptance of responsibility.

I would like to hear, Mr. Fernich, from you about that.

MR. FERNICH: Well, ma'am, the papers were very

carefully drafted to allege a defect in the plea proceedings themselves. We are in no way backing off his acceptance of guilty, his guilty plea or allocution, the factual things that he said regarding allocution in any way. We are simply saying what was said, and I don't want to get back into relitigating what was said before, that what was said did not satisfy the mandates of Rule 11.

So, we're in no way contesting that he is guilty of what he said he is guilty to and he fully accepts consistent with the allocution in the plea agreement. We simply made the technical legal argument that the factual basis as elicited at the plea hearing did not satisfy the mandates of Rule 11. That was the second branch of the motion.

The first bunch of the motion was simply --

THE COURT: But there were also the objections to the presentence report and certainly, I think that a reading of those objections to the presentence report could be fairly made or an interpretation could be fairly made that there is a failure to accept responsibility.

He claimed the victims were not afraid. The objection to the aggravated role enhancement which is something that he stipulated to in the plea agreement. It was agreed upon by the mere fact that he signed off on it --

MR. FERNICH: Yes.

THE COURT: -- in the plea agreement. Now, granted,

the plea agreement is not binding on Probation or the court, but it does show the defendant's understanding of what his role is.

MR. FERNICH: Ma'am, maybe that wasn't phrased as well as it should have been.

We're not per se objecting to the acceptance of the responsibility enhancement because we stipulated to it, but the plea agreement does permit us to argue under 3553 for a sentence below the stipulated guidelines range. In the spirit of what Your Honor had said earlier with regard to 3661 and 1B1.4, there's no restriction on the type, I emphasize type, of information the Court can consider in sentencing.

THE COURT: But that is advocacy to the Court. That is different from objections to the presentence report and objecting to, in particular with respect to his crime of conviction, to basically step back away from the facts of that particular count.

I am not even looking at the stuff where he says, you know, I did not participate in the murders of these two people and the government says, okay, we're not going to go forward and prove that. I'm not considering that. That's been stricken. That's gone.

MR. FERNICH: Yes, I understand.

THE COURT: That's gone.

MR. FERNICH: Ma'am, I would suggest to Your Honor

that our duty of advocacy extends, in the rendering of effective assistance of counsel, to Probation as well as to the Court because it's in our interest to get as favorable a PSR as possible and not having had any trial for Mr. Persico, both the Court and the Probation Office have no real basis for writing the report other than the information that's given to them by the government. So, it's our duty as counsel to sort of amplify the facts of the case in a way that doesn't contradict his allocution.

In no way does he contradict the allocution. He's just providing a fuller account of the offense conduct, our view of the offense conduct. It doesn't mitigate his culpability in terms of what he pled to in any way, but this is just the rendering of effective assistance of counsel in my view before the Probation Department and before Your Honor, and this is a holistic analysis that the Court has to undertake under 3553 and the nature and circumstances of the offense and history and characteristics of the defendant are vital to that analysis. The information that we give to the Probation Department invariably ends up -- well, not invariably certainly not on our part -- ultimately gets to the Court.

So, ultimately, I think that's six to one, half a dozen to the other. It's all designed to the same end, Your Honor, which is to candidly achieve a sentence as low as

possible and then entails explaining the nature of the crime in a case where there was no trial involving Mr. Persico.

So let me reiterate. He fully accepts responsibility for the crime. He has a plea agreement, an allocution that he sticks to. The things that he said were in no way trying to undermine the factual representations that he made at the allocution. He's guilty of what he pled to. We made a carefully constructed legal argument to assail the nature of the plea proceeding as having not complied, in our view, with Rule 11 and we'll just leave it at that.

THE COURT: Does the government wish to be heard on this issue?

MR. LIFSHITZ: I do. Your Honor, we're not, we're not moving to negate the two level reduction contemplated in the plea agreement.

THE COURT: I am going to --

MR. FERNICH: Ma'am, can I just add one more thing?

THE COURT: I am going to allow the two point reduction to stand.

That being the case, I think the parties are all in agreement that the sentencing guideline range is as calculated by Probation which happens to be the same as that that was stipulated to by the parties in the plea agreement. That is based on a total offense level of 21, a Criminal History Category of I, and a sentence guideline range of 37 to

46 months.

So, I do not know if you remember where you stopped because I cut you off at that juncture, both with respect to the aggravating role and the guideline range calculation.

MR. LIFSHITZ: I think I do, Your Honor. I was nearly done.

All I wanted to add was that if there were a Fatico hearing and we prevailed on every issue that was disputed at the hearing, we would still be bound by the plea agreement. We would still honor the plea agreement. I would still stand up before Your Honor and say the sentence should be within -- the range is 37 to 46 months which I think is one thing that distinguishes this case from the situations Your Honor described earlier where Fatico hearings are more typical, for example, where drug weight is an issue and the government will advocate for a higher range if it proves that the weight was higher than what the defendant says it was.

That's all I have to say about that.

THE COURT: Okay. So, the ball is now in your court, Mr. Fernich. What is your position with respect to a Fatico hearing?

MR. FERNICH: Well, my position with respect to a Fatico hearing -- I thank the Court for its statements earlier because it clarifies where the Court is coming from and enables me to frame my arguments better. My position is as

follows.

With respect to the 389 allegations as I take it that are remaining, principally, the Scopo murder, that to this point, the government has met a bare burden of production with respect to the Scopo issue. Your Honor is quite right that the 3661 and 1B1.4 places no restriction on the type of information that a court may consider at sentencing, but those provisions say nothing about the quality of the information that a court may consider at sentencing because that is controlled by the due process clause as interpreted in cases like McMillan versus Pennsylvania, pre-guideline sentencing cases such as McMillan versus Pennsylvania and the Williams case out of the Supreme Court from 1949. Those are the cases that I recall that mandate the preponderance of the burden of proof at sentencing.

So, it's true the Court can consider any type of information, but it cannot consider, in my view, to enhance a sentence in any way information that has not been proven by a preponderance of the evidence and the government has not proven upon the record as it stands these allegations by a preponderance of evidence. They have met a bare burden production which is insufficient for the Court to consider --

THE COURT: But --

MR. FERNICH: Yes?

THE COURT: That's argument. All I need to know

from you is whether you want to have the Fatico hearing or not. What I am hearing from you, based on what you have said thus far, is, in a nutshell, that you challenge the government.

MR. FERNICH: We do challenge it, yes.

THE COURT: The government's statement.

MR. FERNICH: Yes.

THE COURT: That they can prove let's call these other bad acts. Okay?

MR. FERNICH: Yes.

THE COURT: By the preponderance of the evidence. So from what I said before, that puts it in a different context in which case, if I have counsel that comes to me and says, you know, I know the government said they can prove it, I'm not believing it, then that's what a Fatico hearing is for. Let's put it to the test because the parties have provided transcripts of the Guerra trial and various other trials, Basciano and some other ones or Basciano was a witness in some other trials. I'm getting the names a little confused here because some of these acts go way back where there were a bunch of other trials that were I suppose relevant in certain ways and it does not help the Court to decide the issue for a number of reasons.

To have these arguments made on cold paper, if you will, for example, the defense challenge to Russo's

credibility, right, because I don't know on what basis the jury decided the charges that it decided to convict or acquit Guerra on. I really don't know. I was not there in the deliberating room. I need to make my own credibility assessment.

Also, the burden of proof is different. It may have been that the jury thought that perhaps the government might have met a preponderance standard if that was the charge that they were given. They might have thought that, but they also might have thought maybe not beyond a reasonable doubt. The burden of proof here is by a preponderance of the evidence which is a different standard.

The other thing is that it is not fair for the defendant for me to decide whether or not the government can substantiate its preponderance case, right, based on a cold transcript where the defendant was not present as a litigant and represented by counsel and did not have the opportunity to challenge the witness himself, right? Because his interest would be different from Guerra's interest in some ways. Right? Because so long as the blame is going to somebody else and somebody else knows something, I, as defense counsel, might let them know go rambling on about what everybody else did that but you know what, you didn't hear my guy doing that, it was all these other people doing that.

So, the defendant should have the opportunity if he

wishes to have that opportunity to have his counsel challenge the witnesses and have the government put to the test. If you are challenging the government's statement that they can prove it, then we need to have the Fatico hearing and the next step is to schedule it and I want to schedule it for as soon as possible.

This case has been pending for six years now. There has been a lot of delay in the case and I do not want to delay the case further. This case was ready for trial at one point. 3500 material had been turned over a long time ago. The parties certainly have access to a lot of information. There is a lot of material here, a lot of transcripts and, obviously, for purposes of the Fatico hearing, the government will have its own 3500 material obligations to make sure that it complies in that regard.

MR. LIFSHITZ: Your Honor, we -- I apologize.

THE COURT: That's okay.

MR. LIFSHITZ: Because we were about to have the hearing before Judge Townes, we actually turned over the exhibits and 3500 material for the hearing.

THE COURT: Okay.

MR. LIFSHITZ: If there is anything additional, it will be minimal and turned over promptly, but there is anything that we've withheld that exists.

THE COURT: Okay.

MR. FERNICH: Ma'am, could I just amplify? I don't wish to antagonize Your Honor any further. I understand the Court's position that we will have a hearing. If I can just flesh this out for a moment.

My position, to be clear, is right now, it's not that we're contesting their ability to prove it by a preponderance or not. We are contesting the factual allegations that they made to date. In a case where there's a plea --

THE COURT: That's double speak.

MR. FERNICH: No, it's not.

THE COURT: Yes, it is. Yes, it is. Okay? Because they are saying based on facts A through T, this shows that he was involved in this misconduct and this misconduct and this misconduct. Okay? In particular, we are talking about participation in the Scopo murder and then there is another aspect to which is his participation in extortionate activity and loansharking. Correct?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: Extending usurious loans for a certain extended period of time as part of the criminal activities of the Colombo crime family which the government has maintained all along and consistently, what gave the victims the cause to believe that failure to pay would result in harm coming to them because of the power of this enterprise being behind the

defendant. That is the government's argument and it may not be phrased the way you would phrase it, but I think that is a nutshell of what you have been arguing all along.

MR. LIFSHITZ: Yes, that's all accurate, Your Honor, and on January 19th of 2015, we filed a short letter.

THE COURT: Yes.

MR. LIFSHITZ: Document number 802.

THE COURT: That is what I had read.

So you cannot have it both ways. You cannot tell me that you are not challenging it but that you are challenging the strength of their facts. You just cannot have it both ways.

MR. FERNICH: I'm not suggesting that at all. We are challenging it. And my final position, in a nutshell, is really twofold.

First of all, I don't think they've met a minimal burden of going forward sufficient to warrant a hearing, first of all.

THE COURT: I disagree.

MR. FERNICH: I understand.

And more fundamentally, I'd like to turn back to the last statement that Mr. Lifshitz made before I began speaking which is what, he said that even if we have a Fatico hearing and we prove everything we said we're going to prove, I'm still going to get up before Your Honor and say, and I have no

doubt that he will, the sentence should be between 37 and 46 months.

Now, it strikes me, ma'am, when there's a plea agreement --

THE COURT: Yes, but the Court --

MR. FERNICH: Can I just --

THE COURT: Let's not go back to the plea agreement.

MR. FERNICH: No.

THE COURT: The plea agreement is clear. It has been ruled on. Okay? The government has not said anything that contradicts that plea agreement today or to date. So let's be clear about that.

MR. FERNICH: I understand.

THE COURT: Regardless of what the government's position is.

MR. FERNICH: Yes.

