# 17-2701

*To Be Argued By*:
ALLON LIFSHITZ

# United States Court of Appeals

**For the Second Circuit**

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JAMES C. BOMBINO, ALICIA DIMICHELE, also known as ALICIA GAROFALO, EDWARD GAROFALO, JR., also known as BOBBLE, also known as TALL GUY, THEODORE N. PERSICO, JR., also known as SKINNY, also known as TEDDY, THOMAS PETRIZZO, LOUIS ROMEO, MICHAEL D. SCIARETTA, also known as MIKE LNU, ANTHONY PREZA, FRANCIS GUERRA, also known as BF,

*Defendants,*

MICHAEL J. PERSICO,

*Defendant-Appellant.*

**On Appeal From The United States District Court**
**For The Eastern District of New York**

## BRIEF AND APPENDIX FOR THE UNITED STATES

BRIDGET M. ROHDE
*Acting United States Attorney,*
*Eastern District of New York*
*271-A Cadman Plaza East*
*Brooklyn, New York 11201*
*(718) 254-7000*

AMY BUSA
ALLON LIFSHITZ,
*Assistant United States Attorneys,*
*Of Counsel.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES....................................iii

PRELIMINARY STATEMENT....................................1

STATEMENT OF FACTS.......................................3

I. The Indictment........................................3

II. The Information and Plea Agreement...................3

III. The Plea Proceeding.................................5

IV. The Motions Alleging Breach and Seeking to Withdraw the Guilty Plea...........11

A. The First Motion......................................11

B. The Second Motion.....................................12

C. Sentencing Proceedings................................13

D. The Sentencing........................................15

E. Motion for Bail Pending Appeal........................15

F. Appeal of Decision Denying Motion for Bail............16

ARGUMENT - SUMMARY OF ARGUMENT...........................17

POINT ONE - THE DISTRICT COURT CORRECTLY FOUND THERE WAS NO BREACH...........19

I. Legal Standards.......................................19

II. The District Court Correctly Found that There Was No Breach of the Plea Agreement............20

A. Providing Information to the Probation Department and the District Court Was Not a Breach of the Agreement..........20

B. Responding to Persico's Request for a Six-Month Sentence Was Not a Breach of the Agreement..........30

POINT TWO - THE DISTRICT COURT CORRECTLY FOUND THAT THE PLEA WAS SUFFICIENT....................37

I. Legal Standards....................37

A. No Right to Withdraw Plea....................37

B. Finality Is Critical....................38

C. The District Court Is Entitled to Deference....................39

D. The Factual Basis Requirement....................40

E. The Charged Crime....................42

II. The District Court Correctly Found that the Guilty Plea Was Sufficient....................43

POINT THREE - THE DISTRICT COURT CORRECTLY CONSIDERED UNCONVICTED CONDUCT....................53

I. Legal Standards....................53

II. Application....................55

CONCLUSION....................57

Case 17-2701, Document 82, 12/08/2017, 2190731, Page4 of 99



# TABLE OF AUTHORITIES

Page

## CASES

Alleyne v. United States,
570 U.S. 99 (2013) ........................................ 54

Blackledge v. Allison,
431 U.S. 63 (1977) ........................................ 40

Godwin v. United States,
687 F.2d 585 (2d Cir. 1982) ................................ 45

Hayle v. United States,
815 F.2d 879 (2d Cir. 1987) ................................ 48

Irizarry v. United States,
508 F.2d 960 (2d Cir. 1974) ........................ 41, 45, 51

Jackson v. Virginia,
443 U.S. 307 (1979) ....................................... 39

McMillan v. Pennsylvania,
477 U.S. 79 (1986) ........................................ 53

United States v. Adams,
448 F.3d 492 (2d Cir. 2006) ................................ 45

United States v. Amico,
416 F.3d 163 (2d Cir. 2005) ............................ 31, 32

United States v. Anderson,
747 F.3d 51 (2d Cir. 2014) .............................. 46-47

United States v. Andrades,
169 F.3d 131 (2d Cir. 1999) ............................ 41, 51

United States v. Badaracco,
954 F.2d 928 (3d Cir. 1992) ................................ 35

United States v. Beardsley,
691 F.3d 252 (2d Cir. 2012) ................................ 53

United States v. Boatner,
966 F.2d 1575 (11th Cir. 1992) ......................... 27, 28

Case 17-2701, Document 82, 12/08/2017, 2190731, Page5 of 99



United States v. Booker,
543 U.S. 220 (2005) .................................... 26, 54

United States v. Burnett,
671 F.2d 709 (2d Cir. 1982) .................................. 38

United States v. Calderon,
610 F. App'x 42 (2d Cir. 2015) ............................... 54

United States v. Canada,
960 F.2d 263 (1st Cir. 1992) ................................. 27

United States v. Carmona,
873 F.2d 568 (2d Cir. 1989) .................................. 25

United States v. Concepcion,
983 F.2d 369 (2d Cir. 1992) .............................. 25, 53

United States v. Cordoba Murgas,
233 F.3d 704 (2d Cir. 2000) .................................. 53

United States v. Crosby,
397 F.3d 103 (2d Cir. 2005) .................................. 55

United States v. Crusco,
536 F.2d 21 (3d Cir. 1976) ................................... 36

United States v. Culbertson,
670 F.3d 183 (2d Cir. 2012) .................................. 45

United States v. Cummings,
329 F. App'x 317 (2d Cir. 2009) .............................. 55

United States v. Darling,
766 F.2d 1095 (7th Cir. 1985) ................................ 46

United States v. Davis,
690 F.3d 127 (2d Cir. 2012) .................................. 47

United States v. Doyle,
348 F.2d 715 (2d Cir. 1965) .................................. 48

United States v. Fagans,
406 F.3d 138 (2d Cir. 2005) .................................. 55

United States v. Florez,
447 F.3d 145 (2d Cir. 2006) .................................. 55

United States v. Garcia,
587 F.3d 509 (2d Cir. 2009) .................................. 45

United States v. Gonzalez,
647 F.3d 41 (2d Cir. 2011) ................................... 37

United States v. Gonzalez,
970 F.2d 1095 (2d Cir. 1992) ................................. 38

United States v. Gordon,
987 F.2d 902 (2d Cir. 1993) .................................. 39

United States v. Grullon,
No. 94 CR. 466, 1996 WL 437956 (S.D.N.Y. Aug. 5, 1996) ...... 49

United States v. Guerra,
647 F. App'x 38 (2d Cir. 2016) ............................... 54

United States v. Guerra,
888 F.2d 247 (2d Cir. 1989) .................................. 53

United States v. Heredia,
768 F.3d 1220 (9th Cir. 2014) ............................. 32-33

United States v. Lombardozzi,
491 F.3d 61 (2d Cir. 2007) ................................ 42, 46

United States v. Lumpkins,
845 F.2d 1444 (7th Cir. 1988) ................................ 52

United States v. Maher,
108 F.3d 1513 (2d Cir. 1997) ............................. passim

United States v. Martinez,
525 F.3d 211 (2d Cir. 2008) .................................. 54

United States v. Miller,
993 F.2d 16 (2d Cir. 1993) ................................... 19

United States v. Mondragon,
228 F.3d 978 (9th Cir. 2000) .............................. 34-35

United States v. Moscahlaidis,
868 F.2d 1357 (3d Cir. 1989) ................................. 35

United States v. Moschella,
727 F.3d 888 (9th Cir. 2013) ................................. 34

United States v. Moses,
No. 1:05-CR-133, 2010 WL 3521724 (D. Vt. Sept. 7, 2010) ..... 50

United States v. Pica,
692 F.3d 79 (2d Cir. 2012) .................................. 54

United States v. Reyes,
302 F.3d 48 (2d Cir. 2002) .................................. 42

United States v. Riera,
298 F.3d 128 (2d Cir. 2002) ............................. 20, 24

United States v. Rivera,
971 F.2d 876 (2d Cir. 1992) ................................. 39

United States v. Rodriguez,
501 F. App'x 86 (2d Cir. 2012) .............................. 41

United States v. Rosen,
409 F.3d 535 (2d Cir. 2005) ............................. 38, 49

United States v. Selby,
476 F.2d 965 (2d Cir. 1973) ................................. 48

United States v. Shahid,
486 F. App'x 915 (2d Cir. 2012) ............................. 55

United States v. Smith,
160 F.3d 117 (2d Cir. 1998) ................................. 52

United States v. Sweeney,
878 F.2d 68 (2d Cir. 1989) .............................. 38, 39

United States v. Taylor,
77 F.3d 368 (11th Cir. 1996) ............................ 26, 27

United States v. Taylor,
464 F.2d 240 (2d Cir. 1972) ................................. 39

United States v. Torres,
129 F.3d 710 (2d Cir. 1997) ............................. 37, 49

United States v. Tracy,
12 F.3d 1186 (2d Cir. 1993) ................................. 25

United States v. Vaughn,
430 F.3d 518 (2d Cir. 2005) ............................. 54, 55

United States v. Vaval,
404 F.3d 144 (2d Cir. 2005) ........................ 21, 25, 31

United States v. Velez Carrero,
77 F.3d 11 (1st Cir. 1996) ................................. 19

United States v. Watts,
519 U.S. 148 (1997) ........................................ 55

United States v. Wyatt,
06 CR 782, 2008 WL 2433613 (E.D.N.Y. June 12, 2008) .. 21, 28-29

United States v. Williamsburg Check Cashing Corp.,
905 F.2d 25 (2d Cir. 1990) ................................. 23

STATUTES

18 U.S.C. § 371........................................ 42, 46

18 U.S.C. § 891(6) .......................................... 42

18 U.S.C. § 892.............................................. 42

18 U.S.C. § 892(a) .......................................... 42

18 U.S.C. § 892(b) ...................................... 43, 45

18 U.S.C. § 3553(a) ..................................... 32, 55

RULES AND SENTENCING GUIDELINES

Fed. R. Crim. P. 11.......................... 37, 39, 48, 51, 53

U.S.S.G. § 3B1.1(b) ......................................... 36

OTHER AUTHORITIES

C. Wright, Federal Practice and Procedure § 467, at 658-65
(1982) ...................................................... 39

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket No. 17-2701

UNITED STATES OF AMERICA,

Appellee,

-against-

JAMES C. BOMBINO, ALICIA DIMICHELE, also known as ALICIA GAROFALO, EDWARD GAROFALO, JR., also known as BOBBLE, also known as TALL GUY, THEODORE N. PERSICO, JR., also known as SKINNY, also known as TEDDY, THOMAS PETRIZZO, LOUIS ROMEO, MICHAEL D. SCIARETTA, also known as MIKE LNU, ANTHONY PREZA, FRANCIS GUERRA, also known as BF,

Defendants,

MICHAEL J. PERSICO,

Defendant-Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

BRIEF FOR THE UNITED STATES

## PRELIMINARY STATEMENT

Defendant-Appellant Michael J. Persico appeals from a judgment entered on August 25, 2017, in the United States District Court for the Eastern District of New York (Irizarry, C.J.),

sentencing him to 60 months' imprisonment and three years' supervised release and ordering him to pay a fine of $ 250,000. On appeal, Persico argues that the district court erred when it (1) found that the government never breached the plea agreement; (2) found that Persico's guilty plea was sufficient; and (3) considered unconvicted conduct at sentencing. As explained below, these arguments are without merit, and the judgment should be affirmed in its entirety.

## STATEMENT OF FACTS

### I. The Indictment

On February 9, 2012, Persico was charged in a fourth superseding indictment with participating in a racketeering conspiracy from 1987 to 2011 as an associate of the Colombo organized crime family of La Cosa Nostra, including as racketeering acts the conspiracy to murder, and murder of, Joseph Scopo; financing, extending and collecting an extortionate extension of credit as to Anthony Russo (identified as John Doe #2); the extortion of Russo; financing and conspiring to make an extortionate extension of credit to John Doe #8 and John Doe #9; and other crimes. (DE:376, ¶¶ 14-26, 30-33, 44-51 and 56-78).[1]

### II. The Information and Plea Agreement

On June 8, 2012, during jury selection, Persico pled guilty to the sole count of a superseding information (the "Information") that charged him with conspiring to participate in the extortionate extension of credit to victims identified as John Doe #1 and John Doe #2 (formerly John Does #8 and #9 in the fourth

---

[1] "Br." and "A" refer to Persico's brief and appendix. "DE" refers to entries on the relevant court's docket sheet. "GA" refers to the government's appendix. "BMA" refers to the appendix Persico submitted in connection with his motion in this Court for bail pending appeal. (United States v. Persico, 17-2701, DE:16 (2d Cir. Sept. 9, 2017)).

superseding indictment), in violation of 18 U.S.C. § 371. (A 101-08).

The plea agreement entered by the parties provided, inter alia, that:

- "The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence." (A 110; GA 2).

- The government estimated that the advisory Guidelines range of imprisonment was 37 to 46 months, and Persico stipulated to that calculation. (A 111; GA 3).

- The government agreed to bring no further criminal charges against Persico for his participation in sixteen specifically enumerated crimes, including racketeering conspiracy; the murder of Joseph Scopo; the extortionate extension, financing and collection of credit as to Russo; and the extortion of Russo, all as charged in the fourth superseding indictment, as well as loansharking. (A 114-16; GA 6-8).

- The government would "take no position concerning where within the Guidelines range determined by the Court the sentence should fall," and would "make no motion for an upward departure under the Sentencing Guidelines." (A 116; GA 8).

- "[N]o promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. . . . [T]his agreement supersedes all prior promises,

> agreements or conditions between the parties."
> (A 117-18; GA 9-10).

III. The Plea Proceeding

At the plea proceeding, the Honorable Sandra L. Townes, to whom the case was originally assigned, placed Persico under oath and instructed him at the outset, "If there's anything you do not understand, please don't hesitate to tell me. I'll be happy to stop and clarify anything that's not entirely clear to you. Do you understand that?" Persico answered, "Yes." (A 121-22). Persico stated that he attended college and that he had a clear mind. (A 122-23). He said he was satisfied with the assistance of his counsel, he had received a copy of the Information, and he had reviewed it with his counsel prior to the proceeding. (A 124). When the district court asked, "Do you understand the charge contained in the information?", Persico answered, "I do." (Id.).

The district court then reviewed the Information in detail, as well as the facts that the government would need to establish at trial, including that: (1) two or more persons entered into the unlawful agreement charged in the Information; (2) the defendant knowingly and willfully became a member of the conspiracy; (3) the members of the conspiracy committed at least one of the overt acts charged in the Information; and (4) the overt act that was committed was in furtherance of the object of the conspiracy. (A 124-27).

The district court then explained that, as to making an extortionate extension of credit, the government must establish that (1) a defendant knowingly made an extension of credit, and (2) there was an understanding between the defendant and the borrower, express or implied, tacit or otherwise, that if the borrower delayed in making repayments or there was a failure to repay, violence or other criminal means would be used to force payment. (A 127). The district court then asked whether that was Persico's understanding of the elements, to which defense counsel responded, "Yes, that's our understanding, as well." (Id.).

The district court then reviewed the rights Persico was waiving by pleading guilty, as well as the statutory sentencing scheme, the applicable Sentencing Guidelines provisions, and the terms of the plea agreement. (A 128-36). With respect to those terms, the court established, through a colloquy with Persico, that he read the entire agreement, that he discussed its terms with counsel, that he understood "absolutely everything" in it, that nobody made him any promises outside the agreement, that the court could impose a sentence above the Guidelines range, and that it would also consider other factors about Persico when determining his sentence. (A 133-36). When asked if there was anything else the court should discuss about the plea agreement, defense counsel said, "I don't believe so, Your Honor." (A 139).