THE COURT: To the extent that you are going to be arguing to me that your client should get a below guidelines sentence, which clearly you intend to do --

MR. FERNICH: That's something we're entitled to do.

THE COURT: You're entitled to do.

MR. FERNICH: I don't know that we are going to do that.

THE COURT: Well, your papers indicate that because part of your objections to the presentence report which

Probation did not agree to change, and I think it is correct, with respect to the position of your client as being the sole provider for two children because the mother of the children died, okay, but these children are adults now. One is 23 and the other one is 21. They are adults. One is almost graduating college already if she didn't already and the other one probably on the verge of graduating if she didn't already. So they are on their way.

The court is also entitled to consider pursuant to 3553(a) and pursuant to guideline 5K2.0 whether or not an upward departure or a variance is appropriate under all the circumstances of the case.

MR. FERNICH: Right. And for the government to put before the Court the most explosive, uncharged allegation that you can put before a court and say we can prove it at a hearing but we're not going to argue for anything other than the guidelines range is, with all respect, an invitation for the Court to do that on its own and that contravenes every known principle, respectfully, of plea jurisprudence.

THE COURT: That is ridiculous and it is rejected.

MR. FERNICH: I understand.

THE COURT: It is ridiculous. It is rejected.

MR. FERNICH: Okay.

THE COURT: It was rejected by Judge Townes. I am rejecting it now.

MR. FERNICH: I understand. I understand.

THE COURT: And I told you that I am not buying that argument.

MR. FERNICH: Okay. That's fine. I just made a record. That's all.

THE COURT: You have made that same argument now a gazillion times.

MR. FERNICH: Well, now it's being crystallized though.

THE COURT: No, you have said the same thing.

MR. FERNICH: Okay.

THE COURT: You have said the same thing.

MR. FERNICH: I understand.

THE COURT: And I am done with hearing it.

MR. FERNICH: I've said my piece.

THE COURT: That is what I am entitled to listen to. I am entitled to hear it.

So, now we are going to have a Fatico hearing July 22nd at 10 o'clock. I may interrupt briefly in the middle of that, say at 11:30. Maybe I will give the parties a break for a brief status conference, but I have the whole day free that day that we can have the hearing and maybe if the parties can give me an estimate as to how long they think it will take. I don't know how many witnesses you intend to have.

Just to be clear, as I see it, it is two areas. It's the Scopo murder and then it's the loansharking activities, correct?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: For whatever that period of time was.

MR. LIFSHITZ: I'll -- that is --

THE COURT: Early to mid 1990s to 2010. Am I reading it correctly?

MR. LIFSHITZ: Yes, Your Honor, and not necessarily every year in that period.

THE COURT: Within that time frame?

MR. LIFSHITZ: Yes.

Your Honor, if there's a Fatico hearing, the crimes we would prove are the ones set forth on page three of the letter docketed as 802.

THE COURT: That's your January 19th sentencing --

MR. LIFSHITZ: Yes, Your Honor, January 19, 2015.

So, his participation in the racketeering, his participation in the Scopo murder, his participation in loansharking extortion and participation in the conspiracy to acquire and sell video games.

THE COURT: Okay.

MR. LIFSHITZ: And as to the length of the hearing, as we have disclosed, the witnesses would be a cooperating witness who is known to the defense and one agent. The agent

would primarily put in exhibits that were introduced at the Guerra trial. They've been marked for the defense for the purpose of this hearing as well. So, it depends on the length of cross. It could take the bulk of the day. I don't think it would take more than one day.

THE COURT: Well, if we have to continue it, we will work from there.

MR. FERNICH: Ma'am, my client, Mr. Sercarz is going to be handling the hearing and he's not available on that day. I have his availability. He has a window from 8/5 through 8/15 in which he could do it and he also is available in September. He has hearings out of state through the bulk of July.

THE COURT: The bulk of July?

MR. FERNICH: 7/2 through 8/5. I imagine he has a vacation, probably, around the 4th. He did give me that ten-day window in August and then there's a also time in September.

THE COURT: Well, I don't want to put it into September.

MR. FERNICH: I understand.

THE COURT: How is Friday, August 12th, beginning at 11 o'clock?

MR. LIFSHITZ: That's fine for the government.

THE COURT: I have a sentence in the morning.

MR. FERNICH: Yes.

THE COURT: Mr. Sercarz' window is when, July when to when? August 5th?

MR. FERNICH: Yes. 8/5.

THE COURT: I'm sorry. I forgot that my trial will be over by then. So how is August 10th? That's a Wednesday. I have the whole day. We can start at 10 o'clock.

MR. FERNICH: Yes.

MR. LIFSHITZ: Fine for the government.

THE COURT: Okay.

MR. FERNICH: 8/10. 10 a.m.?

THE COURT: 10 a.m.

MR. FERNICH: Thank you.

THE COURT: And at some point, at your convenience, if you can get me a copy of the 3500 material, and I don't know if there are going to be any exhibits.

Do you expect to have any witnesses? Do you know?

MR. FERNICH: I don't believe so but I'm not 100 percent certain.

THE COURT: All right. And then if we need spillover time, right now, I have time on August 11th so we could just continue right into the next day if that's good for everybody.

MR. LIFSHITZ: Yes, Your Honor.

MR. FERNICH: Yes.

THE COURT: Okay. Anything else that the parties want to address today?

MR. FERNICH: No thank you.

MR. LIFSHITZ: I don't have any issues, Your Honor. I want to correct one thing if you'll indulge me. I think there was a reference to the government attempting to prove uncharged conduct. Everything or nearly everything we're trying to prove --

MR. FERNICH: Sorry. Unconvicted conduct. Sorry.

THE COURT: Unconvicted conduct that was alleged in the superseding indictment.

MR. LIFSHITZ: Yes. That's all, Your Honor.

THE COURT: Okay. All right. Anything else?

MR. LIFSHITZ: No, thank you.

MR. FERNICH: No, ma'am.

THE COURT: All right. Thank you.

I think, Probation, you have bank forms and releases for Mr. Persico. So, given that we are not going to have the hearing until then, Mr. Persico has to provide the tax returns by the end of next week, that will be June 10th, and by July 1st, provide Probation with the completed personal financial affidavit and business financial affidavit.

How much time do you need after that for a revised presentence report so you can put it all together?

THE PROBATION OFFICER: By July 10th.

THE COURT: I was going to give you until July 29th.

THE PROBATION OFFICER: Okay.

THE COURT: I will give you until July 29th. Okay.

MR. FERNICH: Okay. Thanks.

THE COURT: All right. Thank you.

MR. LIFSHITZ: Thank you.

(Matter concluded.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Charleane M. Heading — June 14, 2016

CHARLEANE M. HEADING — DATE

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG:NMA/AL
F.#2010R00195

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 12, 2016

By Email and Hand Delivery

Senior U.S. Probation Officer Mary Ann Betts
United States Probation Department
Eastern District of New York
147 Pierrepont Street
Brooklyn, New York 11201

Re: United States v. Michael Persico
Criminal Docket No. 10-147 (S-6) (DLI)

Dear Officer Betts:

The government respectfully submits this letter regarding its objections to the Presentence Investigation Report ("PSR") issued in the above-captioned case, pursuant to the Court's Order (Docket Entry dated Jan. 19, 2016) and Rule 32(f) of the Federal Rules of Criminal Procedure. The government's objections are as follows:

Paragraph 12: As indicated in the Fourth Superseding Indictment (Docket Entry No. 376 at 7), the defendant and others participated in the charged racketeering conspiracy from January 1987 to June 2011, rather than from 1987 to January 30, 2005.

Paragraphs 14-15, 38 and 45: With respect to the murder of Joseph Scopo, the defendant was not merely made aware of the plan to murder Scopo (referred to incorrectly as "John" Scopo in paragraphs 38 and 45). Rather, the defendant participated in the Scopo murder (1) by assembling part of the murder crew, (2) by ordering the participants to carry out the murder before the defendant's brother Alphonse Persico was released from prison, and (3) by arranging for the provision of firearms used to carry out the murder. Cooperating witness Anthony Russo, who was a long-time associate of the Colombo crime family, and who participated in the Scopo murder, testified about the murder, including the defendant's role in it, in the trial of co-defendant Francis Guerra in United States v. Guerra, 10 CR 147 (SLT) (E.D.N.Y.). Russo's trial testimony is attached in its entirety as Exhibit A. Russo testified about the Scopo murder on direct examination at pages 203-31, and specifically

EAG:NMA/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

- against - 10 CR 147 (S-6) (DLI)

MICHAEL PERSICO,

Defendant.

– – – – – – – – – – – – – – – – – – – – – – –X

MEMORANDUM OF LAW REGARDING
EVIDENCE PRESENTED AT *FATICO* HEARING

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
(Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law regarding evidence presented at the Fatico hearing conducted on August 10 and 24, 2016. For the reasons set forth below, the government respectfully submits that it has proven by a preponderance of the evidence that the defendant participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

DISCUSSION

I. RACKETEERING

A. The Testimony of Anthony Russo

At the Fatico hearing, the government called cooperating witness Anthony Russo to testify. Russo testified that he is a 55-year-old Brooklyn native who began committing crimes at age 16. (Transcript of Fatico Hearing (attached as Ex. A) ("Tr.") at 11.) He was involved in organized crime from that age until his arrest in 2011. (Id. at 12.) He has been involved with the Gambino and Colombo crime families, and has held the positions of associate, soldier and acting captain in organized crime. (Id. at 12-13.)

1. The Structure of Organized Crime Families

Russo testified that there are five organized crimes families in New York City, namely, the Bonanno, Colombo, Gambino, Genovese and Luchese families. (Id. at 13.) They share a common structure, including the following positions, ranked from top to bottom: boss, underboss, consigliere, captains, soldiers and associate. (Id.) Each position has specific responsibilities, and there is a formal process to becoming a "soldier," i.e., an inducted member. (Id. at 14-17.) Money flows from the bottom of the structure to the top.

EAG:NMA/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

- against -    10 CR 147 (S-6) (DLI)

MICHAEL PERSICO,

Defendant.

– – – – – – – – – – – – – – – – – – – – – – –X

MEMORANDUM OF LAW IN RESPONSE TO
THE DEFENDANT'S POST-*FATICO* HEARING BRIEF

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
(Of Counsel)

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in response to the defendant's post-Fatico hearing brief ("Def.'s Br.," Docket Entry No. 849). For the reasons set forth below and in the government's post-Fatico hearing brief ("Govt. Br.," Docket Entry No. 846), the government respectfully submits that it has proven by a preponderance of the evidence that the defendant participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

DISCUSSION

The defendant argues that the government has not proven by a preponderance of evidence that the defendant committed various crimes because cooperating witness Anthony Russo should not be credited (although he asserts that Russo should be credited in large part regarding his own participation in various crimes). The defendant's arguments are unpersuasive.

I. RUSSO'S CREDIBILITY AND INCENTIVES

As an initial matter, the defendant makes a number of assertions designed to undermine Russo's general credibility. For example, the defendant argues that Russo said to cooperating witnesses Thomas McLaughlin and Peter Tagliavia that cooperating witnesses lie. (Def.'s Br. at 9 (citing Exs. QQ, QQ(T).) However, Russo made this statement before cooperating, when he was still an active member of the Colombo crime family, talking to men he believed were trusted criminal associates. (Transcript of Fatico Hearing (attached to Govt. Br. as Ex. A) ("Tr.") at 144-46.) It is not surprising that an active member of the Colombo crime family said something disparaging about cooperating witnesses to two

Russo, it is clear that he did in fact refer business to the defendant, which is consistent with the defendant having extorted him. (Govt. Exs. 7002, 838(a), 838(b),)

VI. CONSPIRACY TO ACQUIRE AND SELL STOLEN VIDEO GAMES

The defendant argues that Russo should not be credited as to the defendant's participation in a conspiracy to acquire stolen video games because he did not in fact own the property where a bus company, which Russo believed the defendant owned, was located. (Def.'s Br. at 24.) As with other purported inconsistencies identified by the defense, however, this fact is overwhelmed by the corroborating evidence as to this crime. (Govt. Br. at 21-22.)