The district court then engaged in the following colloquy with Persico, his counsel and the government:

COURT: All right. Now, Mr. Persico, do you have any questions that you would like to ask me about the charge in the superseding Information or about your rights or anything else related to this matter that may not be clear to you?

PERSICO: <u>Everything is clear.</u> No questions.

COURT: All right. Ms. Kedia, do you know of any reason why Mr. Persico should not plead guilty to this sole count of this superseding Information?

COUNSEL: No, Your Honor.

COURT: Do you know of any viable defenses to this charge?

COUNSEL: I do know a viable defenses [sic], Your Honor, but in consideration of everything that Mr. Persico is charged with, and the risks inherent in a trial and the fact that <u>Mr. Persico is able to allocute to this offense</u>, he believes that -- he desires to enter into a plea of guilty to this offense, Your Honor.

COURT: All right. Is that true, Mr. Persico --

PERSICO: It is.

COURT: -- what Ms. Kedia just said?

PERSICO: (Nods head affirmatively.)

COURT: Let me ask you then, how do you plead to the superseding Information number six, charging you with extortionate extension of credit conspiracy?

PERSICO: Guilty.

* * *

COURT: Can you tell me what briefly in your own words what you did in connection with the offense that makes you guilty of the offense charged in the superseding Information?

PERSICO: I arranged for someone to extend $100,000 loan to the trucking company run by James Bambino [sic] and Steve Marcus at a usurious interest rate.

COURT: And is that satisfactory, Ms. Argentieri?

A.U.S.A.: Just one second, Judge?

COURT: Yes.

A.U.S.A.: . . . . . If you could just inquire, Judge, did that conduct occur between May 2009 and February [2010]?

COURT: Yes, and where, also. I don't think we said the venue.

PERSICO: I agree with the time frame.

COURT: Well, you have got to tell me what the time frame is.

PERSICO: Between February 2009 -- May 2009 and February 2010.

COURT: All right. And where? The venue, where?

PERSICO: In the Eastern District of New York.

COURT: Okay.

A.U.S.A.: Judge?

COURT: Yes?

A.U.S.A.: I'm not going to make him allocute to it, but I will just proffer that the government would prove -- be prepared to prove at trial that the extension of credit was made a -- not just a usurious rate, but at a rate of interest in excess of the annual rate of 45 percent per year, and that at the time that the loan was made, the two John Does who this defendant identified believed that Mr. Persico and his conconspirators had a reputation for the use of extortionate means to collect extensions of credit.

COURT: Okay. Did the defendant identify them?

A.U.S.A.: He did. I believe he did.

COURT: I didn't -- I missed that.

A.U.S.A.: I think he identified them as Steven Marcus and James Bambino [sic].

COUNSEL: He did, Your Honor.

A.U.S.A.: Okay.

COURT: Ms. Kedia, is there anything else that I should inquire about?

COUNSEL: No, I don't believe so, Your Honor.

* * *

COUNSEL: So Judge, I just want to set forth our understanding with respect to the plea agreement. As set forth in the plea agreement, there is certain conduct that's specifically laid out that is covered by the plea agreement.

COURT: Yes.

> COUNSEL: And we recognize that -- our understanding is that the government has disclosed all conduct of which it is aware and been investigating with regard to Mr. Persico go to the facts that are covered here under the terms of the plea agreement.
>
> In addition, our understanding is that the government is not going to advocate in any way to the Probation Office or to the Court for a sentence above the Guideline range or where within the Guideline range Mr. Persico should fall. That's entirely up to the Court. <u>Of course, we will be advocating for a sentence below the Guideline range</u>, but we understand, of course, and Mr. Persico understands that it's up to the Court to impose sentence here.
>
> COURT: Yes.
>
> A.U.S.A.: The agreement is the agreement, and we have in no way represented that Mr. Persico is getting coverage for every single crime the federal government believes he may have committed.
>
> COURT: Let's go through it and see what-
>
> A.U.S.A.: <u>Judge, the reason why the agreement is in writing is because everything that we have agreed to is in the agreement, and the agreement is what controls. And I'm not going to stand here and modify verbally any part of the agreement.</u>

(A 139-45 (emphasis added)). The district court found that Persico was acting voluntarily; that he fully understood the charge in the

Information, his rights and the consequences of his plea; and that there was a factual basis for the plea, and it accepted the plea. (A 146).

## IV. The Motions Alleging Breach and Seeking to Withdraw the Guilty Plea

### A. The First Motion

On September 29, 2014 -- more than two years after pleading guilty -- Persico moved to withdraw his guilty plea, asserting that (1) "the government breached its plea agreement with Persico by engaging in impermissible sentencing advocacy before the Probation Department," i.e., by advising Probation that it could prove conduct beyond the offense of conviction, and (2) "the plea lack[ed] an adequate factual basis and was otherwise insufficiently informed." (BMA 90-92, 100-26).

On October 29, 2014, Judge Townes denied Persico's motion. (A 190-214). In a thorough written opinion, Judge Townes found that both the plain text of the plea agreement and statements made by counsel at the plea proceeding compelled the conclusion that there was no breach. (A 199-201). Notably, Judge Townes found that the plea agreement contained no limitations on the government's communications with Probation. (A 192, 200-01). Judge Townes further found that any contrary understanding by the defense was "not a reasonable interpretation." (A 201). Judge Townes carefully distinguished this case from cases in which a

breach was found. (A 202-05). With respect to the plea allocution, Judge Townes found that there was a factual basis for the plea and that Persico understood the nature of the charge. (A 205-14).

Later that day, Judge Townes sua sponte ordered a Fatico hearing -- even though the government stated that it did not seek such a hearing (A 217) -- in order to determine whether Persico had committed crimes beyond the offense of conviction. (A 215-20).

B. The Second Motion

On January 21, 2015, Persico again moved to withdraw his guilty plea. (BMA 211-18). Persico claimed he was renewing the motion because the government had identified to the district court -- rather than to Probation -- the crimes it intended to prove at the Fatico hearing. (BMA 211-12). On January 30, 2015, the government responded. (DE:805). On February 4, 2015, Persico filed a reply accompanied by an Affirmation by Paul Shechtman, Esq., who, along with Sarita Kedia, Esq., represented Persico prior to and at his guilty plea. (A 150-53, 154-57). In the Affirmation, Mr. Shechtman made certain representations about plea negotiations and wrote that he considered the government's representation as to "other crimes" to be a breach. (A 152-53).

On March 2, 2015, Judge Townes denied the renewed motion. (A 225-43). In doing so, Judge Townes explained that the plea agreement prohibited only two types of advocacy: taking a position concerning where within the Guidelines range determined by the Court the sentence should fall, and making a motion for an upward departure. (A 234). Judge Townes found that the government's sentencing letter did not constitute either type of prohibited advocacy. (Id.). Notably, Judge Townes also concluded that evidence of the parties' intentions in negotiating the plea agreement was "irrelevant" because the portions of the plea agreement at issue were "unambiguous." (A 236-37).

C. Sentencing Proceedings

On November 24, 2015, the case was reassigned to Chief Judge Irizarry. (DE dated Nov. 24, 2015). On June 3, 2016, the parties appeared before Judge Irizarry to address objections to the Presentence Investigation Report, and on August 10 and 24, 2016, she conducted a Fatico hearing. Notably, Judge Irizarry ordered the hearing even after the parties jointly advised that they would both seek a sentence within the stipulated Guidelines range (a change in Persico's position) and that neither party believed a hearing was necessary. (DE:835 (letter filed by government); DE dated August 5, 2016 (Court Order stating, "[T]he Court has an obligation to consider factors under 18 U.S.C.

§ 3553(a)[.] . . . The parties' approach usurps the Court's sentencing discretion, which is unacceptable. Accordingly, the Fatico hearing shall go forward[.]")).

On July 19, 2017, after the hearing, Judge Irizarry issued an opinion finding that the government had proven the following crimes at the Fatico hearing, at which cooperating witness Anthony Russo, a former acting captain in the Colombo crime family, testified and was cross-examined, and after the parties each offered many additional exhibits:

- Persico participated in the 1993 murder of Joseph Scopo. (GA 15-21). The murder occurred during a civil war for control of the crime family. (GA 5). Persico, who is the son of the crime family's official boss, instructed Russo to find and kill Scopo, a high-ranking member of the rival "Orena faction" of the crime family. (GA 16). Persico, through an intermediary, provided Russo and a coconspirator with firearms to commit the murder. (Id.). After one failed attempt, Persico ordered Russo to complete the task before Persico's brother's trial began. (GA 7 n.11). Soon thereafter, Russo and four others murdered Scopo using a MAC-10 firearm provided through the intermediary by Persico. (GA 17-18).

- "[T]hroughout the 1990s," Persico loaned approximately $ 150,000 to $ 200,000, at an interest rate of one percent per week, to Russo and Colombo family associate Francis Guerra, which they in turn provided to loansharking customers at a weekly interest rate of two to three percent. (GA 21). When Russo and Guerra had trouble repaying Persico, Persico demanded the full amount, which

resulted in Russo's brutally assaulting several customers. (GA 21-22).

- In 2009 -- shortly before Persico's arrest -- Persico extorted Russo himself. (GA 23-25). More specifically, Russo and Colombo family member Anthony Stropoli sought to open a valet-parking business. (GA 23). Persico, who also operated a valet-parking business, told Russo to make his life "easier" by instead obtaining business for Persico in exchange for a commission. (GA 24).

- Persico participated in racketeering, as part of the Colombo family, from the 1990s through 2009. (GA 26-27). This included instructing Russo, through intermediaries, not to complain about Russo's then-failure to get inducted into the crime family -- complaints that risked retribution from Persico. (Id.).

D. The Sentencing

On July 21, 2017, Judge Irizarry sentenced Persico to a 60-month term of imprisonment, to be followed by a three-year term of supervised release, as well as ordered him to pay a fine of $ 250,000. (A 333-45). She permitted Persico to self-surrender to his designated facility on October 20, 2017. (A 341-42).

E. Motion for Bail Pending Appeal

On July 24, 2017, Persico moved for bail pending appeal. (DE:869). In support, he argued that his motion "to vacate his plea for legal infirmity and government breach" raised issues that could have been decided in his favor. (Id. at 1). The motion attached a Declaration by Sarita Kedia, Esq., asserting that, during plea negotiations, a supervisory Assistant U.S. Attorney

stated, in substance, that the government would be in breach of the plea agreement if it asked the court to consider a murder or murder conspiracy at sentencing. (BMA 87-88). On August 23, 2017, the district court denied that motion, finding that Persico is a danger to the community and that his appeal would not raise any substantial issues of fact or law. (BMA 398-401).

F. Appeal of Decision Denying Motion for Bail

On September 12, 2017, Persico filed a motion to this Circuit for bail pending appeal. (Persico, 17-2701-cr, DE:25-1). In the motion, he argued not only that he posed no danger to the community, but also that his appeal on the merits was likely to raise substantial issues regarding whether his guilty plea was sufficient and whether the government had breached the plea agreement by providing information to the Probation Department and district court. (Id.). On September 18, 2017, the government filed its opposition, arguing that the district court had correctly rejected the arguments Persico raised, and had also correctly determined that Persico posed a danger to the community. (Persico, 17-2701-cr, DE:39).

On October 19, 2017, this Court denied Persico's motion for bail pending appeal. (GA 31).

## ARGUMENT

## SUMMARY OF ARGUMENT

The district court did not commit any of the errors alleged by Persico. First, the district court correctly found that the government never breached the plea agreement. The agreement simply did not prohibit the government from providing information relevant to sentencing to either the Probation Department or the district court, and indeed explicitly stated that the government would provide such information. Persico's arguments to the contrary are factually and legally wrong, and should be rejected.

Second, the district court correctly found that Persico's guilty plea was sufficient. Under this Court's precedent, his straightforward, plain-language allocution to arranging a usurious loan, understood in the context of other facts in the record, clearly established his guilt -- as he himself recognized by not challenging the plea until more than two years had passed.

Third, the district court correctly considered unconvicted conduct at sentencing. This Court and the Supreme Court have repeatedly held that such conduct may be considered at sentencing if it is found by a preponderance of the evidence that the defendant committed the conduct in question.

Case 17-2701, Document 82, 12/08/2017, 2190731, Page26 of 99



For these reasons, as expanded upon below, the district court's judgment should be affirmed in its entirety.

## POINT ONE

## THE DISTRICT COURT CORRECTLY FOUND THERE WAS NO BREACH

The district court correctly concluded that the government never breached the plea agreement, because, as the court found, the agreement did not prohibit the government from providing information relevant to sentencing to either the Probation Department or the district court. Moreover, the limited prohibitions that are actually contained in the agreement were never violated. Persico's arguments to the contrary, including his arguments about his counsel's purported understanding of the agreement, strain credulity and should be rejected.

### I. Legal Standards

"To determine whether a plea agreement has been breached, a court must look to what the parties reasonably understood to be the terms of the agreement," and "any ambiguity should be resolved against the government." United States v. Miller, 993 F.2d 16, 20 (2d Cir. 1993). Moreover, "[b]ecause plea bargaining requires defendants to waive fundamental constitutional rights, we hold prosecutors engaging in plea bargaining to the most meticulous standards of both promise and performance." United States v. Velez Carrero, 77 F.3d 11, 11 (1st Cir. 1996) (citation and internal quotation marks omitted). This Court "review[s] interpretations of plea agreements de novo and in accordance with

principles of contract law." United States v. Riera, 298 F.3d 128, 133 (2d Cir. 2002).

## II. The District Court Correctly Found that There Was No Breach of the Plea Agreement

### A. Providing Information to the Probation Department and the District Court Was Not a Breach of the Agreement

Persico initially argued below that the government breached the agreement by providing information to the Probation Department about crimes beyond the crime of conviction. (BMA 91-92). Judge Townes carefully considered this argument and correctly rejected it.

First, with respect to the plea agreement itself, Judge Townes found -- consistent with the plain language in the agreement -- that the government had agreed only that it would not bring certain enumerated charges, that it would take no position as to where within the Guidelines range the sentence should fall, and that it would not make a motion for an upward departure. (A 192). However, Judge Townes found, the government not only never agreed to withhold information from the Probation Department but, in fact explicitly provided in the agreement that it would advise the Probation Department (and the district court) of "information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence." (Id. (quoting Plea

Agreement)). Judge Townes then correctly found that under the plain language of the agreement, there was no breach. (A 198-202).

Judge Townes also carefully considered the precedent relied on by Persico, which is also relied upon on appeal. Notably, Judge Townes found that United States v. Vaval, 404 F.3d 144 (2d Cir. 2005), was distinguishable because it involved improper statements by a prosecutor to a sentencing judge, including that the government believed it could move for an upward departure, that simply were not present in this case. (A 202-03). Judge Townes also found that United States v. Wyatt, 06 CR 782 (DLI), 2008 WL 2433613 (E.D.N.Y. June 12, 2008), was inapposite because in that case, the government provided the sentencing judge with information about an uncharged murder allegedly committed by the defendant, and then used that information to seek a sentence near the top of the Guidelines range, even though the plea agreement "prohibited the government from using information already in its possession at the time of the plea to advocate for a specific sentence within the guidelines range or to move for an upward departure." (A 204 (quoting Wyatt at *7)). Because there was no such advocacy in this case, Judge Townes correctly concluded that Wyatt did not apply. (A 204-05).