* * *

The government respectfully submits that, for the reasons set forth above and in the government's original post-Fatico hearing brief, Russo's testimony should be credited. He testified in a straightforward manner on both direct and cross-examination, his motivations and incentives are to tell the truth, and his testimony is corroborated. Based on the totality of his testimony and corroboration, Russo's testimony should be credited.

CONCLUSION

For the reasons set forth above and in the government's post-Fatico hearing brief (Docket Entry No. 846), the government respectfully submits that it has proven by a preponderance of the evidence that the defendant participated in (1) racketeering; (2) the 1993 murder of Joseph Scopo; (3) loansharking; (4) extortion; and (5) a conspiracy to acquire and sell stolen video games.

Dated: Brooklyn, New York
September 28, 2016

Respectfully submitted,

ROBERT L. CAPERS
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By: /s/ Allon Lifshitz
Nicole M. Argentieri
Allon Lifshitz
Assistant U.S. Attorneys
(718) 254-6232/6164

cc: Clerk of Court (DLI) (by ECF)
Defense Counsel (by ECF)
U.S. Probation Officer Mary Ann Betts (by email)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, : 10-CR-147 (DI)
:
Plaintiff, :
: United States Courthouse
-against- : Brooklyn, New York
:
MICHAEL J. PERSICO, :
: Friday, July 21, 2017
Defendant. : 2:15 p.m.
- - - - - - - - - - - - - - - - - - - - - X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE DORA IRIZARRY
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

For the Government: BRIDGET ROHDE, ESQ.
Acting United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201
BY: ALLON LIFSHITZ, ESQ.
ASSISTANT UNITED STATES ATTORNEY

For the Defendant: SERCARZ & RIOPELLE
810 Seventh Avenue, Suite 620
New York, New York 10019
BY: MAURICE H. SERCARZ, ESQ.

LAW OFFICES OF MARC A. FERNICH
810 Seventh Avenue, Suite 620
New York, New York 10019
BY: MARC FERNICH

LAW OFFICES OF SARITA KEDIA
5 East 22nd Street, Suite 7B
New York, New York 10010
BY: SARITA KEDIA

Court Reporter: DAVID R. ROY, RPR
225 Cadman Plaza East/Brooklyn, NY 11201
DRROYOFCR@GMAIL.COM

Proceedings recorded by Stenographic machine shorthand, transcript produced by Computer-Aided Transcription.

(In open court.)

THE COURTROOM DEPUTY: Criminal cause for sentencing, Docket Number 10-CR-147, United States versus Michael Persico.

Please state your appearances.

MR. LIFSHITZ: Allon Lifshitz for the United States. Good afternoon, Your Honor.

And also at counsel table are FBI Special Agent Chance Adam --

THE COURT: Good afternoon.

MR. LIFSHITZ: -- and United States Probation Officer Michael Dorra.

MR. DORRA: Good afternoon.

THE COURT: Good afternoon to all of you. You can have a seat.

MR. LIFSHITZ: Thank you.

MR. SERCARZ: Good afternoon, Your Honor. For the Defendant Michael Persico, Maurice Sercarz, S-E-R-C-A-R-Z; Sarita Kedia; and Mark Fernich. The defendant is present in court.

THE COURT: Yes. Thank you. Good afternoon to all of you.

Good afternoon, Mr. Persico.

MS. KEDIA: Good afternoon.

THE COURT: All right. And good afternoon to,

what I guess, are a lot of family members, friends, and observer.

All right. We are here today for sentencing. I am assuming that the parties have received the Court's decision concerning the Fatico hearing that was held in this case. The Court issued that opinion a little earlier in the week. And the Court has found that the Government proved by more than a preponderance of the evidence that the defendant participated in the murder, specifically, that of Joseph Scopo, of conspiracy to by and sell stolen property, specifically involving some stolen -- a truckload of stolen video games, loan shark, extortion, and racketeering. These crimes were all part of an overall racketeering scheme. And as such, the Court is free to consider such relevant conduct in its fashioning an appropriate sentence in this case.

Now, before we actually get to the heart of this sentencing, Mr. Persico, first for your benefit and also for the benefit of the observers, I just want to outline how we are going proceed this afternoon, all right? First, I want to make sure that all of us have received all the same documents and information relevant to sentencing, that all of your -- you are assured that I have received what I should have received, and that all of you also have copies of what I have received so that we are all working with the same set of facts; so that we are all on the same page.

Next, I also want to address any other outstanding objections to the presentence report. I do not think that there are any, except that, perhaps, the defense may have a continuing objection to the Court's Fatico ruling, but I will let Counsel address that.

And next as I am required to do under the current state of federal sentencing laws and as an initial matter, I have to make a determination as to what the appropriate sentence guideline range is in this case. The guidelines are advisory. They are not mandatory. Nevertheless, the Court is required to make that determination as to what the guideline range should be in this particular case, as a starting point.

The Court has to consider within that advisory guideline structure not only the policies and public considerations embodied in the guidelines, but also whether any departures, either upwardly or downwardly, from the guidelines and within that guideline structure. And the Court also has to consider what are called 3553 factors, which I am sure there will be more discussion about during this hearing, to determine whether or not a variance from that, the guideline range is appropriate, again, either upwards or downwardly from what the guidelines say.

In that regard, because I do have all of these other things to consider, the Court has considered the

voluminous sentencing submissions that have been provided by the parties in this case. But the Court certainly will give the attorneys an opportunity to address the Court and address anything that they may not have already addressed in their papers.

The law also gives you the right, Mr. Persico, to make a statement to the Court. And if you wish to make a statement, I will be happy to give you the opportunity to do that.

It is not until after we have gone through all of that that I actually will impose sentence.

Do you understand that process, sir?

THE DEFENDANT: I do.

THE COURT: Okay. So needless to say, of course, there was the Fatico hearing itself, and then there was a lot of briefing in connection with that. I am not going to go through chapter and verse. But what was submitted in connection with the briefing itself, I did consider because there was a lot of discussion in the sentencing submissions argument about the issues under consideration pursuant to the Fatico hearing. The Court did consider those in fashioning the decision, you know, with respect to the Fatico hearing.

There was a revised presentence investigation report. And moving forward, during this proceeding when I

refer to the presentence report, I am referring to that updated, revised presentence report, which incorporated the rulings that I had made previously as to some objections that were raised by the defense to the original presentence report and clarifications also that were made by the Government to the original presentence report. So, for example, there was certain alleged relevant conduct that the Government stated it was not prepared to prove by a preponderance of the evidence that wound up being omitted in the revised presentence report pursuant to my ruling. And that report, along with a revised sentence recommendation, was filed on July 29th of 2016.

There is the defendant's sentencing submission dated October 12th of 2016, which had a number of exhibits. There were -- I did not count them, but there were a great many letters that were submitted on your behalf, Mr. Persico, by family members, friends, people from the community, and so on, people who wished to attest to your character. Some of the letters were -- had been addressed originally to Judge Townes, who originally had this case. Others were addressed to me.

There were some transcripts that were submitted as well. Some were trial transcripts and others were transcripts of recordings.

There was the Government's sentencing memorandum

of October 19th of 2016.

The defendant's reply sentencing memorandum.

There were additional exhibits that were attached consisting of additional letters, again, from family members, friends, community people. It seems to me that a couple of letters had been repeated -- letters from the same individuals were put in twice, but that is neither here nor there.

There was a second addendum to the revised presentence report addressing arguments made by the parties in their sentencing briefs. And with respect to the defendant's arguments that really were geared towards the issues discussed or resolved by the Fatico hearing, the probation deferred to the Court. An argument has been made repeatedly by the defendant that because the Court in sentencing Anthony Preza, did not use any evidence of, either uncharged or unconvicted offenses in sentencing him, that it should not be used -- that the defendant should -- the Court -- this Court should not use that type of evidence in sentencing Mr. Persico to avoid this treatment.

The Court agrees with Probation that, first of all, there is no information that Preza, P-R-E-Z-A, engaged in similar conduct as was alleged against Mr. Persico. He was not similarly situated. The Government argued that as well.

And then Probation, essentially, agrees with the Government that there is no exceptional family circumstance that applies here warranting a downward departure or a downward variance at sentence.

There is the defendant's May 9th submission, which in essence is yet another mini briefing with respect to the Fatico issue, again, attacking the witness, the one who testified at the hearing.

There are exhibits. Exhibit 6 contains more letters from, again, more family members, business associates, community people in support.

Exhibit 7 appears to be an FBI interview report, which really has no identifying information. It is one page. It has a highlight. I do not particularly care for that. If you want to submit something, submit it clean. Request was made by Defendant to file under seal. However, apparently, the person who was the source of this information that is alleged to be contained in this report openly testified at two trials. So there is no need to file that under seal; and in any event, it was discussed in an unsealed portion of Defendant's submission of the Government's submission.

With respect to the contents of the May 9th letter, that has all been addressed in the Court's Fatico opinion.

And the Government's letter of May 31st letter is a response to that submission by the defendant clarifying the circumstances under which that Exhibit 7 statement was made.

There was a pretrial supervision status conference. I require that in all of my sentencing matters. The initial report was filed on January 18th of 2017 indicating that Mr. Persico has been compliant with all of the conditions of supervision. And the Court did receive on two dates, on February 20th, 2017 and on June 22, 2017, an email from Probation -- or excuse me, from Pretrial Services saying there is nothing to add to the status conference from Michael Persico. So that is the extent of those emails.

And that is everything that I have.

Is that everything that I should have? I have reviewed the docket and I did not see anything else.

MR. LIFSHITZ: I believe it is, Your Honor.

THE COURT: Mr. Sercarz?

MR. SERCARZ: We're in agreement, Your Honor.

MR. DORRA: Judge?

THE COURT: Yes, sir.

MR. DORRA: I may have -- there wasn't the first addendum to the revised PSR.

THE COURT: Did I not mention that?

MR. DORRA: It was dated August 9th, and that just

updated the PSR regarding the defendant's tax filing history.

THE COURT: I do not have that.

Did you all receive that?

MR. LIFSHITZ: Your Honor --

THE COURT: It should be on the docket.

MR. LIFSHITZ: Your Honor, we did. I believe it was dated August 9th of 2016.

I'm happy to hand up a copy if the Court doesn't have it.

THE COURT: Oh, you know what? I may have misspoken. Just on one second. Bear with me for just one second.

Yes. There was an addendum -- thank you. There was an addendum to the revised presentence report which was dated August 10th which contained information about Mr. Persico's IRS tax filing history, explaining why there was a discrepancy between IRS information and so on.

And then there was a second addendum to the revised presentence report that was filed on October 26th of 2016. That one discusses, again, the sentencing submission by the parties.

The only edit, if you will, that I have in connection with the second addendum is in the first section relating to objections by the Government. The second

paragraph, four lines down from the top of that second paragraph, and the sentence reads: The Court had previously directed the Probation Department to revise the PSR by removing information about the defendant's historical criminal conduct within the Colombo family apart from the Scopo murder conspiracy.

That is not quite accurate. It was only a removal about some of the defendant's historical criminal conduct. So the word "some" should be inserted in there because not all of it was removed. There were just certain specific incidents that were described that were omitted because the Government did not pursue to prove that at the Fatico hearing.