Subsequently, Persico again moved for a finding of breach, this time on the purported basis that the government had somehow "induced" the district court to order a Fatico hearing and then, after being ordered to prove additional crimes, stating in a letter that it could do so. (BMA 211-12). Judge Townes again carefully considered the facts and precedent, distinguished the cases relied upon by Persico, and denied the motion in a well-reasoned opinion. (A 226-37). Notably, Judge Townes found that the government did not, and could not have, "invent[ed] a pretext" in order to inform the court of additional crimes because that information had been placed before the court during the trial of co-defendant Francis Guerra, and because the district court had, on its own initiative, ordered the Fatico hearing.[2] (A 235-36). Furthermore, in considering defense counsel's assertions as to

---

[2] It is important to note that, in addition, the most significant of the additional crimes -- twenty years of racketeering activity, including the 1993 murder of Joseph Scopo, loansharking, extortion and other crimes -- were actually charged against Persico in this very case. (DE:376, ¶¶ 14-26, 30-33, 44-51 and 56-78). Furthermore, the heavily negotiated plea agreement provided him with "coverage" for these crimes and others. (A 114-16). In light of these facts, it is clear that the district court was aware -- long before sentencing -- that the government believed Persico had committed additional crimes. Thus, the government did not "induce" the district court to order a Fatico hearing, and it is not believable that Persico or his counsel were surprised when the government stated it could prove these crimes by a preponderance, as it necessarily had done in obtaining the fourth superseding indictment, and as he no doubt believed it could do when he negotiated the "coverage" provision of his plea agreement.

Persico’s understanding of the plea agreement, Judge Townes found that “evidence of the parties’ intentions would have been irrelevant because paragraph 11 [of the plea agreement] is unambiguous.” (A 236).

On appeal, Persico argues that he had a “reasonable” understanding that the government would not “raise” unconvicted conduct at sentencing, apparently based on purported discussions with government attorneys. (Br. 21-22). But, as Judge Townes correctly found, any purported outside conversations are irrelevant, because the plain meaning of the agreement is clear, and it does not include the prohibitions that Persico and counsel have conjured, and which Persico himself denied existed. (A 134 (“The Court: Except for any promises in writing in this document, did anyone make any promises to you to induce you to plead guilty? Defendant: No, not at all.”). Indeed, and significantly, to interpret the agreement to keep Probation and the sentencing court ignorant of relevant information would not only contradict its plain terms, but would render it unenforceable. See United States v. Williamsburg Check Cashing Corp., 905 F.2d 25, 28 (2d Cir. 1990).

Persico also argues the government breached the agreement because it “sua sponte asserted that it could prove such conduct by preponderant evidence.” (Br. 22) (emphasis omitted).

As an initial matter, the government never made any such sua sponte assertion, but rather only responded truthfully to inquiries by the district court or the Probation Department, and presented evidence at a Fatico hearing only after being ordered to do so by two federal judges. See Riera, 298 F.3d at 134-35 (finding no breach because, among other reasons, government's sentencing submission was in response to the court's inquiry). More importantly, however, the plea agreement not only did not prohibit the provision of this information, but explicitly stated that the government would provide it. (A 110 ("The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence.")). Indeed, given that Persico was indicted in this very case for most of the unconvicted conduct -- which necessarily involved a finding by the grand jury by a preponderance -- it is particularly hard to believe that Persico and defense counsel expected the government to misrepresent to the Probation Department and the district court its ability to prove those crimes.

Persico also asserts that the government "goaded" the district court into holding a Fatico hearing. (Br. 24). That assertion is directly contradicted by the record. Indeed, as noted

above, both Judge Townes and Chief Judge Irizarry ordered a Fatico hearing that the government made clear it did not want. As Judge Townes explained, she wanted the hearing because, having presided over the trial of co-defendant Francis Guerra, she had already heard evidence of Persico's involvement in racketeering and the Scopo murder.[3] By the time Chief Judge Irizarry inherited the case, the Fatico hearing had long been contemplated, and, in light of that fact, as well as the charges in the fourth superseding indictment and the "coverage" provision in the plea agreement, it cannot seriously be believed -- and borders on offensive to argue -- that an experienced chief district court judge was somehow duped by prosecutors into holding a hearing that they proposed, in writing, not be held at all.[4]

---

[3] Notably, ordering the Fatico hearing could be construed as a benefit to Persico, because Judge Townes had every right to make findings based on the record established in the Guerra trial. See, e.g., United States v. Tracy, 12 F.3d 1186, 1203 (2d Cir. 1993); United States v. Carmona, 873 F.2d 568, 574 (2d Cir. 1989); cf. United States v. Concepcion, 983 F.2d 369, 387-88 (2d Cir. 1992) (court can consider any information known to it so long as defendant has an opportunity to respond).

[4] Relatedly, Persico argues that the government breached because after the Fatico hearing, it said its cooperating witness should be credited. (Br. 24 (citing Vaval)). Having been ordered to participate in a Fatico hearing, the government cannot seriously be expected to argue that its own witness did not tell the truth, and no provision in the plea agreement, or legal principle announced anywhere, suggests such a senseless rule.

Persico argues that, under an Eleventh Circuit case decided in 1996, the government's conduct was a breach. (Br. 25-27). That argument lacks merit. In the cited case, United States v. Taylor, 77 F.3d 368 (11th Cir. 1996), the government and the defendant entered a plea agreement under which the defendant pled guilty to possessing marijuana and the government agreed to recommend a ten-year term of imprisonment. Id. at 369. After the Probation Department found that the defendant's plan to import cocaine was relevant conduct, the government offered to prove that plan prior to sentencing. Id. As a result, the district court found that plan proven, resulting in a Guidelines range of imprisonment of 151 to 188 months, and the court then imposed a term of 151 months. Id. at 369-70. The Eleventh Circuit found a breach because "[a]dvocacy of a position requiring a greater sentence is flatly inconsistent with recommendation of a lesser sentence." Id. at 370 (emphasis added). This holding reflects the primary distinction between Taylor and the present case: Taylor was decided before United States v. Booker, 543 U.S. 220 (2005), when the Guidelines were mandatory rather than advisory. As such, offering to prove facts that would increase the Guidelines range could have been found to contradict a promise to seek a sentence below the Guidelines range. Here, by contrast, nothing

the government proved obligated the district court to do anything and, in any event, had no effect on the Guidelines range.

Persico also purports to find support in two other out-of-Circuit cases: United States v. Canada, 960 F.2d 263 (1st Cir. 1992), and United States v. Boatner, 966 F.2d 1575 (11th Cir. 1992). However, these cases are even less useful than Taylor. In Canada, the government agreed in the plea agreement to recommend a sentence of 36 months' imprisonment, and to inform the court of the full nature and extent of the defendant's cooperation. 960 F.2d at 268. At sentencing, however, the Assistant U.S. Attorney never "herself affirmatively recommended a 36 month sentence," and instead explicitly requested "a substantial period of incarceration" and "a lengthy period of incarceration." Id. at 269. Because the prosecutor "failed affirmatively to recommend 36 months, as promised," and made the quoted statements, among others, and because she "fail[ed] ever to delineate the nature and extent of Canada's cooperation with the government," which had been the basis for the low sentence recommended in the agreement, the First Circuit found a breach. Id. at 269-70. The present case is readily distinguishable, because in this case, the government repeatedly and directly asked for the sentence it had agreed to ask for, and of course never withheld information it agreed to provide about any cooperation.

In Boatner, the government agreed in a plea agreement "that two ounces of cocaine would be the only quantity considered for sentencing purposes." 966 F.2d at 1577. At sentencing, however, the government stated that an additional two and three-quarters to three kilograms should be considered as well. Id. Therefore, the Eleventh Circuit found a breach, noting that although, in general, "[t]he solemnization of a plea agreement does not preclude the government from disclosing pertinent information to the sentencing court," the government in that case had specifically agreed "that only two ounces of cocaine would serve as the factual predicate for determining Boatner's sentence," which "obligate[d] the government to strict compliance." Id. at 1578. In the present case, by contrast, the government never argued that the Guidelines range was anything other than the range set forth in the agreement. More importantly, and as noted above, the government never agreed to withhold any information, and, instead, the agreement explicitly provided that "[t]he Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence." (A 110; GA 2).

Persico next argues that Wyatt supports his position, and, moreover, that Chief Judge Irizarry's decision in the present

case contradicts her own decision in Wyatt. (Br. 27-29). That argument, however, mischaracterizes both cases. In Wyatt, Chief Judge Irizarry found a breach not because the government identified information about criminality beyond the offense of conviction, but rather because it advocated for a particular sentence within the Guidelines range, as prohibited by the plea agreement. Wyatt, 2008 WL 2433613, at *11. Indeed, the government specifically, and erroneously, stated in that case that it was "free to argue for" a sentence at the high end of the range. Id. In the present case, by contrast, the government did no such thing, and therefore Judge Townes correctly found that Wyatt was distinguishable -- and Chief Judge Irizarry agreed. In addition, Wyatt is distinguishable because, in that case, the government offered evidence at sentencing that it had known about but that had not been known to either the defense or the court. Id. at *10. In this case, by contrast, the unconvicted crimes were known to everyone, and it is not reasonable for anyone to have believed the agreement precluded its consideration at sentencing.

As Chief Judge Irizarry, the author of Wyatt, observed when Persico attempted to raise these issues again, for a third time, Judge Townes' opinions were well-reasoned and correct:

> Her decision [finding no breach of the agreement] is sound. It is based on a very thorough, comprehensive and sound legal reasoning based on her examination of the

> facts of this case, the documents in this case, all the proceedings that were had in this case and the relevant case law and rules. Then there was a subsequent motion by the defense challenging that ruling and asking the Court to reconsider it and she reviewed it yet again and, again, the Court found that the government had not breached the plea agreement. . . . There is no breach of the plea agreement here.

(A 257-58).

Judge Townes has twice carefully considered and rejected the arguments advanced on appeal. Judge Irizarry reviewed those decisions and found that they were correct. A panel of this Court implicitly has found that the arguments did not support granting Persico bail pending appeal. Those judges were all correct, and, on this merits appeal, Persico's breach arguments should again be rejected.

### B. Responding to Persico's Request for a Six-Month Sentence Was Not a Breach of the Agreement

Persico also argues that the government breached the plea agreement by using, at sentencing, language that he characterizes variously as "highly inflammatory," "pejorative editorializing," "needless and aggressive commentary," "incendiary remarks" and "highly negative characterizations." (Br. 29-34). But Persico's conclusory recitation of these phrases does not accurately describe anything the government said. Indeed, the list of supposedly troubling statements made by the government

consists of plain-vanilla descriptions of some of Persico's crimes, such as noting that loansharking is a "staple of organized crime" and that murder is "the ultimate crime." (Br. 30-31; A 321). See United States v. Amico, 416 F.3d 163, 168 (2d Cir. 2005) (distinguishing Vaval because statements made by the government were "non-provocative, merely informative, and substantially justified"). Again, it is not credible to argue that this basic rhetoric could have tricked the district court into imposing a sentence it otherwise would not have imposed.

Moreover, Persico has completely omitted some very important context. When the government was first asked to address the district court at sentencing, it simply stated the following:

> Your Honor, I'm generally content to rely on the written record[]. I think the letter we submitted on October 19th of 2016 is the most recent and complete statement of our position. As to sentencing, it precedes the Court's recent opinion [making post-Fatico hearing findings], but it advocates for [the] finding[s] the Court made. So we're asking for a sentence in the guidelines range[,] which the Court just articulated. A fine in the guidelines range is also appropriate.
>
> At this time, I don't -- I don't think I have anything to add, unless the defense says something[,] I may ask permission to respond.

(A 305-06). Subsequently, the defense asked the district court to impose "a short sentence of imprisonment, and I'm talking about a six-month sentence[.]" (A 319). In support, the defense described, at length, "the defendant's exemplary character," "the

defendant's ability to comport his life to the requirements of law enforcement," his "acting as an ethical businessman in the community," and "his efforts to conform his conduct to law." (A 306-20).

Only after the defense's extensive, counterfactual argument in support of a six-month term of imprisonment -- which is less than one-sixth of the bottom end of the stipulated Guidelines range -- did the government respond by reminding the district court of the crime of conviction and Persico's other crimes, and then only in support of the very argument it originally and consistently advanced: that "the requested sentence, a sentence below the guidelines range[,] would not be sufficient, and a sentence within the guidelines range is necessary to satisfy all of the purposes of Section 3553(a)." (A 322). The government was under no obligation to remain silent while the defense misled the court about Persico's history and characteristics, nor was the government prohibited from opposing a plainly inadequate sentence of six months. See Amico, 416 F.3d at 165-66 (defendant "opened the door to this response when he attempted to characterize the criminal scheme in a manner favorable to himself"). Given this context, it would be inappropriate to find that anything the government said in support of a sentence within the Guidelines range breached the plea agreement.

The out-of-Circuit cases that Persico cites in support of his argument are all inapposite. (Br. 29-32). In United States v. Heredia, 768 F.3d 1220 (9th Cir. 2014), the Ninth Circuit considered a sentence imposed pursuant to a "fast-track" plea agreement used in immigration cases in the Southern District of California. 768 F.3d at 1224-28. In the agreement, the government agreed, pursuant to Rule 11(c)(1)(C), "that the appropriate disposition of the case was a prison term equal to the low end of the applicable Guidelines range[.]" Id. at 1228. The Ninth Circuit found a breach in part because the government cited additional, aggravating information at sentencing even though "there was no reason to believe that the district court was considering imposing a sentence less harsh than the stipulated one." Id. at 1232. In the present case, by contrast, the government initially made no statements at all in support of the requested sentence, and then made the challenged statements only because Persico sought a plainly inadequate sentence of six months based on a mischaracterization of his personal history.

In United States v. Mondragon, 228 F.3d 978 (9th Cir. 2000), the government promised the defendant that it would "make no recommendation regarding [the] sentence." 228 F.3d at 979. The Ninth Circuit found that the government's subsequent arguments about the defendant's conduct constituted an implicit sentencing

recommendation. Id. at 980-81. In the present case, by contrast, the government agreed to recommend a sentence within the Guidelines range of 37 to 46 months, and the challenged statement were clearly made in support of that range, as permitted by the plea agreement, only after Persico argued for a far lower, six-month sentence. See United States v. Moschella, 727 F.3d 888, 892 (9th Cir. 2013) (distinguishing Mondragon and finding no breach where prosecutor responded to request for downward variance and plea agreement permitted government to provide relevant information to the court).

In United States v. Badaracco, 954 F.2d 928 (3d Cir. 1992), the government agreed in a plea agreement that "the defendant's conduct did not involve more than minimal planning." Id. at 939. At sentencing, however, although the government acknowledged that agreement, it stated, "If the Court can go off anywhere it is there [sic] the there was an affirmative step taken by Mr. Badaracco indicating that he was concealing something" and noted that concealment was sufficient to support a finding of "more than minimal planning" under the Guidelines -- a finding the district court then made. Id. at 939 (modification and emphasis in original). In the present case, by contrast, none of the challenged statements conveyed any information that the government had ever agreed to withhold, nor did the government explicitly or

implicitly seek any Guidelines enhancement that was not stipulated to in the plea agreement.