MR. LIFSHITZ: Your Honor, one more thing.

THE COURT: Yes.

MR. LIFSHITZ: Since I -- I just looked in my PSR file. There were also sentencing recommendations issued Probation that the parties received. I think they're relevant.

THE COURT: Yes. They are attached to presentence report. There was a second revised, second recommendation attached to the revised presentence report. And there were two prior sentence recommendations relating to the original presentence report that had been provided.

MR. SERCARZ: Your Honor, the defense is in

possession of all of those documents.

THE COURT: All of those. Okay. So thank you for making that notation.

And the Government has those as well, correct?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: So, Mr. Persico, I know I have mentioned an awful lot of documents here. Have you had an opportunity to review all of these with your attorneys?

THE DEFENDANT: Yes.

THE COURT: And do you understand and are you familiar with the objections that have been raised on your behalf by your attorneys?

THE DEFENDANT: Yes.

THE COURT: Asides from those objections that they raised, is there anything in the revised presentence report as it stands now that you think is incorrect, anything about personal history or anything like that that you think needs to be corrected?

THE DEFENDANT: I'm good with that.

THE COURT: Okay.

Now, notably -- well, with respect to the -- let's first address any objections to the revised presentence report. Does the Government have any objections to the revised presentence report?

MR. LIFSHITZ: No, Your Honor.

THE COURT: Mr. Sercarz, from the defense's view?

MR. SERCARZ: None beyond any previously stated.

THE COURT: Okay.

And obviously the Court by its ruling on the Fatico issue, that means that the conduct that is described therein pertaining to the activities that were the subject of the Fatico hearing remain included in the presentence report.

Anything that the Government wishes to state about that?

MR. LIFSHITZ: No, Your Honor.

THE COURT: Mr. Sercarz?

MR. SERCARZ: No, not on that schooling, Your Honor.

THE COURT: Okay.

Everyone has been in agreement, I think, from the beginning. There was the original presentence report that the sentence guideline range is calculated by Probation, and which has remained the same both in the original presentence report and the revised presentence report was correctly calculated, and in fact is consistent with the guideline range that was estimated in the plea agreement that was entered into by the parties. Although, obviously, the Court has independently calculate the guideline range, and neither Probation nor the Court are bound by the plea agreement.

But that sentence guideline range is calculated based on a total offense level of 21, a Criminal History Category of 1, and that results in a sentence guideline range of 37 to 46 months.

Is the Government in agreement that that is the appropriate guideline range here?

MR. LIFSHITZ: Yes, Your Honor.

THE COURT: Mr. Sercarz, the defense --

MR. SERCARZ: We're in agreement, Your Honor.

THE COURT: Okay.

All right. So that being said, as I mentioned, the submissions have been quite extensive in this case. I will give the parties an opportunity to address the Court if there is anything besides what is in your sentencing submissions that you would like to add for the record.

Mr. Lifshitz, is there anything that you would like to state for the record?

MR. LIFSHITZ: Your Honor, I'm generally content to rely on the written records. I think the letter we submitted on October 19th of 2016 is the most recent and complete statement of our position. As to sentencing, it precedes the Court's recent opinion, but it advocates for finding the Court made. So we're asking for a sentence in the guidelines range which the Court just articulated. A fine in the guidelines range is also appropriate.

At this time, I don't -- I don't think I have anything to add, unless the defense says something I may ask permission to respond.

THE COURT: Of course.

And just so that we are clear for the record, the fine range is: There is a maximum fine of $250,000, and the guideline range on the fine is 7,500 to 75,000.

MR. LIFSHITZ: The Government agrees.

THE COURT: Mr. Sercarz?

MR. SERCARZ: We're in agreement as to the fine range, Your Honor. And needless to say, there are some comments that I wish to make when the Court's ready to hear them.

THE COURT: Yes.

MR. SERCARZ: Now is the time?

THE COURT: Yes, sir.

MR. SERCARZ: Your Honor, do you want me here or would you like me at the podium?

THE COURT: If you would remain seated and speaking into the microphone, then all of us can hear you, including all the people all the way in the back.

MR. SERCARZ: Your Honor, the Court has gone to great lengths to talk about the amount of ink that has been spilled in litigating this case, and I am going to make it my mission not to repeat any of the arguments already made.

The Court has made its Fatico findings, and I am not going to seek to relitigate them. But I am concerned about the remaining issue of how the Court is going to consider this uncharged, or more appropriately, the conduct to which the defendant did not plea, and what it is that the Court gains as an impression of my client as a result.

In that regard I want to tell the Court in all candor that my abiding regret is that before that hearing ended, I didn't grab Ms. Kedia and suggest to her that she offer into evidence at the Fatico hearing the letters that this Court has read on my client's behalf.

THE COURT: And that would not have been appropriate, sir. The Fatico hearing was limited to certain issues. You have submitted the letters. I have read each and every last one of them. There must be close to 200 letters there --

MR. SERCARZ: Here's --

THE COURT: -- if not more.

MR. SERCARZ: Your Honor, here's what I want to say --

THE COURT: And I would have rejected them at that time.

MR. SERCARZ: I'm sorry.

THE COURT: That would not have been appropriate. So it is a good thing you did not.

MR. SERCARZ: Here's what I want to say at this point about those letters because they paint a picture of my client, a consistent picture which is at odds with the portrayal that was offered on the witness stand. I am not relitigating the Fatico issue, but I respectfully submit to the Court that when the Court is in possession of extraordinary letters such as this, a volume of letters such as this, letters that speak consistently to the defendant's exemplary character such as this that they're worthy of greet consideration if not on the Fatico issues, than in consideration of what an appropriate sentence would be and how the Court would appropriately make use of the information that it obtained from the Fatico hearing. These letters speak volumes about the defendant's ability to comport his life to the requirements of law enforcement, his love and engagement with his family, and the many good deeds that he has offered to the members of his community both in Brooklyn and in Saugerties, New York.

With regard to presentence report, we are in agreement with the findings in the report and if guidelines calculation. But this is one perspective that I do not feel has received adequate attention, Your Honor, and that is what I would like to talk about just for the few minutes that I intend to spend with the Court. The report is extensive and it goes into the facts underlying my client's

offenses and personal history and circumstances. But I did note the following, and I don't mean just to jump on a couple of words in the report, but for the sake of making a point, I hope that the Court bears with me. The report at -- I believe it's Paragraph 82 indicates that the defendant reported an unremarkable childhood, and I was struck by that word. In a subsequent pleading, similar language was used. I believe the words were that the defendant -- this is in the U.S. Probation Department's second revised sentence recommendation. That the defendant came from an impact home. And all due respect, that's not the full story, Your Honor.

It's undisputed in this case that my client grew up with a father who has been convicted of being a boss of the Colombo crime family, and is doing 139-year sentence of imprisonment. By my calculation according to what is contained in the report, Mr. Persico was at home with his son for four years, only four years after my client reached the age of 16. My client's brother, Alphonse Persico, Jr., is serving a life sentence in a Pennsylvania penitentiary for his involvement in the Colombo crime family. My client's brother, Lawrence Persico, has served stretches of imprisonment. He has been diagnosed as bi-polar. And with all due respect to the author of the presentence report, my client did not have an unremarkable childhood in an impact

family.

And the point that I want to make is best made by contrasting these circumstances with the circumstances of my client's four children: Michael Persico, age either 33 or 34, gainfully employed in an auto parts business; my client's daughter, Carmen Persico, age 32, third grade teacher in the New York City Department of Education; my client's daughter, Joyce Ann Persico, age 24, student at St. John's University, a junior, who's currently taking a period off to work as a paraprofessional in the New York Public School System; my client's daughter, Patricia Persico, age 22, student at Kingsborough Community College, a sophomore. Four children gainfully employed, making their way through life. And if anyone asks the question why or to what they can attribute the success of these children in life, it's absolutely clear from the letters that they wrote on behalf of their father, and the Court has said it's read them. I'm not going to belabor the issue. But a couple of sentences from each one, Your Honor, just to make this point if you will indulge me.

THE COURT: I have read them. Not only did I read them, you practically rewrote them in your written submission.

MR. SERCARZ: Your Honor, the point then has been made. How did it happen? My client was present. He was

present for their children. He was present in this hard times. The letters indicate that he taught them, their words, not to wear a grudge; to deal with life with a sense of equanimity; never to show their temper; always to try and look on the bright side.

My client was there for his children. For the five years that we have been litigating this case, he has gone about the business of conforming his life to the scriptures of the law, taking care of his children, and acting as an ethical businessman in the community. And my client's legacy is that the linkage between the Colombo crime family and the --

THE COURT: If he is such an ethical businessman, then what were the concerns with him providing a personal financial statement to Probation and a business financial statement? He has got a number of businesses. The letters support the fact that he is partners with a number of different people. Some businesses he sold. He sold a deli. He sold a pizzeria. He has got rental property, and essentially asserting the Fifth Amendment has decided not to submit a complete financial picture.

MR. FERNICH: Judge, if I may, I'll address that issue.

THE COURT: If you could remain seated and speak into the microphone. None of them will hear a word if you

do not do that. There is a reason why I have you do that.

MR. FERNICH: Judge, I'll address that, if I may. Because Mr. Persico invoked the Fifth Amendment on my advice as he's legally entitled to do. So if Your Honor --

THE COURT: I am not contesting that he is not legally entitled do that. But he was requested to provide it. It is an important piece of the presentence report because it does assist the Court in making determinations about fines and so on. This would be restitution case, but my understand is that the victims did not suffer loss, so there is no restitution. But had there been a loss, all of that is relevant for the Court's consideration. And considering that there was an initial disparity as to what the IRS records show and what his records show, I think it is an appropriate concern of the Court.

MR. FERNICH: Your Honor, it may well be an appropriate concern of the Court, and I will address the law on that if it becomes relevant later in the proceeding.

But I would point out to the Court that it's my understanding from the lengthy history of this case that the putative discrepancy the Court is referring to was some sort of the Governmental glitch.

Mr. Persico provided ten full years of tax returns that is more extensive and more forthcoming than what the President of the United States has currently provided.

THE COURT: Excuse me. You provided --

MR FERNICH: So there's nothing --

THE COURT: From 2012 to 2015 was what he provided to Probation.

MR. FERNICH: Sorry. Five -- five --

THE COURT: And the president is not on trial in this courtroom nor is he subject to sentencing right now.

MR. FERNICH: Judge, we're not going to relitigate and belabor the papers, but there's been an extensive history, part of which was elicited at the Fatico hearing, about an ongoing antagonistic relationship between the Persico family and the United States Government. I don't reasonably think that's a matter subject to dispute.

There are any number of inferences, fair or unfair, that could be drawn from even the most robust and fully scrupulously accurate financial disclosure form in this case. Given the nature of the inferences and the tendency of the United States Government to draw the worst inferences that could possibly be drawn from anything that Mr. Persico would write on that form given that it would be under oath, even an accidental mistake could turn around and redound to Mr. Persico's detriment in a future criminal proceeding, be it for false statement, be it for perjury, be it for any number of things. So there's clearly under ***Hoffman*** and his progeny, a legitimate basis for the

assertion of the Fifth Amendment Privilege.

The Court has his tax returns before him that, again, are robust and extensive. And I recognize the Court's concern. We stipulated at the outset that Mr. Persico could pay whatever the Court was inclined to impose. There's a tension in the law between Rule 32 and what it requests and the Fifth Amendment right to refrain from incriminating oneself in the sentencing proceeding -- in the sentencing context I should say. I'm not responsible for that tension. I just have to navigate it in the best way possible for my client.