In United States v. Moscahlaidis, 868 F.2d 1357 (3d Cir. 1989), the government agreed not to "take a position relative to whether or not a custodial sentence shall be imposed" at all. 868 F.2d at 1358. At sentencing, however, it referred to the defendant's "greed and moral bankruptcy," "demonic pursuit" and "utter contempt for the welfare of his fellow man." Id. at 1359. In the present case, again, the government initially made no statements at sentencing, and then made the challenged statements (which lack the pejorative qualities of the statements in Moscahlaidis) only after Persico sought a sentence of six months' imprisonment, far lower than the bottom of the range the government was permitted to seek.

Finally, in United States v. Crusco, 536 F.2d 21 (3d Cir. 1976), the government, "after first agreeing to abstain from taking a position on sentencing," argued at sentencing about "the importance in organized crime that [the defendant] has" and "the danger to the community" he would pose "out in the street." Id. at 25. In other words, the government in Crusco had effectively agreed not to oppose whatever sentence the defendant sought, no matter how lenient, but then offered arguments against the requested lenient sentence. In the present case, by contrast, and

Case 17-2701, Document 82, 12/08/2017, 2190731, Page44 of 99



again, the government offered the challenged statement in support of a sentence it was permitted to seek, and only after Persico requested a much lower sentence.[5]

---

[5] Persico also argues that the government breached by advocating for a sentence within the range of 37-46 months "before the court had determined the applicable Guidelines range," in particular because a three-level role enhancement might have been found not to apply. (Br. 33 n.8). However, Persico stipulated in the plea agreement that the three-level enhancement (under U.S.S.G. § 3B1.1(b)) applied and that the Guidelines range was 37-46 months. (A 111, GA 3). Further, while Persico subsequently argued that the enhancement might not apply, that argument was specious. As Chief Judge Irizarry explained, Persico argued that the enhancement applied only if the criminal activity involved five or more participants. (A 262-63). However, the enhancement plainly applies if "the criminal activity involved five or more participants <u>or was otherwise extensive</u>," and determining whether a crime was "otherwise extensive" requires considering "all persons involved." U.S.S.G. § 3B1.1(b) & App. Note 3 (emphasis added). Given that the loansharking loan he admittedly extended was made when he was a Colombo family associate, Persico cannot seriously dispute that the enhancement to which he stipulated applies, or that the government breached by advocating for a sentence within the Guidelines range that incorporated the enhancement. Accordingly, the court found that the enhancement applied. (A 264).

## POINT TWO

## THE DISTRICT COURT CORRECTLY FOUND THAT THE PLEA WAS SUFFICIENT

Persico argues that the district court erred in denying his motion to withdraw his guilty plea for failure to comply with Federal Rule of Criminal Procedure 11. To the contrary, Persico's statements at his plea allocution, coupled with information in the record at the time of the plea, were sufficient to satisfy Rule 11.

### I. Legal Standards

#### A. No Right to Withdraw Plea

A defendant "has no absolute right to withdraw his guilty plea." United States v. Torres, 129 F.3d 710, 715 (2d Cir. 1997) (citation and internal quotation marks omitted). After a defendant has pled guilty, and before he is sentenced, the plea may be withdrawn only for a "fair and just reason." Fed. R. Crim. P. 11(d)(2)(B). The defendant bears the burden of demonstrating valid grounds for withdrawal, United States v. Gonzalez, 647 F.3d 41, 56 (2d Cir. 2011), and only after the defendant meets this burden is the government required to show that it would be prejudiced by withdrawal of the plea, United States v. Maher, 108 F.3d 1513, 1529 (2d Cir. 1997). In general, to determine whether the defendant has shown a "fair and just reason" to justify withdrawal, a district court should consider, inter alia:

> (1) whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea; (2) the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just); and (3) whether the government would be prejudiced by a withdrawal of the plea.

United States v. Rosen, 409 F.3d 535, 546 (2d Cir. 2005) (internal quotation marks omitted).

B. Finality Is Critical

As this Court has repeatedly held, once a defendant's plea has been accepted by a court, the defendant is not automatically entitled to withdraw that plea because "[s]ociety has a strong interest in the finality of guilty pleas," and allowing the withdrawal of pleas not only "undermines confidence in the integrity of our judicial procedures," but also "increases the volume of judicial work, and delays and impairs the orderly administration of justice." Maher, 108 F.3d at 1529 (quoting United States v. Sweeney, 878 F.2d 68, 70 (2d Cir. 1989)); see also United States v. Burnett, 671 F.2d 709, 712 (2d Cir. 1982). Moreover, this Court has expressly held that "[t]he fact that a defendant has a change of heart prompted by his reevaluation of either the Government's case against him or the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea." United States v. Gonzalez, 970 F.2d 1095, 1100 (2d Cir. 1992). Put simply, "[d]efendants may not plead guilty in order to

test whether they will get an acceptably lenient sentence." Sweeney, 878 F.2d at 70.

C. The District Court Is Entitled to Deference

On appeal, the standard of review applicable to a decision denying withdrawal of a guilty plea is deferential to the district court. Indeed, as this Court has observed, a conviction based on a guilty plea is no more susceptible to challenge than a conviction after a jury trial:

> It is well established that a defendant who challenges the sufficiency of the evidence to support his conviction after a jury verdict bears a heavy burden. In reviewing such a challenge, an appellate court is required to view the evidence, "whether direct or circumstantial, in the light most favorable to the government, crediting every inference that could have been drawn in its favor," United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993), and to deem the evidence sufficient if "any rational trier of fact could have found the essential elements of the crime," United States v. Rivera, 971 F.2d 876, 890 (2d Cir. 1992) (internal quotation marks omitted) (emphasis in original). The same standard is applicable to a district court reviewing a motion for a judgment of acquittal. See generally Jackson v. Virginia, 443 U.S. 307, 318-19 . . . (1979); United States v. Taylor, 464 F.2d 240, 243 (2d Cir. 1972); 2 C. Wright, Federal Practice and Procedure § 467, at 658-65 (1982); id. at 663-65 ("It is not for the [district] court to assess the credibility of witnesses, weigh the evidence or draw inferences of fact from the evidence. . . . The court must . . . take the view of the evidence and the inferences therefrom most favorable to the government." (footnotes omitted)).

> The burden of a defendant who has been convicted after pleading guilty, and who contends thereafter that he should be allowed to withdraw his plea because he is innocent, is plainly no less heavy. The self-inculpatory statements he made under oath at his plea allocution "carry a strong presumption of verity," Blackledge v. Allison, 431 U.S. at 74 . . ., and the court, in reviewing the belated claims of innocence, must draw all permissible inferences in favor of the government and against the defendant, especially when, as here, the defendant has gone to trial, heard most of the government's evidence, and then pleaded guilty, describing his wrongdoing and acknowledging that he could not effectively defend against that evidence.

Maher, 108 F.3d at 1530.[6]

D. The Factual Basis Requirement

Rule 11(b) of the Federal Rules of Criminal Procedures sets forth procedures for district courts to follow in considering and accepting guilty pleas. Rule 11(b)(3) directs, "Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea." The standard for finding a factual basis for a guilty plea is neither a certainty that a jury would find the defendant guilty or the court's independent weighing of the evidence against the defendant, but rather a determination that the conduct to which the defendant admits is in

[6] Although Persico pled guilty during jury selection, rather than during or after the presentation of evidence to the jury, he had received the government's trial exhibits and witness statements before pleading guilty, and therefore had the same information as the defendant in Maher.

fact an offense that is alleged in the charging instrument. Maher, 108 F.3d at 1524.

In determining whether there is a factual basis for a plea, the district court is "free to rely on any facts at its disposal - not just the admissions of the defendant." Irizarry v. United States, 508 F.2d 960, 967 (2d Cir. 1974). Therefore the district court is not limited to the statements made by the defendant in the course of the plea, but can also consider statements of the attorneys for the government and other evidence in the record at the time of the plea. United States v. Andrades, 169 F.3d 131, 134, 136 (2d Cir. 1999) (citing Maher, 108 F.3d at 1524); see also United States v. Rodriguez, 501 F. App'x 86, 91 (2d Cir. 2012) ("When considering the factual basis for a plea, a district court need not consider evidence from the government regarding the interstate-commerce element, nor must the district court make any factual findings. Rather, the court must ensure that the defendant is aware of all the elements of the offense and has acknowledged actions that violate the charged offense. Accordingly, representations of the attorneys for the government at the plea colloquy may satisfy this requirement.") (citations and quotation marks omitted).

E. The Charged Crime

In this case, Persico pled guilty to conspiring, pursuant to 18 U.S.C. § 371, to make an extortionate extension of credit, pursuant to 18 U.S.C. § 892(a). To prove a violation of Section 371, the government must prove three elements:

> (1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy.

United States v. Reyes, 302 F.3d 48, 53 (2d Cir. 2002).

With respect to the object of the conspiracy, an extortionate extension of credit is "any extension of credit with respect to which it is the understanding of the creditor and the debtor at the time it is made that delay in making repayment or failure to make repayment could result in the use of violence or other criminal means to cause harm to the person, reputation, or property of any person." 18 U.S.C. § 891(6).[7] The government can prove a prima facie case that a loan was extortionate by showing that (1) repayment would be unenforceable through civil judicial process against the debtor, (2) the loan had an annual interest

[7] This Circuit has not decided whether a debtor's state of mind is an element of conspiracy under 18 U.S.C. § 892. See United States v. Lombardozzi, 491 F.3d 61, 68 n.1 (2d Cir. 2007) (observing that "other Circuits that have addressed the issue have held that the debtor's state of mind is irrelevant").

rate in excess of 45 percent, (3) "[a]t the time the extension of credit was made, the debtor reasonably believed that . . . the creditor had a reputation for the use of extortionate means to collect extensions of credit or to punish the nonrepayment thereof," and (4) the total extensions of credit by the creditor to the debtor exceeded $100. 18 U.S.C. § 892(b). Notably, however, Section 892(b) makes clear that "this subsection is nonexclusive and in no way limits the effect or applicability of subsection (a)," which generally prohibits "mak[ing] any extortionate extension of credit."

## II. The District Court Correctly Found that the Guilty Plea was Sufficient

In this case, there was no basis to withdraw the guilty plea, and the district court correctly rejected the withdrawal motion. Persico's clear, plain-language allocution, considered in light of the other facts in the record, easily satisfied the elements of the charged crime. Indeed, allowing Persico to withdraw his plea -- more than two years after it was entered -- would have been error, and would have subverted the very purposes of finality and certainty that are served by well-informed guilty pleas.

Persico first argued that his plea was insufficient on September 29, 2014, more than two years after pleading guilty, advancing the same arguments now made on appeal. (BMA 100-27).

On October 29, 2014, Judge Townes issued a thorough, well-reasoned opinion in which she carefully reviewed the record and the law, and then denied the motion. (A 190-214). In reviewing the record, Judge Townes observed that the Information alleged that Persico was a Colombo family associate who knowingly and intentionally conspired to make one or more extensions of credit to two victims, and that, as an overt act, he aided in the extension of a $100,000 usurious loan. (A 191-92). Judge Townes further found that, at the plea proceeding, Persico stated he had read and understood the Information. (A 193). Further, the court had read to him the loansharking charge, summarized the portions of the Information alleging his role in the Colombo family and explained the elements of the charged offense, which the parties agreed were stated correctly. (A 193-94). Judge Townes also found that Persico stated that he "arranged for someone to extend [a] $100,000 loan to the trucking company run by James Bambino [sic] and Steve Marcus at a usurious interest rate," and that the government stated that the rate of interest exceeded forty-five percent per year and that the two victims believed Persico and his co-conspirators had a reputation for using extortionate means to collect extensions of credit. (A 194-95).

Judge Townes correctly stated the applicable legal standards, noting, inter alia, the following:

> In determining whether an adequate factual basis exists, a court is "not limited to an examination of the defendant's plea allocution, but may look more broadly to 'any facts on the record at the time of the plea proceeding.'" [United States v. Garcia, 587 F.3d 509, 514 (2d Cir. 2009) (quoting United States v. Adams, 448 F.3d 492, 499 (2d Cir. 2006)).] In other words, "so long as the facts relied on are placed on the record at the time of the plea, 'the district court, in determining whether there was a factual basis for the plea, [i]s free to rely on any facts at its disposal-not just the admissions of the defendant." [United States v Maher, 108 F.3d 1513, 1524-25 (quoting Irizarry v. United States, 508 F.2d 960, 967 (2d Cir. 1975)). . . . However, a court cannot "find that a factual basis exists when the defendant actively contests a fact constituting an element of the offense in the absence of circumstances warranting the conclusion that the defendant's protestations are 'unworthy of belief.'" Id. (quoting Godwin v. United States, 687 F.2d 585, 590 (2d Cir. 1982)).

(A 206); accord United States v. Culbertson, 670 F.3d 183, 190 (2d Cir. 2012) (court "may use 'whatever means is appropriate in a specific case'") (quoting Maher, 108 F.3d at 1524)).

Judge Townes found that although Persico's allocution, considered in a vacuum, did not satisfy all elements of the offense, the totality of the record made clear that the elements were satisfied. (A 205-11). More specifically, Judge Townes considered 18 U.S.C. § 892(b), which provides that an extension of credit can be proven "extortionate" based on four enumerated factors: that repayment was legally unenforceable, that the annual rate of interest exceeded 45 percent, that the debtor reasonably

believed that the creditor had previously used extortionate means to collect credit or had a reputation for doing so, and that total extensions by the creditor to the debtor exceeded $100. (A 208-09). Judge Townes correctly found that Persico's allocution, read together with the full record, satisfied all four factors, and therefore that the record supported a finding of intent. (A 209-11). Judge Townes relied on United States v. Lombardozzi, 491 F.3d 61 (2d Cir. 2007), which held that "a jury may permissibly infer that someone who makes an unsecured loan and charges exorbitant interest rates surely intends to back up the loan with threats of violence." (A 210 (quoting Lombardozzi, 491 F.3d at 71)).

Further, Judge Townes explained that Persico's "admission that he 'arranged for someone' to make the loan implies that he conspired to make the extortionate extension of credit." (A 210).[8] Judge Townes's reasoning was correct. "The government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence." United States v. Anderson, 747

---

[8] At the plea, Judge Townes explained the elements of a Section 371 conspiracy to Persico. (A 126-27). Thus, United States v. Darling, 766 F.2d 1095 (7th Cir. 1985), upon which Persico relies (Br. 45), is inapposite. There, the defendant was never instructed about the elements of conspiracy, nor was there any mention of conduct that could involve a conspiracy. Darling, 766 F.2d at 1097-1100 ("it is only from outside sources that we know that Darling was charged with conspiracy and not the underlying substantive offense").

F.3d 51, 60 (2d Cir. 2014) (citations omitted). Notably, where, as here, a defendant "arranged" for the commission of a substantive crime, an inference of conspiratorial intent is particularly warranted. In United States v. Davis, 690 F.3d 127 (2d Cir. 2012), this Court found a critical distinction between a principal who arranges for the commission of a crime and a subordinate who "plausibly could have fulfilled that role without knowing the scheme's criminal nature." Id. at 131. Conspiratorial intent can be easily inferred where evidence established that a defendant "played a principal role, even a managerial one, in [a] conspiracy and for that reason would have reasonably possessed the requisite criminal knowledge." Id. at 132; see also id. at 133 ("because it logically can be inferred that one who arranges a shipment knows its contents, the jury here easily could have found from the totality of the evidence that Davis knew precisely what was in the shipped packages"). Because Persico allocuted to arranging for the extension of a usurious loan, Judge Townes did not err in finding his plea sufficient as to the crime of conspiracy.

In light of the record in this case, therefore, the guilty plea was correctly held to be sufficient.