The constitutional prerogative has to trump Rule 32. And there is extensive case law which we've referred previously to the Court about drawing negative inferences or penalizing the defendant at sentencing to the assertion of his Fifth Amendment rights. And that case law applies both in the 3553 context and in the context of selecting an appropriate sentence within the guideline range that the Court determines to be applicable.

THE COURT: You may have briefed that with another judge but not here because the issue was not raised here.

MR. FERNICH: Well, if it's going to be raised, I would like the opportunity to be --

THE COURT: I have heard enough briefing from all of you.

MR. FERNICH: Then I will cite for the record the DC Circuit case from 2011 of ***U.S. versus Sani***, S-A-N-I, that holds it is constitutionally suspect -- suspect, it's not a clear holding -- to use the assertion of the Fifth Amendment privilege in a way that enhances the sentence under 3553.

I would cite the case of --

THE COURT: I do not need to rely on the tax returns for any aspect of sentencing here, so let's be clear about that.

MR. FERNICH: Well, Your Honor, respectfully, you did question Mr. Sercarz as to if Mr. Persico was such an outstanding businessman, why he was loathed to make --

THE COURT: I thought that was --

MR. FERNICH: -- a disclosure --

THE COURT: -- a fair question.

MR FERNICH: -- that Your Honor would be --

THE COURT: I thought that was a fair question --

MR. FERNICH: And I'm giving you --

THE COURT: -- in response to his argument.

MR. FERNICH: -- essentially what I think is a fair response.

THE COURT: And in the response to his argument.

MR. FERNICH: It may or may not be a fair question. Certainly if you used -- Your Honor used the word

"concern," and I knowledge that it's a fair concern.

Whether it is a fair consideration on which Your Honor could draw any kind of adverse inference in sentencing or use it in any way to guide the determination --

THE COURT: I do not need to rely --

MR FERNICH: -- of sentence implicitly --

THE COURT: Excuse me. Enough.

MR FERNICH: -- or explicitly --

THE COURT: Excuse me. That is enough.

MR. FERNICH: Well, Your Honor --

THE COURT: That is enough.

MR FERNICH: Okay.

THE COURT: I have heard enough. When I am talking, you do not talk. I have heard enough.

Let me make it abundantly clear: I do not need to rely on anything relating to his tax returns in fashioning an appropriate sentence here, nor do I intend to rely on anything concerning his tax returns in fashioning the sentence here.

MR. FERNICH: I understand the Court's point, and of course, I -- I accept it. I would just say for the purposes of the record that the record will speak for itself and the matter was already -- already been raised in a way --

THE COURT: Enough of this.

MR FERNICH: -- that --

THE COURT: I want to stop you right there.

MR FERNICH: Yes.

THE COURT: Because one of the things that judges do --

MR. FERNICH: Uh-huh.

THE COURT: -- in -- for example, in deciding a hearing, issues at a hearing, a suppression hearing, lawyers may try to introduce evidence that is not necessarily admissible. The Court hears argument. This is what judges do. Judges consider what is appropriate evidence and what is not. We set aside what is not appropriate and we considering what is appropriate. And I take a fair amount of umbrage, sir, that you might be implying that I cannot do that.

So I have heard enough argument on this. I think the record is clear that I have said that I do not intend to rely on any information concerning his tax returns, reliance on the Fifth Amendment, or even his initial failure to comply with Probations request in fashioning a sentence here.

Mr. Sercarz, you may continue.

MR. SERCARZ: Thank you, Your Honor. I'm near the end. The Court will be happy to know. I just want to

attempt to tweak the 3553 factors, and I will be done, Your Honor.

With regard to Section 3553A(2)(c), the need to protect the public from further crimes by the defendant, I would urge the Court, once again, to consider the portrayal of my client in these letters. I would urge the Court to consider what you have heard from Pretrial Services over this five year period about the ability of my client to conform his behavior to the requirements of law with only minimal supervision requirement.

And it may be worthy of note to recall that the defendant was originally detained in this case on grounds of dangerousness, and as I understand it, had to litigate aggressively in order to win his release about three months after he was first locked up. And ever since then, he has -- he has maintained a record of compliance, and indeed, after only a few months the monitoring restrictions were relaxed after observing the way that this defendant conducted himself.

With regard to the kinds of sentences available, and I am speaking now to 3553(a)(3), I would ask the Court not to lose sight of to defendant's age. He is 60 years old. This defendant, I would respectfully submit, he's a very good candidate for a short period of incarceration, shorter than the guidelines call for under circumstances

such as this with monitoring and -- and supervised release conditions, which will provide the Court with all needed reassurance regarding the defendant's behavior once he is released.

I also submit, Your Honor, that a short sentence of imprisonment, and I'm talking about a six-month sentence to be followed by terms of supervised release, would have the benefit of allowing the defendant to remain close to his family members. And, Your Honor, you have read the -- the poignant letters from family members who are relying on Michael Persico for their continued guidance and welfare. The Court can impose such a sentence and at one in the same time reflect the seriousness of the offense charged and its findings regarding the unconvicted conduct before an adequate deterrence, both general deterrence and specific deterrence.

The message will emanate from this courtroom that remaining too close to members of organized crime will not be tolerated. Conduct that furthers the goals of organized crime will not be tolerated in these Courts. And yet, the Court is capable of recognizing the legacy of this defendant, the role he has played in the lives of his children, his efforts to conform his conduct to law, his rehabilitation during the period between the time that these crimes occurred and the present.

And, Your Honor, one footnote here, and I would note with regard to the findings that the Court made regarding the conduct to which the defendant did not plead guilty. All of these acts took place in the 1990s with the exception of what is described as the valet parking extortion, which frankly, with hindsight seems like it even, according to the testimony of Mr. Russo, was not an extortion at all. And I'm not relitigating the facts, Your Honor. I would urge upon the Court that kind of the sentence.

And I have one other thing to propose to the Court before I'm finished. I was approached by a gentleman. He's here. He would like to address the Court briefly on behalf of the broader community --

THE COURT: Denied.

MR. SERCARZ: Understood, Your Honor.

THE COURT: Does the Government wish to respond at all?

MR. LIFSHITZ: I do, Your Honor. Thank you. I'll try to be brief, as well.

As I said our position is stated fully in the sentencing letter we filed last October. I would like to just respond to the theme presented by defense counsel that the defense submissions paint a picture that the defendant that's inconsistent with the evidence the Court has heard,

as well as the defendant's guilty plea in this case.

There are people in this community who are able to maintain some sort of double-life, and I am sure the Court has sentenced people who have operated a legitimate business or have been successful in raising their family while at the same time committing very serious crimes. I agree, the Court should consider all aspects of his life. But since the defense highlighted some of what they believe is positive. I would just like to very briefly highlight a few things on the other side.

First of all, the record is so big in this case I don't want to lose sight of the crime of conviction, conspiracy to extend a loan sharking loan. That's a very serious crime. It's a staple of organized crime. When it's done consistently, it inevitably leads to violence, as was proven at the Fatico hearing. That's how crime families perpetuate themselves and that's why they exist. To the extent the defense suggests that it was somehow an aberration in the context of an otherwise law-abiding life, that's been proven not to be true.

It's now clear after the Fatico hearing that the loan sharking loan was made in the context of a long participation in racketeering with the Colombo family. That included violence, which included ordering the murder of Joseph Scopo, the ultimate crime. The defendant can't blame

his father for that. He can't blame the Government for pursuing him when he's committed a crime of that magnitude.

The context also includes what he was doing in 2009 and 2010. That's when he committed the crime he pled guilty to. It's also when he committed the extortion of Anthony Russo relating to the valet business, and that was clearly an extortion. Anthony Russo was a -- was a -- and Anthony Strapoli, another soldier in the crime family refrained from opening a business because they were afraid of Michael Persico. That's how he was acting in the community right before he was arrested. And that should matter a lot more than how he's behaved since his arrest. It's no feat to refrain from committing crimes when he's under the scrutiny of Pretrial Services and the Court.

For all of these reasons, the requested sentence, a sentence below the guidelines range would not be sufficient, and a sentence within the guidelines range is necessary to satisfy all of the purposes of Section 3553(a).

MR. FERNICH: Judge, if I may, I would just like to complete the record on what I said about the glitch, because it has been such a long time and I forgot what happened, and I am reminded with regard to tax returns --

THE COURT: That subject is dead.

MR. FERNICH: Right. But --

THE COURT: No, not right. That means that you

stop talking about it.

You know, your entire team subscribes to that style of litigation where you think that by continuing to repeat the same arguments over and over and over again, and once a judge has said that they have had enough, you continue to re -- to argue your same position. You think that somehow you are unmeritorious arguments are going to become meritorious or that somehow you are going succeed, sir.

I can tell you that that is not a successful way of litigating. We get it the first time around. And I have already said it is over. It is not relevant any longer.

MR. FERNICH: Well, with respect to --

THE COURT: No. I have said --

MR. FERNICH: -- settling an argument --

THE COURT: Enough. Enough.

MR. FERNICH: I'm going to objection to the way the sentencing proceeding is being conducted. I think that --

THE COURT: You can. So noted.

MR. FERNICH: I think that the sentencing proceeding is deny Mr. Persico his right to due process at sentencing, and I don't think the Court --

THE COURT: Mr. Fernich --

MR. FERNICH: -- is giving Mr. Persico an ample

opportunity --

THE COURT: Mr. Fernich, you know what --

MR FERNICH: -- to make a record in accordance with the scriptures of due process.

THE COURT: You know what, Mr. Fernich? I have accepted all of the filings that have been made, which were quite extensive. I have --

MR. FERNICH: Just doing our job, Your Honor.

THE COURT: Excuse me -- and I am doing mine.

MR. FERNICH: I appreciate that.

THE COURT: And I am doing mine.

MR. FERNICH: This is the job of a defense attorney.

THE COURT: Excuse me, sir. I know full well what the job of a defense attorney is, and I do think that it is one of the most important protections that our constitution guarantees to people.

MR. FERNICH: And that's what we're trying to do here.

THE COURT: And I really wish that you would desist already, because I tell you now that you want to persist in discussing something that is not an issue at this point, and I have said that I have heard enough. I have given everybody their opportunity to be heard. I have yet to give Mr. Persico his opportunity to be heard, and he will

be given his opportunity to be heard as is his right to do so. It is also my prerogative to tell attorneys when they have overstepped, when it is time for them to stop arguing, and when the Court has heard enough to enable it to make whatever decision it has to make.

The record will speak for itself, sir.

I do have a question for you, Mr. Sercarz. Since you have addressed generally the sentencing factors here. There was a great deal of space devoted to discussing what I can only characterize as what the defense believes to be a paucity of evidence in connection with the -- or perhaps maybe quantity is not the right word -- perhaps weaknesses in the Government's case in connection with the crime of conviction here, the crime to which Mr. Persico pled, the trucking business loan.

MR. SERCARZ: Yes, Your Honor.

THE COURT: Okay?

And that and in the scheme of the history of this case, given that he seems by those arguments to be in some way denying his responsibility for the crime to which he has pled guilty. And I am wondering whether or not, in fact, he should be entitled to the three points of responsibility, the reduction of three points of responsibility.

MR. SERCARZ: Your Honor --

THE COURT: Because in essence he said, Well, I am

pleading guilty. But you know what? It really was not extortion, and it really was not a loan. And I really did not give the money. The money came from somebody else.

MR. SERCARZ: May I have a moment to consult with my colleague, Your Honor.

THE COURT: Absolutely.

MR. LIFSHITZ: Your Honor, I would just note that the acceptance reduction here is only 2 points because he pled during jury selection.

THE COURT: I am sorry, two points, yes.