In support of withdrawing his plea, Persico argues that he is innocent because the borrower of the loan was his cousin, as well as other circumstances that Persico purports to have proven

via cherry-picked transcripts submitted on appeal. (Br. 41-42). This assertion of innocence is not credible. As this Circuit has explained in a similar case:

> These arguments could have been made to a jury if defendants had not pleaded guilty. Insofar as this appeal is concerned, however, they have been waived, for a defendant who pleads guilty unconditionally admits his guilt and waives his right to appeal all nonjurisdictional contentions. See, e.g., Hayle v. United States, 815 F.2d 879, 881–82 (2d Cir. 1987) (factual issues waived by plea of guilty); United States v. Selby, 476 F.2d 965, 967 (2d Cir. 1973) (per curiam); United States v. Doyle, 348 F.2d 715, 718 (2d Cir.), cert. denied, 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965). While such a defendant retains the right to contend that there were errors in the proceedings that led to the acceptance of his plea of guilty, and he may argue that the district court failed to comply with Rule 11(f)'s requirement that the court be satisfied "that there is a factual basis for the plea," the latter requirement, as discussed in Part II.B. above, does not focus on the factual sufficiency or persuasiveness of the government's evidence but rather on the relationship between (a) the law and (b) the acts the defendant admits having committed, along with other pertinent facts culled by the court from the government's proffer or from elsewhere. Questions that a defendant might raise as to which of competing inferences should or might be drawn, or whether there are innocent explanations for behavior that could be viewed as culpable, do not survive his plea of guilty.

Maher, 108 F.3d at 1528–29. In light of Maher, Persico's offer of evidence should be rejected, particularly because it is one-sided and cannot be contradicted other than by conducting a trial,

including offering extensive testimony by a cooperating witness with personal involvement in the crime at issue.

In addition, under Rosen, determining whether a defendant has shown a "fair and just reason" to justify withdrawal requires a court to consider not just "whether the defendant has asserted his or her legal innocence in the motion to withdraw the guilty plea," but also "the amount of time that has elapsed between the plea and the motion (the longer the elapsed time, the less likely withdrawal would be fair and just)" and "whether the government would be prejudiced by a withdrawal of the plea." 409 F.3d at 546 (citation and internal quotation marks omitted). As to the amount of time that has elapsed, Persico pled guilty more than two years before moving to withdraw. This lapse of time is further evidence that his motion is frivolous. Torres, 129 F.3d at 715 (citing seven-month delay as basis to deny motion to withdraw guilty plea); United States v. Grullon, No. 94 CR. 466, 1996 WL 437956, at *6 (S.D.N.Y. Aug. 5, 1996) (holding that defendant's attempt to withdraw guilty plea was fatally undermined by delay of about three months).

Furthermore, although the government is not required to establish prejudice where a defendant fails to prove a fair and just basis for withdrawing his guilty plea, Maher, 108 F.3d at 1529, the government notes, as an additional basis for denying the

motion, that it would be prejudiced by withdrawal of the guilty plea. Given the two-plus years that passed between the plea and the motion, if the plea had been withdrawn, the government would have faced the difficulties of having to reassemble its witnesses and prepare anew for trial, and to expend scarce and valuable resources on preparing for and conducting a trial that it had already prepared for once. See United States v. Moses, No. 1:05-CR-133, 2010 WL 3521724, at *21 (D. Vt. Sept. 7, 2010) (sufficient prejudice to the government demonstrated where "the prosecution's efforts were dropped, with the understanding that it was no longer necessary to marshal the evidence against Moses" at the time of the guilty plea, and many months later, the defendant "ask[ed] the government to revive the prosecution and prepare for trial again").

Persico also argues that his allocution was insufficient because he did not use specific legal terms such as "conspiracy" and "intent." (Br. 42-46). This argument should be rejected. As an initial matter, and contrary to this argument, allocutions that simply recite legalistic language, such as by tracking the text of an indictment or statute, are disfavored; instead, the better practice is to have a defendant explain in his own words -- in plain language -- what he did, which is precisely what Persico did in this case. (A 141-42). It would be anomalous to permit him to

withdraw his plea on the basis that he used plain language rather than robotically reciting the statutory elements.

Moreover, Persico's plain-language allocution, considered in light of other facts in the record, amply supports a finding that the elements of the charged crime are satisfied. As noted above, in determining whether there is a factual basis for a plea, the district court is "free to rely on any facts at its disposal - not just the admissions of the defendant," Irizarry, 508 F.2d at 967, and can consider statements of the attorneys for the government and other evidence in the record at the time of the plea, Andrades, 169 F.3d at 134, 136. As noted above, Judge Townes carefully considered the record before confirming that the guilty plea was indeed sufficient.

Finally, Persico argues that the district court failed to ascertain his understanding of the charge. (Br. 46-49). This argument is also belied by the record of the plea proceeding, which demonstrates that the district court in fact thoroughly established Persico's understanding of the charge. Any argument to the contrary lacks credibility. More specifically, Judge Townes considered whether Persico understood the nature of the charge to which he pled guilty, as required by Fed. R. Crim. P. 11(b)(1). (A 211-14). This Court has held that, although it is not required, "[i]t is usually the better practice for the district court in

Case 17-2701, Document 82, 12/08/2017, 2190731, Page60 of 99



conducting plea allocutions to detail the elements of the offenses charged in the counts to which the defendants are pleading guilty or to read those counts of the indictment to them." Maher, 108 F.3d at 1524. In this case, Judge Townes found that this "better practice" was applied, and even exceeded, at the plea proceeding, including by securing representations from Persico that he understood the charge and had no questions about it. (A 212-13). Because this finding is amply supported by the record, there is no basis to credit Persico's assertion that he did not understand the charge, and no basis to disturb the district court's conclusion.[9]

---

[9] Persico subsequently asked the district court to reconsider this conclusion, based in part on facts that he proffered long after the plea proceeding. (BMA:214-16). On appeal, Persico advances this argument again. (Br. 12-16, 41). Judge Townes considered and correctly rejected this argument because "Rule 11 'does not require the district court to weigh any evidence or predict what a jury would do with the case,' [United States v. Smith, 160 F.3d 117, 121 (2d Cir. 1998)], or 'replicate the trial that the prosecutor and defendant entered a plea agreement to avoid.' United States v. Lumpkins, 845 F.2d 1444, 1451 (7th Cir. 1988)." (A 242). This issue was correctly decided in light of that precedent.

## POINT THREE

## THE DISTRICT COURT CORRECTLY CONSIDERED UNCONVICTED CONDUCT

To preserve the issue for further potential review, Persico argues that the district court erred because, at sentencing, it considered "unconvicted conduct," i.e., his participation in racketeering, murder and other crimes in addition to the loansharking conspiracy to which he pled guilty. (Br. 49). This argument has been rejected by both the Supreme Court and this Court, and should be rejected here as well.

### I. Legal Standards

It is well established that conduct may be considered at sentencing as long as it is proven by a preponderance of the evidence. United States v. Beardsley, 691 F.3d 252, 274 (2d Cir. 2012); see also United States v. Cordoba Murgas, 233 F.3d 704, 708-09 (2d Cir. 2000) (holding that the preponderance standard is "mandated"); United States v. Concepcion, 983 F.2d 369, 388 (2d Cir. 1992) (holding that disputed sentencing factors need only be proved by a preponderance of the evidence); United States v. Guerra, 888 F.2d 247, 251 (2d Cir. 1989) (same); accord McMillan v. Pennsylvania, 477 U.S. 79, 91 (1986) (holding that the preponderance standard satisfies due process).

Significantly, a district court may rely even upon acquitted conduct -- as distinct from merely "unconvicted" conduct

-- when making a sentencing determination. United States v. Calderon, 610 F. App'x 42, 45-46 (2d Cir. 2015); United States v. Martinez, 525 F.3d 211, 214-16 (2d Cir. 2008) (per curiam) (rejecting due process and Sixth Amendment challenge to use of uncharged crime to enhance a sentence); United States v. Vaughn, 430 F.3d 518, 521 (2d Cir. 2005) (holding that after United States v. Booker, 543 U.S. 220 (2005), district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause"). In cases without a mandatory minimum sentence, a judicial finding of facts that were not proven to the jury but used to enhance a sentence, so long as the defendant was sentenced within the statutory maximum authorized by the jury's verdict, is permissible. See Alleyne v. United States, 570 U.S. 99, 133 S. Ct. 2151, 2161 n.2, 2163 (2013).

As this Circuit has explicitly held, "[a] district court may treat acquitted conduct as relevant conduct at sentencing, provided that it finds by a preponderance of the evidence that the defendant committed the conduct." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012); see also United States v. Guerra, 647 F. App'x 38 (2d Cir. 2016) ("The ability of district courts to sentence on the basis of acquitted conduct proved by a

preponderence of the evidence is well established.") (citing United States v. Watts, 519 U.S. 148, 149 (1997); United States v. Vaughn, 430 F.3d 518, 525–27 (2d Cir. 2005) (Sotomayor, J.)); United States v. Florez, 447 F.3d 145, 156-57 (2d Cir. 2006) (concluding that after Booker, a district court may continue to make its own preponderance finding of a higher drug quantity than the amount found by the jury); United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005) ("with the mandatory use of the Guidelines excised, the traditional authority of a sentencing judge to find all facts relevant to sentencing will encounter no Sixth Amendment objection"), abrogated on other grounds by United States v. Fagans, 406 F.3d 138 (2d Cir. 2005). Notably, this rule applies not only to "relevant conduct" under the Sentencing Guidelines, but also to facts that are relevant to sentencing factors enumerated in 18 U.S.C. § 3553(a). United States v. Shahid, 486 F. App'x 915, 916-17 (2d Cir. 2012); United States v. Cummings, 329 F. App'x 317, 319 (2d Cir. 2009).

II. Application

In this case, the district court's consideration of unconvicted conduct was appropriate under clear Supreme Court and Second Circuit precedent. Indeed, such conduct was considered in this case only after a lengthy, thorough, heavily litigated Fatico hearing. Because the law on this point is clear, and the district

court’s findings were so carefully made, there is no reason to distinguish this case from those permitting the consideration of unconvicted conduct, or to use this case as a vehicle to challenge the well-established rule permitting such consideration.

Case 17-2701, Document 82, 12/08/2017, 2190731, Page65 of 99



## CONCLUSION

For the reasons stated above, the judgment should be affirmed.

Dated: Brooklyn, New York
December 8, 2017

Respectfully submitted,

BRIDGET M. ROHDE,
Acting United States Attorney,
Eastern District of New York.

By: /s/
ALLON LIFSHITZ
Assistant U.S. Attorney

AMY BUSA,
ALLON LIFSHITZ,
Assistant United States Attorneys,
(Of Counsel).

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,114 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a monospaced typeface using Microsoft Word in 12-point Courier New font.

Dated: Brooklyn, New York
December 8, 2017

/s/
AMY BUSA
Assistant U.S. Attorney

# A P P E N D I X

# TABLE OF CONTENTS

Page

Plea Agreement,
United States v. Michael Persico, 10-CR-147 (SLT),
Dated June 8, 2012 ........................................ GA 1

Opinion and Order,
United States v. Michael Persico, 10-CR-147 (DLI),
Dated July 19, 2017 ........................................ GA 11

Order Denying Defendant's Motion for Bail Pending Appeal,
United States v. Michael Persico, 17-2701 (2d Cir.),
Dated Oct. 19, 2017 ........................................ GA 31

AO386-C
GOVERNMENT EXHIBIT
CASE NO. 10CR147
EXHIBIT NO. 1

TM:NMA/RJN/AL
F.#2010R00195

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

\- - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

\- against -

MICHAEL PERSICO,

Defendant.

\- - - - - - - - - - - - - - - - - - -X

PLEA AGREEMENT

10 CR 147 (S-6) (SLT)

Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and MICHAEL PERSICO (the "defendant") agree to the following:

1. The defendant agrees to waive indictment and plead guilty to a superseding information to be filed in this district "Superseding Information (S-6)", charging a violation of 18 U.S.C. § 371. The count carries the following statutory penalties:

a. Maximum term of imprisonment: 5 years (18 U.S.C. § 371).

b. Minimum term of imprisonment: 0 years (18 U.S.C. § 371).

c. Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years imprisonment without credit for pre-release

imprisonment or time previously served on post-release supervision (18 U.S.C. § 3583(b), (e)).

d. Maximum fine: the greater of $250,000, or twice the gross gain or gross loss (18 U.S.C. § 3571(b)(3), (d)).

e. Restitution: to be determined by the Court (18 U.S.C. §§ 3663 and 3663A).

f. $100 special assessment (18 U.S.C. § 3013).

g. Other penalties: criminal forfeiture in the amount of $325,000, as set forth below.

2. The defendant understands that although imposition of a sentence in accordance with the United States Sentencing Guidelines (the "Guidelines" and "U.S.S.G") is not mandatory, the Guidelines are advisory and the Court is required to consider any applicable Guidelines provisions as well as other factors enumerated in 18 U.S.C. § 3553(a) to arrive at an appropriate sentence in this case. The Office will advise the Court and the Probation Department of information relevant to sentencing, including criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. The Office estimates the likely adjusted offense level under the Guidelines to be level 23, which is predicated on the following Guidelines calculation:

Extortionate Extension of Credit Conspiracy

| | |
|---|---|
| Base Offense Level (§ 2E2.1) | 20 |
| Plus: Manager or Supervisor (§ 3B1.1(b)) | +3 |

Total: 23

If the defendant clearly demonstrates acceptance of responsibility, through allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a), resulting in an adjusted offense level of 21 and a range of imprisonment of 37 to 46 months, assuming that the defendant falls within Criminal History Category I. The defendant stipulates to the above Guidelines calculation.

3. The Guidelines estimate set forth in paragraph 2 is not binding on the Office, the Probation Department or the Court. If the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement.

4. The defendant agrees not to file an appeal or otherwise challenge, by petition pursuant to 28 U.S.C. § 2255 or any other provision, the conviction or sentence in the event that the Court imposes a term of imprisonment of 46 months or below. This waiver is binding without regard to the sentencing analysis used by the Court. The defendant waives all defenses based on the statute of limitations and venue with respect to any prosecution that is not time-barred on the date that this agreement is signed

in the event that (a) the defendant's conviction is later vacated for any reason, (b) the defendant violates this agreement, or (c) the defendant's plea is later withdrawn. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 12(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

5. The defendant acknowledges that he owns property that is subject to forfeiture as a result of his participation in an extortionate collection of credit conspiracy, as charged in the Superseding Information (S-6). The defendant consents to the forfeiture of $325,000 in United States currency (the "Forfeiture Money Judgment") pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offense to forfeit any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense, and/or as substitute assets pursuant to Title 21, United States Code, Section 853(p). Payment of the Forfeiture Money Judgment shall be made by certified or bank check, payable to the United States Marshal Service. On or before August 3, 2012, the defendant shall cause said check to be hand-

delivered to Assistant United States Attorney Brian Morris, United States Attorney's Office, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201, with the criminal docket number noted on the face of the check.

6. If the Forfeiture Money Judgment is not paid on or before August 3, 2012, interest shall accrue on any unpaid portion thereof at the judgment rate of interest from that date. If the defendant fails to pay any portion of the Forfeiture Money Judgment on or before August 3, 2012, the Office may execute the Forfeiture Money Judgment against any other assets of the defendant, up to the outstanding balance, pursuant to 21 U.S.C. § 853(p), the Federal Debt Collection Procedure Act, or any other applicable law.