(Pause in proceedings.)

MR. FERNICH: Judge, in drafting the breach motion, we were careful not to deny --

THE COURT: I am not talking about the breach motion.

MR. FERNICH: Right.

THE COURT: The breach motion is over and done with.

MR. FERNICH: So this is the --

THE COURT: And I told you before I do not want to talk anymore about the breach --

MR. FERNICH: Excuse me.

THE COURT: -- of the pleading --

MR FERNICH: I misspoke.

THE COURT: -- or anything else.

MR FERNICH: I meant the plea withdrawal motion.

THE COURT: I am talking about the sentencing submission.

MR. FERNICH: No. The sentencing submissions reference the facts underpinning the crime without denying responsibility for them to address the 3553(a) factor of the nature and circumstances of the offense to point out that it was an atypical extortion in the context of what Mr. Lifshitz just referred to, and it's the staple mob-tried crimes of loan sharking, extortion, et cetera. So it's in no way an effort to deny responsibility for the conduct underlying the crime, but simply to point out that the nature of the crime categorically on the facts of this case is different from the garden variety loan shark and extortion crime, and that should bear on the 3553(a) factor of the nature and circumstances of the offense. As contrasted with a denial of responsibility for Mr. Persico's having engaged in the conduct underlying the offense. And it's my bad. I misspoke about breach. I meant to say plea withdrawal motion. We were careful to walk that line of saying that the allocution --

THE COURT: But I am not talking about that motion. I am --

MR. FERNICH: But then I will rest on my --

THE COURT: -- relying on --

MR FERNICH: -- my comments on --

THE COURT: Excuse me, sir --

MR FERNICH: -- 3553.

THE COURT: Why do you persist in talking over me. That is exceptionally rude and not protocol. I did not interrupt you, sir.

Are you done?

MR. FERNICH: Yes.

THE COURT: I am relying on the sentencing submission, the discussions that were contained in the opening brief, the opening sentencing brief, and the exhibits, the transcripts relating to that effect. That is what I was referring to.

MR. FERNICH: To reiterate, Mr. Persico fully accepts responsibility for the conduct underlying the offense and fully accepts the conduct to which he allocuted, again, the nature and circumstances of the offense itself as opposed to Mr. Persico's culpable for that conduct. His statutorily required for the Court to consider under 3553, and that was the nature -- the context in which the nature of the offense was discussed. Give the Court a full picture of the offense conduct in order to properly assess the 3553(a) factors.

THE COURT: Anything else that any of you would like to add?

MR. SERCARZ: No, thank you, Your Honor.

THE COURT: From the Government, anything that you would like to add?

MR. LIFSHITZ: No, thank you, Your Honor.

THE COURT: Mr. Persico, like I told you earlier, you have the right to address the Court if you wish. If you would like to do that, you may do that now, sir.

Would you like to make a statement?

THE DEFENDANT: Could I have a second?

THE COURT: Of course.

(Pause in proceedings.)

THE DEFENDANT: No, thank you, Your Honor.

THE COURT: So, Mr. Persico, as you can see just from the history of the cases everything that has gone into the sentencing from the very beginning, sentencing by the Court is a very complicated process. It is not a simple process.

The Court has an obligation to consider many things. As I explained earlier, we start with the sentencing guidelines, but they are not mandatory. They are advisory only. They are guidelines. They are exactly that, a guide but not the end point. So the Court has to give them due consideration to start with. But the Court does have to consider other things, including whether there are departures that are appropriate within that system, either

below the guidelines or above the guidelines. And of course the Court has to consider what has been discussed in the last few minutes here, the 3553(a) factors.

And very simply, so that the folks in the audience will understand, what the 3553(a) factors are, very simply, Congress made a determination that there were certain goals that should be accomplished whenever a federal judge imposes a sentence. And they put those goals into a statute in Title 18 of the United States Code, Section 3553(a). And it is those goals that we call the 3553(a) factors.

Now, the statute does start with what is called a parsimony clause that says that whatever sentence a Court imposes should not be greater than necessary to achieve those goals of sentencing that are listed in that statute. Not all of the goals necessarily apply in every case. In particular, here the Court has considered the nature and circumstances of the offense, and I am talking about the offense of conviction. The Court has considered the history and characteristics of the defendant before the Court, Mr. Persico.

The sentence should reflect the seriousness of the offense. It should promote respect for the law. The sentence should provide just punishment for the offense. The sentence should afford adequate deterrence to criminal conduct generally and to society as a whole. It should also

protect the public from any further crime of the defendant. It should provide the defendant with any needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, and to provide restitution for victims of the offense.

This normally would be an offense that would require restitution made to victims if there were losses to the victims, that's the loss. However my understanding, and I think the Government confirmed that earlier, there were no losses to any victims here, so restitution will not play a party in the sentence here today.

Any judge of this court -- any judge of any court, will tell you, and I tell you, that sentencing is the hardest part of our job. I guarantee you I loss sleep every time I have to sentence somebody. And that is because I am not sentencing a piece of paper, a case, a docket number, but a living, breathing human being. I take it very seriously.

If I am hard on the lawyers, it is because I expect them -- expect much from them, because the more information they gave me, the better information they give me, the more informed my decision can be. And I do hope that they do not take offense if I am hard on them, because as Mr. Fernich said, it is their job to make sure that I have the information that I need to make the best decision

possible under all the circumstances.

The offense that you pled guilty to is, indeed, a serious one. Perhaps it is not, as Mr. Fernich explained and as is discussed in the defense sentencing memorandum, completely typical of the way extortionate extensions of credit are handled in the types of cases that, certainly, I have handled myself and that have come through the court, and as described by the Government today and in its paper. It does not, in my view, make it a benign crime, a word that was used in the defense papers to describe the offense.

It is still a serious crime. It was clear from the Fatico hearing that Mr. Persico grew up and was involved in this kind of extortion, extensions of credit for a sustained period of time, a factor that is relevant to the Court in fashioning a sentence here. And while much of what was the subject of the Fatico hearing occurred in the '90s, the offense conduct here occurred more or less about seven or eight years ago, during which time he was being a single dad to his two youngest daughters, engaging in his various businesses as described by the many letters that were submitted on his behalf, being a good friend and being a good neighbor.

And in many of those cases, ultimately there was a resort to violence when people did not pay. And you were responsible for that. And all of this is part of the

racketeering enterprise. The Scopo murder was part of protecting your family and your family's role in the Colombo crime family. That is what that was about, and I am sure Mr. Scopo had a family of his own.

Did he have children?

MR. LIFSHITZ: Yes, he did.

THE COURT: So those children grew up without a father. There was a wife without a husband. I do not know what his extended family was.

And there was involvement in the other offenses that were the subject of the Fatico hearing, the stolen video games and so on. I have seen it often enough. As the Government says, that all too often people present two sides. It is like Dr. Jekyll and Mr. Hyde. The family and friends see one side, but there is the other side that engages in criminal conduct that the family cannot each fathom. It is unbelievable to them.

I have no reason to doubt the utter sincerity of to letters that have been written to the Court, especially the family letters. I have no doubt Mr. Persico may have been a wonderful dad. The success of his children certainly are a testament to that. Caring for his wife while she was suffering with cancer. And then being a single dad to his two youngest daughters because the other ones, I think, were much older then, but then finishing the process of raising

the rest of the children on his own.

It is not clear to me to what extent he cares for his mother who is about 80 years old. Given that the letters seem to indicate that he is all over the place participating, helping people out establishing their businesses; making sure his daughters are driven to school or to work; helping people out in their time of need, whenever that may be. One thing is apparent, that with a busy schedule like that, with so many properties to look after and to be involved in, that certainly he is not with his mother 24/7 caring for her. So somebody must be caring for her. And there is nothing in the writings that indicate that she is that infirmed that she requires people do absolutely everything for her. In this court we have a number of judges who are over 90 and many more who are over 80 that come to work every day and they perform their duties. Age alone does not mean that a person cannot at least help themselves in some way. And I am not saying that she is not in need of assistance.

His daughters are grown. He has got grown children, adult children in their thirties. He has got two sisters. He has got other family members who can help with the care of his mom. And one thing is very apparent, I agree with you Mr. Sercarz, that the letters do show that this is a very -- it is a large family. It is a closely

knit family. And then there is the grander definition of family, the family that you grow from the community from your friendships.

There were letters from people who have been close to Mr. Persico for 30, 40 years. Some went to grammar school with him. Their children played together, have grown up together. And then there is the community in which he lives and works that attest to his philanthropy. And what I have to say to them is if you are indeed grateful to the good deeds that Mr. Persico has done, according to what you have attested to this Court, then it is time for you to step up to the plate for him. There are others who can be there to help with family. This is not a situation where family circumstances crying out for a nonjail sentence.

The guidelines here are 37 to 46 months. The statutory maximum is five years or 60 months. As to the uncharged or unconvicted crimes, as I said, not only do they show a pattern of continuing the same type of offense conduct as the offense of conviction, but the fact that to preserve the family's racketeering enterprise, which in a large part did rely on this loan sharking, that he would authorize a murder and facilitate a murder, in my view, in weighing the good deeds with all of that, that offense conduct outweighs the good deed. What value do you put on a human life?

The sentence of the Court is that Mr. Persico will serve 60 months in custody of the attorney general followed by three years of supervised release.

I understand, Mr. Sercarz, that he has complied with the forfeiture agreement in the forfeiture order and has paid already the $325,000 that was --

MR. SERCARZ: Yes, Your Honor.

THE COURT: Okay.

As I said, there is no restitution. A fine is imposed of $250,000 payable -- it is due immediately and payable at the rate of $25 per quarter while in custody and 10 percent of the gross monthly income while under supervised release.

As special conditions of supervised release, the Court imposes the following: No possession of any firearm ammunition or destructive device.

You must hold verifiable full-time employment.

You must cooperate with the Department of Probation in the investigation and approval of any position of self-employment, including any independent, entrepreneurial or freelance employment or business activity. If approved for self-employment, you must provide the Department of Probation with full disclosure of your self-employment and other business records, including but not limited to, all of the records identified in the

probation Form 48-F, which is a request for self-employment records, or as otherwise requested by the Probation Department.

Also, upon request by the Department of Probation, you must provide full disclosure of all your financial records, including any commingled income, expenses, assets and liabilities, to include yearly income tax returns with the exception of the financial accounts that have been reported and noted within the presentence report.

You are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial account for other personal or business purposes without the knowledge and approval of the U.S. Probation Department. You must cooperate with the probation department in the investigation of your financial dealings, and provide truthful monthly statements of your income and expenses. You must cooperate in the signing of any necessary authorization to release information forms permitting the Probation Department to access your financial information and records.

You must refrain from contacting any of the victims of the instance offense. And orders of protection are issued for the victims.

There is an association prohibition; in other words, you must not associate any person through the mail,

electronic mail, or telephone with any individual within an affiliation to any organized crime groups, gangs, or any other criminal enterprise. Nor shall you frequent any establishment or other locale where these groups may meet pursuant, but not limited to a prohibition list provided by the Probation Department.

I know that during the pendency of this case, there has been a prohibition from him speaking to his father and Alphonse, I believe?

MR. SERCARZ: Yes, Your Honor.

THE COURT: And I think that that has been lifted?

MR. LIFSHITZ: I think that's right, as noted in the pretrial report issued in January of this year. It listed some relatives who he was given permission to contact as a carveout.

THE COURT: Is there any objection to continuing that carveout?

MR. LIFSHITZ: No objection to that carveout.

THE COURT: Okay. So that carveout is continued. And I think I did see that somewhere in the presentence report.