7. The defendant consents to the entry of an Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure forfeiting the above-referenced sum of money to the United States. The defendant agrees to fully assist the government in effectuating the payment of the Forfeiture Money Judgment. The defendant agrees not to file or interpose any claim or to assist others to file or interpose any claim to any property against which the government seeks to execute the Forfeiture Money Judgment in any administrative or judicial forfeiture proceedings.

8. The failure of the defendant to forfeit any monies and/or properties as required under this agreement, including the failure of the defendant to execute any document to accomplish same

on timely notice to do so, shall constitute a material breach of this agreement. Upon such a breach, the defendant will not be entitled to withdraw his plea, but the Office may bring additional criminal charges against the defendant.

9. The defendant knowingly and voluntarily waives his right to any required notice concerning the forfeiture of the monies and/or properties forfeited hereunder, including notice set forth in an indictment or information. In addition, the defendant knowingly and voluntarily waives his right, if any, to a jury trial on the forfeiture of said monies and/or properties, and waives all constitutional, legal and equitable defenses to the forfeiture of said monies and/or properties, including, but not limited to, any defenses based on principles of double jeopardy, the Ex Post Facto Clause of the Constitution, the statute of limitations, venue, or any defense under the Eighth Amendment, including a claim of excessive fines.

10. The defendant agrees that the forfeiture of the above sum of money is not to be considered a fine or a payment on any income taxes that may be due.

11. The Office agrees that:

a. no further criminal charges will be brought against the defendant for his participation in: (1) racketeering conspiracy as alleged in Count One of the underlying indictment, captioned Superseding Indictment S-4; (2) the extortionate extension and collection of

credit from John Doe #1[1] between 1989 and 1991 and the conspiracy to commit the same (as alleged in Racketeering Acts 1 and 2); (3) the murder of Michael Devine and conspiracy to commit the same; (4) the murder of Joseph Scopo and conspiracy to commit the same (as alleged in Racketeering Act 3); (5) the extortionate extension, financing and collection of credit to John Doe #2 between 1993 and 1994 (as alleged in Racketeering Act 5); (6) the extortion of John Doe #2 between June 2007 and 2009 and the conspiracy to commit the same (as alleged in Racketeering Act 12 and Counts 4 and 5); (7) the attempted extortion of and conspiracy to extort John Doe #6 between September 2007 and February 2010 (as alleged in Racketeering Act 13); (8) the extortionate extension, financing and collection of credit from John Doe #8 and John Doe #9 between May 2009 and February 2010 and the conspiracy to commit the same (as alleged in Racketeering Act 16 and Counts 8 - 11); (9) wire fraud, commercial bribery and the conspiracy to commit the same related to Testa Corporation between June 2009 and February 2010 (as alleged in Racketeering Act 17 and Counts 13 and 14); (10) attempted extortion, and extortion, of John Doe #10 and John Doe #11 between September 2009 and February 2010 and the conspiracy to commit the same (as charged in Racketeering Act 18 and Counts 15 - 17); (11) the attempted extortion of Testa Corporation between October 2009 and December 2009 and conspiracy to commit the same (as charged in Racketeering Act 19 and Counts 18 and 19); (12) the murder of Joseph Lalima and conspiracy to commit the same; (13) the conspiracy to murder Bruce Black; (14) the extortion and conspiracy to extort Roger Califano; (15) loansharking between 1992 and 2000, as set forth in the government's motion to admit other acts evidence; and (16) illegal gambling - joker poker machines between 2000

---

[1] The John Does referenced in this paragraph reflect the numbering set forth in the underlying indictment captioned Superseding Indictment S-4.

and 2007, and the Office agrees not to use such conduct as a predicate racketeering act in a subsequent prosecution pursuant to 18 U.S.C. § 1962, it being understood, however, that this agreement does not otherwise bar the use of such conduct in a subsequent prosecution, including as the basis for a sentencing enhancement, and at the time of sentence, it will move to dismiss any underlying indictment with prejudice;

and, based upon information now known to the Office, it will

b. take no position concerning where within the Guidelines range determined by the Court the sentence should fall; and

c. make no motion for an upward departure under the Sentencing Guidelines.

If information relevant to sentencing, as determined by the Office, becomes known to the Office after the date of this agreement, the Office will not be bound by paragraphs 11(b) and 11(c). Should it be judged by the Office that the defendant has violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including but not limited to the provisions of paragraph 11(a)-(c).

12. This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

13. This agreement is conditioned upon the following: (a) the defendants listed below (the "covered defendants") entering guilty pleas, pursuant to plea offers dated June 7, 2012, on or before June 8, 2012; and (b) acceptance of those pleas by a United States District Court Judge at the time of the plea allocution. The covered defendants are:

(i) Michael J. Persico and

(ii) Theodore Persico, Jr.

If fewer than all of the covered defendants satisfy conditions 13(a) and 13(b), or if any of the covered defendants subsequently seeks to withdraw his guilty plea, the Office, in its sole discretion, may elect to void any or all of the covered defendants' plea agreements and proceed to trial.

14. Apart from any written proffer agreements, if applicable, no promises, agreements or conditions have been entered into by the parties other than those set forth in this agreement and none will be entered into unless memorialized in writing and signed by all parties. Apart from any written proffer agreements,

if applicable, this agreement supersedes all prior promises, agreements or conditions between the parties. To become effective, this agreement must be signed by all signatories listed below

Dated: Brooklyn, New York
June 8, 2012

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: ______________________
Nicole M. Argentieri
Rachel Nash
Allon Lifshitz
Assistant United States Attorneys

Approved by:

______________________
Taryn Merkl
Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

______________________
MICHAEL PERSICO
Defendant

Approved by:

______________________
Sarita Kedia, Esq.
Paul Shechtman, Esq.
Counsel to Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,

-against-

MICHAEL PERSICO, *et al.*,

Defendant.

---------------------------------------------------------------x

**OPINION AND ORDER**
10-CR-147 (DLI)

**DORA L. IRIZARRY, Chief United States District Judge:**

On June 8, 2012, Michael Persico ("Defendant") pled guilty to the Sixth Superseding Information, which charged him with a single count of conspiracy to engage in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892. *See* Superseding Info., Dkt. Entry No. 565; Change of Plea Hr'g, Dkt. Entry No. 566 at 1. On October 30, 2014, the Court ordered a hearing pursuant to *United States v. Fatico*, 603 F.2d 1053 (2d Cir. 1979) (the "*Fatico* Hearing") as "to those acts that the [G]overnment allege[d] they can prove by a preponderance of the evidence . . . in order to make an informed decision" for sentencing. Oct. 30, 2014 Tr. of Crim. Cause for Sent'g ("Oct. 2014 Tr."), Dkt. Entry No. 823-1 at 4. At the time of his guilty plea and that pre-sentence conference, this case was assigned to the Hon. Sandra L. Townes, U.S.D.J. This matter was reassigned to this Court on November 24, 2015. *See* Nov. 24, 2015 Min. Entry.[1]

Upon reassignment to this Court, both the Government and Defendant claimed that no *Fatico* hearing was necessary. However, as Defendant continued to dispute that the Government could prove certain facts by a preponderance of the evidence, this Court determined that a *Fatico* hearing was necessary. Specifically, Defendant contested the Government's assertions that it could prove, by a preponderance of the evidence, that he participated in: (1) the 1993 murder of Joseph

[1] Notably, prior to the reassignment of this case to this Court, Judge Townes had denied various defense motions in connection with Defendant's attempts to withdraw his guilty plea. *See, e.g.*, Oct. 29, 2014 Mem. & Ord., Dkt. Entry No. 791; Feb. 27, 2015 Mem. & Ord., Dkt. Entry No. 811.

Scopo; (2) loansharking; (3) extortion; (4) a conspiracy to buy and sell stolen video games; and (5) racketeering. *See* Gov't Jan. 19, 2015 Ltr., Dkt. Entry No. 823, at 3; Def. Jan. 21, 2015 Ltr., Dkt. Entry No. 803, at 6-7.[2]

The *Fatico* Hearing was held on August 10 and 24, 2016. *See* Gov't Ex. A ("Hr'g Tr.").[3] During the *Fatico* Hearing, the Government presented testimony from Anthony Russo ("Russo"), an acting captain of the Colombo Crime Family ("Colombo Family") in New York City at the time of his arrest and indictment in 2011 in this District for, *inter alia*, participating in the murder of Joseph Scopo, receiving stolen video games, and conspiracies to commit extortionate extensions and collections of credit, illegal sports betting, and marijuana distribution. *See* Def. Ex. H; Hr'g Tr. at 12, 114. Defendant attempted to introduce testimony from Ronald Dwyer, a private investigator, pertaining to the physical condition of Joseph Scopo's former residence in Brooklyn at the time Scopo was murdered. Hr'g Tr. at 311-14. The Court precluded this testimony after determining that Mr. Dwyer would have no knowledge of the condition of the structure at the time of the murder over two decades ago. *Id.* at 314.

After the *Fatico* Hearing, the Court accepted additional briefing and evidence from the parties on the alleged acts. *See* Gov't *Fatico* Hr'g Br. ("Gov't Br."), Dkt. Entry No. 846; Def. *Fatico* Hr'g Br. ("Def. Br."), Dkt. Entry No. 849; Gov't Resp. to Def. *Fatico* Hr'g Br. ("Gov't Resp."), Dkt. Entry No. 853; Def. Resp. to Gov't *Fatico* Hr'g Br. ("Def. Resp."), Dkt. Entry No. 854; Def. May 9, 2017 Ltr., Dkt. Entry No. 863; Gov't May 31, 2017 Ltr., Dkt. Entry No. 865.

---

[2] The Government previously claimed it could prove other acts by a preponderance of the evidence, but decided not to pursue them (*e.g.*, participation in the 1992 murder of Michael Devine). *See* PSR, Dkt. Entry No. 667, at ¶¶ 38-39.

[3] Unless otherwise noted, the Court refers to the exhibits annexed to the Government's post-hearing submissions with the prefix "Gov't Ex.," and to those annexed to Defendant's post-hearing filings with the prefix "Def. Ex." throughout this Opinion and Order.

For the reasons set forth below, based upon Russo's testimony, which the Court finds credible, and upon due consideration of all the parties' submissions, the Court finds, by more than a preponderance of the evidence, that Michael Persico did participate in the five alleged activities. Accordingly, the Court shall consider all five activities in fashioning a reasonable sentence.

## DISCUSSION

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable [United States Sentencing Guidelines ("U.S.S.G.")] range." *Gall v. United States*, 552 U.S. 38, 49 (2007) (internal citations omitted). This calculation provides "the starting point and initial benchmark." *Id.* However, the range provided by the U.S.S.G. is only advisory. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The Court "may not presume that the Guidelines range is reasonable" for the facts and circumstances in every case. *Gall*, 552 U.S. at 50 (internal citations omitted). Rather, the Court must assess and consider, among other things, "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

To this end, sentencing courts are permitted "to consider the widest possible breadth of information about a defendant [to] 'ensure[] that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)); *See also United States v. Broxmeyer*, 708 F.3d 132, 135 (2d Cir. 2013). This inquiry is "largely unlimited . . . as to the kind of information . . . consider[ed], or the source from which it may come." *Witte v. United States*, 515 U.S. 389, 398 (1995) (internal citations and quotation marks omitted). Indeed, the Court "may consider hearsay statements, evidence of uncharged crimes, dropped counts of an indictment[,] and criminal activity resulting in an acquittal in determining sentence." *United States v. Romano*, 825 F.2d 725, 728 (2d Cir. 1987) (citing *United States v. Pugliese*, 805 F.2d 1117, 1122 (2d Cir. 1986)). "No limitation

shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Any conduct considered must be proven by a preponderance of the evidence. *See Witte*, 515 U.S. at 401. In this Circuit, courts may conduct this inquiry by way of a *Fatico* hearing, during which, "the prosecution and the defense may introduce evidence relating to the appropriate sentence." *United States v. Lohan*, 945 F.2d 1214, 1216 (2d Cir. 1991) (citing *Fatico*, 603 F.2d at 1053).

## I. Findings of Fact

Russo's career in organized crime began as a teenager in the 1970s and ended with his arrest in 2011. Hr'g Tr. at 11-12. For over thirty years, he was associated with both the Gambino and Colombo Families in New York City.[4] *Id.* at 12-13. His association with the Colombo Family began when he was incarcerated with Theodore Persico, Jr. ("Theodore, Jr."), the nephew of the Colombo Family Boss, Carmine Persico ("Carmine"), in Coxsackie, New York.[5] *Id.* 18-20, 23-24.

Upon his release from prison in 1992, Russo joined the Colombo Family as an associate[6] and reported directly to Theodore Persico, Sr. ("Theodore, Sr."). *Id.* at 23-24, 26-28, 30. This reporting structure lasted until 1993 when Theodore, Sr. and other leaders of the Colombo Family were arrested. *Id.* at 31-32. With the leadership decapitated, Russo, along with his close friend and fellow Colombo Family associate Frank Guerra ("Guerra"), reported to Defendant. *Id.* at 29, 32.

[4] Russo explained that there are five "crime families" operating in New York City; the other three are the Bonanno, Genovese, and Lucchese Families. Hr'g Tr. at 13.

[5] Carmine is Defendant's father; Theodore, Jr. is Defendant's cousin. *Id.* at 21.

[6] Russo outlined the general crime family hierarchy along with the roles and responsibilities associated with each level. In ascending order, the positions are: (1) associate; (2) soldier; (3) captain; (4) consigliere; (5) underboss; and (6) boss. *Id.* at 13. Upon becoming a "soldier," individuals were formally inducted into, and made a member of, the particular family. *See Id.* at 14-17.

Although it was unusual for individuals to report to others with the same rank, Russo explained that reporting to Defendant made sense given Defendant's familial ties to the group's leaders. *Id.* at 32. Russo regularly met with Defendant and others at various locations[7] in Brooklyn, New York, to discuss loansharking. *Id.* at 33. He consistently observed other criminal associates of Theodore, Jr. follow a similar pattern and meet with Defendant as well. *Id.* at 33-34. Russo reported to Defendant until Alphonse Persico ("Al"), Defendant's brother, was released from jail in 1994. *Id.* at 68-69.

### A. *The 1993 Murder of Joseph Scopo*

When Russo joined the Colombo Family, it was in the midst of a civil war among family factions that required the organization's members to align themselves with either Carmine or Vic Orena ("Orena"), an acting boss who was trying to wrest control of the syndicate from the Persico family. *Id.* at 30-31; *See also* Def. Ex. C ("*Guerra* Tr.") at 186-87.[8] Russo sided with those loyal to Carmine, choosing to oppose the Orena faction led by Joseph Scopo ("Scopo") and "Wild Bill" Cutolo ("Cutolo"). Hr'g Tr. at 30-31. Shortly after joining the Colombo Family, Russo and other Persico loyalists began plotting to kill Cutolo.[9] *Id.* at 34.

---

[7] These locations included Defendant's limousine business in Brooklyn ("Romantique"), a bus company in Coney Island, and others. *Id.* at 27, 33.

[8] This exhibit contains Russo's testimony in *United States v. Guerra*, No. 10-CR-145 (SLT) (E.D.N.Y.).