If you have any questions about that, you need to check with your probation officer about that. Any questions about any of this, you need to clarify with your probation officer.

Do you understand that, sir?

THE DEFENDANT: I do.

THE COURT: All right. There was -- probation had recommended participation in an outpatient drug treatment; however, based on the prior DUI's that you had in your background, I do note that you had completed a program in connection with one of those incidents. And pretrial has not noted any need for any drug treatment or has made any recommendation for any. So I am not going to recommend any. Obviously, you need to make sure that -- to the extent that you have wine or something at dinner, that it is reasonable and that you do not drive intoxicated, obviously. If you commit a new crime, you are going to be in violation of your supervised release, and I do not think you want that, okay?

Also, Probation had recommended a search condition. However, I am not going to impose one because I do not see -- the Circuit has made it clear that conditions -- special conditions of supervised release must bear some relation to the offense of conviction, and I could not see a relationship between the search condition and the offense of conviction. So I am not going to impose a search condition here.

And I believe that there are open indictments in this case?

MR. LIFSHITZ: Yes, Your Honor. We would move to

dismiss the underlying indictments. He plead guilty to a one-count information. There are no open counts there. But he would dismiss -- we would move to dismiss the indictments that preceded it.

THE COURT: Okay. Those are dismissed.

You must also, as a special condition of your supervised release, comply with the fine order. And the condition of full financial disclosure has already been imposed, so I do not need to impose that, again, in connection with the fine.

I do not recall if there was a plea waiver in the plea agreement. It may have been found on the topic of the guideline range. Nonetheless, I do advise you, sir, that if you do -- you may be entitled to appeal from the sentence imposed by the Court. And if you do wish to do so, you must do so within 14 days of the final entry of judgment.

You may be entitled to be represented by counsel. If you cannot -- on your appeal if you cannot afford counsel, you may ask for the Court to appoint counsel for you at no cost to you. If you cannot afford the fees and the cost of the appeal, you may also ask for leave to proceed by way of poor person relief from the Court. I would ask counsel to remain on the case for that requisite 14-day period and file such a notice on behalf of your client, if that is what he wishes to do.

The other question is whether or not the Government has any objection to Mr. Persico voluntarily surrendering himself to the designated institution?

MR. LIFSHITZ: Your Honor, we don't object to a reasonable surrender date. I defer to the Court as to how long in the Court's experience the BOP needs to designate a facility, but we don't object to the principal.

THE COURT: There is also -- by the way, before I forget and before I address that, there is a special assessment of $100 that must be imposed.

The Bureau of Prisons says a normal matter can take anywhere from eight to ten weeks to make a designation. I am going to -- under the circumstances here, I am going to give Mr. Persico a few extra weeks so that he can celebrate his birthday with his family, and he shall self-surrender at 9:30 at the designated facility on October 20th, which is a Friday.

MR. SERCARZ: October 20th? I'm sorry.

THE COURT: October 20th of 2017.

MS. KEDIA: Judge, just with respect to the time, depending on the institution that he is designated to, could we make that time 2:00 p.m., because it may be that he's designated to New Jersey or Allenwood. It may take a few hours to drive there. So he doesn't have to go -- I typically hear 12:00 or 2:00, I believe.

THE COURT: He has to self-surrender before noon.
MR. LIFSHITZ: Before noon?
THE COURT: Yes.
MS. KEDIA: That's fine.
THE COURT: Yes. 12:00, 12:00 p.m.
MS. KEDIA: Okay. Thank you, Judge.
MR. SERCARZ: Your Honor, will the Court hear me on the subject of designation or recommendation?
THE COURT: Yes, please, any recommendation that you would like to make to me.
MR. SERCARZ: We would ask the Court to recommend that the defendant be housed at FCI Danbury.
THE COURT: Okay. I will make that recommendation with the understanding -- I am happy to make that recommendation for you, sir -- with the understanding that at the end of the day, ultimately, it is up to the Bureau of Prisons to make the designation. A lot of things go into consideration, including something as simple as the availability of space, not -- that being said, the Court has been informed by the Bureau of Prisons that it does try to comply with the recommendations that are made by the Court. So the Court will make that recommendation.
If that is not -- if that is not possible, is there any other close to the New York City area?
MR. SERCARZ: Closest available consistent with

the defendant's security rating, Your Honor.

THE COURT: Okay. Anything else? Anything from Probation?

MR. DORRA: No, Your Honor.

THE COURT: The Government?

MR. LIFSHITZ: No, Your Honor, thank you.

MR. FERNICH: Judge?

THE COURT: Yes.

MR. FERNICH: We do have an objection. I tried to get every one of the conditions that Your Honor imposed to supervised release conditions.

THE COURT: Yes.

MR. FERNICH: We have -- and the objection is the same one that Your Honor stated in declining to impose the search condition under 3583(d). We don't think the following conditions are reasonably related to the 3553 factors or reasonably necessary deprivations of liberty and property, and that's the same sort of parsimony provision that you find in 3553. And the condition that we object to are the reporting of self-employment, the business records, the financial records, the account preapproval requirement, the financial statement requirement -- and I'm trying to decode my own handwriting, something about an information release I caught. And --

THE COURT: The signing of any necessary

authorizations to release information form.

MR. FERNICH: Yes. In addition to those stated objections, we're relying on the ***Jenkins*** case, the recent ***Jenkins*** case from Judge Parker in the Second Circuit on that. And also I'm afraid that we're going to go down the same Fifth Amendment road with some of these conditions that we had during the litigation of this case, for the same reasons that I articulated earlier. I'm not -- not interesting in belaboring that, but those are the grounds on which we object. Principally for the same reason that Your Honor stated in declining to impose the search condition.

THE COURT: Given that the offense conduct is an extortionate extension of credit in connection with the businesses, given the testimony that I heard during the Fatico hearing about the same in connection with for example the valet parking extorsion, and there were various others extortionate extensions of credit, it is certainly relevant and pertinent to the offense conduct.

So your objection is noted for the record.

MR. FERNICH: Thank you.

THE COURT: Anything else?

MR. LIFSHITZ: Not from the Government.

THE COURT: All right. Thank you all very much.

MR. LIFSHITZ: Thank you.

MS. KEDIA: Judge, I apologize. One other recommendation we would request.

THE COURT: Yes.

MR. LIFSHITZ: If I may? For the Bureau of Prisons to consider maximum term of placement in community confinement facility or home detention pursuant to the Second Chance Act, this applies to the end of his release -- the end of the term of imprisonment. There's, as Your Honor I'm sure is well aware, there was a Second Change Act enacted by Congress.

THE COURT: I am very familiar with the Second Chance Act, yes.

MR. LIFSHITZ: And my understanding is that the Bureau of Prisons will make that decision, of course, on its own; but it does consider a recommendation from the Court as well.

THE COURT: I am not going to weigh in on that now. If they want me to weigh in on it at the relevant time, then I will.

MS. KEDIA: Very well.

(Matter concluded.)

--ooOoo--

*I (we) certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.*

*/s/ David R. Roy* — *24th Day of July, 2017*
*DAVID R. ROY* — *Date*

**United States of America v. Michael Persico, Docket No. 17-2701**
**Oral Argument Transcript on Motion for Bail Pending Appeal**
**October 17, 2017**

**Panel: Jon O. Newman, José A. Cabranes, C. JJ., Robert N. Chatigny, D.J.**

**MF: Marc Fernich, Esq., Attorney for Michael Persico**
**AL: Allon Lifshitz, Attorney for United States of America**
**JJN: Circuit Judge Jon O. Newman**
**JJC: Circuit Judge Jose A. Cabranes**

JJC: Good afternoon. We have a day calendar this afternoon in five cases. The clerk informs me that counsel are ready in all of them except the last one in which one counsel may not have surfaced. But we'll begin with the motions calendar, and we have two motions to be argued. The first is USA v. Persico.

MF: Good afternoon, Your Honors. May I proceed?

JJC: Please.

MF: Marc Fernich this afternoon for Michael Persico. Your Honors, the district court's bail denial rests on two key legal errors that drain any deference otherwise due. First, and most significant, the court vastly overstated Persico's burden by forcing him to establish the merits of his prospective appellate arguments by clear and convincing evidence and that standard, found nowhere in the Bail Reform Act, defies 30-year-old precedent of this court requiring only a close question that's more than non-frivolous and could very well go the other way, and that's from the *Randell* case that the Court is undoubtedly familiar with. And, if accepted, this standard minted by the district court would effectively condition bail on a district court's finding that its own judgment will likely be reversed on appeal, and that's exactly what *Randell* says the court, the district court, is not supposed to do. And that's precisely the showing the district court demanded here in making its second error, namely denying bail because Persico's arguments underwent two reviews by Judge Townes, and this is all in the four-page bail denial so I'm not embroidering or embellishing it here. Under the proper test, Your

Honors, Mr. Persico raises three fairly debatable issues, debatable issues, warranting continued release. First, the government breached the plea agreement to a straight forward extortionate credit transaction by insisting it could prove by preponderant evidence Persico's participation in murder, a tail wagging the dog if ever there was one. And that's the language Judge Newman that you used all those years ago in the concurrence that you wrote in *Concepcion*, which is all that we had to rail against the use of unconvicted conduct at sentencing for some time.

JJN: But the issue there wasn't whether the plea agreement barred it, and that's your issue, is whether the plea agreement barred it. So what in the plea agreement barred him from saying that?

MF: Well, Judge, the – to answer your question, what barred him from saying that directly is the provision that the government will take no position on where within the guideline range the sentence should fall and won't move for an upward departure. Now against – we have to consider this language against the well-settled backdrop of plea bargaining law in this Circuit and it's one of the few areas of the law that's actually good for a criminal defendant. Why do I say that? The Court had said over and over again that plea agreements implicate special due process and fairness concerns; that they're construed strictly against the government as drafter; and most important that prosecutors are held to meticulous standards, the most meticulous standards, from *Altro*, of promise and performance. And this all derives from *Santobello*. And it's especially true now that the Supreme Court has acknowledged in *Lafler* and *Frye* that pleas, plea agreements, plea bargaining is the criminal justice system. So, if there's ever a case where a contract has to be read in defendant's favor and you have to look at the spirit of the agreement, as well as the literal language, plea bargaining is it. And I submit to the Court that the only conceivable reason for the government to juxtapose the worst of crimes – murder – with the representation that it could meet the applicable proof standard at sentencing – just a preponderance – all that's doing is encouraging the court to sentence at the top of or above the guidelines range and that's naturally what happened in this case. And that defies the letter, I would submit, and the spirit of the provision that I just quoted, read, as it properly must be, in the defendant's favor. Now what does the government say about this? They say we reserve the right to give the court relevant information at sentencing. All true, all true. But let's not overlook, I think it's footnote six in their brief. What do they say? They say that Mr. Persico was already indicted for this very charge. So that indictment

was already on file with the court. It already had all the relevant information. It had the information that a grand jury had found by probable cause that Mr. Persico had participated in this murder. Now they agreed to – Yes?

JCC: What was the page in the brief that you just referred to?

MF: Judge, I don't have the brief before me –

JCC: You just said it, what did you just – I'm asking simply for repetition of what you said.

MF: Footnote six in the government's brief, I don't –

JCC: Okay.

MF: Page 23.

JCC: Alright.

MF: So consider this. The court has the indictment before it. The indictment ipso facto constitutes a finding by probable cause that Mr. Persico was involved in this murder. What did it need to go to Probation, an arm of the court, and say, hey by the way, we can prove this by a preponderance of the evidence and we just dismissed this out of good graces for Mr. Persico's benefit. All it had to do was say: (a) say nothing, (b) point the court – court toward the indictment and say a grand jury found this by probable cause, or just simply say we have information implicating Mr. Persico in this murder. What possible reason could there be to say – hey, Mr. Persico participated in the murder of this man back in 1993 and, by the way, we can prove it by a preponderance of the evidence, when they said they're taking no position on where within the guidelines range the sentence should fall and they're not moving for an upward departure. They're not saying–

JJN: What do you do with the issue of dangerousness?