[9] Defendant claims that Russo contradicted himself by testifying both that he participated in the war "the minute he got home" (Hr'g Tr. at 34) and "[s]ometime in '93" (*Guerra* Tr. at 204). *See* Def. Br. at 11-12. Any such disparity is trivial and inconsequential. It is undisputed that Russo was associated with the Colombo Family upon his release from prison. *Compare* Hr'g Tr. at 26-30, 34-35, *with Guerra* Tr. at 182, 204-05. Nor is there any incongruity between Russo's testimony that a "cease fire" existed from the time of his release until Scopo was murdered (*Guerra* Tr. at 578-79), and joining the war as soon as he came home (Hr'g Tr. at 34). *See* George James, *Man Tied to Crime Family Is Shot to Death in Queens*, N.Y. TIMES, Oct. 22, 1993, http://www.nytimes.com/1993/10/22/nyregion/man-tied-to-crime-family-is-shot-to-death-in-queens.html (noting that the murder "signaled a resumption of hostilities in the bloody civil war between factions" of the Colombo Family).

Following a few botched attempts to kill Cutolo,[10] Russo mentioned the failures to Defendant who, in turn, advised that Eric Curcio ("Curcio"), another Colombo Family member, "had a line" on (*i.e.*, knew where to find) Scopo. *Id.* at 35-36. Russo understood this as an instruction to contact Curcio, find Scopo, and kill him. *Id.* at 36. Russo followed the direction. Both he and Guerra visited Curcio, who told them that he knew where Scopo was, and asked if they would be willing to assemble "a crew" for the murder. *Id.* at 38. Russo and Guerra agreed to do so. *Id.* Shortly after that meeting, Russo and Guerra told Defendant of their plan to kill Scopo and asked for weapons. *Id.* at 40. Defendant directed them to "Smiley," another Colombo Family associate, who would "bring them a bag" of guns. *Id.* Later that day, Guerra received a black duffle bag containing a "MAC-10 with a silencer" and "a couple of pistols" from Smiley. *Id.* at 40-41.

Separate from Defendant's role in pushing the murder forward, Theodore, Jr. actively advocated for it as well. *See Id.* at 42, 45-46. In fact, during Russo's testimony, he recalled a particularly notable meeting during the summer of 1993. That summer, Theodore, Jr., who was incarcerated at the time, was transported to Brooklyn so that he could attend his grandmother's funeral. *See Id.* at 45-46; Gov't Ex. 861 (death certificate of Eleanor Avena); Gov't Ex. 862 (bill for funeral services for Eleanor Avena); Gov't Ex. 863 (a manifest noting that an inmate named Persico was transported to Brooklyn for funeral services on August 18, 1993). While meeting with his family and friends at the funeral home, Theodore, Jr. pressured Russo and others to murder Scopo. Hr'g Tr. at 46; *See also* Superseding Info., Dkt. Entry No. 562; Theodore, Jr. Guilty Plea, Dkt. Entry No. 563 (pleading guilty to a single count of conspiracy to murder Joseph Scopo in-aid-of racketeering).

[10] Defendant argues that Russo has not reliably testified about the order in which he planned to kill Cutolo and Scopo. *See* Def. Br. at 12-13. Any issue with the order of intended murders does not assail Russo's testimony vis-à-vis Defendant's role.

On the night of the murder in October 1993,[11] the "crew" consisted of Russo, Guerra, Curcio, Johnny Pappa ("Pappa"), and John Sparacino ("Sparacino") (collectively, the "Hit Crew"). Hr'g Tr. at 46-47. The murder occurred outside Scopo's home, around 111th or 110th Street and 109th Avenue, in Ozone Park, Queens. *Id.* at 52. Curcio provided Scopo's location. *Id.* The plan included the use of three vehicles: Curcio and Guerra each drove a "crash"[12] car and Russo drove the third (the "Hit Car"). *Id.* at 52-53. Pappa and Sparacino, the designated shooter who was armed with the MAC-10 Defendant helped procure, rode in the Hit Car. *Id.* at 53. While he could not recall the make or model of the car he drove during the murder, Russo testified that the Hit Car was a stolen, brown or beige, four-door vehicle. *Id.* at 53-54; Gov't Ex. 17(c) (a photograph of a brown, four-door Buick with a shattered windshield found on 106th Street after the murder). It was started with a screwdriver. Hr'g Tr. at 54; *See also* Gov't Ex. 20(d) (a photograph of the Buick's driver's seat, showing an exposed steering column and screwdriver).

That night, the Hit Crew waited outside their cars at a corner near Scopo's home. Hr'g Tr. at 54. Eventually, Curcio saw Scopo's car approaching, and the men entered their designated vehicles. *Id.* Russo testified that Scopo appeared in a small, light-colored Nissan Altima (the "Scopo Car"). *Id.*; *See also* Gov't Exs. 18(a), 18(c) (photographs of a white Nissan Altima with shattered windows and bullet damage found on 110th Street after the murder). Scopo was in the front passenger seat, and an unidentified youth drove the vehicle. Hr'g Tr. at 55. Russo planned to pull the Hit Car up alongside the Scopo Car, have Sparacino "kick [his] door open and . . . empty

---

[11] There were two attempts on Scopo's life before the actual murder. *See* Hr'g Tr. at 47-52. After Russo reported the first bungled attempt to Defendant, Defendant ordered, "You got to get this thing done before my brother [Al] goes to trial." *Id.* at 49. Defendant's challenge to the veracity of this statement (*See* Def. Br. at 13-14) is unavailing, as the Court finds Russo's testimony credible and there is other evidence tending to show that Defendant orchestrated Scopo's murder.

[12] A "crash" car is used to block off the street, prevent any unanticipated party from getting involved, and allow shooters to get away. Hr'g Tr. at 48.

that [MAC-10] . . . into the car." *Id.* at 54. As the Scopo Car was being parked, Russo pulled alongside, and positioned the backend of the Hit Car's rear passenger door along the Scopo Car's front bumper. *Id.* at 55. Sparacino then opened the rear passenger door and fired the MAC-10 into the Scopo Car. *Id.* at 55-57; *See also* Gov't Exs. 21(e), 21(i) (photographs of the Altima's rear passenger side and backseat). As Sparacino fired, a bullet "came through the back window of" the Hit Car and went through its windshield. Hr'g Tr. at 56; *See also* Gov't Ex. 20(c) (photograph of the Buick's shattered rear windshield); Gov't Ex. 20(g) (photograph of bullet casings on the Buick's backseat).

Russo fled the scene and drove to a prearranged spot a few blocks away, where the Hit Crew planned to abandon the Hit Car. Hr'g Tr. at 57; *See also* Gov't Ex. 17(c). After parking, Russo told Sparacino to leave the MAC-10 in the Hit Car, per Defendant's direction.[13] Hr'g Tr. at 57-58; *See also* Gov't Exs. 19(a), 19(b) (photographs of a weapon with a silencer found in the backseat of the Buick). Russo also testified that he took a ski mask off Sparacino's head, and threw it, along with a pair of gloves he was wearing, into a nearby bush. Hr'g Tr. at 57-58. Guerra pulled up nearby and the group fled the area. *Id.* at 58. Scopo died later that night. *Id.*

A few days after the murder, Russo was approached by members of the Colombo and Lucchese Families who asked about the murder. *Id.* at 59. Although Russo denied any knowledge of the incident, both he and Guerra complained to Defendant that Curcio was speaking openly about the murder.[14] *Id.* at 59-61. Defendant ordered Russo and Guerra to speak with Curcio about

[13] Defendant asserts that any testimony as to an instruction to leave the murder weapon in the vehicle is suspect based upon Russo's testimony in *Guerra*. Def. Br. at 14-15. The Court finds just the opposite. In *Guerra*, Russo testified that he told Sparacino to leave the weapon in the vehicle. *See Guerra* Tr. at 735-37. Here, he simply elaborated that Defendant was original source of the order. *See* Hr'g Tr. at 58.

[14] Defendant contends that the Colombo associate who approached Russo, another informant, claims Russo stated to him that "he, Guerra, John Sparacino and John Pappa were involved in the murder" of Joseph Scopo. Def. May 9, 2017 Ltr. This exchange allegedly occurred after the murder of Carmine Gargano, which was committed in July 1994. Gov't May 31, 2017 Ltr. at 2 n.2. This does not impugn Russo's testimony and, as the statement does not

his indiscretions, directly. *Id.* at 61. Additional testimony from Russo also demonstrated that those persons who had participated in Scopo's murder, and were talking about it or complaining that they were not properly recognized or compensated for the job, were murdered. *Id.* at 63-64.

Defendant suggests that much of Russo's testimony consists of outright lies, particularly as to: (1) whether Russo carried a gun during the murder (Def. Br. at 16-17); (2) what Russo did with his gloves and Sparacino's ski mask after the murder (*Id.* at 16); (3) when Pappa first became involved in the plot (*Id.* at 17); (4) when the Hit Car was stolen (*Id.* at 19); (5) the date and circumstances of Theodore Jr.'s grandmother's funeral (*Id.* at 17); (6) the failed attempt to kill Scopo at his home and whether Russo recognized him (*Id.* at 17-18); (7) Orena's liberty status in 1992 (*Id.* at 16); and (8) Defendant's role (*Id.* at 19).

The first seven points have no bearing on *Defendant's* role in the murder. Inconsistencies about tangential details unconnected to Defendant's participation, such as whether Russo carried a gun while driving the Hit Car (it is undisputed that he was not the shooter) or when Eleanor Avena's funeral was and who was near Russo when Theodore, Jr. approached him (it is undisputed that the meeting occurred), more than two decades after the fact, are irrelevant. The Court finds unavailing Defendant's eighth point, that Russo is incredible because, during his testimony in *Guerra*, he completely failed to mention Defendant's name "in connection with the Scopo murder." *Id.* at 19. The testimony cited by Defendant reads, in pertinent part:

> Q: And the only person that gave you the order to kill Joseph Scopo was Theodore Persico, Junior?
>
> A: He told us that day, yes.
>
> Q: Is he the only person that told you?

---

appear to proffer a comprehensive list of murder participants, it does not exonerate Defendant. There is no dispute that Defendant was not present at the murder scene. However, this detail does not alter the fact that he directed and facilitated the murder.

A: I mean, basically, yes.

*Guerra* Tr. at 684. However, Russo also testified in *Guerra*, consistent with his *Fatico* Hearing testimony that, when Defendant told him that Curcio "ha[d] a line on" Scopo, he understood that Defendant "wanted [Russo] to help him kill [Scopo]." *Id.* at 205. Also consistent with his *Fatico* Hearing testimony, Russo testified in *Guerra* that Defendant helped procure the weapons for the murder. *Id.* at 208. There is no contradiction between Russo's testimony in *Guerra* and his testimony in this matter. While the "order" to kill Scopo "basically" may have come from Theodore, Jr. "that day," there is no deviation from the fact that Defendant advocated for and helped plan the murder.

Defendant also argues that the evidence accompanying the briefs defeats the Government's claims because: (1) Theodore, Jr. did not identify Defendant as a participant in the murder during his guilty plea allocution (Def. Resp. at 5); (2) Russo had the MAC-10 before Defendant allegedly got involved (*Id.* at 7); and (3) Judge Townes commented that Defendant's role in the murder seemed "vague" (*Id.* at 9-10). These arguments lack merit.

First, the fact that Defendant was not mentioned in Theodore, Jr.'s guilty plea allocution is inconsequential. In fact, Theodore, Jr. did not identify any other participants in the cited excerpt. Rather, he clearly admitted, "In or about 1993, for the purpose of maintaining my position in the charged enterprise, *I agreed with others* that members of the Arena [sic] side, including Joe Scopo, should be killed because they were trying to kill my family." Def. Ex. KKKK at 25 (emphasis added). This statement neither implicates nor exonerates any particular person.[15]

Second, Defendant argues that Russo could not have received the murder weapon from

[15] Defendant also argues that Theodore, Jr. "did not plead to participating in Scopo's murder." Yet, Defendant submitted a portion of the guilty plea transcript in which Theodore, Jr. confessed to doing just that. *See* Def. Ex. KKKK.

him *after* looking for Cutolo because Russo testified that a MAC-10 was used while searching for Cutolo. Def. Resp. at 7. This argument does not corrupt the core of Russo's testimony: the MAC-10 used in the Scopo murder was obtained with Defendant's help during the course of planning the murder. *See* Hr'g Tr. at 40-41, 43, 57; *Guerra* Tr. at 208-09, 226-29. Russo consistently has explained Defendant's role in procuring the MAC-10 that was used in the murder and was left in the backseat of the Hit Car, per Defendant's instructions.

Finally, the Court declines Defendant's invitation to rely on Judge Townes' 2011 characterization of Defendant's role to support his claim that the Government has failed to offer any "corroboration." At the time Judge Townes made her observations, she did not have the benefit, as this Court does, of having presided over the *Fatico* Hearing and having reviewed the additional submissions of the parties, consisting of over a thousand pages of argument, records, testimony, photographs, and recordings. Indeed, it was for just such a reason that Judge Townes had ordered that a *Fatico* hearing be held.

**B. *Loansharking Activities***

Russo made money throughout the 1990s by loansharking or "shylocking" with and for the Colombo Family.[16] *See* Hr'g Tr. at 33, 72-73. The procedure was simple. He and Guerra would borrow money from Defendant at the weekly interest rate of one percent, and then lend that money to their customers at a weekly interest rate of two to three percent. *Id.* 73-74. From 1993 until 1996 or 1997, Russo and Guerra had borrowed approximately $150,000 to $200,000 from Defendant for loansharking.[17] *Id.* at 74. However, in the mid-1990s, when the pair had difficulty paying the

[16] Defendant claims that Russo contradicted himself as to the identity of the person who supplied the money for his loansharking activities with the Gambino Family in the 1980s. Def. Br. at 22. This has no bearing on his loansharking activities with the Colombo Family.

[17] Defendant attacks these approximations. Def. Br. at 22. In *Guerra*, Russo testified that he received approximately $100,000 between 1993 and either 1995 or 1996. *Guerra* Tr. at 259-60. Here, he testified that he received approximately $150,000 to $200,000 between 1993 to either 1996 or 1997. Hr'g Tr. at 74. These

one percent tribute, Defendant demanded that the entire amount owed be repaid. *Id.* at 75-76. With this order, Russo and Guerra began to collect the outstanding debts, and a number of assaults to effectuate the collections followed. *Id.* at 76. In one instance, Russo assaulted "Fat Lenny" in order to collect a loan of $30,000, but Defendant intervened and arranged for repayment through a member of the Gambino Family. *Id.* at 76-77. In another incident, Russo assaulted "Tony," who owed $7,000 or $8,000. *Id.* at 77. In this situation, members of the Genovese Family interceded on Tony's behalf and asked Russo to reduce the debt to $2,000 or $3,000, but Russo refused to do so, as he lacked authority to negotiate debts owed to Defendant. *Id.* at 77-78. However, Russo relayed the information to Al, who, in turn, met with members of the Gambino Family to arrange repayment. *Id.* at 78-79.

On a separate, related occasion, Russo assaulted a stockbroker who owed a Colombo Family associate $100,000. *Id.* at 98-99. After the beating, Russo was approached by a member of the Gambino Family who negotiated a payment plan consisting of two installments of $50,000. *Id.* at 99-101. After receiving the first payment, Russo pocketed $5,000 and gave Al the remaining $45,000. *Id.* at 101-02. Al was enraged when he discovered that Russo took any part of the payment without prior authorization. *Id.* at 101-02. When Russo offered to return the money, Al stated, "[Y]ou owe my brother [Defendant] money. Give it to him." *Id.* at 102. During this exchange, Russo still had an outstanding debt to Defendant connected to loansharking. *Id.*

In 2000, Russo was arrested and federally prosecuted in the Southern District of New York. *Id.* at 102-03. While Russo was out on bail, Defendant contacted him "to make sure [he] was all right and if [he] had anything to look after," and to discuss his outstanding debt of approximately $60,000 to $70,000. *Id.* at 103-04. Defendant forgave the debt. *Id.* at 104. By making this gesture,

---

discrepancies are not jarring and they do not "indicate[] that [Russo] has concocted [Defendant]'s involvement in loansharking." Def. Br. at 23.