MF: Oh, respectfully, I think that that is the easiest one here. And if you look at the text of 3143(a), it speaks of mandatory detention while waiting imposition or execution of sentence. Mr. Persico is awaiting execution of sentence right now, so the judge necessarily found by clear and convincing evidence already that he wasn't dangerous or she would have remanded him

right on the spot. She certainly wouldn't have kept him out an extra period of time pending sentence execution.

JCC: What – let's just stick for a moment to the proceedings in the district court.

MF: Sure.

JCC: There was a Fatico hearing, right?

MF: There was.

JCC: Before whom?

MF: Well it took place before Judge Irizzary, and it was originally ordered by Judge Townes, Your Honor.

JCC: Yes, Judge Townes was ill I believe, right?

MF: Well –

JCC: And was unavailable in any event.

MF: Yes, she – the case was transferred to Judge Irizzary.

JCC: Alright, and so what happened at this hearing?

MF: Well this –

JCC: What were the findings of the district court?

MF: The district court found, as the government represented it could prove in the PSR by a preponderance of the evidence, at least a preponderance I think was the word, that Russo was credible enough to establish Mr. Persico's participation in this murder, and specifically the way it found that he allegedly participated was by securing weapons through an intermediary. And my colleague reminds me with respect to dangerousness and, uh, I see I'm out –

JCC: No, it's ok. Go ahead.

MF: Look, here's something else that's vital, and I don't remotely fault –

JCC: And I have no problem with your [laughter] whatever she – We do it the English style, the junior barrister leans over and can whisper if she wants.

MF: [Laughter] Sorry

JCC: We do it the English style, the junior barrister leans over and can whisper if she wants.

MF: Junior only in age, but not in stature. But let's… let's --

JCC: Right, very good, very good.

MF: -- put that to one side.

JCC: [Laughing] Now let me just, let me just – I'm a very simple sort of person. What exactly happened at this Fatico hearing. What did she find?

MF: She found, Your Honor, by a preponderance of the evidence that Mr. Persico most significantly had participated in this murder conspiracy by procuring the weapons. She also found that --

JCC: What was the basis of that finding?

MF: The testimony of this Anthony Russo – the, the cooperating witness –

JCC: So she credited the testimony –

MF: She did.

JCC: -- of somebody who testified.

MF: She did. She credited it.

JCC: Alright.

MF: On the erroneous assumption that he would risk all incentives and protections he negotiated in exchange for his guilty plea. And we're not contesting those findings for purposes of today's hearing. It's crucial to

realize, and I go back quickly to what I said at the outset. What's our burden here? What's our burden here? It's not to establish that we have a meritorious appellate claim by clear and convincing evidence or require a showing, a preliminary showing in front of the district court that she should reverse herself. We have to show a close question, one that's fairly debatable, one that could – very well could go the other way.

JJN: Has this appeal been scheduled?

MF: No and we're willing to expedite it

JJN: Have you made a motion to expedite it?

MF: We have not but we are more than willing to do that within 30 – we're willing to file our brief within 30 days.

JJN: I don't think, I don't think I'm asking are you willing.

MF: The answer is we have not. We have not presently made a motion.

JJN: You want something expedited, you usually let us know that with a motion.

MF: That's my, that's my bad, Your Honor, and I'll do that today and --

JJN: [Unintelligible]

MF: No, No, we're more than willing to expedite it and get the brief done on any expeditious schedule the Court might order. It's not like these issues haven't been briefed by us before, so that's an oversight on my part.

JCC: We'll take this as an oral motion by you.

MF: Yes, it is, Your Honor. And could I just point out one more, one more quick –

JCC: What do you want from us? What is the remedy that you're seeking?

MF: Ultimately, Your Honor, we're seeking with – and we will be on the merits brief – seeking what we sought in the district court – which is withdrawal of the plea agreement and obviously, there's sort of an open question –

JCC: What do you want from us?

MF: Today?

JCC: Today.

MF: We want you to stay execution of the sentence and continue his release on the same conditions pending appeal that he's been out on for the last seven years. And to that end I'd just add very quickly, I don't remotely fault Judge Irizarry for being thorough, deliberate and trying hard to get it right. He was out on bail, it took over a year to issue a Fatico ruling here, over a year to issue a Fatico ruling, and she had obviously already made a gut determination about whether this Russo was credible or not. If he's that dangerous, you don't leave him out generally for that duration of time. And again I appreciate the thoroughness and the consideration. I'm citing this for a different reason. The world is not going to end tomorrow if Michael Persico remains out pending the disposition of this appeal, and even if we take the government's facts in the light most favorable to the government, and we dispute them, the last bad act that they're attributing to Mr. Persico is in 2010, seven years ago. This case has been pending for an inordinate amount of time, and Mr. Persico has scrupulously, scrupulously complied with his release conditions. The Pretrial Services Officer said the same thing and their recommendation –

JCC: You would, you would be satisfied with an extension of the current conditions of release?

MF: Yes sir. Absolutely.

JCC: Until such time as the Court will…decides the appeal?

MF: Yes, until such time as the Court decides the appeal.

JCC: Anything else?

MF: No sir. I thank you for hearing from me.

JCC: Thank you.

AL: Good afternoon. May it please the Court, my name is Allon Lifshitz. I represent the government in this case. The motion for bail pending appeal should be denied because Judge Irizzary did not commit a clear error in this case, either in finding that the defendant is a danger, or in finding that his appeal on the merits fails to raise a substantial question. Either of those grounds is sufficient on its own to deny the motion for bail pending appeal, and indeed, detention is mandatory under the statute if either of those conditions is satisfied.

JCC: What do you make of Mr. Fernich's comment, forceful comment, a few minutes ago that he's been, he's been on – released on conditions of release for over six years.

AL: He was -- Your Honor, he was arrested in 2010, he was committing crimes up until his arrest. His ability to refrain –

JCC: I understand that but, offhand, you have, he's – he hasn't shown during that, or you haven't indicated that during these seven years that he's a danger to the community or a risk of flight, otherwise you would have sought the revocation of the conditions of release.

AL: Correct, Your Honor. First of all, we did seek remand at the outset. We prevailed, the issue went up to the Circuit and was ultimately reversed. We accepted that decision at the time and moved on. I would say, Your Honor, that his ability to refrain from committing crimes while under the microscope of Judge Townes and then Judge Irizzary and Pretrial Services does not warrant significant credit. The more important thing is that earlier –

JCC: What doesn't, what doesn't deserve credit?

AL: The fact that he is not, has not been found to have committed crimes after his arrest in this case. What's important is that he was found in July of this year by Judge Irizzary after a Fatico hearing that was really more like a trial to have committed murder, extortion, loan sharking, up until 2009 and 2010, all as a powerful associate of the Colombo family, essentially compelling a finding that he's a danger to the community. How could a judge find otherwise in that context? And these are findings of fact, as Your Honor observed. They're based largely on a cooperating witness who testified and was cross-examined in a hearing presided over by Judge Irizzary. If that finding is not disturbed, detention is mandatory under the statute. I'll skip to

the breach issue if the Court doesn't have additional questions about dangerousness. There was no breach in this case. I think the panel asked as to what provision was breached. There is no provision of the plea agreement that was breached. The plea agreement is part of the record. We never agreed that we would withhold information from Probation or the court. We never would agree to that, it wouldn't even be enforceable. And our footnote that was used against us that referred to the indictment in this case, superseding indictment, that charged most of the crimes that were proven at the Fatico. The point is Probation and the court knew about these crimes. We never asked for a Fatico hearing. We said we didn't want one. Judge Townes knew what we had alleged, and she's perfectly within her rights to insist on knowing whether it was true that Michael Persico committed these additional crimes, as was Judge Irizzary who independently also decided that she wanted a Fatico hearing. And it's important to remember in this case, the defendant didn't bargain for us to withhold information. The defendant bargained for a five-year statutory cap in light of the charges he was facing.

JJN: There is, at least, some tension when the government says we won't take a position where in the Guideline range he should be and then gives, uh, the Probation Officer information that, in your view, makes him a very bad guy. That's not exactly neutral as to where in the Guidelines he should be, is it?

AL: Your Honor, those are bad facts about the defendant but what we –

JJN: No, I understand. And had you said we won't take a position on the precise months within the Guideline range, but we do reserve our normal right to inform Probation of his background. But when you don't have that reservation, and you say, "We won't take any position on –" I assume the range was pretty broad in this particular case, was it?

Al: Your Honor, the range was 37 to 46 months.

JJN: Three, so three to four – was 37 to 46? Three to four years.

AL: Correct.

JJN: Okay.

AL: Essentially. But we did say in the plea agreement that we –

JJN: So, it could have been three years it could have been four years?

AL: Correct.

JJN: So when you say, he committed a murder, isn't that tantamount to saying it probably ought to be pretty close to the top of the range?

AL: No, Your Honor, because we didn't even ask for the Fatico hearing. Of course, of course, saying that he committed the murder suggests he's a bad person.

JJN: It certainly doesn't say put him at the bottom of the range.

AL: No, Your Honor, but we simply agreed not to advocate for a number. We said, and to clarify –

JJN: I know. All I'm suggesting is, as you draft these, there is a, on a surface at least, tension between saying we won't, we won't – we're absolutely neutral on where in the range it should be, but we're going to tell them he's a terrible person.

AL: I understand Your Honor's point, but we would never be able to enter into an agreement that frankly is quite favorable to defendants and allows them to plead to a less serious crime if we were held to a standard that we would also lie to a district court and say we can't prove that he also committed the other crimes.

JJN: No one's suggesting that you say you can't prove it. The question is should you, should you at the same time you say what you won't do, do the other.

AL: Your Honor, we said what we would do. The plea agreement says that we would provide the probation department and the court with information relevant to sentencing. That's absolutely in the plea agreement.

JCC: You have no objection to expediting the appeal?

AL: No, Your Honor.

JCC: If we were to do that. And, uh, when is, what is his surrender date?

AL: I believe it's October 20th.

JCC: Okay. Thanks very much.

AL: Thank you.

JCC: We'll reserve decision.

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

United States District Court

Eastern District of New York

Caption:
United States of America v.

Michael Persico

Docket No.: 10-CR-147
Dora L. Irizarry
(District Court Judge)

Notice is hereby given that Michael Persico appeals to the United States Court of Appeals for the Second Circuit from the judgment ✓, other [ ] ______ (specify)
entered in this action on 8/25/17 (date).

This appeal concerns: Conviction only [ ] Sentence only [ ] Conviction & Sentence [✓] Other [ ]

Defendant found guilty by plea [✓] trial [ ] N/A [ ].

Offense occurred after November 1, 1987? Yes [✓] No [ ] N/A [ ]

Date of sentence: 7/21/2017 N/A [ ]

Bail/Jail Disposition: Committed [ ] Not committed [ ] N/A [ ]

Appellant is represented by counsel? Yes ✓ No [ ] If yes, provide the following information:

Defendant's Counsel: Sarita Kedia

Counsel's Address: 5 East 22nd Street, Suite 7B
New York, New York 10010

Counsel's Phone: 212-681-0202

Assistant U.S. Attorney: Allon Lifshitz

AUSA's Address: 271 Cadman Plaza East
Brooklyn, NY 11201

AUSA's Phone: 718-254-6164

Signature