Russo felt that Defendant was recognizing the role he played in Scopo's murder and subtly asking that he "keep [his] mouth shut." *Id.* Later on, while serving his sentence, the Colombo Family provided Russo's then-girlfriend with hundreds of dollars every month so that she could deposit funds into his prison commissary account. *Id.* at 104-05. Sometime after his release, Russo learned that the monthly payments came from Defendant. *Id.* at 106.

Defendant claims that, since Russo's loansharking books were destroyed after his 2011 arrest, there is an "inference" that the records did not implicate him as a loan originator. Def. Br. at 22. Defendant is in error. There is no indication that the records contained any information as to whom Russo was indebted. All that was established is that the records noted who *received* loans and needed to make payments. *See* Hr'g Tr. at 261 (noting that Fat Lenny had a debt of $10,000 in the ledger). Defendant also argues that three recordings from 2009 establish that Russo was actually indebted to, and forgiven by, Al, Defendant's brother, at the time of his 2000 arrest. Def. Br. at 23; *See also* Def. Exs. D(T), VV(T), WWW(T). However, the recordings do not contradict the testimony concerning Defendant's participation. At most, the recordings indicate that Russo was indebted to Al and that Al forgave that debt. Notably, the debt associated with Al in the recordings is not connected definitively to loansharking. Nonetheless, even if the only debt owed and discharged in 2000 belonged to Al, that fact does not rebut the testimony that Defendant provided Russo with loansharking funds and received interest payments on those loans, and that those loans were collected in a violent manner at his bidding during prior years.

**C. *Valet Company Extortion***

In approximately 2010, Russo planned to start a valet parking company with Anthony Stropoli ("Stropoli"), an affiliate of the Colombo Family who sold fish to restaurants in New Jersey. Hr'g Tr. at 121-22. The two intended to use Stropoli's preexisting contacts to build their

business. *Id.* at 122. Before the endeavor began, Stropoli suggested that Russo speak with another "Anthony" who "ran a couple of valet parking systems." *Id.* at 122. Russo arranged to meet Anthony and, when he arrived, found Defendant waiting for him. *Id.* at 123. Defendant was upset because Russo's enterprise would compete with his own valet company. He asked Russo, "[H]ow would [Stropoli] and you like it if I opened up a -- a fish company?" *Id.* Instead of striking out on their own, Defendant suggested that Russo "make [his own] life easier" by selling Defendant's business to Stropoli's contacts in exchange for twenty percent of the profit from every customer brought on. *Id.* at 124.

Russo secured at least one restaurant for Defendant's valet business, an Italian restaurant in Red Bank, New Jersey. *Id.*; *See also* Gov't Ex. 7002 (sealed FBI report containing an interview with a restauranteur who was approached, and used a valet company suggested, by Russo for approximately six months); Gov't Exs. 838(a), 838(b) (sealed business records showing payments from the restaurant to two valet companies, located at the same address, on various dates between June 2009 and February 2011); Rev. PSR, Dkt. Entry No. 833 at ¶ 101 (Defendant's 2012 tax returns identify him as a co-owner of a valet company that invoiced the restaurant from June 2009 through June 2010). Russo's business never materialized because he "didn't want problems" with Defendant. Hr'g Tr. at 125.

Here, Defendant attacks Russo's testimony because, on cross-examination, he could not recall if he ever referred a business and took a percentage. Def. Br. at 24. Yet, the testimony cited by Defendant does not contain any indication that Russo "could not recall" if he referred any valet business; Russo said only that he did not remember whether he took a percentage of the profit. *See* Hr'g Tr. at 272-73. That does not undercut the testimony and substantial evidence supporting the conclusion that he *did*, in fact, refer a customer. Defendant further takes issue with the

Government's initial claim that the extortionate activity took place between 2007 and 2009 but now, with Russo's testimony, places the activity in 2009 or 2010. Def. Resp. at 9. This discrepancy is diminutive in light of the fact that 2009 was confirmed by Defendant's own tax returns as a year when his valet business invoiced the subject restaurant.[18]

### D. *Conspiracy to Sell Stolen Video Games*

Defendant also participated in a plan to procure and sell stolen handheld video games in late 1994. The plan first came into existence when Russo's father told him about a man named "Spider" who wanted to unload a truckload of stolen video games. Hr'g Tr. at 81. Russo met Spider and agreed to pay $70,000 for a "tractor trailer load" of video games. *Id.* at 82-83. Russo approached Defendant about this scheme and Defendant, in turn, referred him to a "friend" who provided the purchasing capital. *Id.* at 82-83. Defendant also agreed to store the stolen games in the garage of a bus company he owned. *Id.* at 83. Russo had his father rent a truck for Spider to use and deliver the games in two shipments, with a payment of $35,000 upon delivery. *Id.* at 83; *See also* Gov't Ex. 864 (lease agreement for a U-Haul truck dated October 26, 1994 and signed by "Anthony Russo").

However, when Spider arrived with the first load of games, Russo thought federal agents were monitoring the transaction. Hr'g Tr. at 84; *See also* Gov't Exs. 212(a), 212(b), 212(c) (photographs of Russo at the intended meeting location taken by FBI Special Agent Kevin Wevodau). After becoming suspicious, Russo took Spider into a nearby business to check and see if he was wearing a microphone. Hr'g Tr. at 84. After confirming that Spider was not an informant,

---

[18] Defendant makes a passing conclusory argument that it would be improper for the Court to consider his unconvicted conduct because "Judge Townes only considered the unconvicted conduct . . . to determine . . . the Guidelines range" for Guerra's sentence. Def. Resp. at 10. As already noted *supra*, this Court may consider all relevant conduct, whether Defendant is uncharged, or convicted or acquitted of it, in determining an appropriate sentence for Defendant.

Russo told Spider to abandon the truck, which still contained the games, so that he could report it as stolen. *Id.*; *See also* Gov't Exs. 865(a)-(e) (photographs of the truck and its contents); Gov't Exs. 7009, 7010, 7011 (reports concerning the truck and its contents completed by FBI Special Agent Matthew Tormey). The transaction never materialized. Hr'g Tr. at 84. A few days later, Defendant asked Russo to return the loan and he agreed to do so. *Id.* at 85.

Defendant's efforts to undermine Russo's testimony concerning this activity fall flat. Defendant argues that he has never owned a bus company, and when Russo identified the garage he planned to use for storage, Russo took federal agents to an address that was owned by an unknown third party from 1980 to 2002. Def. Br. at 24. Even if these arguments are true, they do not impugn Russo's testimony as to Defendant's role in securing the purchasing capital.

E. ***Other Racketeering Activities***

In addition to the actions outlined above that were geared toward making money and maintaining power, Russo offered various other anecdotes about the Colombo Family's activities. For example, during the 1990s, Russo owned and operated a liquor store on Staten Island which was registered in the name of his girlfriend's father. *See* Hr'g Tr. at 85, 88-89. His start-up capital for that endeavor came from Defendant, Frank Persico (Defendant's cousin), and Stropoli. *Id.* at 85-86. Russo ran the store until he was arrested in 2000, at which point he turned the business over to Defendant, who continued to run it with another Colombo Family member. *Id.* at 87-89. Defendant ultimately sold the store and Russo was not given any share of the proceeds. *Id.* at 89.

Russo also testified about the use of violence and intimidation that defined the Colombo Family during his tenure. For this, he offered an anecdote from the late 1990s, when he was angry that other people were being inducted into the Colombo Family before him, despite his role in the Scopo murder and his demonstration of loyalty to the Persicos. *Id.* at 90-91. He voiced his

frustrations to Guerra, who, in turn, informed Defendant. *Id.* at 91-92. The next day, Frank Persico and Stropoli confronted Russo about his commentary, suggesting such opinions would get him into "trouble." *Id.* at 92. By openly insinuating that Defendant and the Colombo Family had done wrong by him, Russo had insulted them and risked retribution; by informing Defendant about these statements, Guerra hoped to stop Russo from speaking in a way that "could get [him] killed."[19] *Id.*

Beyond illegal activities, Russo and Guerra tried to start a legitimate car detailing business in 2009. *Id.* at 115. The pair approached Defendant, who helped secure the business' initial capital by directing them to Scott Reback ("Reback"), who provided the money. *Id.* at 115-16. Defendant also assisted them in securing business from Colombo Family members who owned car dealerships. *Id.* at 117-18. The detailing business was opened at a space provided by Defendant. *Id.* at 116. Shortly thereafter, Russo approached Reback for additional help. *Id.* at 118-19. After Reback notified Defendant of the request, Colombo members met with Russo and cautioned him about acting outside the chain of command. *Id.* at 119-21.

## II. FINDINGS OF CREDIBILITY

Russo is a Colombo Family associate turned informant. Throughout his cooperation with the Government, he has outlined the Colombo Family's hierarchy, identified actors along with their positions and responsibilities within that organization, provided information concerning two additional murders (beyond that of Joseph Scopo), and testified at trial. *See generally*, Hr'g Tr.; *Guerra* Tr. By providing this information and cooperating with the Government, Russo placed his life, and those of his loved ones, in peril. In fact, at his sentencing, the Hon. Kiyo A. Matsumoto, U.S.D.J., noted that the decision to become an informant rendered Russo "a marked man[,] and

[19] The issue of induction cropped up again in 2008, when Defendant informed Russo that Al finally wanted to induct him into the Colombo Family. Hr'g Tr. at 109-10. Defendant coached Russo on how to behave and carry himself in his new role. *Id.* at 110.

there are many who will take pride in killing him [or his family] as a result of his cooperation." Def. Ex. VVV at 39. At the present juncture, if Russo were to fabricate testimony or refuse to cooperate with the Government, he would risk all incentives and protections he negotiated in exchange for his guilty plea. *See* Hr'g Tr. at 149-50, 281; *See also United States v. Russo*, No. 11-CR-30 (KAM) (RER) (E.D.N.Y.), Gov't Mot. for D'wrd Depart., Dkt. Entry No. 1221, at 2; *Id.*, J'gmt as to A. Russo, Dkt. Entry No. 1233, at 4. This was the context within which Russo's testimony was proffered in this matter.

Nevertheless, Defendant launches a number of attacks to discredit Russo as a liar and a killer who is out to save himself. *See generally* Def. Br. at 3-10. In support of this position, Defendant argues that, if Defendant had been implicated in any criminal activity, he would have been mentioned alongside other "Persico loyalists" in a number of recordings from 2009 and 2010.[20] *See Id.* at 4-7. This argument is unpersuasive, as the cited recordings have little to do with the testimony and evidence provided by the Government on Defendant's activities at issue here. The recordings concern general Colombo Family administration and Russo's promotion (Def. Exs. Q(T), U(T), V(T), W(T), Z(T), FF(T)), Russo's son's behavior and participation in organized crime (Def. Exs. X(T), EE(T)), Russo's belief that there was a "rat" in their ranks (Def. Ex. Y(T)), the procedure for contacting him (Def. Ex. T(T)), and a brief reference to the night of the Scopo murder (Def. Ex. L(T)). None of these subjects necessarily would require mentioning Defendant. Furthermore, Defendant has not explained why Russo would volunteer information about Defendant's particular criminal conduct when: (a) the topics do not seem to naturally lend

[20] Defendant cites a recording from 2010 in which Russo told Peter Tagliavia, a Colombo Family member, that Defendant is "truly legitimate" and "has nothing to do with anything." Def. Br. at 4-5; *See also* Def. Ex. E(T) at 2. He also cites a recording in which James Bombino, another Colombo Family member, called Defendant "as squeaky clean as they come." Def. Br. at 22; *See also* Def. Ex. TTT(T). When considered alongside Russo's testimony here and in *Guerra*, the Court finds that these statements merely support the notion that Defendant also made money for the Colombo Family "through legitimate businesses, too." *Guerra* Tr. at 154.

themselves to discussing Defendant; (b) Russo feared the consequences of speaking liberally about crimes he committed or disrespecting Colombo Family leaders; and (c) Defendant is closely tethered to Colombo Family leadership. It seems logical to assume that Russo would not disclose any interaction with Defendant unless absolutely required to do so.

Defendant also claims that Russo had "substantial motive to implicate" Defendant (Def. Br. at 8) and that he "knew what to say" to prosecutors (*Id.* at 9). These arguments also are unconvincing. Defendant cites to various recordings wherein Russo allegedly is aware that the Government sought to prosecute Defendant (*See* Def. Exs. B(T), KK(T), LL(T), MM(T), NN(T), OO(T), PP(T)) and declares that cooperating witnesses are inherently untrustworthy and are coached on their testimony (*See* Def. Exs. E(T), QQ(T), RR(T), SS(T)).[21] Yet, no matter how Russo might have described the Government's objective or informants before he became one, the simple fact that he was not a "disinterested party" is insufficient, on its own, to "deprive [his] statements of probative value." *United States v. Chang*, 59 F. App'x 361, 364 (2d Cir. 2003).

Having conducted the *Fatico* Hearing and evaluated Russo's credibility alongside the other evidence submitted, the Court finds Russo's testimony credible, consistent, and detailed. As discussed throughout this opinion, Defendant's repeated attempts to attack Russo's testimony are, at times, irrelevant, or unpersuasive. *See United States v. Messina*, 806 F.3d 55, 64 (2d Cir. 2015) ("The law affords a factfinder considerable discretion in resolving evidentiary inconsistencies.").

---

[21] In one recording, Russo stated, "even if [Defendant] blows trial, he's only facing a couple of years." Def. Ex. PP(T) at 1. Defendant does not explain how Russo could believe Defendant risked "blow[ing] trial" if Russo knew Defendant was innocent of any wrongdoing.

## CONCLUSION

For the reasons stated above, the Court finds, by more than a preponderance of the evidence, that Defendant participated in a murder, a conspiracy to buy and sell stolen property, loansharking, extortion, and racketeering. Consequently, the Court shall consider these five activities in connection with the factors listed under 18 U.S.C. § 3553(a), in fashioning a reasonable sentence on Defendant's conviction for conspiracy to participate in an extortionate extension of credit, in violation of 18 U.S.C. §§ 371, 892.

SO ORDERED.

Dated: Brooklyn, New York
July 19, 2017

/s/
DORA L. IRIZARRY
Chief Judge

# UNITED STATES COURT OF APPEALS
# FOR THE
# SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 19th day of October, two thousand and seventeen.

Before: Jon O. Newman,
José A. Cabranes,
*Circuit Judges,*
Robert N. Chatigny,
*District Judge.**

---

United States of America,

Appellee,

v.

Michael J. Persico,

Defendant - Appellant.

---

**ORDER**

Docket No. 17-2701

Appellant moves for bail pending appeal pursuant to Fed. R. App. P. 9(b).

IT IS HEREBY ORDERED that the motion for bail is DENIED.

For the Court**:**

Catherine O'Hagan Wolfe,
Clerk of Court

UNITED STATES SECOND CIRCUIT COURT OF APPEALS

---

*Judge Robert N. Chatigny, of the United States District Court for the District of Connecticut, sitting by designation.